**No. 25-2473**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

GENESIS B. (G.B.), a minor, by and through her Guardian, G.P.; et al.,
*Plaintiffs-Appellants*,

v.

The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; et al.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Central District of California (No. 2:23-cv-10345-MWF-AGR)
Hon. Michael W. Fitzgerald

---

# APPELLANTS' OPENING BRIEF

---

JULIA A. OLSON
ANDREA K. RODGERS
CATHERINE SMITH, Of Counsel
BRIANNA ROSIER KABWIKA
Our Children's Trust
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY
Gregory Law Group
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN
University of California at Irvine School of Law, Civil Rights Litigation Clinic
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON
Schonburn Seplow Harris Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

*Attorneys for Appellants*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 5

ISSUES PRESENTED ........ 5

STATUTORY AUTHORITIES ........ 5

STATEMENT OF THE CASE ........ 6

A. Defendants' Discriminatory Discounting Policies and Practices. ........ 6

B. Defendants' Discriminatory Discounting Policies and Practices are Harming Plaintiffs. ........ 10

C. Procedural History ........ 14

SUMMARY OF THE ARGUMENT ........ 18

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 24

I. Plaintiffs demonstrated Article III standing. ........ 24

A. The district court did not apply the proper 12(b)(1) standard. ........ 24

B. The Plaintiffs are injured. ........ 27

1. Plaintiffs' unequal treatment injuries are cognizable injuries in fact. ........ 27

2. Plaintiffs' economic, mental, and physical injuries are cognizable injuries in fact. ........ 30

3. Plaintiffs' personal injuries are not "generalized grievances" ........ 34

C. Defendants' Discounting Policies and Practices cause Plaintiffs' injuries....38

D. Plaintiffs' requested relief would likely redress Plaintiffs' constitutional injuries....48

II. Plaintiffs are entitled to amend their Complaint to address the district court's new bases of dismissal. ....54

CONCLUSION ....55

STATEMENT OF RELATED CASES

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*,
468 U.S. 737 (1984) ....................37, 38, 54

*Am. Civ. Liberties Union of N.M. v. Santillanes*,
546 F.3d 1313 (10th Cir. 2008) ....................28

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ....................43

*Bacon v. Woodward*,
104 F.4th 744 (9th Cir. 2024) ....................52

*Baker v. Carr*,
369 U.S. 186 (1962) ....................36

*Barnum Timber Co. v. U.S. EPA*,
633 F.3d 894 (9th Cir. 2011)....................53

*Borja v. Nago*,
115 F.4th 971 (9th Cir. 2024)....................23

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024)....................22, 24

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) ....................37, 42

*Conservation Law Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025)....................32

*Davis v. Guam*,
785 F.3d 1311 (9th Cir. 2015)....................28

*De La Cruz v. Tormey*,
582 F.2d 45 (9th Cir. 1978) ....................30

*Diamond Alternative Energy, LLC v. EPA*,
No. 24-7, 2025 WL 1716141 (U.S. June 20, 2025)....................passim

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
438 U.S. 59 (1978) ....................................................................................32

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) ....................................................................................36

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ...............................................................................36, 52

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..................................................................................43

*Gillette Co. v. '42' Prod. Ltd.*,
435 F.2d 1114 (9th Cir. 1970).....................................................................23

*Guinn v. United States*,
238 U.S. 347 (1915) ..................................................................................29

*Gutierrez v. Saenz*,
No. 23-7809, 2025 WL 1758506 (U.S. June 26, 2025)...............................passim

*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001) ......................................................................23

*Harrison v. Kernan*,
971 F.3d 1069 (9th Cir. 2020) ....................................................................28

*Hassan v. City of New York*,
804 F.3d 277 (3d Cir. 2015).....................................................................28, 30

*Heckler v. Mathews*,
465 U.S. 728 (1984) ...............................................................................27, 52

*Hunt v. Cromartie*,
526 U.S. 541 (1999) ..................................................................................26

*In re Gault*,
387 U.S. 1 (1967) ........................................................................................1

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020).........................................................14, 17, 19, 51

*Khodara Env't, Inc. v. Blakey*,
376 F.3d 187 (3d Cir. 2004)........................................................................42

*Kroessler v. CVS Health Corp.*,
977 F.3d 803 (9th Cir. 2020) ......................................................................54

*Larson v. Valente*,
456 U.S. 228 (1982) ....................................................................................53

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..............................................................................51, 52

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) ...................................................................44, 45

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ..............................................................................22, 25

*Lutheran Church–Missouri Synod v. FCC*,
154 F.3d 487 (D.C. Cir. 1998)....................................................................28

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ....................................................................................35

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011)......................................................................22

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) ...................................................................35, 53

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .....................................................................45

*Missouri v. Biden*,
52 F.4th 362 (8th Cir. 2022) ...................................................................44, 45

*Namisnak v. Uber Techs., Inc.*,
971 F.3d 1088 (9th Cir. 2020) .....................................................................38

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .....................................................................55

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993) ....................27

*Novak v. United States*,
795 F.3d 1012 (9th Cir. 2015) ....................34

*Nunes v. Ashcroft*,
375 F.3d 805 (9th Cir. 2004) ....................23

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ....................3

*Orr v. Orr*,
440 U.S. 268 (1979) ....................50

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*,
145 S. Ct. 14 (2024) ....................4

*Peyote Way Church of God, Inc. v. Thornburgh*,
922 F.2d 1210 (5th Cir. 1991) ....................28

*Planned Parenthood Ass'n of Chicago Area v. Kempiners*,
700 F.2d 1115 (7th Cir. 1983)....................50

*Planned Parenthood of S.C. Inc. v. Rose*,
361 F.3d 786 (4th Cir. 2004) ....................28

*Redd v. Guerrero*,
84 F.4th 874 (9th Cir. 2023) ....................51

*Roberts v. Corrothers*,
812 F.2d 1173 (9th Cir. 1987)....................24

*United States v. Carolene Prods. Co.*,
304 U.S. 144 (1938) ....................4

*United States v. Texas*,
599 U.S. 670 (2023) ....................31

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) ....................49

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................................................26

*Walker v. City of Mesquite*,
169 F.3d 973 (5th Cir. 1999) ..........................................................28

*Warth v. Seldin*,
422 U.S. 490 (1975) ........................................................................23

**Constitutional Provisions**

U.S. Const. amend. V ..........................................................5, 14, 21

U.S. Const. amend. XIV ..........................................................14, 19, 30, 46

U.S. Const. art. II, § 3..........................................................passim

U.S. Const. art. III, § 2 ..........................................................5

**Statutes**

28 U.S.C. § 1291 ..........................................................5

28 U.S.C. § 1331 ..........................................................5

28 U.S.C. § 2107(b)..........................................................5

42 U.S.C. § 2000a ..........................................................42

42 U.S.C. § 7401(b), (c) ..........................................................10

42 U.S.C. § 7434(c)(2) ..........................................................10

**Rules**

Fed. R. App. P. 4(b) ..........................................................5

Fed. R. Civ. P. 12(b)(1)..........................................................passim

Fed. R. Civ. P. 12(b)(6)..........................................................43

Fed. R. Civ. P. 15(a)..........................................................23

**Other Authorities**

Catherine Smith, *The Adult Rights-Bearing Archetype and How it Stifles Young People's Equal Protection*, 19 Duke J. Const. L. & Pub. Pol'y 139 (2024)..........3

Exec. Order No. 14154(6)(d) ..........9

Exec. Order No. 14192(6)(b) ..........9

Jane S. Schacter, *Ely at the Altar: Political Process Theory Through the Lens of the Marriage Debate*, 109 Mich. L. Rev. 1363 (2011)..........4

## INTRODUCTION

"[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." *In re Gault*, 387 U.S. 1, 13 (1967). Abridging this abiding constitutional principle, Defendants White House Office of Management and Budget ("OMB") and Environmental Protection Agency's ("EPA") Discounting Policies and Practices challenged here,[1] facially and intentionally discriminate against children, violating their equal protection of the law on matters of life, health, safety, and economic wellbeing. Defendants' Discounting Policies and Practices also assume power that is outside the laws Congress has delegated the agencies to "take care" to execute. The district court erred in denying Plaintiffs standing to seek declaratory and injunctive relief for Defendants' unequal treatment and resulting economic, physical, and mental health harms these constitutional violations cause Plaintiffs personally. Defendants' Discounting Policies and Practices place a lower economic value on children's lives than adults' lives, leading to Defendants' authorization of climate

[1] The policies that are the subject of this litigation are set forth in OMB's Circular A-4 (2003), which incorporates by reference the "Discount Rate Policy" of Circular A-94 (1992), and EPA's Guidelines for Preparing Economic Analyses (the "EPA Guidelines"), which adopt OMB's Circular A-4 (2003) policies. 3-ER-350; Addendum 6a-13a; *see also* 14a-15a (Executive Orders reaffirming 2003 Circular A-4). The challenged policies, and Defendants' implementation thereof, are collectively referred to as "Defendants' Discounting Policies and Practices."

pollution[2] at levels that harm children the most. They do so unabashedly. Despite using Discounting Policies and Practices that were never intended to be applied in the context of controlling pollution through a worsening climate crisis, EPA justifies its actions by highlighting the Discounting Policies' "ubiquity" and arguing that they "ha[ve] long been used to translate monetized future effects into present value units." 2-ER-78. Such explanations are not a constitutionally-permissive basis for discriminatory policies or conduct and only accentuate the need for judicial review in this case. Plaintiffs, who live with their government's unequal treatment of them on a daily basis, are experiencing the grave consequences of growing up exposed to levels of climate pollution—set through the Discounting Policies and Practices—known to be most harmful to them, bearing the direct discrimination and physical, mental, and economic injuries that shape their lives.

Defendants argue that laws often make distinctions between children and adults and that there is nothing to see here. However, most government policies that treat children differently than adults do so to protect or promote the well-being of young people. Defendants' Discounting Policies do the opposite: they place a lower

[2] Climate pollution includes greenhouse gases that accumulate in the air: carbon dioxide ("$CO_2$"), methane, nitrous oxide, and fluorinated gases. 3-ER-362–63. Climate pollution heats the planet and destabilizes the climate. 3-ER-363–65. $CO_2$ from the burning of fossil fuels is the primary pollutant driving the climate crisis, making up 80% of greenhouse gas climate pollution in the United States, with a significant portion of it staying in the air for millennia. 3-ER-363.

value on the lives of children with respect to fundamental rights, while children bear climate pollution's highest physical, psychological, and economic costs, which are far greater than imposed on adults today. The law cannot turn a blind-eye to the lifetime of hardships being imposed on these Plaintiffs as children in violation of their equal protection guarantee. Singling out children who lack political and economic power to shoulder the costs of climate change, knowing they are limited in their ability to alleviate their plight, is a constitutional failure of the highest order. As Justice Kennedy once explained, "new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged" and "new dimensions of freedom become apparent to new generations, often through perspectives that begin in pleas and protests and then are considered in the political sphere and judicial process." *Obergefell v. Hodges*, 576 U.S. 644, 660, 673 (2015).

Because children do not possess the economic or voting power necessary to influence the political sphere,[3] it is imperative that their right to be heard and vindicated be allowed in the courts.[4] A recent dissent by Justice Alito mirrors the

---

[3] It cannot be presumed that adult voters represent children's interests. Catherine Smith, *The Adult Rights-Bearing Archetype and How it Stifles Young People's Equal Protection*, 19 Duke J. Const. L. & Pub. Pol'y 139, 194–95 (2024) ("adults have failed to exercise their political power to protect children from climate change through either lack of political power or political will").

[4] *Id.* at 193 ("An area of special constitutional sensitivity exists when children suffer large-scale catastrophic harm that imposes present and future physical, social, economic, and psychological injuries while providing no democratic mechanism to alleviate them.").

district court's error here: "some federal courts are succumbing to the temptation to use the doctrine of Article III standing as a way of avoiding some particularly contentious constitutional questions." *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 145 S. Ct. 14, 14–15 (2024) (Alito, J., dissenting). When government actors harm young people instead of protecting them, judicial intervention is warranted to protect the most politically powerless group in our democracy.[5] Two new Supreme Court opinions on standing make undeniable that the district court has Article III authority to hear Plaintiffs' claims and if they prevail, to redress their unequal treatment and ensuing constitutional injuries. *Gutierrez v. Saenz*, No. 23-7809, 2025 WL 1758506 (U.S. June 26, 2025); *Diamond Alternative Energy, LLC v. EPA*, No. 24-7, 2025 WL 1716141 (U.S. June 20, 2025). This Court should reverse the district court's error in dismissing Plaintiffs' equal protection and separation of powers claims based on standing. Alternatively, the Court should hold the district court abused its discretion in denying Plaintiffs leave to amend.

---

[5] Jane S. Schacter, *Ely at the Altar: Political Process Theory Through the Lens of the Marriage Debate*, 109 Mich. L. Rev. 1363, 1364 (2011) (explaining footnote four of *United States v. Carolene Products*, "[i]n its contemporary form [ . . . ], the principle has been most prominently associated with the more specific idea that judicial scrutiny should increase when a socially subordinated group cannot compete fairly in the political process.").

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1331 and Article III, Section 2 and the Fifth Amendment of the U.S. Constitution.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as this is an appeal of a final judgment.

The district court issued final judgment on February 11, 2025, and Plaintiffs filed a notice of appeal on April 10, 2025. Notice was timely under 28 U.S.C. § 2107(b) and Federal Rules of Appellate Procedure 4(b).

## ISSUES PRESENTED

1. Whether the district court erred in dismissing Plaintiffs' equal protection and separation of powers claims for lack of Article III standing?

2. Whether the district court erred in denying Plaintiffs' request for leave to amend, after dismissing Plaintiffs' First Amended Complaint on different grounds than their original complaint?

## STATUTORY AUTHORITIES

All relevant statutory and constitutional authorities appear in the Addendum attached to the end of this brief.

## STATEMENT OF THE CASE

### A. Defendants' Discriminatory Discounting Policies and Practices.

Discounting is an economic tool that has "a disproportionate effect on children and future generations[.]" 2-ER-198 (Dr. Stiglitz[6]), *see also* 3-ER-348. Discount rates are used in benefit-cost analyses to compare costs and benefits across time while valuing future benefits as less because "people prefer consumption today to future consumption." 3-ER-351, 2-ER-177–78 (Dr. Doganova affirming the same). Discounting assumes that the present is more valuable than the future. *Id*. For example, in monetary terms, "[a]t a discount rate of 5%, $100 in 10 years is worth $63 today and only 80 cents in 100 years." 2-ER-178 (Dr. Doganova); *see also* 3-ER-355 (showing outcomes at other discount rates and time periods). In human terms, discounting devalues the lives of children and prioritizes economic value to present adults. 2-ER-177–78 (Dr. Doganova), 3-ER-354. By design, discounting is discriminatory towards children. *Id*.

Economists use discount rates under the assumption that there will be greater wealth in the future and any future costs will be covered by the greater wealth. 2-

[6] Plaintiffs filed expert declarations in support of their standing in response to Defendants' motion to dismiss their first amended complaint: economics expert on discounting, Dr. Joseph Stiglitz (2-ER-196–209); social science discounting expert, Dr. Liliana Doganova (2-ER-176–87); child and adolescent psychiatrist and pediatrician, Dr. Elizabeth Pinsky (2-ER-166–73); and legal remedies historical expert, Professor Andrew Bradt (2-ER-153–63).

ER-203–04 (Dr. Stiglitz), *see also* 3-ER-403. However, children will not have greater wealth in the future to address mounting climate pollution, will have even greater economic hardships due to the climate crisis, and their losses are not only often irreparable, but uncompensable. 2-ER-204–05 (Dr. Stiglitz), 3-ER-374–96. Use of a positive discount rate—rates higher than zero—ignores "the reality that climate change causes potentially irreversible losses that even future wealth cannot recover, or can recover only with increasingly large expenditures in money." 2-ER-204–05 (Dr. Stiglitz). Defendants know this, and even their own guidance documents recommend lower discount rates for programs implicating climate pollution than their official policy requires. 3-ER-403.

Yet, Defendants employ discounting, both in policy and practice, when making decisions about whether and how to control climate pollution. 3-ER-350–62, 3-ER-403. OMB's policy, through its Circular A-4, provides a "systematic framework for executive agencies to identify, compare, and evaluate the likely outcomes of alternative regulatory choices." 3-ER-350. Circular A-4 requires agencies in their benefit-cost analysis to discount "[a]ll future effects, regardless of what form they take (*e.g.*, changes to consumption, health, environmental amenities, etc.)." 3-ER-351. EPA has incorporated the Circular A-4 discounting directives into its own policy through the EPA Guidelines. 3-ER-350. EPA Guidelines Sections 6.3

and 6.4 require positive discounting regardless of the subject matter or time horizon of a regulatory action, or its anticipated effect on children. *Id*.

EPA's Discounting Practices are consistent with both the Discounting Policies described in the Circular A-4 and the EPA Guidelines. 3-ER-351. EPA applies discount rates when preparing benefit-cost analysis for purposes of Regulatory Impact Analyses ("RIAs") which "inform EPA about the effects of its regulatory actions and influence how EPA develops regulations, chooses between regulatory alternatives, and adopts final regulations." 3-ER-350–51. Pursuant to the Discounting Policies, EPA has discounted as directed, most often using 3% and 7% discount rates in RIAs since 2003. 3-ER-352. In practice, when evaluating how much a climate-pollution-control measure taken today will benefit children 30 years from now, a 7% discount rate ignores 89% of the benefit. 3-ER-355. Even at a 3% discount rate, a future person just 17 years from now is valued as worth three-fifths of a person today. 3-ER-355. Because decisions around climate mitigation are "particularly sensitive to the discount rates used," even small discount rates greatly affect the outcomes of EPA's benefit-cost analysis. 2-ER-199 (Dr. Stiglitz), 3-ER-355. The higher the discount rate in a RIA, the more it excludes the benefits to children of controlling pollution from the analysis. 3-ER-355. This has resulted in regulatory actions that allow substantial amounts of climate pollution, which are harmful to children. 3-ER-355, 3-ER-397–402. Defendants' Discounting Policies

and Practices will continue at the rates of 3% and 7%, pursuant to Executive Orders 14154(6)(d) and 14192(6)(b).

Defendants' Discounting Policies and Practices "heavily influence policy proposals and ultimate decision-making, including by EPA." 2-ER-198–202 (Dr. Stiglitz), 2-ER-180 (Dr. Doganova concluding "it would be highly unusual for a technique so ingrained in decision-making processes to *not* have a policy effect."). EPA's RIAs, which rely on discounting, offer "a distorted evaluation of the full costs of climate disasters and other climate economic harm . . . and the immense cost of delayed action to stop additional greenhouse gas pollution." 2-ER-198 (Dr. Stiglitz), 3-ER-362. This means that EPA has, and will continue to, significantly undervalue the benefits to controlling climate pollution in regulatory actions addressing sources such as wood stoves, cross-state air pollution, solid waste landfills, oil, coal, and natural gas, electric utilities, reclassification of major sources, and standards for vehicles, significantly undervaluing the costs of not doing so. 3-ER-356–62. By underestimating the benefits of controlling air pollution for children and underestimating the costs to children of not controlling air pollution, the RIAs that employ the Discounting Policies predictably result in regulatory programs that allow climate pollution rather than restrict it. *Id.*

No law directs executive agencies to employ discounting, let alone in a manner that discriminates against children. EPA is the sole federal agency with

delegated authority to control and protect the nation's air from climate pollution. 3-ER-346–47; *see also* 42 U.S.C. § 7401(b), (c) (primary purposes of Clean Air Act are pollution prevention and "promot[ing] the public health and welfare"); 42 U.S.C. § 7434(c)(2) (air pollutants under the Clean Air Act include greenhouse gases, "carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride"). Since 1970, through its Discounting Policies and Practices, EPA has allowed and permitted substantial amounts of climate pollution to enter the Nation's sovereign airspace. 3-ER-348, 3-ER-368–71. EPA continues to do so. *Id*. EPA has knowingly authorized unsafe levels of climate pollution through its regulatory programs because of RIAs using discriminatory positive discount rates, in a manner that harms children, including these Plaintiffs. 3-ER-367–69, 3-ER-375.

### B. Defendants' Discriminatory Discounting Policies and Practices are Harming Plaintiffs.

Plaintiffs are all under the age of 18 at the time of filing and belong to the protected class which Defendants' Discounting Policies disfavor: children. 3-ER-317. The Plaintiffs are injured by the discrimination in and of itself. *See, e.g.*, 3-ER-344–45, 2-ER-148–49 (Avroh declaring, "The discrimination against young people . . . . affects me every day and the choices I make about how to live my life in my childhood because I know I will live with the consequences long after all the adults are gone."); 2-ER-193 (Noah declaring, "It is very difficult to sit in Algebra class one minute and have my rights ignored and the climate crisis worsen the next.").

Plaintiffs also face discriminatory impacts in the form of physical and mental harms from the unsafe climate pollution stemming from the Discounting Policies and Practices. *See, e.g.*, 3-ER-320–44 (describing health, mental, safety, educational, and economic harms to individual plaintiffs); 2-ER-166–72 (Dr. Pinsky describing increasing heat and chronic air pollution worsening rates of childhood depression and anxiety, and climate events increasing risk of PTSD and other trauma); 2-ER-206–08 (Dr. Stiglitz describing economic injuries). Every added ton of climate pollution into the air today exacerbates the harm to children, including Plaintiffs. 3-ER-401.

Plaintiffs' health is being harmed by exposure to increasing wildfire smoke and particulate air matter worsened by the climate pollution from the burning of fossil fuels, which impairs Plaintiffs' ability to breathe, causes headaches, and aggravates underlying medical conditions like asthma and allergies. *See, e.g.*, 3-ER-321–26, 3-ER-332–33, 3-ER-338, 3-ER-340–41 (Genesis, Maya W., Maryam A., Zubayr, Muaawiyah, Dani, Maya R., Avroh, Neela, Arishka, Lali). Others face sickness from increasing heat and its effect on their underlying health conditions. *See, e.g.*, 3-ER-321–24, 3-ER-330, 3-ER-337, 3-ER-339, 3-ER-343 (Genesis, Maya W., Maryam A., Noah, Huck, Emma, Dean). Plaintiffs have been evacuated from homes; lost homes, special places, and property to wildfires; and brace every year for worsening wildfire seasons. *See, e.g.*, 3-ER-327–29, 3-ER-331 (Maryam D. lost

campsites her family frequented; Noah evacuated their homes multiple times; Ione lost home and nearly all possessions). All Plaintiffs have seen disruptions in their educations, recreation, athletics, day to day routines, and closely held religious and cultural practices. *See, e.g.*, 3-ER-320, 3-ER-322, 3-ER-325, 3-ER-327–29, 3-ER-335–38, 3-ER-341–43 (Plaintiffs had school cancelled, or were unable to attend school due to effects of climate pollution); 3-ER-323, 3-ER-327, 3-ER-342–43 (Increased heat affects Maryam A. and Maryam D.'s ability to fast during Ramadan, and Maryam D.'s ability to wear religious clothing, including the hijab. Dean is unable to participate in cultural practices in Mono Lake when climate pollution affects water level.). Plaintiffs carry these harms in their bodies and minds through trauma, even while they face worsening injuries in the future, all contributing to an accumulation of Adverse Childhood Events ("ACEs") that doctors say lead to adversity into adulthood. 3-ER-395–96; 2-ER-169–70 (Dr. Pinsky concluding, "ACEs are associated with profound consequences in adulthood, including lower mental health, physical health, economic potential and even life expectancy."). In short, Defendants' Discounting Policies and Practices personally harm each Plaintiff.

Climate pollution does not affect all people equally. 3-ER-374–97. Children, like these Plaintiffs, are especially vulnerable to the dangers of climate pollution as compared to adults because they are still growing, they have unique behaviors different from adults, and they are dependent on their caregivers and their

government, having no independent economic or political power. 3-ER-376. EPA knows this and has referenced the "scientific understanding that children may be at greater risk to environmental contaminants than adults due to differences in behavior and biology and that the effects of early life exposures may also arise in adulthood or in later generations." 3-ER-375; 2-ER-167–71 (Dr. Pinsky, "[t]hough both adults and children can be affected by climate change, children are distinctly more vulnerable to life-long consequences for their physical and mental health in terms of both severity and duration"). As long as Defendants' discriminatory Discounting Policies and Practices continue, children, including these Plaintiffs, will face increasing injuries to their lives, health, and prosperity. 3-ER-374–97; 2-ER-206–09 (Dr. Stiglitz); 2-ER-166–72 (Dr. Pinsky).

Defendants have available non-discriminatory alternatives to undertake benefit-cost analysis of regulatory proposals involving climate pollution. 3-ER-403–04. Under its delegated authority, EPA cannot lawfully discount the lives of children in regulatory actions to control pollution. Indeed, it has considered, but rejected, the adoption of zero or negative discount rates because of ethical considerations including its admission that "[t]he current generation should not discount future lives, since human life is not fungible." 3-ER-403.

### C. Procedural History

On December 10, 2023, Plaintiffs filed suit against Defendants EPA, its then administrator, and the United States of America for its discriminatory Discounting Policies and Practices in controlling climate pollution and valuing children as less through its use of discount rates as violating the Fifth Amendment, the Equal Protection Clause, and the Take Care Clause. 1-ER-20. After briefing and oral argument, on May 8, 2024, the district court dismissed the complaint on Article III redressability grounds, concluding Plaintiffs' injuries could not be redressed with a declaratory judgment based on this Court's decision in *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020). 1-ER-23–25. In its analysis, the Court noted that declaring Defendants' use of discount rates unconstitutional "could arguably mitigate Plaintiffs' injuries" but the allegations did not sufficiently allege how the declaration was substantially likely to remedy Plaintiffs' injuries. 1-ER-24. The district court then granted Plaintiffs leave to amend "to address the standing issues discussed in this Order and any other potential deficiencies." 1-ER-27.

Plaintiffs filed their First Amended Complaint ("FAC") on May 20, 2024, in response to the district court's order. 3-ER-308. Plaintiffs' FAC claims Fifth Amendment-Equal Protection Clause violations as (1) members of a protected class—children—which the Supreme Court has oft treated as requiring "special constitutional sensitivity" in scrutinizing laws that "impose[] lifetime hardships on

children for matters beyond their control"; as (2) meeting the criteria for suspect or quasi-suspect status under the traditional tiers of scrutiny; and as (3) facing discrimination with respect to rights that are fundamental, requiring strict scrutiny review. 3-ER-404–14. Plaintiffs allege that "[t]here is no justification by which Defendants can satisfy their burden under rational basis, intermediate scrutiny, or strict scrutiny at trial." 3-ER-409. Plaintiffs also claim violations of Article II's Take Care Clause and the separation of power by Defendants exceeding their delegated authority and assuming powers not granted them by Congress or the Constitution. 3-ER-414–18. Plaintiffs' FAC added OMB and its director as Defendants, specifying the particular policies of OMB and EPA that are discriminatory and unconstitutional, adding over 100 allegations describing Defendants' discriminatory Discounting Policies and Practices, how they injure Plaintiffs' health and safety and how EPA's practices are in-step with its Discounting Policies, and removing the due process claim. *See generally* 3-ER-308–421.

In opposition to Defendants' Motion to Dismiss the FAC, Plaintiffs filed declarations from experts and plaintiffs affirming the allegations in the FAC, as well as contradicting factual assertions made by Defendants related to Plaintiffs' standing. *See generally* 2-ER-82–221. In those declarations on standing, Dr. Stiglitz, a Nobel Laureate economist and expert in discounting, opined that Defendants' Discounting Policies and Practices "systematically 'discounts' [children, and these Plaintiffs], or

in other language, treats them as second-class citizens," 2-ER-208; explained the "outsized effect these economic analyses have on policymaking," 2-ER-198–204; and opined that eliminating the Discounting Policies "will remove a significant barrier for controlling fossil fuel pollution to the full extent necessary to protect the lives of children and their planet." 2-ER-209.

Dr. Doganova, an expert on historical and sociological aspects of the economy, including discounting, opined that Defendants' Discounting Policies and Practices "create[] an inherent bias against children's interests in EPA's formulation of regulations to control greenhouse gas pollution and other forms of environmental regulation," 2-ER-186; that "[d]iscounting policies guide agency policymakers in a process of decision-making that informs policy considerations and ultimate choices," describing historical examples generally, and an EPA example specifically, 2-ER-179–86; and that eliminating the Discounting Policies would "immediately alter the decision-making process and provide greater clarity into the true costs of these policies on children." 2-ER-186.

Dr. Pinsky, child and adolescent psychiatrist and pediatrician, opined that climate pollution is "already posing significant threats and harming children's physical and mental well-being," and that "[c]limate change is a mental health emergency for children," 2-ER-166–72; that Plaintiffs' injuries "will mount as long as pollution and warming continue unabated" and are aggravated by trauma and

institutional betrayal or "belief that adults [or government] collectively will not protect them," 2-ER-169–72; and that "Plaintiffs' mental health, and therefore physical and developmental wellbeing, would immediately benefit from Defendants ceasing discriminatory policies and practices that devalue children's lives." 2-ER-172.

Professor Bradt, a legal remedies expert, opined that based in the text, history, and purpose of the Declaratory Judgment Act, a requested remedy in the form of "a declaration of unconstitutionality of a law, policy, or ongoing practice that causes harm, like alleged discrimination" is "consistent with the requirements of Article III." 2-ER-154–62. Defendants did not dispute the credibility or testimony of any of the declarants and did not counter Plaintiffs' evidence with any of their own.

On February 11, 2025, after a second oral argument, the district court dismissed the FAC on standing grounds, but not on redressability as it had in its first dismissal order.[7] Instead, the district court took a different tack and concluded that "Plaintiffs cannot demonstrate traceability as to their environmental harms," no injury-in-fact exists because in the court's view Plaintiffs "have not, and cannot, allege that the Discounting Policies are discriminatory in nature," and any injuries

[7] While the district court did not reference *Juliana* in its second order, from the bench it alluded to *Juliana*'s dissent, which would have found standing for plaintiffs there, stating, "Judge Staton and I clearly disagree on this, [] that the Ninth Circuit has decided that the courts have no business doing this." 2-ER-32.

Plaintiffs suffer are no different than anyone else's and amount to a "generalized grievance." 1-ER-13–14. The district court briefly mentioned the declarations of Dr. Stiglitz[8] and Dr. Doganova to critique that they had not stated the Discounting Policies were "binding" and to disregard Professor Bradt and Dr. Pinsky, making no comment on the Plaintiffs' declarations. 1-ER-12. Even though it characterized Defendants' attack on jurisdiction as facial, the district court assumed, contrary to Plaintiffs' allegations and declarations, that the Discounting Policies are not being implemented to discriminatory effect and do not affect ultimate agency decision-making. 1-ER-9. The district court denied Plaintiffs' request for leave to amend based on futility and because it had previously given Plaintiffs leave to amend. 1-ER-17. Plaintiffs timely appealed.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's dismissal of Plaintiffs' case because the district court based its standing determination on extra-record factual findings while characterizing the Rule 12(b)(1) motion as a facial challenge, construed allegations in favor of Defendants rather than the Plaintiffs, and

[8] The district court also confuses Dr. Stiglitz's expert opinion as arguing for a "very low" discount rate, when Dr. Stiglitz clearly concludes that if discounting is used at all, there should be three sensitivity analyses to eliminate the unequal treatment of children: "very low, no discount, and negative rates," concluding that what has been used over at least three presidential administrations is too high and discriminatory. 2-ER-210; 1-ER-12.

disregarded Plaintiffs' sworn and uncontested expert and plaintiff declarations. Had the district court properly construed the allegations in the light most favorable to Plaintiffs, or applied the summary judgment standard of recognizing there was a genuine dispute of material facts, it would have concluded Plaintiffs met their standing burden at this stage of the case. Moreover, the Supreme Court has since issued two Article III standing opinions in *Gutierrez*, 2025 WL 1758506, and *Diamond Alternative Energy*, 2025 WL 1716141, which decisively support Plaintiffs' standing here and restore the proper analysis for determining injury, traceability, and importantly—redressability—that went awry in *Juliana v. United States*, a decision of this Court that predisposed the district court against Plaintiffs' standing here. 1-ER-23–26 (district court citing to *Juliana* in first order), 2-ER-32 (district court referencing *Juliana* at oral argument.)

First, Plaintiffs have injuries typical of an intentional discrimination case under the Equal Protection Clause. Plaintiffs alleged, and supported with declarations, that Defendants' Discounting Policies and Practices treat them legally different and unequal as children compared to adults—to the detriment of fundamental rights to life and other protected interests. This alone establishes standing for an equal protection claim. Even so, Plaintiffs also alleged, and supported with declarations, that Defendants' Discounting Policies and Practices cause them discriminatory impacts in the form of cognizable economic, physical, and mental

health injuries, including harms to individual Plaintiffs' health, safety, homes, bodily integrity, cultural and religious practices, and the threat of a lifetime of hardship from climate pollution that is allowed by EPA. Plaintiffs' injuries are actual and imminent, individual, and deeply personal—in economic terms, they are worthy of far more than a dollar's equivalent. That many other children may experience similar injuries to the Plaintiffs does not render their injuries generalized grievances, a legal blunder that would convert every claim of discrimination against a class of people to be nonjusticiable.

Second, Defendants' Discounting Policies and Practices are the sole cause of Plaintiffs' unequal treatment injury and a significant contributing cause of Plaintiffs' current, worsening, and imminent economic, physical, and mental health injuries due to EPA-sanctioned climate pollution. Unlike the district court's flawed analysis, the causal inquiry is not based on whether the Discounting Policies are binding, but rather if they have been adopted and are being implemented by EPA to discriminatory effect. They are. Plaintiffs alleged, and supporting declarations confirmed, that Defendants' Discounting Policies are designed, adopted, and being implemented in a way that leads to substantial amounts of climate pollution and are thus directly injuring the Plaintiffs.

Third, Plaintiffs ask that their injuries be redressed in the way equal protection claims are typically redressed: by court order declaring and enjoining the

Discounting Policies and Practices as unconstitutional, so the Plaintiffs may receive equal treatment of the law. If the district court rules that the Discounting Policies and Practices violate the equal protection rights of these children, under any of the legal theories presented, or the separation of powers and Take Care Clause, Plaintiffs will have removed a meaningful policy barrier to their equal treatment by EPA—the singular federal agency charged with preventing pollution and protecting their health and welfare over the course of their lives. No Supreme Court and Ninth Circuit precedent prevents the district court from granting this relief. Courts may redress intentional discrimination by the government with declaratory and injunctive relief, without requiring the Plaintiffs to show how eliminating the discrimination will lessen their injuries. Just last week in *Gutierrez*, the Supreme Court affirmed that is enough. Even so, Plaintiffs went beyond their redressability burden and adequately alleged, and supported by expert declarations, that enjoining EPA's Discounting Policies and Practices is likely to lead to a reduction in EPA-sanctioned climate pollution because it would lay bare that the economic benefits of preventing climate pollution today far outweigh the enormous costs of tomorrow, and that children bear the brunt of the health and economic costs of the pollution. With all standing prongs met, the court has jurisdiction to hear Plaintiffs' Fifth Amendment and Take Care Clause claims.

Finally, even if this Court upholds the district court's jurisdictional dismissal, Plaintiffs should have an opportunity to address any remaining standing defects through amending their complaint. Plaintiffs' good faith effort to substantially amend their complaint based on the district court's initial redressability ruling, only to have the district court pivot to other prongs of standing to dismiss the FAC, is a basis for this Court to find that amendment is not futile and grant leave to amend per the liberal standard of this Court and the Federal Rules.

## STANDARD OF REVIEW

This Court reviews a district court's 12(b)(1) dismissal based on a party's Article III standing de novo. *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 (9th Cir. 2024). In a facial challenge to standing under Fed. R. Civ. P. 12(b)(1), the court must "accept as true all material allegations" and "construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). At the pleading stage, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

Plaintiffs establish standing by alleging: (1) they have suffered or likely will suffer an injury in fact; (2) that the injury likely was caused or will be caused by the defendant; and (3) is likely to be at least partially redressed by "the requested judicial relief." *Diamond Alternative Energy*, 2025 WL 1716141, at *6.

Standing "often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Hall v. Norton*, 266 F.3d 969, 976–77 (9th Cir. 2001) ("The purpose of the standing doctrine is to ensure that the plaintiff has a concrete dispute with the defendant, not that the plaintiff will ultimately prevail against the defendant."). When Plaintiffs allege an equal protection violation, that framing is "crucial to [this Court's] analysis of whether Plaintiffs have Article III standing" to challenge government action. *Borja v. Nago*, 115 F.4th 971, 978 (9th Cir. 2024) (holding that challenging a classification "baked into" a statute and the enforcement that results in differential treatment of plaintiffs suffices for Article III standing).

A complaint for declaratory judgment sufficiently alleges a "controversy" if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Gillette Co. v. '42' Prod. Ltd.*, 435 F.2d 1114, 1118–19 (9th Cir. 1970) (citation omitted).

A "court should freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a). Denial of leave to amend a complaint is reviewed for abuse of discretion. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004).

# ARGUMENT

## I. Plaintiffs demonstrated Article III standing.

### A. The district court did not apply the proper 12(b)(1) standard.

By disputing allegations of facts in Plaintiffs' complaint, Defendants' motion to dismiss based on jurisdiction was a factual attack on standing. *See, e.g.*, 2-ER-295 (Defendants arguing that they do not rely exclusively on discounting in decision-making). As opposed to a facial attack, a factual attack on jurisdiction contests "the truth of the plaintiff['s] factual allegations." *Bowen*, 118 F.4th at 1142 (quotations omitted). If the jurisdictional question turns on disputed facts not intertwined with the merits of the case, a district court should resolve the factual disputes itself. *Id.* However, when the merits of the case are intertwined with the standing inquiry, as they are here, the district court must resolve factual questions under the summary judgment standard and "leave the resolution of material factual disputes to the trier of fact." *Id*. at 1143. The merits of constitutional claims, including equal protection claims, are intertwined with jurisdiction, and any factual attack on jurisdiction should be resolved under that summary judgment standard. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

The district court chose not to apply the factual attack standard and instead characterized the Defendants' attack on jurisdiction as facial. 1-ER-11. Yet, rather than accepting Plaintiffs' allegations as true under the 12(b)(1) facial standard, the

district court departed from precedent by conducting its own factual analysis outside of a proper evidentiary proceeding, with no evidence from Defendants to contest Plaintiffs' undisputed expert evidence. In so doing, the court improperly concluded the opposite of what Plaintiffs alleged and demonstrated through expert declarations—that the Discounting Policies and Practices *do not* disfavor children over adults. 1-ER-14. Resolving factual disputes between the parties is an issue for the merits, not on a motion to dismiss, but notably, the district court's independent economic analysis directly contradicts Plaintiffs' qualified experts on discounting, including a Nobel Laureate economist.

Regardless of whether Defendants' challenge was facial or factual, the district court applied the wrong standard because it did not construe the facts in the light most favorable to the plaintiffs under 12(b)(1), and instead impermissibly resolved material factual disputes in favor of the Defendants (who presented no evidence) without abiding by the summary judgment standard. *Lujan*, 497 U.S. at 889; *see also* 1-ER-12 (mischaracterizing conclusions of Dr. Stiglitz and Dr. Doganova and assuming the Discounting Policies have no effect because they are not binding even though EPA uses them to discriminatory effect); 1-ER-14 (concluding "climate related harms will be experienced relatively equally by all people" contrary to allegations and declarations stating otherwise). The district court's error in trusting the Defendants' misrepresentation of their Discounting Policies and Practices, with

zero supporting evidence, is especially heightened in the context of equal protection claims, which traditionally are allowed to proceed under Article III based on allegations of discrimination, despite government claims that its actions are nondiscriminatory. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977). Government actors rarely admit to discriminatory behavior. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

The district court made at least two factual determinations that go towards the merits, and are contrary to Plaintiffs' evidentiary submissions, and thus should be resolved on a fully developed factual record. First, the court found Defendants' Discounting Policies do not classify and disfavor children over adults, in contrast to the Plaintiffs' allegations and the expert opinions of Drs. Stiglitz and Doganova that they do. 1-ER-13; *contra* 2-ER-198, 2-ER-208 (Dr. Stiglitz concluding that the Discounting Policies "systematically "discounts" [children], or in other language, treats them as second-class citizens, or of little accord."); 2-ER-178–79, 2-ER-186 (Dr. Doganova concluding that "discrimination against future generations, which have been demonstrated to be inherent in discounting, has direct discriminatory effect against children because they are in fact the future generations who will be living in the longer future."). Second, the court found that if Defendants ceased their discriminatory discounting practices that it would not affect their decision-making around controlling or allowing climate pollution, which Plaintiffs' experts disagree

with, and government evidence will demonstrate is patently wrong. 1-ER-12; *contra* 2-ER-179–86 (Dr. Doganova opining, "it is improbable that the use of discounting by the EPA has not had any policy effect and has not shaped the decisions made about the implementation of environmental regulation, including pollution control"); 2-ER-198–203 (Dr. Stiglitz opining, "cost-benefit analyses . . . heavily influence policy proposals and ultimate decision-making"). These are both genuine issues of material fact for the merits, not just standing, and were improperly resolved against Plaintiffs on a motion to dismiss. As detailed below, had the district court applied the proper standard on a 12(b)(1) motion to dismiss, or even summary judgment, it would have found Plaintiffs had met their standing burden at that stage to proceed to the merits of their claims.

### B. The Plaintiffs are injured.

#### 1. Plaintiffs' unequal treatment injuries are cognizable injuries in fact.

Supreme Court and Ninth Circuit precedent has long-established that allegations of unequal treatment by the government suffice for Article III standing. *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) ("discrimination itself, . . . by stigmatizing members of the disfavored group as

'innately inferior' . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group"); *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015) ("equal treatment under law is a judicially cognizable interest that satisfies the case or controversy requirement of Article III, even if it brings no tangible benefit to the party asserting it"); *see also Harrison v. Kernan*, 971 F.3d 1069, 1072–74 (9th Cir. 2020) (recognizing an allegation of being denied "equal treatment under law" satisfies Article III standing).[9] Courts have used "discrimination" and "impermissible classification" interchangeably to constitute a cognizable injury. *See, e.g.*, *Walker v. City of Mesquite*, 169 F.3d 973, 980 (5th Cir. 1999) ("[T]he racial classification of the homeowners is an injury in and of itself."). In oral argument, Defendants conceded that being personally subject to government discrimination is a cognizable injury. 2-ER-39 ("[S]tigmatic harm of the kind that plaintiffs are alleging here can be concrete and particularized . . . if a plaintiff can allege that they were themselves denied equal treatment by operation of the allegedly discriminatory policy.").

---

[9] Sister Circuits hold the same. *See, e.g.*, *Lutheran Church–Missouri Synod v. FCC*, 154 F.3d 487, 493 (D.C. Cir. 1998); *Am. Civ. Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1214 n.2 (5th Cir. 1991); *Hassan v. City of New York*, 804 F.3d 277, 289, 294 (3d Cir. 2015); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004).

Here, the Plaintiffs have adequately alleged that they were personally harmed by Defendants' Discounting Policies and Practices that deny them equal treatment solely because of their status as children. 3-ER-353–56 (allegations describing how Discounting Policies treat adults and children differently); 2-ER-185–86 (Dr. Doganova supporting the same); 2-ER-198 (Dr. Stiglitz supporting the same); 3-ER-320–46 (allegations of Plaintiffs' personal injuries from the discrimination); 2-ER-148–49, 2-ER-192–93, 2-ER-217 (Avroh, Noah, and Maryam D.'s declarations supporting the same). Because these allegations and declarations establish the Defendants' Discounting Policies and Practices discriminatory treatment of the Plaintiffs as children, they have met their standing burden at the motion to dismiss stage.

The district court erred in its belief that stigmatic harm must "derive from [the] mention of children in the Discounting Policies." 1-ER-14. Defendants' Discounting Policies need not use the word "children" to facially discriminate against the class because the Policies discriminate against children, including Plaintiffs, by design. 3-ER-312, 3-ER-343–44, 3-ER-350–54. When a law's operation turns on the status of the disfavored group, it is constructively facial discrimination. *See Guinn v. United States*, 238 U.S. 347, 364–65 (1915) (finding facial discrimination where law "contains no express words of an exclusion from the standard . . . on account of race, color, or previous condition of servitude, . . . but the

standard itself inherently brings that result into existence since it is based purely on a period of time before the enactment of the 15th Amendment, and makes that period the controlling and dominant test of the right of suffrage"). Unequal treatment is a cognizable injury apart from discriminatory impact and by alleging unequal treatment and supporting their allegations with expert opinions, Plaintiffs have met and exceeded their burden at this stage.

**2. Plaintiffs' economic, mental, and physical injuries are cognizable injuries in fact.**

Along with their unequal treatment injuries, Plaintiffs' mental, physical, and economic injuries are independently cognizable injuries under Article III. "Collateral consequences" of discrimination can establish injury in fact for standing. *Hassan*, 804 F.3d at 293. Even if Defendants' Discounting Policies and Practices were taken as facially neutral at the merits stage, allegations of disparate impact that raise the inference of intentional discrimination are sufficient for a cognizable injury under the Equal Protection Clause. *See, e.g.*, *De La Cruz v. Tormey*, 582 F.2d 45, 58 (9th Cir. 1978) (unequal effect and discriminatory course of conduct can demonstrate intentional discrimination).

Plaintiffs have standing because they "will also suffer disproportionate harm from the increased financial burdens climate crisis poses, including lost property values and increasing costs from catastrophic events and harm." 3-ER-394; *see also* 3-ER-346 ("additive economic harms to Plaintiffs"); 3-ER-400, 3-ER-402

(economic health costs of fossil fuel pollution in California that Plaintiffs will assume as they become adults); 3-ER-404 (children financially subsidize climate pollution for adults today); 3-ER-404–05 (economic harm will worsen for Plaintiffs). Plaintiffs alleged they have already experienced economic injuries from climate pollution, which are mounting. 3-ER-330 ("With increasing temperatures and heat waves, Noah experiences severe physical and psychological harm that has led to hospitalization, which comes with great academic, social, and financial costs."); 3-ER-325 (home repairs from extreme climate events cost Dani's family $100,000 not covered by homeowner's insurance); 3-ER-334–45 (Ariela's family has lost homes and crops central to her family's economic wellbeing); 3-ER-343–44 (damage to and complete loss of Plaintiffs' homes from climate events); 3-ER-320–21 (economic costs of air conditioning is prohibitive for Genesis). The past, present, and mounting out-of-pocket costs that EPA's Discounting Policies and Practices impose on Plaintiffs "hurts their bottom line" pocketbooks and these "monetary costs 'are of course an injury.'" 2-ER-206–08; *Diamond Alternative Energy*, 2025 WL 1716141, at *8 (citing *United States v. Texas*, 599 U.S. 670, 676 (2023)). "Even 'one dollar'" of resources lost is an injury. *Id.* at *8. Plaintiffs have more than satisfied injury in fact by alleging that they are subjected to disparate financial harm from Defendants' Discounting Policies and Practices.

Plaintiffs also allege their past, ongoing, and imminent mental and physical injuries from Defendants' discriminatory Discounting Policies and Practices are disproportionate to adults. 3-ER-362–97 (describing increasing wildfire, smoke, heat, drought, poor air quality, extreme precipitation, and flooding from the climate pollution permitted by Defendants while implementing the Discounting Policies and which increasingly threaten Plaintiffs' mental and physical health, safety, property, education, recreation, religious and cultural practices, and overall growth); 2-ER-166 (Dr. Pinsky, "Current levels of increased temperatures from greenhouse gas pollution, and the climate consequences of that, are already posing significant threats and harming children's physical and mental well-being. Further pollution and heating will exacerbate that already present harm to children."). The Supreme Court has recognized similar ongoing and imminent health injuries as cognizable. *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74, 82 (1978) (recognizing health and genetic consequences from even small emissions from nuclear power plants as a cognizable injury and that "delayed resolution of these issues would foreclose any relief from the present injury"); *see also Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 88 (1st Cir. 2025) ("[I]nterference with the public health . . . . [and] breathing polluted air is 'traditionally recognized as providing a basis for a lawsuit in American courts.'") (internal citations omitted).

The district court's conclusion that "climate related harms will be experienced relatively equally by all people," a fact presented by neither party, is directly contradicted by Plaintiffs' allegations that they face unequal effects as children, different from that of adults.[10] 3-ER-353–56. The allegations establish that children, including Plaintiffs, are disproportionately harmed by both the Defendants' Discounting Policies and Practices ***and*** the climate harms that stem from those policies and practices. *Id*. Plaintiffs support their allegations with their own declarations as well as Dr. Pinsky's declaration, which opines that children differ from adults in both "severity and duration" of physical and mental harms related to climate pollution and are uniquely vulnerable to trauma stemming from

[10] The district court's dismissal was informed by his finding, with no supporting evidence, that "much of the harm that will allegedly befall the Plaintiffs will occur when they are adults." 1-ER-14. The FAC contradicts that statement by explaining that, "[t]he climate pollution concentration in our air is already dangerous for Children. It has already caused an energy imbalance and climate destabilization. More climate pollution will exacerbate the dangerous situation." 3-ER-398, 3-ER-401 ("We are already in the danger zone."). "Every ton of climate pollution emitted adds more heat-trapping molecules to the air. Inversely, every ton of climate pollution not emitted reduces the amount of heat that can be trapped by those molecules. In the context of climate crisis, incremental changes offer meaningful relief in mitigating and avoiding additive physical harms to Plaintiffs, additive economic harms to Plaintiffs, and avoiding irreversible climate tipping points that would leave Plaintiffs no recourse to restore Earth's energy balance." 3-ER-346. Substantial harm is befalling Plaintiffs today because for every ton of climate pollution EPA allows to be emitted today and in the near term, "a significant portion of it stays in the air for millennia." 3-ER-363. What happens today determines Plaintiffs' future in terms of their childhood exposure and the $CO_2$ levels they will irreversibly live with, and continue to be harmed by, as they grow.

"circumstances that threaten the safety, stability, and security of the childhood environment." 2-ER-168–69. These traumas are being experienced now and will have "profound consequences in adulthood, including lower mental health, physical health, economic potential and even life expectancy," and the greater number of these experiences are associated with a greater number of negative outcomes including "lower educational attainment and employment, increased rates of mental illness and suicide, increased rates of cancer, diabetes, and heart disease, and early death." 2-ER-169. Dr. Pinsky's conclusions confirm that the climate pollution stemming from Defendants' Discounting Policies and Practices harms Plaintiffs differently than adults but also that the effects are leaving these Plaintiffs with a lifetime of hardship. 2-ER-168–73. Plaintiffs' economics expert confirms that Plaintiffs will experience financial harm far greater than adults. 2-ER-206–08. The district court does not have discretion to disregard the complaint allegations and expert declarations and engage in independent fact finding, or assumptions, outside of an evidentiary proceeding on the merits. Thus, Plaintiffs amply alleged as members of a protected class, they are suffering and will suffer a multitude of cognizable disparate injuries.

#### 3. Plaintiffs' personal injuries are not "generalized grievances".

That the injury effects a large group—children—does not make this a generalized grievance. *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015)

("[T]he fact that a harm is widely shared does not necessarily render it a generalized grievance."); *Massachusetts v. EPA*, 549 U.S. 497, 523 n.24 (2007) ("To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion."). Certainly, if the Court was reviewing discriminatory policies and practices by Defendants that were devaluing lives based on gender or race, or another protected characteristic, there would be no question that a member of that class, though large, has standing to bring suit. The same is true here.

Traditionally, generalized grievances are defined by their "abstract and indefinite nature—for example, harm to the common concern for obedience to law." *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022). The generalized grievances cases do not restrict courts from hearing cases implicating certain topics, like climate change, but instead restrict courts from hearing impersonal injuries, those where the plaintiffs do not have a stake in the action. *Massachusetts v. EPA*, 549 U.S. at 522 (recognizing injuries related to climate change can be both concrete and widely shared).

Plaintiffs are not required to show EPA's regulatory decisions are directed at individuals to demonstrate a personal injury. *Diamond Alternative Energy*, 2025 WL 1716141, at *9 (injured parties need not be the regulated party so long as the

"regulation (or lack thereof) may cause downstream or upstream" injuries); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024) ("[W]hen the government regulates parks, national forests, or bodies of water, for example, the regulation may cause harm to individual users."); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (holding that agency decision to not classify an organization as a political action committee, was a personal information injury to voters, who sought disclosures required by political action committees, even though voters were not subject to the agency decision). Contrary to the district court's reasoning, 1-ER-14, just because the effects of Defendants' regulatory actions may apply to society at large, like many government policies, does not mean that the Discounting Policies and Practices are not discriminating against a class and personally discriminating against the Plaintiffs.

Discriminatory actions are often done so at a societal basis. For example, in *Baker v. Carr*, which challenged a statute governing representative apportionment, the statute allegedly resulted in "a gross disproportion of representation to voting population" in certain counties. 369 U.S. 186, 207 (1962). This statute could not be said to regulate individual voters, but each individual voter was affected because the "classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties." *Id*. at 207–08.

Plaintiffs here presented allegations and evidence of both living within the area of discrimination, the United States, as EPA's jurisdiction is the airspace of the entire nation, and presented specific evidence of discriminatory treatment. 3-ER-312, 3-ER-346–47, 3-ER-366 (EPA has exclusive delegated control over climate pollution which accumulates in the Nation's airspace.); 3-ER-321–46 (Plaintiffs live within the Nation's airspace and are subject to EPA's decision-making around climate pollution and discriminatory Discounting Policies and Practices worsening climate pollution). When determining whether plaintiffs are personally subject to discrimination this Court should look at the alleged classification and who is being affected. For example, in *Brown v. Board of Education*, the school boards, through their policies and practices, discriminated by classifying and segregating schools, and inherently the children who attended their schools, by race. 347 U.S. 483, 488 (1954). While the discrimination was certainly widespread, the plaintiffs still had standing.

In contrast, the district court relied on an inapposite case, *Allen v. Wright*, 468 U.S. 737, 740 (1984), where parents of public-school children challenged the sufficiency of IRS standards designed to fulfill the agency's obligation to deny tax-exempt status to private schools that were discriminatory. Plaintiffs in that case sought to compel enforcement of nondiscrimination policies against third parties; they were not claiming direct discrimination by the government. The private schools

receiving the funding were the discriminatory party and thus "the plaintiffs were not personally subject to the challenged discrimination." *Id*. at 755. This Court reaffirmed this important distinction in *Namisnak v. Uber Technologies, Inc*., 971 F.3d 1088, 1090, 1094 (9th Cir. 2020) (explaining that the defendant IRS was not the source of the unequal treatment in *Allen*, but the defendant *Uber* was the source of the unequal treatment injuries by failing to comply with the ADA). Similarly here, OMB and EPA are the source of the challenged Discounting Policies and Practices, the resulting climate pollution allowances, and the unequal treatment of Plaintiffs. There is no other party the district court could enjoin that would give Plaintiffs relief from their injury of unequal treatment because Defendants are the only parties applying the Discriminatory Policies and Practices in a way that injures the Plaintiffs.

### C. Defendants' Discounting Policies and Practices cause Plaintiffs' injuries.

Plaintiffs' allegations and declarations establish the causal chain between Defendants' Discounting Policies and Practices and Plaintiffs' economic, physical, and mental health injuries. First, as for the unequal treatment injury of Plaintiffs by Defendants' Discounting Policies and Practices, traceability is clear: "All future effects, regardless of what form they take . . . should be discounted to reflect changes in valuation of impacts across time." 3-ER-351. The Discounting Policies intentionally subject Plaintiffs to the pollution because of a regulatory framework

where "people prefer consumption today to future consumption" and where EPA maximizes today's "net benefits" as compared to the benefits and costs of tomorrow that have been discounted at compounded rates. 3-ER-351–56; 2-ER-198–99 (Dr. Stiglitz); 2-ER-185–86 (Dr. Doganova).

> Defendants' Discounting Policies applied to controlling climate pollution are explicitly discriminatory towards Children, including Plaintiffs, because Defendants' Discounting Policies put a thumb on the scale against reducing climate pollution tomorrow and in the years ahead. When a regulatory [benefit cost analysis] applies *any* positive discount rate (more than zero) to a proposed regulation versus a more stringent alternative, the discount rate guarantees that the calculation will generate a result that makes the future benefits of reducing climate pollution—or the future costs of *not* reducing pollution today—appear much lower than the future costs actually are.

3-ER-354.

Second, Plaintiffs allege EPA has been applying those Discounting Policies in its Discounting Practices through its regulatory programs and decision-making that authorizes climate pollution. 3-ER-356–62. The Discounting Policies are used "to develop, analyze, and select regulatory programs that allow substantial amounts of climate pollution that is harming Children." 3-ER-256–57. Just between 2019-2024, Plaintiffs identified 31 different regulatory analyses that affect climate pollution where the Discounting Policies were implemented. 3-ER-357–62. Plaintiffs allege:

> Because of the Discounting Policies, each of these RIAs intentionally and by design underestimated the benefits of controlling air pollution for Children and underestimated the costs to Children of not controlling air pollution, putting a discriminatory thumb on the scale of EPA's regulatory programs, leading to dangerous allowances of pollution in

> the past and in the years to come. As a result, EPA never proposes, analyzes, or adopts regulatory programs to control climate pollution that would treat Children equally under law.

3-ER-362. Plaintiffs' expert on discounting, Dr. Stiglitz, confirms their allegations:

> In short, the discounting policies challenged here provide a distorted evaluation of the full costs of climate disasters and other climate economic harm, including projections about the range of harms going forward, and the immense cost of delayed action to stop additional greenhouse gas pollution. These discounting policies have a disproportionate effect on children and future generations and the discounting practices do not provide an accurate view of the impacts either of climate change or actions taken to mitigate or adapt to climate change. This opinion is based on the principles underlying discount rates and the sensitivities of models generally to the discount rates employed in the analyses, particularly the discriminatory effects on children and future generations. In other words, discounting discriminates by date of birth—it attaches lower value (and consideration) to a person born later, like these children.

2-ER-198.

"EPA agrees that 'commonsense economic principles' can be useful when evaluating Article III standing" and just as "those commonsense economic principles support the fuel producers' standing" in *Diamond Alternative Energy,* they support Plaintiffs' standing here, too. 2025 WL 1716141, at *9–10 (in defending regulations, government cannot argue regulations meant to change the automobile market, will not change the automobile market). The Discounting Policies are intended to favor short-term economic consumption today, placing greater value on adult economic interests, while de-valuing children's lives, treating them "as second-class citizens, or of little accord." 2-ER-208. Discounting Policies have an "outsized effect"

"heavily influence policy proposals and ultimate decision-making, including by EPA." 2-ER-198 (Dr. Stiglitz); 3-ER-365–73. These unequal policies cause immediate unequal treatment in rulemaking, but also cause traceable downstream injuries to Plaintiffs who suffer economic, physical, and mental health harms from the higher value Defendants put on adult life and money today when setting allowable climate pollution levels. This is akin to the traceable harm to fuel producers the Supreme Court found when California set standards allowing less gasoline and liquid fuels to be produced.[11] *Diamond Alternative Energy*, 2025 WL 1716141, at *9; *see also* 3-ER-320–46, 3-ER-356–57, 3-ER-362, 3-ER-373, 3-ER-401; 2-ER-172–73 (Dr. Pinsky). When Defendants knowingly discount the lives of children in policymaking, they can expect that children will be worse off than adults. That is predictable discrimination. And the further proof is in the pollution. "Despite fluctuations in the past three decades, U.S. climate pollution is still close to what it was in 1990. Eighty percent of climate pollution in the U.S. is $CO_2$, largely from the power generation and transportation sectors, sources directly under EPA's control. More than 90% of $CO_2$ pollution is from fossil fuels from sources under EPA's control" that are regulated through the Discounting Policies, i.e., through unequal

[11] The notable difference is that the fuel producers' downstream injury in *Diamond* was purely economic and did not involve a fundamental right, whereas, Plaintiffs' injuries here as children include unequal treatment to fundamental rights to life, personal security, health, safety, and other liberties, in addition to economic harm.

treatment of children. 3-ER-367–71. The historic harm to Plaintiffs from the Discounting Policies and Practices is evidence of likely future harm by the same or similar policies. *Diamond Alternative Energy,* 2025 WL 1716141, at *10 (record evidence of past harm and commonsense show that the policies (or their elimination) likely "would make a difference").

Plaintiffs need not allege or prove that the Discounting Policies and Practices are the only source of their injuries. *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) (holding that standing is not defeated by, multiple "independent [causes of the harm] that are potentially removable but that cannot be challenged in a single litigation"). This is especially true in discrimination cases, where often the unequal treatment by the government is one of multiple sources of a protected party's injury. For example, in recognizing that to "separate [children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone," the Supreme Court did not and could not eliminate the damaging effects of segregation on these children outside of the public education context. *Brown*, 347 U.S. at 494. Those children would not be legally protected from segregation in public accommodations for another decade. *See* 42 U.S.C. § 2000a. Likewise, Plaintiffs here need not allege that their economic, physical, and mental

injuries are solely caused by Defendants' Discounting Policies and Practices, only that they contribute to their ongoing and future injuries, which they do.

This Court has held that in intentional discrimination claims, "a plaintiff need provide very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Arce v. Douglas*, 793 F.3d 968, 977–78 (9th Cir. 2015) (quotations omitted). While this precedent pertains to the Rule 12(b)(6) standard, it illustrates that the district court impermissibly "raise[d] the standing hurdle higher than the necessary showing for success on the merits." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000); *see also Gutierrez*, 2025 WL 1758506, at *5 n.1 (success on the merits of a constitutional claim are not relevant to the standing analysis).

In terms of Plaintiffs' separation of powers Take Care Clause claim, the same causation chain applies, but begins with the separation of powers violation. Plaintiffs have alleged that Defendants' Discounting Policies and Practices are outside the authority granted EPA by the Constitution and Congress. 3-ER-346–48. This in turn, leads to the same unequal treatment of Plaintiffs as children and the unsafe levels of climate pollution that harm them. 3-ER-320–46, 3-ER-348–49.

The district court below relied on cases out of the Fifth and Eighth Circuits where certain states, prior to implementation of any policy, challenged the social

cost of carbon[12] in *Draft* Circular A-4. Both Circuits dismissed those APA challenges because the states only alleged "possible future" sovereign injuries, economic injuries, and procedural injuries, which were insufficient to establish standing. *Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) ("Plaintiffs rely on harms wrought by regulations that *may* result from the Interim Estimates."); *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022) (noting states' hypothetical claims of injury *if* social cost of carbon interim estimates are used in future regulations). These cases' pre-enforcement posture matters because the states *could not* allege that any regulations, or implementation thereof, had resulted and there was uncertainty over whether agencies would use it in future rulemakings in a way that harmed the states. *Louisiana*, 64 F.4th at 681; *Missouri*, 52 F.4th at 368. Those cases raised no equal protection claims of ongoing unequal treatment of a protected class.

Here on the other hand, Defendants' Discounting Policies treat children unequally (and adversely) by design and ***have been*** implemented frequently and consistently in ways that demonstrably harm the Plaintiffs. 3-ER-356–62 (allegations of multiple instances in which Defendant EPA applied discount rates in regulatory actions allowing climate pollution).

[12] The social cost of carbon, which relies on a discount rate, is another economic valuation tool meant to inform Defendants of the value of reducing levels of climate pollution. 3-ER-356.

The district court's causation analysis imported the ***pre-enforcement*** legal analysis on the draft social cost of carbon of *Louisiana* and *Missouri*, *supra*, of whether "the Discounting Policies are binding." 1-ER-11. However, this question is not relevant when Plaintiffs have alleged the ways in which the Discounting Policies have been applied as mandatory by Defendants and have consistently been implemented as such over decades. 3-ER-356–62; *see Diamond Alternative Energy*, 2025 WL 1716141, at *10 (rejecting EPA's and California's arguments that were unsupported by record evidence that the regulations no longer had any effect on the market and wouldn't change anything if they were invalidated). In this context, the proper equal protection standing causation analysis asks whether the Discounting Policies and Practices treat children, including Plaintiffs, unequally, and are traceable to Plaintiffs' alleged downstream injuries. Even if the Discounting Policies were determined to be "non-binding" on a full record, a conclusion that contravenes well-pled allegations in the FAC, even "non-binding" policies cause constitutional injuries to plaintiffs when they are being implemented in a discriminatory way (also a question of fact). *See, e.g.*, *Melendres v. Arpaio*, 784 F.3d 1254, 1263 (9th Cir. 2015) (law enforcement policy of racial profiling only during "saturation patrol" traffic stops, but not normal traffic stops, "flowed into" an unconstitutional practice of racial profiling during normal traffic stops, causing constitutional injuries to plaintiffs).

Here, Plaintiffs not only alleged, but supported with declarations, that the Discounting Policies are being regularly implemented for activities that cause climate pollution that harms the Plaintiffs, and Defendants have a long-standing and well-documented practice of discrimination implementing such policies. 3-ER-356–62 (alleging discrete examples of how EPA based its analysis on benefit-cost analysis). The district court erred by relying on factual assumptions outside the present case and record (i.e., that the Discounting Policies are non-binding and thus could be ignored) and disregarding Plaintiff and expert declarations as to the effect of the Discounting Policies as they are implemented; experts whose qualifications, credibility, and opinions were uncontested by Defendants. 1-ER-12. Binding or not, Plaintiffs have adequately alleged EPA implements the Discounting Policies in violation of the Equal Protection and Take Care Clauses.

Defendants' own filings concede that their Discounting Policies and Practices can affect their decision-making around climate pollution. *See, e.g.*, 2-ER-286 ("Monetized, discounted future benefits may or may not weigh in the balance," "in determining whether and how to regulate."). Defendants provided no evidence to counter Plaintiffs' allegations that EPA's regulatory decisions *are* affected by discounting. By adopting the Defendants' claims that discounting does not matter or is only one of many factors going into a final decision, the district court contravened its obligation to see Plaintiffs' allegations in the light most favorable to them, and to

leave for the merits the resolution of genuine issues of material facts. 1-ER-11. *See Gutierrez*, 2025 WL 1758506, at *8 (that a defendant may find another reason to deny relief "does not vitiate" standing to argue the defendant is violating the plaintiff's constitutional rights). As the Supreme Court just admonished:

> To deny standing based on a theory that invalidating an important [policy] would actually have zero impact . . . requires a degree of economic and political clairvoyance that is difficult for a court to maintain. That is particularly so when the government [policy] may be skewing the market at issue. So courts should exercise caution before denying standing because of a claimed lack of [causation or] redressability rooted in questionable economic speculation.

*Diamond Alternative Energy*, 2025 WL 1716141, at *13.

Further, the district court's imposition upon Plaintiffs of a heightened factual burden to show that but for the Defendants' unequal treatment through the Discounting Policies and Practices, Plaintiffs would have not experienced any injuries from climate change, far exceeds what is required under Article III for Plaintiffs to invoke the court's jurisdiction. 1-ER-9–13. Under *Diamond Alternative Energy*, Plaintiffs have sufficiently showed injury traceable to the Discounting Policies and Practices of Defendants. Under the Supreme Court's and this Court's Equal Protection cases, Plaintiffs have also demonstrated by their allegations and declarations intentional unequal treatment by the Discounting Policies and Practices sufficient for Article III standing.

### D. Plaintiffs' requested relief would likely redress Plaintiffs' constitutional injuries.

"Article III's redressability requirement serves to align injuries and remedies. The primary goals of that requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions." *Diamond Alternative Energy,* 2025 WL 1716141, at *11. To show redressability, Plaintiffs need only "show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury." *Id.* (internal quotations omitted).

"In all events, record evidence confirms what common sense tells us: Invalidating the [Discounting Policies and Practices] likely (not certainly, but likely) would make a difference for [children]" because EPA would value children equally to adults and consider the true, undiscounted costs of allowing, and benefits of limiting climate pollution, and would likely limit climate pollution to lower levels through its regulatory programs, abating more economic, physical, and mental health harm to Plaintiffs. *Diamond Alternative Energy*, 2025 WL 1716141, at *10; 3-ER-397–404. At minimum, invalidating the Discounting Policies and Practices would likely provide at least "one dollar" of economic benefit to Plaintiffs, which "would satisfy the redressability component of Article III standing." *Diamond Alternative Energy*, 2025 WL 1716141, at *8 (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279,

292 (2021)).[13] Indeed, "it would be surprising and unusual if invalidating the [Policies and Practices] did not redress [Plaintiffs'] injuries." *Id.* at *10.

The Supreme Court just clarified that it does not demand "that plaintiffs introduce evidence from expert economists or from directly regulated third parties to show how third parties would likely respond to a government regulation or invalidation thereof," to meet the redressability prong of standing. *Id.* at *11; *see also Gutierrez*, 2025 WL 1758506, at *7 (redressability does not require Plaintiffs to guess as to how a favorable court decision will ultimately lead to the desired result on the merits). Plaintiffs have nonetheless provided declarations here from economic discounting experts who explicitly opine that, "eliminating the policies at issue here, the use of an excessively high discount rate, will remove a significant barrier for controlling fossil fuel pollution to the full extent necessary to protect the lives of children and their planet. At minimum, it will compel government decisionmakers, like those at EPA to remove the differential treatment that disadvantages children." 2-ER-209 (Dr. Stiglitz). That is more than enough to meet the redressability requirement the Supreme Court set forth in *Diamond* and *Gutierrez.*

The district court erred because rather than keeping the "proper focus of the standing inquiry" on the complaint and redressing the unequal treatment injuries

[13] Notably, the district court's interpretation of *Uzuegbunam* in its first order on the motion to dismiss was squarely rejected by the U.S. Supreme Court's application of its holding in *Diamond*. 1-ER-25–26.

caused by the Defendants, the court improperly speculated as to the how the government might or might not respond to judicial relief. *Gutierrez*, 2025 WL 1758506, at *6. Plaintiffs challenge the Discounting Policies and Practices as a barrier to their lives being equally valued in EPA's decision-making. They are not required to prove that a favorable decision would result in different regulatory outcomes, only that the barrier would be removed. *See Gutierrez*, 2025 WL 1758506, at *8 (holding that removing a prisoner's legal barrier to accessing exculpatory evidence is sufficient redress, even if the prisoner ultimately would be denied access for another reason); *Orr v. Orr*, 440 U.S. 268, 273 (1979) (in case challenging alimony statute that could require men to pay alimony but not women, standing turned on whether the husband "bears a burden he would not bear were he female"); *see also Planned Parenthood Ass'n of Chicago Area v. Kempiners*, 700 F.2d 1115, 1137 (7th Cir. 1983) (Posner, J., separate opinion) ("If a public university had a policy of not admitting any black [people] to its medical school, a black [person] would not lack standing to challenge the constitutionality of this policy merely because he might not be admitted if the policy were abandoned.").

Furthermore, the Supreme Court has resolved any remaining confusion created by *Juliana v. United States*, on which the district court placed some weight, over the value of declaratory judgments by affirming that courts have long redressed

constitutional injuries with declaratory judgments.[14] *See, e.g.*, *Gutierrez*, 2025 WL 1758506, at *6 (declaratory judgment redresses constitutional injury by ordering a change in the legal status of the parties and eliminating government's unlawful justification for its conduct); *Redd v. Guerrero*, 84 F.4th 874 (9th Cir. 2023) (when a procedural due process right has been denied, and defendants have duty and power to comply with a declaratory judgment recognizing that right, redressability is established); *see generally* 2-ER-154–62 (Professor Bradt, recounting declaratory judgment history). The Supreme Court recently reaffirmed the solemn duty of the judiciary in rendering judgments on interpretation of the law:

> The Framers also envisioned that the final "interpretation of the laws" would be "the proper and peculiar province of the courts." Unlike the political branches, the courts would by design exercise "neither Force nor Will, but merely judgment." . . . And in the following decades, the Court understood "interpret[ing] the laws, in the last resort," to be a "solemn duty" of the Judiciary.

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (citations omitted). The supremacy of the Constitution "demands that there shall be opportunity to have some

---

[14] *Juliana*'s redressability analysis on declaratory relief, at minimum, is a dead-letter after *Diamond Alternative Energy* and *Gutierrez*. Moreover, *Juliana v. United States*, 947 F.3d at 1169–70, did not involve Equal Protection or Take Care Clause claims against these Discounting Policies (plaintiffs' "sole claim is that the government has deprived them of a substantive constitutional right to a 'climate system capable of sustaining human life,'") where the Court focused on different requested remedies, ("The crux of the plaintiffs' requested remedy is an injunction requiring the government not only to cease permitting, authorizing, and subsidizing fossil fuel use, but also to prepare a plan subject to judicial approval to draw down harmful emissions.").

court decide whether an erroneous rule of law was applied." *Id*. at 387 (citation omitted). The district court's de facto deference to Defendants' interpretation of facts and the constitutionality and discriminatory effect (or lack thereof) of their Discounting Policies and Practices, directly conflicts with the Supreme Court's reasoning in *Loper Bright*, which recognized that legal interpretation is the responsibility of the judiciary, not executive agencies. *Id*. at 409.

Even more so, in the equal protection context, the relief requested here, declaratory and injunctive relief, are standard forms of relief. 3-ER-319–20, 3-ER-419–20; *Heckler*, 465 U.S. at 740 (when the "right invoked is that of equal treatment," the appropriate remedy is a mandate of equal treatment); *Food & Drug Admin.*, 602 U.S. at 381, 385 ("If a defendant's action causes an injury, enjoining the action [ ] will typically redress that injury."); *Bacon v. Woodward*, 104 F.4th 744, 750 (9th Cir. 2024) ("prospective injunctive relief" seeking "to alter [ ] the status quo" redresses a live controversy).

Plaintiffs' injury of unequal treatment can be completely redressed by declaratory and injunctive relief. Even if eliminating Plaintiffs' injury of unequal treatment of the law will not completely eliminate their impending economic, physical, and mental health injuries caused by climate pollution, they have still established standing. Reducing climate pollution by even one ton meaningfully affects Plaintiffs' lives. *See* 3-ER-318–19, 3-ER-344, 3-ER-346, 3-ER-348, 3-ER-

356–57, 3-ER-401, 3-ER-404; *see also* 2-ER-197–98, 2-ER-208–09 (Dr. Stiglitz, "Preventing, or even reducing, more greenhouse gas pollution today and in the years to come will make an enormous difference for children"); 2-ER-166, 2-ER-171–73 (Dr. Pinsky, "fully accounting for children's lives and accurately incorporating these costs into policy making could begin to alleviate these escalating harms").

Plaintiffs need not guarantee that their injuries would be fully redressed by a favorable decision, only that their requested relief would significantly increase the likelihood of redress. *Diamond Alternative Energy*, 2025 WL 1716141, at *6; *Mecinas*, 30 F.4th at 900. Moreover, Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis original); *see also Diamond Alternative Energy*, 2025 WL 1716141, at *8 (invalidating regulatory action would redress "at least some" of the plaintiffs' injuries); *Barnum Timber Co. v. U.S. EPA*, 633 F.3d 894, 901 (9th Cir. 2011) ("[Plaintiffs] need not eliminate any other contributing causes [to their injury] to establish [their] standing.").

The Plaintiffs have satisfied their burden to establish standing under the tests articulated and applied in *Diamond Alternative Energy* and *Gutierrez*. To hold these children to a different standard than a fossil fuel producer falls into the trap Justice Jackson warned of in her *Diamond Alternative Energy* dissent, where courts make it easier for corporate interests to have their claims heard, than the most vulnerable of

our population. *See* 2025 WL 1716141, at *15, *22 (Jackson, J., dissenting) (noting the fossil fuel producer was being treated more favorably by the Supreme Court on standing than kids injured by segregation in *Allen v. Wright*). Such a ruling would be particularly egregious and acutely ironic in a case where Plaintiffs who are children are asking the court to review government action that is placing adult and corporate interests over children's equal constitutional rights, lives, health, safety, economic wellbeing, and futures. Plaintiffs here established their injuries could be redressed by declaratory or injunctive relief, and accordingly the district court's order should be reversed.

## II. Plaintiffs are entitled to amend their Complaint to address the district court's new bases of dismissal.

Courts weigh several factors in deciding whether to grant leave to amend including "undue delay, bad faith, dilatory motive, *repeated* failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Kroessler v. CVS Health Corp*., 977 F.3d 803, 814–15 (9th Cir. 2020) (emphasis added). Leave to amend is not futile if plaintiffs can "bolster" their complaint with allegations of the evidence required to establish jurisdictional requirements. *Id.* at 816.

The district court denied leave to amend because it held "the structural lack of injury-in-fact and traceability as to their claims" demonstrated futility and because it had previously given Plaintiffs leave to amend. 1-ER-17. However, the district

court dismissed the original complaint based on redressability alone and did not even raise injury-in-fact or traceability deficiencies. *See generally* 1-ER-19–27. Plaintiffs were responsive to what the district court identified as deficiencies in their original complaint and the district court recognized as much. 2-ER-32, 2-ER-53 ("I appreciate your efforts to pivot after my last order" and "I do appreciate that the plaintiffs clearly listened last time."). Based on the district court's second dismissal order, which did not dismiss for lack of redressability, Plaintiffs' first amendment was not futile.

Should this Court agree with the district court's standing analysis, which Plaintiffs contend is wrong and should be reversed, this Court should find the district court abused its discretion in denying leave to amend when it dismissed a second time on different grounds. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (plaintiffs should be given opportunity to amend and address standing deficiencies "absent a clear showing amendment would be futile") (overruled on other grounds).

## CONCLUSION

*Diamond Alternative Energy* and *Gutierrez* clarify that Plaintiffs have alleged what is required to establish Article III standing in this equal protection and separation of powers case. This Court should apply those new precedents to Plaintiffs' FAC and reverse and remand the district court's dismissal, ruling that

Plaintiffs have adequately met Article III's requirements at the pre-trial phase of litigation.

DATED this 2nd day of July, 2025.

Respectfully submitted,

*s/ Julia A. Olson*
JULIA A. OLSON
ANDREA K. RODGERS
CATHERINE SMITH, Of Counsel
BRIANNA ROSIER KABWIKA
Our Children's Trust
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY
Gregory Law Group
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN
University of California at Irvine School of Law, Civil Rights Litigation Clinic
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON
Schonburn Seplow Harris Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

*Attorneys for Appellants*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 25-2473

The undersigned attorney or self-represented party states the following:

- (●) I am unaware of any related cases currently pending in this court.
- ( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.
- ( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Julia A. Olson **Date** Jul 2, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-2473

I am the attorney or self-represented party.

**This brief contains** 12,961 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Julia A. Olson **Date** Jul 2, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

## ADDENDUM

U.S. Const. art. II, § 3 ........................................ 1a

U.S. Const. art. III, § 2 ........................................ 2a

U.S. Const. amend. V ........................................ 3a

U.S. Const. amend. XIV ........................................ 4a

Declaratory Judgment Act
28 U.S.C. § 2201(a) ........................................ 5a

Circular A-4 (Sept. 17, 2003), Relevant Excerpts ........................................ 6a

Circular A-94 (1992), Relevant Excerpts ........................................ 10a

U.S. EPA, Guidelines for Preparing Economic Analysis (Dec. 17, 2010, updated May 2014), Relevant Excerpts ........................................ 12a

Exec. Order 14154, Unleashing American Energy (Jan. 20, 2025), Section 6(d) ........................................ 14a

Exec. Order 14192, Unleashing Prosperity Through Deregulation (Jan. 31, 2025), Section 6(b) ........................................ 15a

**Article II, Section 3 of the United States Constitution**

. . . [H]e shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

## Article III, Section 2 of the United States Constitution

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;-- . . . to Controversies to which the United States shall be a Party . . . .

**Fifth Amendment to the United States Constitution**

No person shall be . . . deprived of life, liberty, or property, without due process of law . . . .

**Fourteenth Amendment to the United States Constitution**

Section 1. . . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. . . .

**Declaratory Judgment Act**
**28 U.S.C. § 2201(a)**

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(9) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**Circular A-4 (Sept. 17, 2003) (Relevant Excerpts)**

. . . .

A. Introduction

This Circular is designed to assist analysts in the regulatory agencies by defining good regulatory analysis – called either "regulatory analysis" or "analysis" for brevity – and standardizing the way benefits and costs of Federal regulatory actions are measured and reported. Executive Order 12866 requires agencies to conduct a regulatory analysis for economically significant regulatory actions as defined by Section 3(f)(1). This requirement applies to rulemakings that rescind or modify existing rules as well as to rulemakings that establish new requirements.

. . . .

*Discount Rates*

Benefits and costs do not always take place in the same time period. When they do not, it is incorrect simply to add all of the expected net benefits or costs without taking account of when the actually occur. If benefits or costs are delayed or otherwise separated in time from each other, the difference in timing should be reflected in your analysis.

As a first step, you should present the annual time stream of benefits and costs expected to result from the rule, clearly identifying when the benefits and costs are expected to occur. The beginning point for your stream of estimates should be the year in which the final rule will begin to have effects, even if that is expected to be some time in the future. The ending point should be far enough in the future to encompass all the significant benefits and costs likely to result from the rule.

In presenting the stream of benefits and costs, it is important to measure them in constant dollars to avoid the misleading effects of inflation in your estimates. If the benefits and costs are initially measured in prices reflecting expected future inflation, you can convert them to constant dollars by dividing through by an appropriate inflation index, one that corresponds to the inflation rate underlying the initial estimates of benefits or costs.

1. The Rationale for Discounting

Once these preliminaries are out of the way, you can begin to adjust your estimates for differences in timing. (This is a separate calculation from the adjustment needed to remove the effects of future inflation.) Benefits or costs that occur sooner are generally more valuable. The main rationales for the discounting of future impacts are:

(a) Resources that are invested will normally earn a positive return, so current consumption is more expensive than future consumption, since you are giving up that expected return on investment when you consume today.
(b) Postponed benefits also have a cost because people generally prefer present to future consumption. They are said to have positive time preference.
(c) Also, if consumption continues to increase over time, as it has for most of U.S. history, an increment of consumption will be less valuable in the future than it would be today, because the principle of diminishing marginal utility implies that as total consumption increases, the value of a marginal unit of consumption tends to decline.

There is wide agreement with point (a). Capital investment is productive, but that point is not sufficient by itself to explain positive interest rates and observed saving behavior. To understand these phenomena, points (b) and (c) are also necessary. If people are really indifferent between consumption now and later, then they should be willing to forgo current consumption in order to consume an equal or slightly greater amount in the future. That would cause saving rates and investment to rise until interest rates were driven to zero and capital was no longer productive. As long as we observe positive interest rates and saving rates below 100 percent, people must be placing a higher value on current consumption than on future consumption.

To reflect this preference, a discount factor should be used to adjust the estimated benefits and costs for differences in timing. The further in the future the benefits and costs are expected to occur, the more they should be discounted. The discount factor can be calculated given a discount rate. The formula is $1/ (1+ \text{the discount rate})^{t}$ where "t" measures the number of years in the future that the benefits or costs are expected to occur. Benefits or costs that have been adjusted in this way are called "discounted present values" or simply "present values". When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits.

2. Real Discount Rates of 3 Percent and 7 Percent

OMB's basic guidance on the discount rate is provided in OMB Circular A-94 (http://obamawhitehouse.archives.gov/omb/circulars/index.html). This Circular points out that the analytically preferred method of handling temporal differences between benefits and costs is to adjust all the benefits and costs to reflect their value in equivalent units of consumption and to discount them at the rate consumers and savers would normally use in discounting future consumption benefits. This is sometimes called the "shadow price" approach to discounting because doing such calculations requires you to value benefits and costs using shadow prices, especially for capital goods, to correct for market distortions. These shadow prices are not well established for the United States. Furthermore, the distribution of impacts from regulations on capital and consumption are not always well known. Consequently, any agency that wishes to tackle this challenging analytical task should check with OMB before proceeding.

As a default position, OMB Circular A-94 states that a real discount rate of 7 percent should be used as a base-case for regulatory analysis. The 7 percent rate is an estimate of the average before-tax rate of return to private capital in the U.S. economy. It is a broad measure that reflects the returns to real estate and small business capital as well as corporate capital. It approximates the opportunity cost of capital, and it is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector. OMB revised Circular A-94 in 1992 after extensive internal review and public comment. In a recent analysis, OMB found that the average rate of return to capital remains near the 7 percent rate estimated in 1992. Circular A-94 also recommends using other discount rates to show the sensitivity of the estimates to the discount rate assumption.

. . . .

For regulatory analysis, you should provide estimates of net benefits using both 3 percent and 7 percent. An example of this approach is EPA's analysis of its 1998 rule setting both effluent limits for wastewater discharges and air toxic emission limits for pulp and paper mills. In this analysis, EPA developed its present-value estimates using real discount rates of 3 and 7 percent applied to benefit and cost streams that extended forward for 30 years. You should present a similar analysis in your own work.

In some instances, if there is reason to expect that the regulation will cause resources to be reallocated away from private investment in the corporate sector,

then the opportunity cost may lie outside the range of 3 to 7 percent. For example, the average real rate of return on corporate capital in the United States was approximately 10 percent in the 1990s, returning to the same level observed in the 1950s and 1960s. If you are uncertain about the nature of the opportunity cost, then you should present benefit and cost estimates using a higher discount rate as a further sensitivity analysis as well as using the 3 and 7 percent rates.

. . . .

4. Intergenerational Discounting

. . . .

If your rule will have important intergenerational benefits or costs you might consider a further sensitivity analysis using a lower but positive discount rate in addition to calculating net benefits using discount rates of 3 and 7 percent.

5. Time Preference for Non-Monetized Benefits and Costs

Differences in timing should be considered even for benefits and costs that are not expressed in monetary units, including health benefits. The timing differences can be handled through discounting. EPA estimated cost-effectiveness in its 1998 rule, "Control of Emissions from Nonroad Diesel Engines," by discounting both the monetary costs and the non-monetized emission reduction benefits over the expected useful life of the engines at the 7 percent real rate recommended in OMB Circular A-94.

Alternatively, it may be possible in some cases to avoid discounting non-monetized benefits. If the expected flow of benefits begins as soon as the cost is incurred and is expected to be constant over time, then annualizing the cost stream is sufficient, and further discounting of benefits is unnecessary. Such an analysis might produce an estimate of the annualized cost per ton of reduced emissions of a pollutant. . . .

## Circular A-94 (1992) (Relevant Excerpts)

. . . .

8. **<u>Discount Rate Policy</u>.** In order to compute net present value, it is necessary to discount future benefits and costs. This discounting reflects the time value of money. Benefits and costs are worth more if they are experienced sooner. All future benefits and costs, including nonmonetized benefits and costs, should be discounted. The higher the discount rate, the lower is the present value of future cash flows. For typical investments, with costs concentrated in early periods and benefits following in later periods, raising the discount rate tends to reduce the net present value. (Technical guidance on discounting and a table of *discount factors* are provided in Appendix B.)

a. <u>Real versus Nominal Discount Rates</u>. The proper discount rate to use depends on whether the benefits and costs are measured in real or nominal terms.

(1) A real discount rate that has been adjusted to eliminate the effect of expected inflation should be used to discount constant-dollar or real benefits and costs. A real discount rate can be approximated by subtracting expected inflation from a nominal interest rate.

(2) A nominal discount rate that reflects expected inflation should be used to discount nominal benefits and costs. Market interest rates are nominal interest rates in this sense.

b. <u>Public Investment and Regulatory Analyses</u>. The guidance in this section applies to benefit-cost analyses of public investments and regulatory programs that provide benefits and costs to the general public. Guidance related to cost-effectiveness analysis of internal planning decisions of the Federal Government is provided in Section 8.c.

In general, public investments and regulations displace both private investment and consumption. To account for this displacement and to promote efficient investment and regulatory policies, the following guidance should be observed.

(1) <u>Base-Case Analysis</u>. Constant-dollar benefit-cost analyses of proposed investments and regulations should report net present value and other outcomes determined using a real discount rate of 7 percent. This rate

approximates the marginal pretax rate of return on an average investment in the private sector in recent years. Significant changes in this rate will be reflected in future updates of this Circular.

(2) Other Discount Rates. Analyses should show the sensitivity of the discounted net present value and other outcomes to variations in the discount rate. The importance of these alternative calculations will depend on the specific economic characteristics of the program under analysis. For example, in analyzing a regulatory proposal whose main cost is to reduce business investment, net present value should also be calculated using a higher discount rate than 7 percent.

Analyses may include among the reported outcomes the *internal rate of return* implied by the stream of benefits and costs. The internal rate of return is the discount rate that sets the net present value of the program or project to zero. While the internal rate of return does not generally provide an acceptable decision criterion, it does provide useful information, particularly when budgets are constrained or there is uncertainty about the appropriate discount rate.

(3) Using the *shadow price of capital* to value benefits and costs is the analytically preferred means of capturing the effects of government projects on resource allocation in the private sector. To use this method accurately, the analyst must be able to compute how the benefits and costs of a program or project affect the allocation of private consumption and investment. OMB concurrence is required if this method is used in place of the base case discount rate

. . . .

APPENDIX A
DEFINITION OF TERMS

Discount Rate -- The interest rate used in calculating the present value of expected yearly benefits and costs.

Discount Factor -- The factor that translates expected benefits or costs in any given future year into present value terms. The discount factor is equal to $1/(1 + i)^t$ where $i$ is the interest rate and $t$ is the number of years from the date of initiation for the program or policy until the given future year. . . .

**U.S. EPA, Guidelines for Preparing Economic Analysis (Relevant Excerpts) (Dec. 17, 2010, updated May 2014)**

. . . .

6.3.2.1 Efficiency and Intergenerational Equity

A principal problem with policies that span long time horizons is that many of the people affected are not yet alive. While the preferences of each affected individual are knowable (if perhaps unknown in practice) in an intragenerational context, the preferences of future generations in an intergenerational context are essentially unknowable. This is not always a severe problem for practical policy making, especially when policies impose relatively modest costs and benefits, or when the costs and benefits begin immediately or in the not too distant future. Most of the time, it suffices to assume future generations will have preferences much like those of present generations.

The more serious challenge posed by long time horizon situations arises primarily when costs and benefits of an action or inaction are very large and are distributed asymmetrically over vast expanses of time. The crux of the problem is that future generations are not present to participate in making the relevant social choices. Instead, these decisions will be made only by existing generations. In these cases social discounting can no longer be thought of as a process of consulting the preferences of all affected parties concerning today's valuation of effects they will experience in future time periods.

Moreover, compounding interest over very long time horizons can have profound impacts on the intergenerational distribution of welfare. An extremely large benefit or cost realized far into the future has essentially a present value of zero, even when discounted at a low rate. But a modest sum invested today at the same low interest rate can grow to a staggering amount given enough time. Therefore, mechanically discounting very large distant future effects of a policy without thinking carefully about the implications is not advised.[22]

---

[22] OMB's *Circular A-4* (2003) requires the use of constant 3 percent and 7 percent for both intra- and intergenerational discounting for benefit-cost estimation of economically significant rules but allows for lower, positive consumption discount rates, perhaps in the 1 percent to 3 percent range, if there are important intergenerational values.

For example, in the climate change context, Pearce et al. (2003) show that decreasing the discount rate from a constant 6 percent to a constant 4 percent nearly doubles the estimate of the marginal benefits from carbon dioxide ($CO_2$) emission reductions. Weitzman (2001) shows that moving from a constant 4 percent discount rate to a declining discount rate approach nearly doubles the estimate again. Newell and Pizer (2003) show that constant discounting can substantially undervalue the future given uncertainty in economic growth and the overall investment environment. For example, Newell and Pizer (2003) show that a constant discount rate could undervalue net present benefits by 21 percent to 95 percent with an initial rate of 7 percent, and 440 percent to 700 percent with an initial rate of 4 percent, depending upon the model of interest rate uncertainty.

. . . .

8.3.1.3 Discounting

Social discounting procedures for economic analyses are reviewed in considerable detail in Chapter 6. Benefits and costs that occur over time must be properly and consistently discounted if any comparisons between them are to be legitimate.[23]

. . . .

---

[23] In a CEA, it is equally important to properly discount cost estimates of different regulatory approaches to facilitate valid comparisons.

**Exec. Order 14154, Unleashing American Energy (Jan. 20, 2025), Section 6(d)**

Sec. 6. Prioritizing Accuracy in Environmental Analyses. . . .

(d) Prior to the guidance issued pursuant to subsection (c) of this section, agencies shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A–4 of September 17, 2003 (Regulatory Analysis). . . .

**Exec. Order 14192, Unleashing Prosperity Through Deregulation (Jan. 31, 2025), Section 6(b)**

Sec. 6. Implementation. . . .

(b) The Director shall revoke OMB Circular No. A-4 of November 9, 2023 (Regulatory Analysis), and all accompanying appendices, guidelines, and documents, and shall reinstate the prior version of Circular A-4, issued on September 17, 2003 . . . .