**No. 25-2473**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

GENESIS B. (G.B.), a minor, by and through her Guardian, G.P.; et al.,
*Plaintiffs-Appellants*,

v.

The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; et al.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Central District of California (No. 2:23-cv-10345-MWF-AGR)
Hon. Michael W. Fitzgerald

---

**EXCERPTS OF RECORD**
**Volume 2 of 3**

---

JULIA A. OLSON
ANDREA K. RODGERS
CATHERINE SMITH, Of Counsel
BRIANNA ROSIER KABWIKA
Our Children's Trust
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY
Gregory Law Group
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN
University of California at Irvine School of Law, Civil Rights Litigation Clinic
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON
Schonburn Seplow Harris Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

*Attorneys for Appellants*

08:49:44

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

| | |
|---|---|
| G.B., et al., Plaintiffs, vs. THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants. | 2:23-CV-10345-MWF |

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Monday, September 30, 2024

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here: www.amydiazfedreporter.com*

APPEARANCES OF COUNSEL:

For the Plaintiffs:

GREGORY LAW GROUP
By: Philip Gregory, Attorney at Law
1250 Godetia Drive
Redwood City, California 94062

OUR CHILDREN'S TRUST
By: Julia Olson, Attorney at Law
Andrea Rodgers, Attorney at Law
Brianna Kabwika, Attorney at Law
1216 Lincoln Street
Eugene, Oregon 97401

For the Defendants:

U.S. DEPARTMENT OF JUSTICE
By: Sean Duffy, Assistant U.S. Attorney
Andrew Coghlan, Assistant U.S. Attorney
150 M Street Northeast
Washington, D.C. 20002

09:02:03 THE CLERK: Calling item number one, CV-23-10345-MWF, G.B. vs. United States Environmental Protection Agency, et al.

09:02:17 Counsel, please state your appearances for the record, starting with the plaintiff.

09:02:21 MS. OLSON: Good morning, Your Honor. Julia Olson on behalf of the 18 children plaintiffs who are here with us on the live stream. Thank you.

09:02:30 THE COURT: Good morning.

09:02:31 MS. KABWIKA: Your Honor, Brianna Rosier Kabwika on behalf of the plaintiffs.

09:02:40 MR. COGHLAN: Good morning, Your Honor. Andrew Coghlan on behalf of defendants.

09:02:46 MR. DUFFY: And good morning, Your Honor. Sean Duffy on behalf of defendants.

09:02:51 MR. GREGORY: Good morning, Your Honor. Philip Gregory on behalf of the plaintiffs, sharing the Zoom with Ms. Olson.

09:02:58 MS. RODGERS: And good morning, Your Honor, Andrea Rodgers, also sharing the Zoom with Ms. Olson. Thank you.

09:03:05 THE COURT: All right. Counsel, anyone else?

09:03:09 Okay. Good morning, counsel.

09:03:11 In light of the tentative, let me hear first from the plaintiffs.

09:03:18 MS. OLSON: Thank you, Your Honor. Good morning.

09:03:21 And I'm still skimming it, but I'll do my best to address the issues presented.

09:03:25 THE COURT: I can summarize it for you very closely. I appreciate your efforts to pivot after my last order, and the mandamus order, and so you approached it in a -- you attempted to do that. You approached -- the motion was presented in a somewhat technical way. I approached it in a technical way, and indicating why I'm inclined to grant it, but really even apart from all of that, I have yet to be convinced. And much more importantly than what I think, Judge Staton and I clearly disagree on this, is that the Ninth Circuit has decided that the courts have no business doing this. So it really is just a very, very, uphill problem that you have.

09:04:14 But that being said, you did your best to try to change things, both on the -- between the two complaints, and I think that the thrust of the Motion to Dismiss in your opposition reflected that; and therefore, I think this order reflects that, as well.

09:04:37 So, Counsel, with that -- I have summarized the tentative for you, so go ahead.

09:04:45 MS. OLSON: Thank you, Your Honor.

09:04:46 And I'm -- so I'm going to jump right into standing, and then I am going to turn it over briefly to my colleague to address equal protection, because I think it's important

09:04:55 to put this in that context. And so jumping straight in, we
09:05:01 have over 100 new allegations in this Complaint, and I would
09:05:06 like to walk you through a bit of it to try to change your
09:05:08 mind on the tentative.

09:05:10 So we are challenging now specific policies of OMB
09:05:15 and the EPA, and those are laid out clearly at paragraphs 130
09:05:19 to 161, and we are challenging the specific practices of
09:05:23 implementing those policies on the ground at 162 to 200.

09:05:28 And, Your Honor, I noticed that there was an
09:05:30 indication that maybe we hadn't alleged that the EPA is
09:05:35 required to use those policies, and I would just point the
09:05:38 Court to paragraphs 2, 132, 137 and 141 where we allege
09:05:44 several times and in different ways that the EPA guidelines
09:05:47 and the Circular A-4 require the use of discounting.

09:05:52 And then, Your Honor, I mean, one reason why we
09:05:56 think this case should really get beyond the Motion to
09:05:59 Dismiss is if you look at the Guidelines in more depth, and
09:06:02 look at the kind of expert testimony that we would present,
09:06:05 that we put forth in Dr. Stiglitz and Dr. Doganova's
09:06:10 declarations, it is clear that these policies significantly
09:06:15 impact the regulatory choices the EPA makes.

09:06:18 So for example, on page 1-1 of the Guidelines, EPA
09:06:23 says that Circular A-4 greatly influences its conduct and the
09:06:28 development of new analytical tools and the approaches the
09:06:33 agency takes.

09:06:34 So I want to turn back again to the injuries. So the first injury is the denial of equal treatment that these children are personally experiencing, and the barrier the discriminatory discounting policies create for them in being fairly considered when EPA makes decisions about how much pollution to allow.

09:06:56 And it is -- it is black letter law, Your Honor, that when you remove a discriminatory policy and the barrier that a policy is creating through its discrimination, that that in and of itself provides redress for plaintiffs in a discrimination case regardless of the children's ultimate ability to obtain the benefit of pollution control that they seek from EPA.

09:07:20 And so the *City of Jacksonville* case, *Heckler* at 739 to 40 stand for that. Those Supreme Court cases bind this Court's analysis on standing in an equal protection case.

09:07:36 And the unequal treatment injury itself is alleged at paragraphs 28, 107 to 112, 197 to 254. And this time, Your Honor, to make it clear and to prove up some of these allegations, we have submitted the expert declarations.

09:07:54 Dr. Pinsky is a renowned pediatrician and child psychiatrist. She talks about the institutional betrayal that is happening among our children today at paragraphs 14 to 16, and how removing discrimination has an immediate benefit to children, including these plaintiffs, and their

mental health. And this isn't just psychic satisfaction or happiness, this is truly removing the stigma and the harm associated with being treated unequally in the face of a climate crisis.

Plaintiffs Avroh, Maryam and Noah back this up in their declarations. They describe the despair of being devalued by their government, and being dismissed, and being treated as less than adults, and what it would feel like to finally be treated equally by their Government.

So as the Court knows, *Juliana* was not a discrimination case. The Ninth Circuit never addressed the issue of standing and the context of equal protection, and my declaration at paragraph 3 walks through that. We challenged in the *Juliana* case different conduct. We were challenging the national energy system, as opposed to the discrete policies and practices challenged here, Your Honor.

And the bottom line is there is a legal barrier in place for these children to even try to have pollution control that considers them equally as adults.

And then moving to the second form of injury that these, which is where I think Your Honor's order goes -- and again, we can win on that first injury -- but with respect to the second injury, which is the physical consequences of EPA's discriminatory policies, those are carried out in the pollution regulations the EPA promulgates with, informed by

09:09:50 and heavily affected by the discounting policies that they -- 09:09:54 that they implement.

09:09:55 So Dr. Stiglitz, a Nobel laureate economist who has 09:10:01 worked in the White House, has been talking and writing and 09:10:04 researching this for years, says at paragraphs 6, 7, 10, 13 09:10:09 and 27 to 29 in his declaration, that the discounting results 09:10:14 in less stringent climate protection. There is a significant 09:10:18 impact on regulatory programs that get proposed and adopted, 09:10:21 and that it would have a huge difference, and it would really 09:10:26 benefit children to have these discriminatory policies 09:10:28 removed.

09:10:29 Dr. Doganova at paragraphs 8, 9, 11, 14 and 15 also 09:10:34 backs this up. She gives specific examples, like in the 09:10:37 asbestos context, of how the discounting policy changes the 09:10:41 way these agencies regulate pollution, and it changes EPA's 09:10:49 conduct.

09:10:49 And so at this stage of the proceeding, Your Honor, 09:10:52 before we get to the merits, those allegations in the 09:10:54 Complaint that are now backed up by expert testimony have to 09:10:58 be taken as true; and in fact, the Government does not 09:11:02 dispute any of that, that these do have real and meaningful 09:11:06 effect.

09:11:08 I want to turn to the issue of *Allen v. Wright*, 09:11:12 which I know the Government has relied heavily upon. So 09:11:15 first of all, to put this in context, I hear Your Honor

struggling with this issue of this is climate change, this is the airspace, it's large, but that is the reality. The EPA is the single federal agency responsible for protecting our national airspace. And these children live in the conditions of the airspace. They cannot escape it.

So if you think of it, it's like the nation's air is the district. It's like the school district that Linda Brown was trying to get equal education in. It's like the voting districts that are malapportioned that the people in Tennessee wanted to redress for in *Baker vs. Carr*.

Here, the airspace is the district, and the children can't escape it. And the fact that it is large, and that pollution intermixes across the nation in a matter of a day or two, does not change the fact that their agency is discriminating against them when it -- when it exercises its congressionally-delegated authority to control the air and to control pollution that enters the air.

So *Allen v. Wright* said that unequal treatment injury caused by discrimination is still viable, just as it was in *Brown*. The difference in that case was that the Court found that the plaintiffs hadn't alleged that they were actually subjected to the discriminatory treatment, and talked about how students in Hawaii, for example, couldn't sue to challenge what was happening in a school district in another state across the country.

09:12:57 In contrast, also in *Allen*, what distinguishes it 09:13:03 from this case, is that the IRS had no control over 09:13:09 desegregating public education. And so the Court found a 09:13:11 lack of causation to the injury itself because the tax 09:13:15 exemptions weren't causing the harm, and the IRS had no 09:13:20 control over desegregation.

09:13:22 In contrast, here, only EPA can protect the nation's 09:13:27 airshed for these plaintiffs. They exercise total control 09:13:33 over it. So that is another reason that there is a big 09:13:37 difference.

09:13:37 So, Your Honor, while I haven't read the whole 09:13:40 order, dismissing this case, it runs contrary to an abundant 09:13:49 body of equal protection law, from *Heckler*, to *Jacksonville*, 09:13:53 *Quinn v. Millsap*, you would have to disavow the Ninth 09:13:57 Circuit's precedent in *Davis v. Guam*, all saying that the 09:14:02 denial of equal treatment alone is injury in fact, even if 09:14:04 the ultimate benefits are not obtained.

09:14:06 And, Your Honor, I can think -- while I may disagree 09:14:12 with the results of the case, I think we can also even look 09:14:14 to the Supreme Court's decision in *Student For Fair Admission* 09:14:17 *vs. Harvard*, where the Court said there in terms of standing 09:14:21 that it didn't matter if the students were ever going to 09:14:24 ultimately be admitted to the schools for which they sought 09:14:27 admission. The Supreme Court has said that one factor that 09:14:32 is discriminatory in a decision is enough. And we can agree

with that or not, but that is the law on equal protection right now.

THE COURT: Thank you. Let me give, on the points that you have specifically raised, let me give the EPA a chance to respond before we hear the further argument.

What does the -- you know, there -- clearly, the plaintiffs listened to the Court the last time, and as well the Ninth Circuit, and there has been this pivot. There is the specificity. There are the additional allegations, and there is obviously, most importantly, the focus on equal protection.

So what is the EPA's response to that?

MR. COGHLAN: Thank you, Your Honor. Andrew Coghlan for the United States.

So, I mean, stigmatic harm of the kind that plaintiffs are alleging here can be concrete and particularized, but only if a plaintiff can allege that they were themselves denied equal treatment by operation of the allegedly discriminatory policy.

And plaintiffs here just have not and cannot make that showing. And the fact is that discounting in the abstract does not require plaintiffs to do or refrain from doing anything, and the objection to discounting that they assert is one that could be asserted by anybody who essentially plans to live into the future. It's that

discounting devalues future harms, and that is an objection that is available basically to everybody, which is a generalized grievance, if there ever was one, and generalized grievances are not enough to support standing.

I do want to just briefly refer the Court to the Ninth Circuit's 2021 decision in a case called *Meland v. Weber*, which has a really nice encapsulation of the rule against generalized grievances that I think drives the point home quite nicely. So this is at 2 F.4th 844. And I'm quoting, "To confer standing under Article III the injury in fact must affect the plaintiff in a personal and individual way that is beyond the psychological consequence presumably produced by observation of conduct with which one disagrees."

And I think that a claim of psychological harm is really the crux of plaintiffs' asserted stigmatic injury. And we are not disputing that that is a sincere claim, but as a matter of black letter law, it's just insufficient to support standing.

THE COURT: All right. Anything else that you would like to say before we move on to the next portion of plaintiffs' argument?

MR. COGHLAN: Sure. I can pivot to their climate-related harms, and address why there isn't a sufficient connection between discounting and those climate-related harms to produce standing, because I think

09:17:27 they have two asserted injuries. I could wait to do that.

09:17:30 THE COURT: Why don't we wait on that, and let's hear the next argument.

09:17:34 MR. COGHLAN: Okay.

09:17:36 MS. OLSON: All right. Thank you, Your Honor.

09:17:40 Briefly, I want to talk about traceability and causation for a moment.

09:17:48 So again, the amended allegations name the discrete policies that have been in place, and they have been practiced for decades. So that there is no dispute, I don't think the defendants dispute that these policies are in place, and that they are practiced and carried out across their regulatory programs.

09:18:07 And what I'll say about this is that the Government actually creates a dispute of material fact in their Motion to Dismiss. At page 14, they say that the monetized value of discounted future benefits may or may not weigh in the balance when EPA enacts the regulations.

09:18:28 So they are saying that it may have an effect, it may not have an effect. And that is an evidentiary question that would be decided on the merits, and is enough for us to overcome our Motion to Dismiss hurdle to plead a claim and plead standing here.

09:18:44 There is absolutely no evidence before the Court to counter plaintiffs' allegations, or the declarations of the

09:18:52 very real world effect of these discriminatory policies in terms of the amount of pollution that gets controlled by the EPA through its regulatory programs.

09:19:01 And again, Your Honor, you would have to not only discount our allegations, but the expert testimony that we have now provided, given that --

09:19:10 THE COURT: Well, excuse me, Counsel. One way of looking at the argument that you are making where there is a particularized harm, is saying where would the line be drawn? You know, yes, there is obviously a lot of evidentiary work going into this iteration of the Complaint, but -- and in a sense, you know, if anyone living into the future is suffering this harm, and as the Government is saying, look, it's this generalized harm and therefore it can't be Article III standing if everybody shares in it.

09:19:45 You know, in a sense what you are arguing is saying, well, yes, but some people are sharing it more. But where would one draw the line? Is it the fact of everyone who is younger than 18, or anyone -- how are you not just saying that there is the harm, but getting around the particularized -- or showing the particularized harm for these plaintiffs in opposition to the Government's argument about a generalized harm?

09:20:17 MS. OLSON: Yeah, absolutely, Your Honor. It is about children under 18, and how they are disproportionately

09:20:22 harmed. They are not just young people, they have developing bodies and physiologies that are different than adults. And in a moment, I do want to pass to my colleague to speak to this important point about children as a protected group.

THE COURT: And I do want to hear that, and I also have another Zoom call coming up, so let's get to that.

MS. OLSON: Before I pass, I want to quickly address a couple of other points.

So I think the Court referenced the *Missouri vs. Biden* and *Louisiana vs. Biden* cases.

So first of all, those were not equal protection cases, they are, of course, out of circuit, but importantly, there what the Court said is that the social cost of carbon had not yet been applied to any regulatory program that was having an adverse effect on the states.

Here, we have alleged that these discounting policies have been applied for decades, they continue to be applied, and that they are having an effect on the regulatory programs that are selected, and on the levels of pollution that we are seeing, which have continued to rise for decades and decades.

And, Your Honor, in case there still is an opportunity, we would respectfully request leave to amend to address any allegations with respect to traceability or injury, since those weren't the subject of dismissal in the

09:21:41 prior order.

09:21:42 And with that, Brianna, I would like to turn to you to discuss the protected group issue.

09:21:48 Thank you, Your Honor.

09:21:49 THE COURT: Counsel?

09:21:50 MS. KABWIKA: Thank you, Your Honor.

09:21:52 I'll start by addressing your question about the line drawing about what class we are talking about here. And I think this is really important, because when we discuss the -- in your tentative, you discuss how if there is a classification, a stigmatizing harm could come from that classification itself.

09:22:15 And so if the Court goes to our Complaint, we have outlined the characteristics of that class in 374 and 375. Not only does it have to do with the age of the plaintiffs, but also the special characteristics that come with the period of age of childhood. Children have developmental vulnerabilities, they have special vulnerabilities not only to the physical harms that are arising out of the defendant's policies and practices, but also stigmatizing and mental harms that will carry for the rest of their lives.

09:23:02 And why that is important, is we see the Court treats children specially, not only in the equal protection context, but in all areas of the law.

09:23:13 And so I want to go to the Court's statements that

09:23:16 there is not a classification here, because even the
09:23:20 defendants concede that if the plaintiffs are being
09:23:25 personally affected, we don't have the same issues with
09:23:28 standing here. We don't see these kinds of things appearing
09:23:31 in equal protection cases.

09:23:33 The discounting policies and practices touch
09:23:35 children's lives today and discriminate to them today. So if
09:23:39 you look to our allegations at 137 through 140, 153 through
09:23:44 154, 197 to 200, all of these allegations show how
09:23:50 discounting not only treats children differently, but we also
09:23:55 have allegations and expert support showing that they
09:24:00 ultimately affect children differently.

09:24:03 If you even look to that language that discounting
09:24:07 is a time preference. So what that means is adults are given
09:24:11 preference over children's -- over children EPA's
09:24:14 decisionmaking on the ground. A buck for adults in fuel
09:24:19 companies today is worth more than children's health and
09:24:23 future today and tomorrow.

09:24:23 And we don't have to have explicit language saying
09:24:26 we are discriminating against children here, because the
09:24:30 Supreme Court has already held that as long as the provision
09:24:34 inherently discriminates, even if it's not on -- explicitly
09:24:39 in the language, that is enough to have facial
09:24:42 discrimination. The Court can look to the *Guinn* case, where
09:24:46 they were challenging grandfather clauses that granted

exemptions to literacy tests for the grandparents that were born prior to 1967. It doesn't mention -- I'm sorry, not 1967, 1867 -- that implicates race, because obviously, the voters who are black had enslaved grandparents at that time.

And this is not just allegations we are making in a vacuum, Your Honor. If you look to the allegations at 357 and 358, we use the EPA's own language showing that there is a differentiation between generations in its discounting policies. So they recognize that there is a classification that is occurring.

And I just want to briefly bring this case into all the children rights cases that have been brought before this Court -- brought before the Supreme Court previously. And this is the kind of harm that the Constitution is especially concerned about in terms of children. Children have rights under the Equal Protection Clause, and the Constitution is concerned about, in the words of *Brown*, "afflicting upon children harms to their hearts and minds that are likely to never be undone." Or in the words of *Plyler*, "imposing a lifetime of hardship for matters beyond their control." Or in *Weber v. Aetna*, "imposing disabilities on a child with no relation to individual responsibility and wrongdoing."

So children have rights of equal protection, and since those classifications approach their sensitive and fundamental personal rights, which is another aspect of the

09:26:29 Equal Protection Clause, this Court should hear this case and allow it to go to the merits.

I don't know if you have any other specific questions, but I would ask either to just have a minute or two after --

THE COURT: Well, we are running out of time here.

Let me hear from the EPA.

Counsel?

MR. COGHLAN: Thank you, Your Honor.

I'll just briefly address why there is no causal connection between the practice of discounting and plaintiffs' climate-related harms.

And I think that, you know, the fundamental problem here, is that discounting by itself does not have any concrete and particularized actual or imminent impact on plaintiffs. Regulations can have those kinds of impacts, and if EPA were ever to rely on discount rates when setting greenhouse gas emissions regulations, then plaintiffs would have every opportunity to press their claims in a properly-fashioned petition for review in a Court of Appeals, but they haven't, in 400-plus numbered paragraphs in their Complaint, identified a specific instance in which EPA is alleged to have set a regulation based on discount rates in the way that they say happens all the time.

And without that kind of --

09:27:47 THE COURT: Let me -- where -- what in your view -- perhaps obviously for trial that would be a point, perhaps on summary judgment, what makes you feel that that argument is so clear now on a Motion to Dismiss that it's clear that it -- just the allegations don't do that, I think the plaintiffs would dispute that, but beyond that, that they just can't.

09:28:16 What is the bright-line rule here that makes this amenable to being decided on a Motion to Dismiss?

09:28:22 MR. COGHLAN: Well, I think that the rule is that plaintiffs' burden on a Motion to Dismiss follows their burden at each successive stage of litigation.

09:28:32 And so at the pleading stage here we are governed by the standard as articulated in the *Twombly* and *Iqbal* decisions. They need to allege facts, not just bald, conclusory allegations, and they need to allege facts establishing not just plausibility, but probability of the thing to which they are objecting actually having harmed them.

09:28:52 And I think if you want to stretch their Complaint, the most that they have got here are facts that are alleged that are consistent with their theory of liability, but both *Twombly* and *Iqbal* say that facts consistent with the theory of liability and nothing more are not enough.

09:29:08 I'll also say that there is a 50-year track record

09:29:11 of EPA regulations. They say themselves, that to decide this
09:29:16 case, the Court would need to wade through all that. Those
09:29:20 rulemakings are an open book, and so plaintiffs could easily
09:29:24 identify if they found an instance in which EPA has actually
09:29:28 underregulated GHG, the instance to which they object. But
09:29:32 without that kind of concrete application, there is just
09:29:34 nothing to connect the practice of discounting in the
09:29:37 abstract with the specific harms that they allege due to
09:29:41 climate change.

09:29:41 And there is also no nonspeculative basis to assume
09:29:45 that an order that prohibits discounting, which is what they
09:29:50 say they want, would appreciably alter EPA's regulatory
09:29:53 decisionmaking, and doubly speculative to assume it would
09:29:55 alter that decisionmaking so much that it would actually
09:29:57 provide redress for plaintiffs' climate-related harms.

09:30:01 And so we are left with this abstract dispute about
09:30:05 the government policy, and it's precisely the kind of dispute
09:30:08 that standing and ripeness doctrine exists to keep Federal
09:30:12 Courts from entangling themselves in.

09:30:14 THE COURT: And to state the obvious, this is the
09:30:17 Rule 12(b)(6) argument and not the jurisdictional argument.
09:30:21 But in your view, then, is there -- in order to deal
09:30:27 completely with this iteration of the Complaint, is it
09:30:31 necessary to reach the Rule 12(b)(6), or in the EPA's view
09:30:35 would -- if I were to agree with those arguments, would the

09:30:40 jurisdictional arguments dispose of the issue without reaching the Rule 12(b)(6) issues? Or as I said, do you feel that sooner or later they must be reached if the case is going to be entirely dealt with at this point?

09:30:54 MR. COGHLAN: We think it would be most appropriate to dispose of the case in the 12(b)(1) arguments. There would be no need to reach the 12(b)(6) arguments.

09:31:03 THE COURT: And very briefly, a response from the plaintiffs.

09:31:08 MS. KABWIKA: Thank you, Your Honor.

09:31:09 I just -- I'll just be a minute that I'll take here. But I want to emphasize that discounting has a direct discriminatory effect on children by creating inherent bias against their interests in EPA's formulation of regulations to control climate pollution. That is a statement from our expert Doganova at paragraph 15.

09:31:32 And we recognize that this is a novel -- sorry, Your Honor, did you --

09:31:36 THE COURT: No. Go ahead. I'm sorry.

09:31:38 MS. KABWIKA: We recognize that this is a novel case for the Court, and so we just respectfully ask Your Honor not to prejudge this case as it relates to the national airshed and to climate change. This is a children's discrimination case. And children have long been treated as a protected class by the courts. And so equal protection would have no

meaning if governments could hide discrimination behind regulatory policies and schemes as the Government is asking the Court to do here with the Clean Air Act, and the associated justiciability bars that go with those regulatory schemes.

Defendants will have plenty of opportunities to challenge the justiciability of this case, and we expect that they will, but our allegations, which are comparable to allegations to other equal protection claims as we have presented to the Court, are -- and supported with declarations from both experts and our clients themselves, are sufficient at this stage.

And so dismissal would be an error just as if defendants were devaluing the lives and economic policy based on gender or race, or other classes the Court has recognized are protected.

And so we appreciate your time, Your Honor.

THE COURT: Thank you.

Mr. Coghlan, just a final question here, what -- let's say that even if I were inclined to view your argument that the discounting does not translate into a real harm, let's say that the discounting was the jury aimed at a certain race or religion, or there were allegations sufficient under *Twombly* that de facto the way something was applied, it was obviously, to any thinking person, it was

09:33:28 being applied to a particular community.

09:33:30 You know, let's say, like it was being applied to the Crown Heights neighborhood in New York, and any New Yorker would recognize that would be a code word for observant Jews. In that case, would you really say then because it doesn't translate into some sort of particularized harm, that that would be allowable?

09:33:53 MR. COGHLAN: Well, I want to make sure that I'm understanding you correct. The question to sort of assume the validity of the kind of discriminatory allegation, that there is clearcut case --

09:34:04 THE COURT: Right.

09:34:04 MR. COGHLAN: -- we are not indicating that there is a suspect class here.

09:34:08 THE COURT: I understand. If that is the distinction that you want to make, that is a perfectly understandable legal distinction. I just want to understand if that is, in fact, your distinction.

09:34:18 MR. COGHLAN: Well, I think that is one of our distinctions. I think the broader point, though, is that if the Government is alleged just to have said something odious, but that that statement doesn't translate in any way into a policy that actually denies a specific person equal treatment under the law, then the thrust of the case law in that difficult hypo, I would have to concede, is that there is not

09:34:43 a stigmatic injury that rises to the level of concrete and particularized.

09:34:48 I will say, though, if the Government were to do that, if you can connect it to any policy that does harm the plaintiffs, I think you've got a pretty easy case.

09:34:54 And I also think that if you look at the sweep of the cases in which this rule against generalized grievances is applied, typically where you see it applied is not in an example like the one you brought up, but it's in the challenge to something like an affirmative action policy brought by somebody to whom the policy doesn't apply at all. So I think there are guardrails on this area for good reason.

09:35:18 THE COURT: Right. And as to that, obviously, I would have to balance the argument that you just made against the argument that was made by plaintiffs in regard to the current understanding of affirmative action and the standing there.

09:35:33 So anyway, counsel, thank you very much. Thank you for your briefs, thank you for your arguments. Regardless of how I ultimately rule, I do appreciate that the plaintiffs clearly listened last time.

09:35:45 Thank you very much.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR October 1, 2024

S/ Amy Diaz

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
ANDREW S. COGHLAN (CA Bar No. 313332)
andrew.coghlan@usdoj.gov
Environmental Defense Section
SEAN C. DUFFY (NY Bar No. 4103131)
sean.c.duffy@usdoj.gov
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044
Ph: (202) 532-3252 (Coghlan); Ph: (202) 305-0445 (Duffy)

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENESIS B., a minor, by and through her guardian, G.P., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Defendants. | No. 2:23-cv-10345-MWF-AGR<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 62)**<br><br>Date: Sept. 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. Plaintiffs' climate-related harms are not fairly traceable to discounting; their "unequal treatment injury" is not an injury-in-fact .......... 2

II. A judgment in Plaintiffs' favor would not redress their climate-related harms. .......... 7

III. Plaintiffs' abstract disagreements with discounting are not ripe for review. .......... 9

IV. Plaintiffs fail to plead a cognizable equal protection claim. .......... 11

A. Discounting does not discriminate against children. .......... 11

B. Because they are not a suspect class, any law that classifies children would be subject to rational basis review. .......... 11

C. Discounting does not implicate fundamental rights. .......... 14

D. Plaintiffs fail to allege facts to show that discounting lacks a rational basis. .......... 17

V. Plaintiffs have not stated a claim under the Take Care Clause. .......... 17

CONCLUSION .......... 19

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*,
468 U.S. 737 (1984) .......... 4, 5, 6, 8, 10

*Arakaki v. Lingle*,
477 F.3d 1048 (9th Cir. 2007) .......... 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 11

*Braunstein v. Ariz. Dep't of Transp.*,
683 F.3d 1177 (9th Cir. 2012) .......... 5

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) .......... 8, 13

*Cal. Dump Truck Owners Ass'n v. Nichols*,
784 F.3d 500 (9th Cir. 2015) .......... 9

*Clark v. Jeter*,
486 U.S. 456 (1988) .......... 13

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 17, 19

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) .......... 16

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .......... 17

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 3, 6

*Florida v. United States*,
2022 WL 2431414 (N.D. Fla. May 4, 2022) .......... 18

*Florida v. United States*,
660 F. Supp. 3d 1239 (N.D. Fla. 2023) .......... 18

*Gill v. Whitford*,
585 U.S. 48 (2018) .................................................................... 3

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .................................................................. 12

*Guinn v. United States*,
238 U.S. 347 (1915) .................................................................. 11

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024) ............................................... 11

*Held v. Montana*,
No. CDV-2020-307 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023) ............... 15

*Helling v. McKinney*,
509 U.S. 25 (1993) .................................................................... 16

*Hills v. Gautreaux*,
425 U.S. 284 (1976) .................................................................... 8

*In re Border Infrastructure Env't Litig.*,
284 F. Supp. 3d 1092 (S.D. Cal. 2018) ....................................... 18

*In re Hawai'i Elec. Light Co.*,
526 P.3d 329 (Haw. 2023)........................................................... 15

*Ingraham v. Wright*,
430 U.S. 651 (1977) .................................................................. 16

*Juliana v. United States*,
2023 WL 9023339 (D. Or. Dec. 29, 2023)....................................... 12

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) ............................................... 6, 7, 8

*Lehnhausen v. Lake Shore Auto Parts Co.*,
410 U.S. 356 (1973) .................................................................. 17

*Levy v. Louisiana*,
391 U.S. 68 (1968) .................................................................... 13

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) .......... 8

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) .......... 2

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 4

*Mass. Bd. of Retirement v. Murgia*,
427 U.S. 307 (1976) .......... 12

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......... 8

*Missouri v. Biden*,
52 F.4th 362 (8th Cir. 2022) .......... 2, 7

*Missouri v. Biden*,
558 F. Supp. 3d 754 (E.D. Mo. 2021) .......... 7

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) .......... 10

*N. Star Intern. v. Ariz. Corp. Comm'n*,
720 F.2d 578 (9th Cir. 1983) .......... 14

*Nat'l Lime Ass'n v. EPA*,
233 F.3d 625 (D.C. Cir. 2000) .......... 2

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) .......... 10

*Nunez by Nunez v. City of San Diego*,
114 F.3d 935 (9th Cir. 1997) .......... 12

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998) .......... 9, 10

*Ondo v. City of Cleveland*,
795 F.3d 597 (6th Cir. 2015) .......... 13

*Pickett v. Brown*,
462 U.S. 1 (1983) .......... 13

*Plyler v. Doe*,
457 U.S. 202 (1982) .......... 13, 14

*Polanco v. Diaz*,
76 F.4th 918 (9th Cir. 2023) .......... 16

*Rochin v. California*,
342 U.S. 165 (1952) .......... 16

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020) .......... 18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 6

*United States v. Flores-Villar*,
536 F.3d 990 (9th Cir. 2008) .......... 12

*United States v. Hays*,
515 U.S. 737 (1995) .......... 3

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 14

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) .......... 5

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 15

*Weber v. Aetna Casualty & Surety Co.*,
406 U.S. 164 (1972) .......... 13

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 18, 19

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) .......... 2

*Winston v. Lee*,
470 U.S. 753 (1985) .......... 16

*Youngberg v. Romero*,
457 U.S. 307 (1982) .......... 16

**Statutes**

42 U.S.C. § 7607 .......... 9

**International Cases**

*State of the Netherlands v. Urgenda Found.*,
Hoge Raad der Nederlanden [Sup. Ct. Neth.], 20 December 2019, ECLI:NL:HR:2019:2007 .......... 15

*M.K. Ranjitsinh v. Union of India*,
2024 INSC 280 (India Sup. Ct. 2024) .......... 15

**Executive Order**

Exec. Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993) .......... 2

**Guidance Documents**

EPA Guidelines for Preparing Economic Analysis (2016) .......... 5

OMB Circular A-4 (Nov. 9, 2023) .......... 5

## INTRODUCTION

Plaintiffs' only arguably cognizable injuries are their alleged climate-related harms, which stem from the global concentration of greenhouse gasses (GHGs). *See* Am. Compl., ECF 53, ¶¶ 31–107. But the causal connection between those harms and the practice of discounting—which need not inform, let alone control, EPA's regulatory decision-making—is too speculative and attenuated to support jurisdiction. So too is the assumption that an order barring discounting will affect future EPA Clean Air Act regulations, and, by extension, the pace of climate change. Plaintiffs therefore lack standing.

Their claims are also unripe. If EPA were to rely on discounted societal benefits when regulating GHG emissions under the Clean Air Act, then Plaintiffs could bring their claims in a properly filed petition for review. But absent such a concrete application of discount rates in a discrete rulemaking (which a district court would lack jurisdiction to review), Plaintiffs' claims are unsuitable for judicial resolution.

Nothing in Plaintiffs' opposition alters this conclusion. Unable to show that their alleged climate-related harms support standing, Plaintiffs argue instead that because discounting itself is allegedly discriminatory, it inflicts a distinct injury that provides an independent basis for their suit. Not so. Denial of equal treatment can be an injury-in-fact, but only if that denial is concrete and particularized. Plaintiffs' "unequal treatment injury" is neither; it is a generalized, abstract grievance. Such grievances, however sincere, do not suffice to invoke the federal judicial power. The Court should again dismiss, this time with prejudice.

Plaintiffs' Amended Complaint also fails to state claims on which relief can be granted. The discounting practices on which Plaintiffs predicate their equal protection claims are neutral and do not target children for discriminatory treatment. Even if discounting did discriminate against children, Plaintiffs have not alleged facts to support a finding that discounting lacks a rational basis.

Plaintiffs cannot assert an equal protection claim based on an implied fundamental right to a life sustaining climate system because the Constitution does not confer such a right. And they cannot state a claim directly under the Take Care Clause of Article II, § 3. Plaintiffs have thus failed to state a cognizable claim under any of the four counts in the Amended Complaint.

## ARGUMENT

### I. Plaintiffs' climate-related harms are not fairly traceable to discounting; their "unequal treatment injury" is not an injury-in-fact.

When EPA develops a regulation, the Agency assesses societal benefits and costs of its action, consistent with Executive Order 12866, and it presents that benefit-cost analysis in a regulatory impact analysis (RIA). Defs.' Mem. of P. & A., ECF 62 ("MTD") at 2–4. But the benefit-cost analysis, standing alone, has no independent legal effect: nothing in Executive Order 12866, in EPA's Guidelines for Economic Analysis ("Guidelines"), or in OMB's Circular A-4 requires EPA to base its substantive regulatory standards on the findings in an RIA. *Id.* at 3–4. And it is pure speculation to assume that any one input in benefit-cost analysis will have a predictable outcome-determinative effect on substantive regulations, as Plaintiffs suggest. Two circuit courts to consider the issue have already reached this conclusion. *See id.* (discussing *Missouri v. Biden*, 52 F.4th 362 (8th Cir. 2022), *cert. denied*, 144 S. Ct. 278 (2023), and *Louisiana v. Biden*, 64 F.4th 674 (5th Cir. 2023)). This court should too.

Despite a large body of publicly available rulemakings, Plaintiffs fail to identify a single instance in which EPA based GHG emission standards on a comparison of monetized societal benefits and costs. Their failure is unsurprising. The Supreme Court and D.C. Circuit have held that EPA cannot rely on benefit-cost analyses to set standards under certain relevant provisions of the Clean Air Act. *See id.* at 8 (discussing *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 466 (2001), and *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 640 (D.C. Cir. 2000)). And

EPA disclaimed any reliance on the benefit-cost analyses contained in RIAs when it issued the very regulations that Plaintiffs cite in their Amended Complaint. *See id.* 9 (citing Federal Register notices of proposed and final rulemakings). Thus, to accept Plaintiffs' blanket assertion that "the [benefit-cost analyses] in the RIAs control" EPA's regulatory decision-making under the Clean Air Act, Am. Compl. ¶ 162, one must disregard EPA's published statements to the contrary and assume that EPA deliberately flouts blackletter law. Plaintiffs are entitled to no such assumption. Because they cannot establish a non-speculative and non-attenuated causal chain that connects discounting, EPA regulations, climate change, and their climate-related harms, Plaintiffs lack standing.

In response, Plaintiffs reach for what they describe as an "unequal treatment injury" from discounting itself that, they say, provides an independent basis for their suit, apart from their climate-related harms. Pls.' Opp'n 7, ECF 64. Basic precepts of standing foreclose this argument.

Federal courts do not "operate as an open forum for citizens to press general complaints about the way in which government goes about its business." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). "To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (cleaned up). To do so, plaintiffs must show, *inter alia*, that they have suffered a "concrete and particularized" injury that affects them "in a personal and individual way." *Id.* A "generalized grievance" cannot confer standing. *United States v. Hays*, 515 U.S. 737, 743 (1995). And that "rule against generalized grievances applies with as much force in the equal protection context as in any other." *Arakaki v. Lingle*, 477 F.3d 1048, 1060 (9th Cir. 2007) (quoting *Hays*, 515 U.S. at 743).

The Supreme Court applied that rule in *Allen v. Wright*, 468 U.S. 737 (1984), and its reasoning is instructive.[1] *Allen* concerned IRS policies and procedures that allegedly authorized tax exemptions for racially discriminatory private schools, thereby impeding school integration. *Id.* at 739–40. The plaintiffs asserted two injuries: "a direct injury" from the "challenged Government conduct," and, separately, an "injury to their children's opportunity to receive a desegregated education" based on the operation of the IRS's policies. *Id.* at 746. Neither sufficed.

The first of those injuries fell short to the extent that it rested on "the abstract injury in nonobservance of the Constitution," which "is not sufficient, standing alone, to confer jurisdiction on a federal court." *Id.* at 754. The plaintiffs' first injury was no more cognizable if viewed instead as "a claim of stigmatic" harm or "denigration." *Id.* While such a dignitary injury "is sufficient in some circumstances to support standing," it does so only for "those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.* at 755. The plaintiffs' stigmatic injury, however, rested on the "mere fact of the challenged Government conduct," and could be claimed in equal measure by "all members of the particular racial groups against which the Government was alleged to be discriminating." *Id.* at 756. To recognize "standing in such circumstances would transform the federal courts into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Id.* The Court refused to do so. *Id.*

---

[1] *Allen* suggests that the "the rule barring adjudication of generalized grievances" is a "prudential" rather than a "constitutional" restriction. 468 U.S. at 751. But the Supreme Court later explained that "a plaintiff raising only a generally available grievance . . . does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992).

This left the *Allen* plaintiffs' second injury: "their children's diminished ability to receive an education in a racially integrated school." *Id.* That injury was concrete, particularized, and, the Court stressed, "one of the most serious injuries recognized in our legal system." *Id.* at 757. But "the links in the chain of causation between the challenged Government conduct and the asserted injury [we]re far too weak for the chain as a whole to sustain" the plaintiffs' standing. *Id.* at 759.

So too here. Plaintiffs insist that their "unequal treatment injury" is distinct from "the physical and mental" injuries that they attribute to climate change. Pls.' Opp'n 7. But they do not elaborate with any precision on the nature of the harm that they claim to have suffered from the practice of discounting. Indeed, at points they seem to argue that simply by "alleg[ing] facially discriminatory Policies and Practices," they have alleged an injury-in-fact. Pls.' Opp'n 9. No cases support that argument, and plenty rebut it. *See, e.g.*, *Allen*, 468 U.S. at 754; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 477 (1982) (A plaintiff "must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement."); *accord Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1185 (9th Cir. 2012).

Plaintiffs also appear to argue that discounting "stigmatizes" them. Pls.' Opp'n 5; *see also* Avroh Decl. ¶ 30, ECF 64-1. But they do not show how Circular A-4 or EPA's use of discount rates has made them "personally subject to discriminatory treatment." *Allen*, 468 U.S. at 757 n.22. That is unsurprising given that agencies' benefit-cost analyses inform Executive-Branch review but do not themselves regulate the public. MTD 2–4. When EPA considers monetizable future benefits and costs, moreover, it does so at a societal, not an individual, level. *See, e.g.*, Circular A-4 at 27 (agencies "should, if feasible, report the monetized value of the anticipated benefits and costs to society"); *see also* EPA Guidelines at

6-1 ("the type of discounting discussed in this chapter, is discounting from the broad society-as-a-whole point of view that is embodied in benefit-cost analysis"). And the Agency applies discount rates consistently to all societal impacts without reference to who bears costs or realizes benefits. So if Plaintiffs have a cognizable injury-in-fact merely because they feel that their future climate injuries are "undervalue[d]" by the application of discount rates, Pls.' Opp'n 6, then so too would any member of society who anticipates suffering climate-related harm. It is hard to conceive of a more generalized grievance.

Some of the injuries that Plaintiffs attribute to climate change (Am. Compl. ¶¶ 31–107), by contrast, are at least arguably concrete and particularized under *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020). But for the reasons discussed at length in Defendants' opening brief and summarized above (and largely ignored in Plaintiffs' opposition), those climate-related harms are not fairly traceable to the practice of discounting. To have standing, Plaintiffs need a closer, non-speculative connection between injury-in-fact and challenged conduct.

Plaintiffs cannot sidestep this requirement by insisting that "causation standing analysis is typically absent in the equal protection context." Pls.' Opp'n 7–8. "The *irreducible constitutional minimum* of standing consists of *three* elements," of which causation is one. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (emphasis added). And *Allen* shows that "the federal judiciary may not redress" even "the most serious" equal protection injuries, unless all standing requirements—including causation—are met. 468 U.S. at 756–57. Because Plaintiffs do not establish causation, the Court must dismiss.

To point this out is not to improperly argue the merits, as Plaintiffs suggest. Pls.' Opp'n 9–10. Standing's "causation requirement precludes speculative links" and "rules out attenuated links." *All. for Hippocratic Med.*, 602 U.S. at 383. That is true at all phases of litigation, including the pleading stage. *Missouri v. Biden*, which concerned an analogous challenge to benefit-cost methodology, was

resolved on a Rule 12(b) motion. *See* 52 F.4th at 365–66. So too, for that matter, was *Allen*. *See* 468 U.S. at 748. Courts can accept well-pleaded factual allegations while also acknowledging when, as now, the "causal chain" between injury-in-fact and government conduct is "supported by a number of bare assumptions" and is thus "too weak for standing." *Missouri v. Biden*, 558 F. Supp. 3d 754, 767 (E.D. Mo. 2021), *aff'd*, 52 F.4th 362 (8th Cir. 2022).

## II. A judgment in Plaintiffs' favor would not redress their climate-related harms.

Declaratory or injunctive relief aimed at discounting cannot redress Plaintiffs' climate-related harms. To conclude otherwise would be to assume that it is not just possible, but "substantially likely," *Juliana*, 947 F.3d at 1170, that: (1) the nonbinding benefit-cost analyses that EPA prepares for RIAs actually dictate EPA's Clean Air Act regulations (judicial precedent and EPA statements to the contrary notwithstanding); (2) EPA regulations are therefore less climate-protective because of discounting (though Plaintiffs identify no instance in which this has ever happened); (3) eliminating discounting will make future EPA regulations more climate-protective (though, discounting aside, EPA's regulations might be less climate-protective than Plaintiffs would like for any number of reasons); and (4) any substantive changes in EPA regulations from phasing out discounting will redress Plaintiffs' harms because those changes will materially affect climate change.

*Juliana*'s redressability analysis forecloses Plaintiffs' bid for standing. Even in Plaintiffs' telling, discounting plays, at most, a supporting role in EPA's regulatory decision-making. *See* Am. Compl. ¶¶ 2, 24, 151–52, 197 (describing discounting as a "thumb on the scale"). If declaratory and injunctive orders "requiring the government not only to cease permitting, authorizing, and subsidizing fossil fuel use, but also to prepare a plan subject to judicial approval to draw down harmful emissions" would "not alone solve global climate change,"

*Juliana*, 947 F.3d at 1170–71, then, *a fortiori*, declaratory and injunctive orders prohibiting discounting will not either. Applying *Juliana*, this Court correctly held that Plaintiffs had "failed to show how" a judgment in their favor "is substantially likely to remedy the injuries to [their] bodies, their homes, and their daily lives." Order, ECF No. 50, at 6 (internal quotation marks omitted). And it correctly concluded that the link between discounting and regulatory outcomes was "speculative," absent some "further court action" aimed at policy decisions entrusted to the political branches, *id.*, something *Juliana* precludes, 947 F.3d at 1172.

In response, Plaintiffs downplay their reliance on climate-related harms and focus again on their "unequal treatment injury" from discounting itself, which, they say, demands a different mode of redressability analysis than the one contained in *Juliana* or in this Court's prior order. Pls.' Opp'n 11–18. But this argument assumes that Plaintiffs' generalized grievance against discounting is an injury-in-fact. For the reasons noted above, it is not. Unlike the challengers in *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), *Hills v. Gautreaux*, 425 U.S. 284 (1976), and *Brown v. Board of Education*, 347 U.S. 483 (1954), Plaintiffs have not alleged that they were or will be "personally subject to discriminatory treatment" under the allegedly discriminatory policy that they challenge. *Allen*, 468 U.S. at 757 n.22. Their equal-protection injury, one shared by an essentially countless number of potentially "concerned bystanders," *id.*, 468 U.S. at 756, is thus readily distinguishable from the concrete and particularized injuries in the discrimination cases on which they rely.

Plaintiffs' reliance on *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), Pls.' Opp'n at 15, is likewise misplaced. That opinion's discussion of the judicial role assumes federal jurisdiction. Nothing in *Loper Bright*, or any other precedent, suggests that courts have the authority, let alone a "solemn duty," Pls. Opp'n 15, to adjudicate claims that plaintiffs lack standing to bring.

### III. Plaintiffs' abstract disagreements with discounting are not ripe for review.

Plaintiffs' claims are also not ripe. The challenged discounting policies in Circular A-4 and EPA's Guidelines explicitly "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Those policies are, in short, just like the land management plan in *Ohio Forestry Association* in every way that matters for ripeness analysis.

Plaintiffs' counter argument is unpersuasive. They claim that their "unequal treatment injury" and "ongoing" climate-related harm are present injuries that distinguish this case from *Ohio Forestry Association*, where harms were prospective. Pls.' Opp'n 18–21. But the first of Plaintiffs' asserted injuries is a generalized grievance, not an injury-in-fact. *Supra*, Part I. And even on Plaintiffs' theory of standing, the second asserted injury would be traceable to discounting only if discount rates formed the basis of discrete, climate-related EPA actions. Plaintiffs' insistence that this Court must review "the past 50 years of EPA rulemaking" to adjudicate their claims underscores this point. Pls.' Opp'n 21. That statement also belies Plaintiffs' claim that they are challenging discounting simpliciter, rather than Clean Air Act regulations that rely on discounting. *Id.* at 22–23. Plaintiffs cannot have it both ways, but either way they lose. If this is a challenge to discounting in the abstract, then it fails on ripeness grounds. And if this case is instead a backdoor challenge to Clean Air Act regulations that allegedly rely on discounting, then it is reviewable only in the courts of appeals (if it is reviewable at all). *See* MTD 13; 42 U.S.C. § 7607(b)(1) (providing for exclusive mandatory circuit-court review of "any" challenge to EPA final action under the Clean Air Act); *see also Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500,

506 (9th Cir. 2015) (suits that "effectively, if not facially, challenge" EPA final action under the Clean Air Act may be brought only in circuit court).

Acknowledging this legal reality would not inflict any "substantial hardship" on Plaintiffs. Pls.' Opp'n 21. They seek only prospective relief and argue that a judgment in this case will prevent EPA from relying on discounting when issuing some future GHG regulation. But if EPA ever actually did that, then Plaintiffs would "have ample opportunity later to bring [their] legal challenge" in a petition for review of EPA's action. *Ohio Forestry Ass'n*, 523 U.S. at 734. In such a rule-specific challenge, "the scope of the controversy" will have "been reduced" to "manageable proportions, and its factual components fleshed out, by some concrete action applying" discounting "in a fashion that harms or threatens to harm" Plaintiffs. *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (cleaned up). None of that is true today; Plaintiffs' "abstract disagreements over administrative policies," *id.* at 807, are unripe.

* * *

Rather than press their constitutional claims in a petition for review of EPA action, Plaintiffs chose to bring a facial challenge to a government policy or practice. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Id.* Suits "challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish," are "rarely if ever appropriate for federal-court adjudication," even "when premised on allegations of several instances of violations of law." *Allen*, 468 U.S. 759–60. Plaintiffs bear a heavy burden in demonstrating that theirs is the exceptional case. They have not come close to carrying it. The Court should again dismiss for lack of subject-matter jurisdiction, this time without leave to amend.

## IV. Plaintiffs fail to plead a cognizable equal protection claim.

If the Court were to reach the merits of the claims, it should dismiss the Amended Complaint under Rule 12(b)(6) because Plaintiffs have stated no claim for which relief could be granted.

### A. Discounting does not discriminate against children.

Plaintiffs concede that discounting does not name children as a disfavored group. Pls.' Opp'n 24. Indeed, discounting does not employ any age-based classifications or facially discriminate against children. To support their equal protection claims, Plaintiffs instead turn to cases involving laws that used neutral nondiscriminatory language to target disfavored groups. *See, e.g., Guinn v. United States*, 238 U.S. 347, 364–65 (1915) (finding a literacy test that applied only to voters whose ancestors were ineligible to vote prior to 1866 to be discriminatory because it was "based purely upon a period of time before the enactment of the 15th Amendment"); *Hecox v. Little*, 104 F.4th 1061, 1078 (9th Cir. 2024) (finding an act's specific classification of "biological sex" to be carefully drawn to target transgender women and girls). But Plaintiffs point to nothing in discounting that suggests that its use serves as a proxy to target children as a disfavored group. Instead, they offer only conclusory statements, which are afforded no weight in a Rule 12(b)(6) analysis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs have identified no action that classifies children differently from others, and their equal protection claims fail for that reason.

### B. Because they are not a suspect class, any law that classifies children would be subject to rational basis review.

Plaintiffs contend that children should be treated as a suspect class of persons needing extraordinary protection from the majoritarian political process for purposes of equal protection analysis. Pls.' Opp'n 30–33. But they point to no case that has stated that children are a suspect class. The Supreme Court has long rejected the claim that age defines a "discrete and insular group" for purposes of

equal protection analysis; old age "marks a stage that each of us will reach if we live out our normal life span." *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–314 (1976) (cleaned up). And the Ninth Circuit and other courts have consistently rejected claims that children are a suspect class. *See* MTD 14–15 (collecting cases). Thus, rational basis review applies to claims of age-based discrimination. *United States v. Flores-Villar*, 536 F.3d 990, 998 (9th Cir. 2008), *abrogated on other grounds by Sessions v. Morales-Santana*, 582 U.S. 47 (2017).

Plaintiffs respond that the Ninth Circuit's holding in *Flores-Villar*—that "age is not a suspect class"—is not binding,[2] Pls.' Opp'n 30 n.13, but they are incorrect. *Flores-Villar* addressed the constitutionality of an immigration law that treated United States citizen fathers differently depending on whether they lived in the United States for at least five years after the age of fourteen. 536 F.3d at 993. There, the Ninth Circuit applied rational basis review to governmental action that discriminated against teenagers and found the discrimination to be permissible if it had a rational basis. The case, therefore, squarely addressed the issue of age discrimination. And the holding in *Flores-Villar* accords with prior Ninth Circuit precedent rejecting the claim that children are a suspect class. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991)). Thus, as other courts in this Circuit have recognized, the holding in *Flores-Villar* (and other cases) that age is not a suspect class, remains binding precedent. *See, e.g.*, *Juliana v. United States*, 2023 WL 9023339, at *19 (D. Or. Dec. 29, 2023).

This Court, therefore, need not entertain Plaintiffs' argument that children satisfy the three factors used in identifying a suspect class. *See* Pls.' Opp'n 31–32 (arguing that children have been subjected to discrimination; that they are a

---

[2] Plaintiffs also urge the Court not to adopt the reasoning of other courts of appeals, which have similarly concluded that age is not a suspect class. Pls.' Opp'n 31.

discrete group that possesses obvious, immutable, or distinguishing characteristics; and that they are politically powerless). It bears noting, however, that the bar for recognizing a new suspect class is a high one. As one court observed nearly ten years ago, the "Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). Thus, even if the aforementioned precedent did not already foreclose Plaintiffs' argument that children are a suspect class, this Court should decline Plaintiffs' invitation to recognize children as a suspect class in this case.

Plaintiffs next contend that a *sui generis* analysis is an appropriate framework for analyzing equal protection claims brought by children. Pls.' Opp'n 26–30. They cite *Levy v. Louisiana*, 391 U.S. 68 (1968), *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164 (1972), and *Pickett v. Brown*, 462 U.S. 1 (1983), as cases that "accorded less deference to state decisions" in order to protect children's rights. Pls.' Opp'n 27. But each of those cases addressed "classifications that burden illegitimate children" rather than "children's rights" vis-à-vis adults. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Under longstanding precedent, classifications based on illegitimacy are subject to intermediate scrutiny and have been invalidated because "visiting this condemnation on the head of an infant is illogical and unjust." *Weber*, 406 U.S. at 175. The discrimination that the Supreme Court has found to be unlawful in these cases is discrimination *between* two groups of children: children of married parents and children of unmarried parents.

Plaintiffs also describe *Brown v. Board of Education* and *Plyler v. Doe*, 457 U.S. 202 (1982), as equal protection decisions specific to the rights of children. Pls.' Opp'n 1, 26, 28. But again, neither decision addressed the rights of children vis-à-vis adults. Instead, the discrimination that the Supreme Court found to be unlawful in those cases was discrimination *between* children of different races and *between* children whose parents had different legal statuses in the United States.

Indeed, as the Court in *Plyler* observed, what was at stake in those cases was more than "the abstract question of whether [a statute] discriminates against a suspect class, or whether education is a fundamental right." *Plyler*, 457 U.S. at 223. Instead, what was at stake was the denial of a basic education to some schoolchildren and, by extension, "the ability to live within the structure of our civic institutions, and . . . [to] contribute in even the smallest way to the progress of our Nation." *Id.* None of these cases supports Plaintiffs' contention that adoption of a *sui generis* analysis is authorized or warranted in this case, where Plaintiffs contend that all children face discrimination as compared to adults.[3]

Finally, there is no merit to Plaintiffs' contention that "a full factual record" is necessary for this Court to "determine and apply the proper standard of review." Pls.' Opp'n 25. First, as noted above, the standard of review in cases bringing claims of discrimination involving children is the well-established rational basis test and there is no need—or legal basis—for the Court to develop a different standard. Second, because a motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint, *N. Star Intern. v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983), it is appropriately decided without any need for the parties to develop a factual record.

**C. Discounting does not implicate fundamental rights.**

Plaintiffs have also failed to allege that any discrimination burdens a fundamental right protected by the Constitution, *i.e.*, a right that is "objectively,

---

[3] Plaintiffs also rely on *United States v. Windsor*, 570 U.S. 744, 772 (2013), which struck down the Defense of Marriage Act ("DOMA"). Pls.' Opp'n 28. The equal protection issue in that case involved "DOMA's principal effect . . . to identify a subset of state-sanctioned marriages and make them unequal . . . [and] to deprive some couples married under the laws of their State, but not other couples, of both rights and responsibilities." *Id.* The equal protection rights of children in that case, though implicated, were not fundamentally at issue.

deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (cleaned up). Plaintiffs' request that this Court recognize an implied fundamental right to a life-sustaining climate system, Am. Compl. ¶¶ 389, 400, Prayer for Relief (p. 108 ¶ 4), is without basis in the Nation's history or tradition, and courts have consistently rejected the claim that the Fifth Amendment's Due Process Clause provides an implied fundamental right to a healthy environment or climate. MTD 16–17 (collecting cases).

Faced with this uniformly adverse federal court precedent, Plaintiffs turn to cases in state and foreign courts. Pls.' Opp'n 34–35. But none of the cases that Plaintiffs cite found any right based on the United States Constitution. As much as those state and foreign courts identified any rights in connection with climate change, those rights are based on state statutes or constitutions, foreign law, or international law, none of which are implicated in this case.[4]

Plaintiffs' attempt to leverage other substantive due process rights also fails. They allege generally that the United States violated their fundamental rights to "life, personal security, bodily integrity, dignity, family autonomy, [and the]

---

[4] *See, e.g.*, *In re Hawai'i Elec. Light Co.*, 526 P.3d 329, 336 (Haw. 2023) (recognizing right to a life-sustaining climate system under state statute providing a right to a "clean and healthful environment"); *Held v. Montana*, No. CDV-2020-307 at 102 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023) (finding that provisions of the Montana Environmental Protection Act that preclude consideration of greenhouse gas emissions violate explicit rights in the Montana State Constitution), *appeal docketed*, No. 23-0575 (Mont. Oct. 2, 2023); *State of the Netherlands v. Urgenda Found.*, Hoge Raad der Nederlanden [Sup. Ct. Neth.], 20 December 2019, ECLI:NL:HR:2019:2007 (finding that the Netherlands has a positive obligation under the European Convention on Human Rights to take reasonable and suitable measures to prevent climate change); *M.K. Ranjitsinh v. Union of India*, 2024 INSC 280 (India Sup. Ct. 2024) (describing the right to a healthy environment and the right to be free from the adverse effects of climate change under the laws of India).

exercise of cultural and spiritual traditions" by allowing climate pollution to increase. Pls.' Opp'n 33–34; *see also* Am. Compl. ¶ 389. But Plaintiffs do not articulate claims based on these additional rights; these allegations instead form the foundation for Plaintiffs' asserted right to a stable climate system. *See, e.g.*, Am. Compl. ¶ 392 ("Children cannot exercise their equal rights to life without a stable climate system."). As noted above, federal courts have consistently refused to recognize an implied fundamental right to a healthy environment or climate. Even if Plaintiffs had alleged claims based on these six additional rights, the claims would fail because Plaintiffs rely on cases involving individuals held in government custody who challenged conduct that infringed their life or liberty interests. Pls.' Opp'n 33.[5]

At root, Plaintiffs contend that Defendants have not sufficiently protected them from the risks of climate pollution. But a failure to provide specific levels of safety is not a cognizable claim under the Due Process Clause, which acts as a "limitation on the State's power to act" rather than a "guarantee of certain minimal levels of safety and security." *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). None of the cases Plaintiffs cite supports the proposition that a plaintiff can state a cognizable substantive due process claim based on an administrative

---

[5] *See, e.g., Rochin v. California*, 342 U.S. 165, 173, 174 (1952) (criminal conviction overturned where it was based on evidence obtained by involuntary stomach pumping); *Winston v. Lee*, 470 U.S. 753, 761 (1985) (Fourth Amendment violation in case involving forced surgery to remove bullet from a criminal defendant for evidence); *Ingraham v. Wright*, 430 U.S. 651, 683 (1977) (Eighth Amendment cruel and unusual punishment claim based on corporal punishment in school); *Youngberg v. Romero*, 457 U.S. 307, 315 (1982) (finding developmentally disabled persons have protected liberty interests in reasonably safe conditions of confinement); *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993) (Eighth Amendment cause of action based on allegation that prison officials, with deliberate indifference, exposed inmate to tobacco smoke).

agency's alleged failure to provide guaranteed levels of safety from harms due to climate change.

**D. Plaintiffs fail to allege facts to show that discounting lacks a rational basis.**

Plaintiffs' equal protection claims could only survive review if there were no rational basis for the challenged discounting policies. Under rational basis review, a government action should be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for the action, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993), and it is the plaintiff's burden "to negative every conceivable basis which might support" a government action. *Id.* at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Plaintiffs merely allege, in conclusory fashion, that EPA and OMB discount the value of children's lives and allow dangerous levels of climate pollution, and that this is not rationally related to a legitimate government interest. Am. Compl. ¶ 383. The Amended Complaint offers no factual support for these conclusory allegations, which are afforded no weight in a Rule 12(b)(6) analysis, *Iqbal*, 556 U.S. at 678, particularly where discounting is an analytical methodology that has been the subject of peer-reviewed literature and has long been used to translate monetized future effects into present value units. And Plaintiffs have not alleged facts from which the Court could conclude that discounting lacks a rational basis. *See id*. Counts I, II, and III should be dismissed for failure to state a claim.

**V. Plaintiffs have not stated a claim under the Take Care Clause.**

Plaintiffs contend that EPA violated the Take Care Clause because it "exceeded its delegated authority." Pls.' Opp'n 36. But by that reasoning, "every action by . . . [an] executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). The Supreme Court rejected that view in *Dalton*. *See id.*

The Ninth Circuit acknowledged as much in *Sierra Club v. Trump*, 963 F.3d 874, 889–90 & n.13 (9th Cir. 2020), *vacated as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (Mem.). While the Ninth Circuit went on to conclude that an agency action "in excess of statutory authority may" also violate the Constitution if it "violates an express [constitutional] prohibition," like the one in the Appropriations Clause, that reasoning does not help Plaintiffs because the Take Care Clause contains no express prohibition.

Nor does the Take Care Clause furnish a private right of action. *See* MTD 19. Plaintiffs argue otherwise, but the district court cases that they cite, *see* Pls.' Opp'n 38, only highlight the lack of support for their position. The court in *In re Border Infrastructure Environmental Litigation* found no cases "address[ing] the application of the Take Care clause," and it therefore declined to "open the doors to an undisciplined and unguided review process for all decisions made by the Executive Department." 284 F. Supp. 3d 1092, 1139 (S.D. Cal. 2018), *aff'd*, 915 F.3d 1213 (9th Cir. 2019). And while the court in *Florida v. United States* initially found "no reason why [a Take Care Clause] claim could not be pursued," No. 3:21cv1066-TKW-EMT, 2022 WL 2431414, at *13 (N.D. Fla. May 4, 2022), it later expressed doubt that "there is even a private cause of action under the Take Care Clause" and declined to reach the merits of that claim. *Florida v. United States*, 660 F. Supp. 3d 1239, 1283 (N.D. Fla. 2023).

Plaintiffs' reliance on the major questions doctrine is similarly misplaced. Pls.' Opp'n 37–38. Courts have applied that doctrine only in "extraordinary cases" such as where a discrete agency action imposes "unprecedented" requirements on entities "that had never before been subject to such requirements," and does so based on a statutory provision that the agency "had never relied on" in "such a remarkable measure." *West Virginia v. EPA*, 597 U.S. 697, 721–22 (2022) (internal quotation marks omitted). And, in any event, courts applying the major questions doctrine do not ask whether an agency violated the Take Care Clause or

separation of powers; they ask whether the agency exceeded the scope of its authority under a "long-extant statute." *Id.* at 724 (internal quotation marks omitted). Plaintiffs' reliance on *Loper Bright*, Pls. Opp'n 37–38, is inapt for the same reason. Both *West Virginia* and *Loper Bright* addressed *statutory* interpretation. By invoking these cases, Plaintiffs underscore the statutory nature of Count IV. Because statutory claims "are not 'constitutional' claims," *Dalton*, 511 U.S. at 473, Plaintiffs fail to state a claim under the Take Care Clause and Count IV should be dismissed.

**CONCLUSION**

For the reasons explained above, the Court should again grant Defendants' motion and dismiss the Complaint, this time without leave to amend.

Dated: August 29, 2024

TODD KIM
Assistant Attorney General
United States Deparment of Justice
Environment and Natural Resources Division

/s/ Andrew S. Coghlan
ANDREW S. COGHLAN
Environmental Defense Section
SEAN C. DUFFY
Natural Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044
Ph: (202) 532-3252 (Coghlan)
Ph: (202) 305-0445 (Duffy)
andrew.coghlan@usdoj.gov
sean.c.duffy@usdoj.gov

*Attorneys for Defendants*

Of Counsel:

DANIEL CONRAD
United States Environmental
Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

DANIEL JACOBSON
General Counsel
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

**Certificate of Compliance**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,107 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 29, 2024

*/s/ Andrew S. Coghlan*
ANDREW S. COGHLAN
*Attorney for Defendants*

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... iii
INTRODUCTION .................... 1
STATEMENT OF FACTS .................... 1
LEGAL STANDARDS .................... 4
LEGAL ARGUMENT .................... 5
I. PLAINTIFFS ADEQUATELY ALLEGE ARTICLE III CASE OR CONTROVERSY STANDING UNDER EQUAL PROTECTION PRECEDENT. .................... 5
A. Plaintiffs allege a discrete injury of unequal treatment of the law, as well as physical and mental injuries, stemming from Defendants' Discounting Policies and Practices. .................... 5
B. Plaintiffs allege causation for an Equal Protection Claim. .................... 7
C. Plaintiffs' requests for relief would fully redress their injury of unequal treatment from the Policies and would be substantially likely to partially redress their prospective mental and physical injuries from the Practices. .................... 11
i. The Court should look to comparable equal protection precedent rather than *Juliana*, whose complaint is completely distinguishable from Plaintiffs' First Amended Complaint. .................... 12
ii. Declaratory and injunctive relief are typical forms of relief for discrimination claims and provide redress. .................... 14
iii. Plaintiffs allege their injury of being deprived equal protection of the law would be completely remedied by a favorable decision of the Court and are not required to show every other injury will be relieved. .................... 17
II. PLAINTIFFS' CLAIMS ARE RIPE FOR REVIEW. .................... 18
A. Plaintiffs' alleged injuries-in-fact satisfy the constitutional ripeness standard. .................... 19
B. Plaintiffs' claims are fit for judicial decision because they have demonstrated past and ongoing injury from Defendants' Discounting Policies and Practices. .................... 20

C. Plaintiffs face substantial hardship and continuing harm if this Court declines to hear their claims. .......... 21

D. Plaintiffs do not ask this Court to assume jurisdiction to review any specific EPA Clean Air Act Regulations.......... 22

III. PLAINTIFFS' AMENDED COMPLAINT STATES EQUAL PROTECTION CLAIMS UPON WHICH RELIEF CAN BE GRANTED .......... 23

A. Plaintiffs allege Defendants' facial and intentional discrimination against Children.......... 24

B. Plaintiffs allege a cognizable *sui generis* Equal Protection claim.......... 26

C. Plaintiffs also allege a cognizable adult-centric Equal Protection Claim. .......... 30

i. Plaintiffs do not ask this Court to overturn any binding precedent.. 30

ii. Plaintiffs allege that they are members of a protected class warranting heightened scrutiny. .......... 31

iii. Plaintiffs allege their fundamental rights are burdened by Defendants' facial discrimination against their group—Children.... 33

D. At minimum, this Court can find a cognizable claim even treating Children as an unprotected class with no fundamental rights. .......... 35

IV. EPA'S CONDUCT VIOLATES THE TAKE CARE CLAUSE AND CONSTITUTIONAL SEPARATION OF POWERS .......... 36

CONCLUSION.......... 38

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) .......... 12

*Alexander v. Holmes Cnty. Bd. of Educ.*,
396 U.S. 1218 (1969) .......... 12

*Alexis Bailly Vineyard, Inc. v. Harrington*,
931 F.3d 774 (8th Cir. 2019) .......... 15

*Allen v. Wright*,
468 U.S. 737 (1984) .......... 8

*Am. Civ. Liberties Union of N.M. v. Santillanes*,
546 F.3d 1313 (10th Cir. 2008) .......... 6

*Am. Elec. Power Co., Inc. v. Connecticut*,
564 U.S. 410 (2011) .......... 11, 37

*Antilles Cement Corp. v. Fortuno*,
670 F.3d 310 (1st Cir. 2012) .......... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 5

*Bacon v. Woodward*,
104 F.4th 744 (9th Cir. 2024) .......... 16

*Barnum Timber Co. v. U.S. EPA*,
633 F.3d 894 (9th Cir. 2011) .......... 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 5, 32

*Borel on behalf of AL v. Sch. Bd. Saint Martin Par.*,
44 F.4th 307 (5th Cir. 2022) .......... 12

*Bova v. City of Medford*,
564 F.3d 1093 (9th Cir. 2009) .......... 19

*Bowers v. Hardwick*,
478 U.S. 186 (1986) ........ 15

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) ........ passim

*California v. Texas*,
593 U.S. 659 (2021) ........ 16

*Citizens for Responsibility & Ethics in Washington v. Trump*,
302 F. Supp. 3d 127 (D.D.C. 2018) ........ 37

*Clark v. Jeter*,
486 U.S. 456 (1988) ........ 28

*Connecticut v. Am. Elec. Power Co., Inc.*,
582 F.3d 309 (2d Cir. 2009) ........ 11

*Consumer Data Indus. Ass'n v. King*,
678 F.3d 898 (10th Cir. 2012) ........ 15

*Cornett v. Donovan*,
51 F.3d 894 (9th Cir. 1995 ........ 14

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 36

*Davis v. Guam*,
785 F.3d 1311 (9th Cir. 2015) ........ 6

*DeBoer v. Snyder*,
772 F.3d 388 (6th Cir. 2014) ........ 25

*DeBoer v. Snyder*,
973 F. Supp. 2d 757 (E.D. Mich.) ........ 25

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
438 U.S. 59 (1978) ........ 21, 22

*Flast v. Cohen*,
392 U.S. 83 (1968) ........ 5

*Florida v. United States*,
No. 3:21CV1066, 2022 WL 2431414 (N.D. Fla. May 4, 2022) .......................... 38

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................ passim

*Gillette Co. v. '42' Prod. Ltd.*,
435 F.2d 1114 (9th Cir. 1970) ........................................................................ 5

*Gilligan v. Jamco Dev. Corp.*,
108 F.3d 246 (9th Cir. 1997) .......................................................................... 5

*Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*,
377 U.S. 218 (1964) ........................................................................................ 8

*Guinn v. United States*,
238 U.S. 347 (1915) ...................................................................................... 24

*Hardwick v. Bowers*,
760 F.2d 1202 (11th Cir. 1985) .................................................................... 15

*Harrison v. Kernan*,
971 F.3d 1069 (9th Cir. 2020) .................................................................... 6, 8

*Hassan v. City of New York*,
804 F.3d 277, 289 (3d Cir. 2015 ................................................................ 6, 11

*Heckler v. Mathews*,
465 U.S. 728 (1984 ...................................................................................... 6, 8

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024) ................................................................. 10, 24

*Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*,
386 F.3d 1148 (D.C. Cir. 2004) ................................................................ 31, 35

*Held v. Montana*,
CDV-2020-307, Findings of Fact, Conclusions of Law, and Order
(Mont. 1st Jud. Dist. Ct. Aug. 14, 2023) ....................................................... 34

*Helling v. McKinney*,
509 U.S. 25 (1993) ........................................................................................ 33

*Hills v. Gautreaux*,
425 U.S. 284 (1976) .......... 16, 17

*In re Border Infrastructure Env't Litig.*,
284 F. Supp. 3d 1092 (S.D. Cal. 2018) .......... 38

*In re Gault*,
387 U.S. 1 (1967) .......... 26

*Ingraham v. Wright*,
430 U.S. 651 (1977) .......... 33

*Inhabitants of La Oroya v. Peru*,
Inter-Am Ct. H.R. (ser. C) No. 511, Judgment (Nov. 27, 2023) .......... 35

*Juliana v. United States*,
217 F. Supp. 3d 1224 (D. Or. 2016) .......... 34

*Juliana v. United States*,
339 F. Supp. 3d 1062 (D. Or. 2018) .......... 13

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .......... 13, 14, 17, 34

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) .......... 24

*Khodara Env't, Inc. v. Blakey*,
376 F.3d 187 (3d Cir. 2004) .......... 15

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 17

*Levy v. Louisiana*,
391 U.S. 68 (1968) .......... 1, 27, 28, 29

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) .......... 15, 37, 38

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) .......... 9

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 4

*Lutheran Church–Missouri Synod v. FCC*,
154 F.3d 487 (D.C. Cir. 1998) ........ 6

*Lyng v. Castillo*,
477 U.S. 635 (1986) ........ 31

*M.K. Ranjitsinh v. Union of India*,
2024 INSC 280 (India Sup. Ct. 2024) ........ 35

*Massachusetts Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) ........ 30

*Matter of Hawai'i Elec. Light Co., Inc.*,
526 P.3d 329 (Haw. 2023) ........ 34

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ........ 4

*Meese v. Keene*,
481 U.S. 465 (1987) ........ 17

*Meland v. Weber*,
2 F.4th 838 (9th Cir. 2021) ........ 19

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........ 16, 17

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ........ 33

*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) ........ 15, 32

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ........ 36

*Missouri v. Biden*,
52 F.4th 362 (8th Cir. 2022) ........ 9

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ........ 20

*Navahine v. Hawai'i Dep't of Transp.*,
No. 1CCV-22-0000631, Joint Stipulation and Order re: Settlement
(Haw. 1st Circ. Ct. June 20, 2024) ........ 34

*Navahine v. Hawai'i Dep't of Transp.*,
No. 1CCV-22-0000631, Order Denying Defs.' MTD
(Haw. 1st Circ. Ct. Apr. 19, 2023) (same) ........ 34

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993) ........ 6

*Nielsen v. Thornell*,
101 F.4th 1164 (9th Cir. 2024) ........ 29

*Nunez by Nunez v. City of San Diego*,
114 F.3d 935 (9th Cir. 1997) ........ 33

*Nyquist v. Mauclet*,
432 U.S. 1 (1977) ........ 32

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ........ 1, 25, 33

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ........ 20, 21, 22

*Orr v. Orr*,
440 U.S. 268 (1979) ........ 10, 18

*Parsons v. U.S. Dep't of Just.*,
801 F.3d 701 (6th Cir. 2015) ........ 15

*Peyote Way Church of God, Inc. v. Thornburgh*,
922 F.2d 1210 (5th Cir.1991) ........ 6

*Pickett v. Brown*,
462 U.S. 1 (1983) ........ 28

*Planned Parenthood of S.C. Inc. v. Rose*,
361 F.3d 786 (4th Cir. 2004) .................... 6, 15

*Plyler v. Doe*,
457 U.S. 202 (1982).................... passim

*Powell v. Alabama*,
287 U.S. 45 (1932).................... 27

*Quinn v. Millsap*,
491 U.S. 95 (1989).................... 7

*Reeves v. Nago*,
535 F. Supp. 3d 943 (D. Haw. 2021) .................... 17

*Rochin v. California*,
342 U.S. 165 (1952).................... 33

*Romer v. Evans*,
517 U.S. 620 (1996).................... 31, 35, 36

*Roper v. Simmons*,
543 U.S. 551 (2005).................... 31

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004).................... 4

*Safford Unified Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009).................... 32

*Schnitzler v. United States*,
761 F.3d 33 (D.C. Cir. 2014) .................... 15

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017).................... 30

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020).................... 36

*Skinner v. Oklahoma*,
316 U.S. 535 (1942).................... 22

*Skyline Wesleyan Church v. California Dep't of Managed Health Care*,
968 F.3d 738 (9th Cir. 2020) .... 19, 20

*Slockish v. U.S. Dep't of Transp.*,
No. 21-35220, 2021 WL 5507413 (9th Cir. Nov. 24, 2021) .... 17

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .... 18

*United States v. Carolene Prod. Co.*,
304 U.S. 144 (1938) .... 28

*United States v. Flores-Villar*,
536 F.3d 990 (9th Cir. 2008) .... 30

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) .... 23

*United States v. Texas*,
579 U.S. 547 (2016) .... 38

*United States v. Windsor*,
570 U.S. 744 (2013) .... 28

*Urgenda Foundation v. Netherlands*,
No. 19/00135, Judgment (Neth. Sup. Ct. Dec. 20, 2019) .... 35

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .... 23

*Warth v. Seldin*,
422 U.S. 490 (1975) .... 5

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .... 34

*Washington v. Harper*,
494 U.S. 210 (1990) .... 33

*Weber v. Aetna Cas. & Sur. Co.*,
406 U.S. 164 (1972) .... 27, 28, 29, 33

*West Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ... 27

*West Virginia v. EPA*,
597 U.S. 697 (2022) ... 37

*Williams v. Lambert*,
46 F.3d 1275 (2d Cir. 1995) ... 14

*Winston v. Lee*,
470 U.S. 753 (1985) ... 33

*Youngberg v. Romeo*,
457 U.S. 307, 315 (1982) ... 33

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579, 587–88 (1952) ... 36

**Constitutional Provisions**

U.S. Const. amend. V ... 33

U.S. Const. amend. XIV ... 7

U.S. Const. art. II, § 3 ... 36

**Rules**

Fed. R. Civ. P. 12(b)(1) ... 4

Fed. R. Civ. P. 12(b)(6) ... 5

**Other Authorities**

Anne C. Dailey & Laura A. Rosenbury, *The New Parental Rights*, 71 Duke L.J. 75 (2021) ... 26

Anne C. Dailey, *Developing Citizens*, 91 Iowa L. Rev. 431 (2006) ... 29

Barbara Bennett Woodhouse, *The Courage of Innocence: Children as Heroes in the Struggle for Justice*, 2009 U. Ill. L. Rev. 1567 (2009) ... 26

Catherine E. Smith, *"Children's Equality Law" in the Age of Parents' Rights*, 71 Kan. L. Rev. 539 (2023) ... 29

Catherine E. Smith, Brown*'s Children's Rights Jurisprudence and How it Was Lost*, 102 B.U. L. Rev. 2297 (2022) .......... 26, 27

Elizabeth G. Porter, *Tort Liability in the Age of the Helicopter Parent*, 64 Ala. L. Rev. 533 (2013) .......... 26

*Gautreaux v. Chicago Hous. Auth.*, No. 66C1459, Compl. (N.D. Ill. Aug. 9, 1966) .......... 16

Hiroharu Saito, *Equal Protection for Children: Toward the Childist Legal Studies*, 50 N.M. L. Rev. 235 (2020) .......... 32

Lawrence C. Nolan, *"Unwed Children" and Their Parents Before the United States Supreme Court from* Levy *to* Michael H.*: Unlikely Participants in Constitutional Jurisprudence*, 28 Cap. U. L. Rev. 1 (1999) .......... 28

*Melendres v. Arpaio*, No. 07-02513, First Am. Compl. (D. Ariz. July 16, 2008) .......... 17

Steven Mintz, *Huck's Raft, A History of American Childhood* (2004) .......... 26

## INTRODUCTION

This is a discrimination case. EPA intentionally discounts Children's lives in comparison to adults' and sanctions climate pollution in law knowing that young people bear its greatest costs now and into the future. Unlike child labor laws and other youth-protective policies, EPA does not treat this disenfranchised and politically powerless group of people differently to explicitly protect them from harm; EPA treats Children differently to minimize climate pollution's true costs to society and justify the nation's continued reliance on fossil fuels. These claims may be a jarring revelation, however, "new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015). To treat this case—procedurally or substantively—as anything other than a discrimination case is to deny Children their equal protection of laws enshrined in the Constitution. For over a century, courts have heard novel equal protection claims based on historical and scientific evidentiary records, including landmark cases that vindicated Children's rights. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954); *Levy v. Louisiana*, 391 U.S. 68 (1968); *Plyler v. Doe*, 457 U.S. 202 (1982). Yet these decisions and the evolution of Children's rights are often obscured because the law centers adults. Plaintiffs ask this Court to center Children in its analysis, apply long-standing equal protection principles eschewing government action that imposes irreparable lifetime hardship upon a class of people because of their group membership, and deny Defendants' Motion to Dismiss.

## STATEMENT OF FACTS

Plaintiffs are 18 Children. First Am. Compl. ("FAC") ¶¶ 31–104. As Children, Plaintiffs are directly discriminated against by Defendants' Discounting Policies. *Id.* ¶¶ 151, 159–161. The discrimination itself is an injury. *Id.* ¶¶ 108–11; Avroh Decl. ¶¶ 28–30; Noah Decl. ¶¶ 10–12; Maryam Decl. ¶¶ 19–20; Declaration of Child

Psychiatrist and Pediatrician, Dr. Elizabeth Pinsky ("Pinsky Decl.") ¶¶ 13–16; Declaration of Nobel Laureate Economist, Dr. Joseph Stiglitz ("Stiglitz Decl.") ¶¶ 6–7; Declaration of Economics Sociologist, Dr. Liliana Doganova ("Doganova Decl.") ¶ 15. Defendants' discriminatory Policies have contributed to and will continue to contribute to additional injuries to Plaintiffs' physical and mental health. *See, e.g.*, FAC ¶¶ 107, 3, 5, 31–106, 124, 152, 197, 264, 274, 285, 303, 308, 314, 319–23, 329–31, 348, 352, 379; Avroh Decl. ¶¶ 28–30; Noah Decl. ¶¶ 10–12; Maryam Decl. ¶¶ 19–20; Pinsky Decl. ¶¶ 3–18; Stiglitz Decl. ¶¶ 6–7, 22–27. Those Discounting Policies are in Circular A-4 and the EPA Guidelines for Preparing Economic Analyses. FAC ¶ 133. The EPA Guidelines direct EPA that "[b]enefits and costs that occur over time must be properly and consistently discounted if any comparisons between them are to be legitimate." *Id.* ¶ 132. "[I]t is equally important to properly discount cost estimates of different regulatory approaches to facilitate valid comparisons." *Id*. OMB Circular A-4 directs agencies, including EPA, to "select those [regulatory] approaches that maximize net benefits" and that "[a]ll future effects, regardless of what form they take (*e.g.*, changes to consumption, health, environmental amenities, etc.), should be discounted to reflect changes in valuation of impacts across time." *Id*. ¶¶ 135, 137. Federal policy discounts the value of controlling pollution whose benefits, and correlating costs of not controlling pollution, most accrue to Children. FAC ¶¶ 137–40, 142, 159, 357; Stiglitz Decl. ¶¶ 6–7; Doganova Decl. ¶¶ 6–7.

EPA follows these Discounting Policies using discount rates of 3% and 7% to evaluate benefits of its regulatory programs through its Regulatory Impact Analyses ("RIAs") and benefit cost analysis ("BCAs" or "CBAs"). FAC ¶¶ 134, 143, 160–200; Doganova Decl. ¶¶ 11–12. The revised Circular A-4 sets a new required standard discount rate of 2%, which takes effect in 2025. FAC ¶ 144. Even small discount rates greatly affect the outcome of a BCA because discount rates compound

every year. *Id.* ¶ 153; Stiglitz Decl. ¶¶ 8–11; Doganova Decl. ¶ 5. For example, evaluating how much a climate-pollution-control measure taken today will benefit Children 30 years from now, a discount rate of 2% ignores (discounts) 45% of the benefit that would exist in 30 years' time—and a discount rate of 7% ignores 89% of the benefit. FAC ¶ 154; Stiglitz Decl. ¶¶ 9–11; Doganova Decl. ¶ 5. Thus, in using positive discount rates, as a matter of policy, EPA systematically places a lesser economic value on the benefit of reducing climate pollution for Children than for adults. FAC ¶¶ 151–160; Stiglitz Decl. ¶¶ 13–14, 18–19; Doganova Decl. ¶¶ 5–7. The resulting regulatory programs create discriminatory levels of climate pollution and a lifetime of hardship for Children. FAC ¶¶ 6, 130–35, 231–32, 259, 323, 329–34, 339, 366–68, 374. EPA's discounting is intended to, and does, affect its regulatory programs. FAC ¶¶ 130–40, 162; Stiglitz Decl. ¶¶ 7–14, 28; Doganova Decl. ¶¶ 11–13.

EPA is the U.S. agency with exclusive authority to protect the air from climate pollution within U.S. territories. FAC ¶ 217. For over 40 years, EPA has known climate pollution destabilizes the climate and causes catastrophic changes to the habitability of the Nation for generations of Children, including Plaintiffs. *Id.* ¶¶ 207, 212. By the early 1980s, EPA also knew it had only a few decades to avoid those catastrophic changes. *Id.* ¶¶ 207–09, 211–12. EPA knows each increment of climate pollution will worsen current climate conditions for Children. *Id.* ¶¶ 220, 222, 224, 240, 245, 349. Likewise, for over 100 years, Defendant the United States has known environmental degradation would burden Children. *Id.* ¶ 249. EPA admits a "scientific understanding that children may be at greater risk to environmental contaminants than adults due to differences in behavior and biology and that the effects of early life exposures may also arise in adulthood or in later generations." *Id.* ¶ 254; Pinsky Decl. ¶¶ 4, 9–15. EPA admits "Children are uniquely vulnerable to

climate change" and "[c]limate impacts experienced during childhood can have lifelong consequences." FAC ¶ 259; Pinsky Decl. ¶¶ 3–18.

Children-centric reductions in climate pollution will help restore Earth's energy balance in Plaintiffs' lifetimes and stave off more heat and harm. FAC ¶¶ 337, 346–47. Every increment of additional pollution and heating causes more harm to Children, including Plaintiffs. *Id.* ¶¶ 339, 348; Pinsky Decl. ¶¶ 3–7, 17. Conversely, EPA's current regulatory trajectory, carried out through its Discounting Policies, will foreclose the possibility of restoring Earth's energy balance in Plaintiffs' lifetimes. FAC ¶ 337.

## LEGAL STANDARDS

**Article III Case or Controversy Standing**: In a facial challenge to standing under Fed. R. Civ. P. 12(b)(1), the Court must "accept as true all material allegations" and "construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). At the pleading stage, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Where there is a factual challenge to jurisdiction, parties may submit evidence without converting the motion to one for summary judgment. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038–39 (9th Cir. 2004).

Plaintiffs must establish at least one person has standing by alleging: (1) they have "suffered or likely will suffer an injury in fact"; (2) "that the injury likely was caused or will be caused by the defendant"; and (3) is likely to be at least partially redressed by "the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.* ("*FDA*"), 602 U.S. 367, 380 (2024).

A complaint for declaratory judgment sufficiently alleges a "controversy" if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment." *Gillette Co. v. '42' Prod. Ltd.*, 435 F.2d 1114, 1118–19 (9th Cir. 1970) (citation omitted).

**Failure to State a Claim**: To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" and allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This Court need not find Plaintiffs will ultimately prevail. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

## LEGAL ARGUMENT

### I. PLAINTIFFS ADEQUATELY ALLEGE ARTICLE III CASE OR CONTROVERSY STANDING UNDER EQUAL PROTECTION PRECEDENT.

Article III standing under the Constitution does not depend on the merits of the claim. *See, e.g.*, *Flast v. Cohen*, 392 U.S. 83, 99 (1968). Yet standing "often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). The standing analysis for an equal protection claim looks different than for a statutory claim. Under Article III precedent, this Court may easily find standing properly alleged, and supported by declarations, for Plaintiffs' direct, unequal treatment by Defendants through their Discounting Policies and Practices, which may be redressed both by declaring them unconstitutional and enjoining them. Separate allegations and declarations on physical and mental harm are additional bases for standing.

#### A. Plaintiffs allege a discrete injury of unequal treatment of the law, as well as physical and mental injuries, stemming from Defendants' Discounting Policies and Practices.

Impermissible unequal treatment is a discrete injury because it stigmatizes the disfavored group and creates barriers to benefits accessible to the favored groups.

*Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

Ninth Circuit precedent is unequivocal: "[E]qual treatment under law is a judicially cognizable interest that satisfies the case or controversy requirement of Article III, even if it brings no tangible benefit to the party asserting it." *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015); *Harrison v. Kernan*, 971 F.3d 1069, 1072–74 (9th Cir. 2020) (finding standing where imprisoned male challenged prison policies offering different products for purchase to imprisoned females even if remedy produced no tangible benefit). Sister Circuits concur that "the claim that the litigant was denied equal treatment is sufficient to constitute Article III 'injury in-fact,'" and can be redressed by mandating equal treatment. *Lutheran Church–Missouri Synod v. FCC*, 154 F.3d 487, 493 (D.C. Cir. 1998); *see, e.g.*, *Am. Civ. Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1214 n.2 (5th Cir.1991); *Hassan v. City of New York*, 804 F.3d 277, 289, 294 (3d Cir. 2015); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004).

Plaintiffs' first injury is that Defendants' Discounting Policies and Practices "devalue the benefit to Children of controlling climate pollution, and undervalue[e] the hardship EPA's regulatory programs will have on Children in the coming decades." FAC ¶¶ 108, 122, 2; Avroh Decl. ¶¶ 28–30; Stiglitz Decl. ¶¶ 7–14; Doganova Decl. ¶¶ 5–8. Plaintiffs are disfavored by Defendants' Discounting Policies and Practices, whose unequal treatment impose "barriers to Children's health, natural development, and opportunity for a livable future" as well as their ability to avoid "irreversible climate tipping points that would leave Plaintiffs no recourse to restore Earth's energy balance." FAC ¶¶ 108, 112, 350–51; Avroh Decl.

¶¶ 28–30; Stiglitz Decl. ¶¶ 18–20, 29; Doganova Decl. ¶¶ 15–16; Pinsky Decl. ¶¶ 9–13. These allegations suffice under Article III to plead Plaintiffs' constitutional injury of being denied equal protection as caused by Defendants. The declarations provide proof. Notably, Defendants ignore this unequal treatment injury in their standing argument seeking dismissal, and incorrectly state, "Plaintiffs do not claim harm from discounting itself." MTD at 1. Further, Defendants do not argue Plaintiffs are not injured by discounting and do not contest that discounting is discriminatory; Defendants' questioning whether discounting *may* cause harm is a question for the merits. MTD at 7–9.

In addition to the unequal treatment injury, Plaintiffs also allege facts of the physical and mental discriminatory effects they have sustained, which will worsen if the Policies and Practices continue, and which could be partially avoided if the barrier of Defendants' discrimination is eliminated. *See* FAC ¶¶ 31–112, 162, 197, 248, 348–49; Pinsky Decl. ¶¶ 17–19; *supra*, Statement of Facts.

**B. Plaintiffs allege causation for an Equal Protection Claim.**

Equal protection claims, particularly facial challenges like the one here, look at past and ongoing discrimination in government policies and practices to determine if a declaratory judgment action has "the essentials of an adversary proceeding, involving a real, not a hypothetical, controversy." *See Quinn v. Millsap*, 491 U.S. 95, 102–04 (1989) (declining to dismiss on standing and issuing declaratory judgment with no further relief on the facial unconstitutionality of Missouri's requirement that only allowed property owners to be appointed to a government board, after the board had already been appointed, in violation of equal protection clause). Inherent in any alleged equal protection claim is causation by government actors, because unequal treatment is "of the laws." U.S. Const. amend. XIV. Thus, causation standing

analysis is typically absent in the equal protection context. *See Heckler*, 465 U.S. at 739–40; *Harrison*, 971 F.3d at 1073–74.

Applying a statutory claim-style causation analysis in an equal protection claim would foster discriminatory end-runs around equal protection prohibitions and lead to absurd results because of the ways in which intentional, systemic, and implicit discrimination operates. *See, e.g.*, *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218 (1964). In *Griffin,* parents challenged the county's discriminatory economic decision not to levy school taxes and instead close public schools and send funds to private schools rather than desegregate public schools. *Id.* at 221. The Supreme Court held such government action violated the Equal Protection Clause notwithstanding the fact that the county's decision to shutter public schools was only one of many factors preventing children from attending an integrated school. *Id*. The ruling avoided the absurd result of allowing unconstitutional government policies and conduct to stand because of multiple factors in a plaintiff's harm. The Supreme Court has recognized as much, distinguishing statutory cases from constitutional cases brought under the Equal Protection Clause. *Allen v. Wright*, 468 U.S. 737, 762 (1984) (abrogated on other grounds) (reasoning that in equal protection cases, rather than statutory cases, plaintiffs allege "they were personally being denied equal treatment" so there is "no problem of attenuated causation."). Analyzing standing outside of the equal protection context, *where unequal treatment of the law is the injury*, would upend both Article III and the Equal Protection Clause.

It is no surprise Defendants cannot cite one equal protection case that was dismissed on causation grounds. Instead, Defendants focus on statutory cases, which do not conform with the standing analysis the Supreme Court employs in equal protection analyses. *See* MTD at 7–9. For instance, in *FDA*, which was not an equal protection case, the Supreme Court denied standing (and causation), holding that

even if the changes to the FDA policies on mifepristone use would "cause more pregnant women to require emergency abortions," "federal conscience laws definitively protect doctors from being required to perform abortions or to provide other treatment that violates their consciences." 602 U.S at 386–87. Here, Plaintiffs are not "definitively protected" from unequal treatment in Defendants' Policies and Practices. The converse is true.

The cases cited by Defendants underscore the folly of conducting a standing analysis divorced of the context of an equal protection claim. The Fifth and Eighth Circuits dismissed APA challenges by states to the interim social cost of carbon greenhouse gas estimates in the *Draft* Circular A-4 because the states pled "possible future" sovereign injuries, economic injuries, and procedural injuries, which were insufficient to establish standing. *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022) (noting States' hypothetical claims of injury "if" social cost of carbon interim estimates are used in future regulations); *Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) ("Plaintiffs rely on harms wrought by regulations that *may* result from the Interim Estimates."). Unlike State plaintiffs there, here, Plaintiffs allege facially discriminatory Policies and Practices already decades in operation, as well as concrete and ongoing individual mental and physical injuries. FAC ¶¶ 57–61, 67–68, 106–07, 139–41, 163–64, 344, 399.

Further, Defendants' conclusory factual arguments, with no supporting evidence, about whether Defendants' discriminatory Policies and Practices cause Plaintiffs' climate injuries, do not belong in an equal protection standing analysis or a motion to dismiss. MTD at 1 ("Monetized, discounted future benefits may or may not weigh in the balance," "in determining whether and how to regulate."); 9 ("EPA's regulatory decisions under the Clean Air Act need not, and often do not, reflect *any* reliance on RIA benefit-cost analyses that include discounted monetized future benefits."); 14 ("may or may not"). These "may or may not" assertions illuminate

the controversy between the parties and the need for discovery and presentation of evidence to the Court. Indeed, these types of factual disputes are routinely analyzed on the merits of Equal Protection claims in evidentiary proceedings. *See Hecox v. Little*, 104 F.4th 1061, 1076–77 (9th Cir. 2024) (holding statute that discriminated against trans-female athletes had both discriminatory purpose and was facially discriminatory, based on preliminary injunction evidentiary hearing).

Defendants' factual contention, summarized in their words, are that "[d]iscount rates—one potential input among many in regulatory decision-making—do not dictate any particular regulatory outcomes." MTD at 12. The Supreme Court has rejected the argument that a discriminatory policy must be the sole cause of the harm to plaintiffs. *See Orr v. Orr*, 440 U.S. 268 (1979). In *Orr*, a divorcing husband challenged an Alabama statute because of differential alimony treatment based on gender. *Id*. at 270. Ultimately, standing did not turn on whether the husband would have to pay alimony were it not for the discriminatory input of gender in the alimony analysis. Instead, standing turned on whether the husband "bears a burden he would not bear were he female." *Id*. at 273. Likewise, this Court can ask whether Plaintiffs, as Children, have alleged they bear a burden Plaintiffs would not bear were they adults.

Plaintiffs meet their Article III causation burden based on injury of unequal treatment alone, from Defendants' discriminatory Discounting Policies and Practices. FAC ¶¶ 108–09, 122; Avroh Decl. ¶¶ 28–30; Maryam Decl. ¶¶ 19–20; Noah Decl. ¶¶ 10–12. Plaintiffs also adequately allege Defendants' Discounting Policies and Practices have resulted in and continue to result in increasing climate pollution, which disproportionately affects their mental and physical injuries. FAC ¶¶ 108–09, 118, 121, 130–35, 147–48, 151, 162, 197–200, 231–32, 238–41, 247, 260, 290–96, 320, 348; Doganova Decl. ¶¶ 15–16; Stiglitz Decl. ¶¶ 12–14, 20–27. Plaintiffs have experienced harm from climate pollution authorized by EPA,

continue to experience harm, and face future harms from EPA's discriminatory regulation of climate pollution that unequally burdens Children. FAC ¶¶ 31–108. There is no basis for dismissal on causation grounds. At this stage, those allegations suffice, and Plaintiffs should have the opportunity to present evidence on Defendants' contributions to their mental and physical injuries on the merits. *See Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 347 (2d Cir. 2009) (causation in climate change cases is "best left to the rigors of evidentiary proof . . . rather than dispensed with as a threshold question of constitutional standing"); *rev'd on other grounds*, 564 U.S. 410 (2011).

### C. Plaintiffs' requests for relief would fully redress their injury of unequal treatment from the Policies and would be substantially likely to partially redress their prospective mental and physical injuries from the Practices.

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA*, 602 U.S at 380. Courts routinely review claims of impermissible unequal treatment, because the constitutional injury will be redressed by government ceasing the discrimination. Still, courts acknowledge the collateral injuries stemming from discrimination may not be fully redressed with a favorable decision. *See Hassan*, 804 F.3d at 293 (distinguishing between "primary injury" of discrimination and the discriminatory impacts). Ultimately, the injuries stemming from the discrimination inform the type of relief the Court grants. *Id*. Take *Brown*, where the Supreme Court identified first the constitutional injury of discrimination and then the injury that resulted from the effects of the discrimination—"[s]egregation with the sanction of law, therefore, has a tendency to (retard) the educational and mental development of Negro children." 347 U.S. at 494. While the Court held state-sanctioned segregation in schools unconstitutional, the decision did not, and could not on its own remedy state-sanctioned segregation

and its effects. In fact, at the time of the decision, state-sanctioned segregation still existed in many consequential forms and would take decades before being fully deemed unconstitutional by the Supreme Court. *See, e.g.*, *Alexander v. Holmes Cnty. Bd. of Educ*., 396 U.S. 1218 (1969) (noting that 15 years after *Brown*, many school systems in the country were divided into "Negro" and "white" schools so "all deliberate speed" could no longer be the standard); *Adickes v. S. H. Kress & Co*., 398 U.S. 144 (1970) (white school teacher denied service and arrested when she entered a restaurant with six young black people). Students today continue to seek enforcement of desegregation orders. *See, e.g.*, *Borel on behalf of AL v. Sch. Bd. Saint Martin Par.*, 44 F.4th 307 (5th Cir. 2022). That is not to say *Brown*'s declaratory judgment did not matter. The decision crucially outlawed state-sanctioned discrimination, which acted as the impenetrable barrier to those children plaintiffs getting *any* relief from the social, economic, educational, and psychological injuries from racial segregation. With the impenetrable policy removed, Children had a fighting chance at equal integrated education. That the work is not yet done, has setbacks, and faces other socio-economic hurdles, does not deprive young students of standing to vindicate equal protection rights.

**i. The Court should look to comparable equal protection precedent rather than *Juliana*, whose complaint is completely distinguishable from Plaintiffs' First Amended Complaint.**

*Juliana*'s 2020 standing decision is not "on all fours"[1] here because the *Genesis First Amended Complaint* and the *Juliana First Amended Complaint*:

- **Have different claims for relief**: Equal Protection and Take Care Clause v. Substantive Due Process;

[1] ECF No. 50 at 5. This Court's May 8, 2024 Order Granting Defendants' Motion to Dismiss reliance on *Juliana* can be distinguished based on Plaintiffs' FAC and the analysis herein.

- **Challenge different government conduct**: Specific Discounting Policies and Practices v. National Fossil Fuel Energy System;
- **Sue different defendants**: EPA and OMB v. 12 federal entities; and
- **Seek different relief**: Declare unconstitutional and enjoin specific Policies and Practices v. government-wide remedial plan injunction and broader declarations.

Significantly, the *Juliana* court did not conduct *any* standing analysis regarding injury from the denial of equal protection of the law. Unlike Plaintiffs' FAC, the claims in *Juliana* focused on substantive due process, rather than equal protection rights. *Juliana v. United States*, 947 F.3d 1159, 1169 (9th Cir. 2020) ("[T]heir sole claim is that the government has deprived them of a substantive constitutional right to a 'climate system capable of sustaining human life,' and they seek remedial declaratory and injunctive relief."), 1165 (recounting lower court's dismissal of all aspects of the equal protection claims, except those based on the fundamental rights theory); *Juliana v. United States*, 339 F. Supp. 3d 1062, 1103 (D. Or. 2018) ("age" is not a suspect class). *Juliana* did not challenge any specific discriminatory policy as facially unconstitutional and brought no Take Care Clause claim. Olson Decl. ¶ 3. Here, Plaintiffs do not bring a substantive due process claim.

Besides the different claims for relief, *Juliana* is also based on different government conduct and causation, namely the federal fossil fuel energy system. *Id*. While EPA and the Director of OMB were named defendants, the *Juliana* plaintiffs did not challenge OMB's and EPA's Discounting Policies and Practices in their complaint. *Id*.

The *Juliana* plaintiffs also requested different relief than what is sought here. Plaintiffs there sought broader injunctive and different declaratory relief, while Plaintiffs here seek specific declaratory judgment regarding Defendants' Discounting Policies and Practices and narrow corresponding injunctive relief. FAC,

Request for Relief; *Juliana*, 947 F.3d at 1170 ("The crux of the plaintiffs' requested remedy is an injunction requiring the government not only to cease permitting, authorizing, and subsidizing fossil fuel use, but also to prepare a plan subject to judicial approval to draw down harmful emissions."). Moreover, the paragraph on declaratory relief in *Juliana* should be interpreted in the context in which it was written, which was divorced from the standard of the Declaratory Judgment Act in an Equal Protection case and based on the court's understanding of the facts that Plaintiffs' injuries were global climate change writ large and that the relief they would obtain through a declaration was "psychological benefit." Declaration of Remedies Expert, Dr. Andrew Bradt ("Bradt Decl.") ¶¶ 9–10. This Court can rely on the original history and purpose of the Declaratory Judgment Act, longstanding Supreme Court and Ninth Circuit precedent, and over seventy years of Equal Protection declaratory judgments, which the single paragraph in *Juliana* did not undo. *Infra* at III.B.; Bradt Decl.

To hitch this case to *Juliana*'s redressability ruling, absent an Equal Protection standing analysis, would mean that any unequal government policy or practice involving climate pollution is immune from constitutional review—even if it implicates a violation of the Equal Protection Clause. This Court should base its decision in the ample Equal Protection standing precedent, and distinguish *Juliana*, which never addressed standing in this context.

**ii. Declaratory and injunctive relief are typical forms of relief for discrimination claims and provide redress.**

Declaratory relief alone redresses constitutional violations. *Cornett v. Donovan*, 51 F.3d 894, 897 (9th Cir. 1995);[2] *see generally* Bradt Decl. (recounting

[2] Virtually all sister circuits agree. *See, e.g.*, *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310 (1st Cir. 2012); *Williams v. Lambert*, 46 F.3d 1275, 1280 (2d Cir. 1995);

declaratory judgment history). The Supreme Court recently reaffirmed the solemn duty of the judiciary in rendering judgments on interpretation of the law:

> The Framers also envisioned that the final "interpretation of the laws" would be "the proper and peculiar province of the courts." Unlike the political branches, the courts would by design exercise "neither Force nor Will, but merely judgment."
>
> And in the following decades, the Court understood "interpret[ing] the laws, in the last resort," to be a "solemn duty" of the Judiciary.

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024) (citations omitted). The supremacy of the Constitution "demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied." *Id.* at 2259 (citation omitted). If the Court dismisses Plaintiffs' constitutional claims and thereby denies declaratory judgment, the result would be *de facto* deference to Defendants' interpretation of the constitutionality and discriminatory effect (or lack thereof) of their Discounting Policies and Practices. Defendants' ongoing Policies and Practices would go unchecked and the controversies over constitutional rights of the Plaintiffs would go without interpretation and judicial resolution, contrary to *Loper Bright*. FAC ¶¶ 21–23 (stating live controversies). Even as *Chevron* statutory interpretation "deference" has been newly eliminated, constitutional interpretation has *never* been left to agencies. *Loper Bright*, 144 S. Ct. at 2247.

Additionally, Plaintiffs request Defendants' Discriminatory Policies and Practices be enjoined, which suffices for redressability as well. FAC ¶¶ 25–28,

---

*Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 194 (3d Cir. 2004); *Miller v. Brown*, 462 F.3d 312, 318 (4th Cir. 2006); *Planned Parenthood Ass'n of Chicago Area v. Kempiners*, 700 F.2d 1115, 1120 (7th Cir. 1983); *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 780 (8th Cir. 2019); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012); *Hardwick v. Bowers*, 760 F.2d 1202, 1206 (11th Cir. 1985), *rev'd on other grounds*, 478 U.S. 186 (1986); *Schnitzler v. United States*, 761 F.3d 33, 41 (D.C. Cir. 2014); *see also Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 716 (6th Cir. 2015).

Prayer for Relief; *FDA*, 602 U.S. at 381, 385 ("If a defendant's action causes an injury, enjoining the action [ ] will typically redress that injury."); *Bacon v. Woodward*, 104 F.4th 744, 750 (9th Cir. 2024) ("prospective injunctive relief" seeking "to alter [ ] the status quo" redresses a live controversy). At minimum, enjoining the Discriminatory Policies and Practices will stop that unequal treatment of Children in EPA's regulatory programs. FAC ¶¶ 24–25, 108, 159–61. Contrary to Defendants' views, *California v. Texas* did not reverse the last century's redressability analysis for declaratory judgments. 593 U.S. 659, 673–74 (2021) (declaring unconstitutional an unenforceable, inoperable provision of the Affordable Care Act that threatened no harm, would do nothing to change the status quo and would constitute mere advice). In contrast, here, the Discounting Policies are operable, actively being followed by EPA, resulting in both unequal treatment of Children and mental and physical harm, posing a live controversy. *Supra* Statement of Facts.

These remedies for equal protection violations have been recognized by both the Supreme Court and the Ninth Circuit. *See, e.g.*, *Hills v. Gautreaux*, 425 U.S. 284 (1976). In *Gautreaux*, the Supreme Court recognized injunctive and declaratory relief against a housing authority that was systemically segregating housing by race. *Id.* at 289–91; *see* Olson Decl. Ex. 1 (*Gautreaux* Complaint at 2, 14, 17, 19, 21–22 (requesting declarations that "defendants have been and are carrying on a racially discriminatory public housing system within the City of Chicago, Illinois" in violation of Fourteenth Amendment, and to enjoin "defendants from . . . carrying on and perpetuating the racially discriminatory aspects of their public housing system within the City of Chicago")).

Similarly, the Ninth Circuit affirmed injunctive and declaratory relief against a police agency engaged in systemically discriminating against Latinos in traffic stops. *Melendres v. Arpaio*, 695 F.3d 990, 994 (9th Cir. 2012); Olson Decl. Ex. 2

(*Melendres* First Am. Compl., Demand for Relief at A, E (requesting a declaratory judgment "that Defendants have engaged in discrimination based on race, color and/or ethnicity and denied Plaintiffs and plaintiff class equal protection of the laws" and "permanent injunction prohibiting Defendants from continuing to engage in such race, color and/or ethnicity-based discrimination")). Like Plaintiffs in *Gautreaux* and *Melendres*, Plaintiffs here seek standard equitable relief for an equal protection violation that is "substantially likely to redress their injuries" from ongoing discriminatory Policies and Practices and "within the district court's power to award." *Juliana*, 947 F.3d at 1170 (citation omitted).

**iii. Plaintiffs allege their injury of being deprived equal protection of the law would be completely remedied by a favorable decision of the Court and are not required to show every other injury will be relieved.**

"[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis original); s*ee also Meese v. Keene*, 481 U.S. 465, 476 (1987) (enjoining statute requiring filmmaker to label films as "political propaganda" would partially redress his reputational injury satisfying standing); *Barnum Timber Co. v. U.S. EPA*, 633 F.3d 894, 901 (9th Cir. 2011) ("[Plaintiffs] need not eliminate any other contributing causes [to their injury] to establish [their] standing."); *cf. Reeves v. Nago*, 535 F. Supp. 3d 943, 954 (D. Haw. 2021) (declaring a law unconstitutional would not allow people to vote absentee—the relief sought for their injury); *cf. Slockish v. U.S. Dep't of Transp.*, No. 21-35220, 2021 WL 5507413, at *2 (9th Cir. Nov. 24, 2021) (unpublished) (desecration of sacred sites completed so no effective relief could be granted).

Plaintiffs still have standing to bring claims even if their mental and physical injuries stemming from the discrimination would not be redressed because not knowing how Defendants will change their unconstitutional Policies and Practices cannot act as a barrier to standing. *Orr*, 440 U.S. at 271. In *Orr*, the Supreme Court reviewed a statute, challenged by a man, which could require men to pay alimony, but not women. *Id.* The Court reasoned that the statute was underinclusive, and the unequal treatment could be remedied by requiring neither men nor women to pay alimony or making both eligible for paying alimony. *Id*. at 272. Consequently, a ruling in the plaintiff's favor may have still resulted in him paying alimony to his ex-wife, but that did not undermine redressability. *Id*.

Similarly, to meet redressability standards, Plaintiffs need not anticipate and eliminate every action Defendants will take to continue allowing climate pollution. Plaintiffs' only burden at this stage is to allege Defendants are treating them unequally and ask that such unequal treatment cease, which they have done. FAC ¶¶ 108, 122, 358. Plaintiffs also allege how their ongoing and future climate harms would at least be alleviated by a favorable decision of this Court. *See* FAC ¶¶ 22–23, 107, 112, 124, 162, 348, 359; *see also* Stiglitz Decl. ¶¶ 6, 27, 29; Pinsky Decl. ¶¶ 16, 18–19.

Because Plaintiffs meet Article III requirements for standing, this Court should deny Defendants' Motion to Dismiss.

## II. PLAINTIFFS' CLAIMS ARE RIPE FOR REVIEW.

To determine whether a case is constitutionally ripe, Plaintiffs need only show there is an active case and controversy. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) ("The doctrines of standing and ripeness 'originate' from the same Article III limitation. . . . standing and ripeness issues in this case 'boil down to the same question.'"). In reviewing pre-enforcement of regulations and statutes,

courts have, at times, reviewed if a claim is *prudentially* ripe by determining if a case is fit for judicial review and the plaintiffs will suffer hardship if a decision is delayed, but the Supreme Court has cast doubt on finding a case nonjusticiable on prudential grounds. *Id.* at 167 ("To the extent respondents would have us deem petitioners' claims nonjusticiable on grounds that are prudential, rather than constitutional, [t]hat request is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.") (internal quotations omitted). Nevertheless, Plaintiffs meet both these ripeness standards. FAC ¶¶ 21–22.

### A. Plaintiffs' alleged injuries-in-fact satisfy the constitutional ripeness standard.

Injury-in-fact and ripeness are closely related, and "in many cases, [it] coincides squarely." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009). Ripeness is only implicated when there are contingent events that may not occur because "the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Id.* Facial constitutional challenges to ongoing government harm then lend themselves to an identical ripeness and injury-in-fact analysis. *See, e.g.*, *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020) (holding Free Exercise injury-in-fact analysis was same "rubric" for ripeness analysis); *Meland v. Weber*, 2 F.4th 838, 849 (9th Cir. 2021) (holding case was ripe because plaintiff's injury, "being subjected to a law that requires or encourages him to discriminate based on sex," was not conjectural or hypothetical). Notably, the Ninth Circuit has held constitutional injuries of ongoing denial of equal protection of the law is injury ripe for adjudication, regardless of other injuries that may stem from the discrimination. *See, e.g.*, *Bova*, 564 F.3d at 1096 (distinguishing injury of

denial of health insurance, which had not yet occurred, to the ongoing equal protection injury of being denied equal footing in contract bidding process).

Plaintiffs have met, and Defendants do not dispute, the injury-in-fact requirement at this stage of the proceedings. MTD at i; *see supra* at I.A.; FAC ¶¶ 108–10. Plaintiffs need not challenge one specific regulation because the underlying policy and practice of Defendants is facially and intentionally discriminatory, and it inflicts unequal treatment on Children throughout all their regulatory activities. FAC ¶¶ 2, 105, 108, 122, 130, 140–41, 151–52, 197, 231–32, 356, 372, 378. Plaintiffs satisfy the constitutional ripeness standard.

**B. Plaintiffs' claims are fit for judicial decision because they have demonstrated past and ongoing injury from Defendants' Discounting Policies and Practices.**

Statutory cases, in the pre-enforcement stage, are not precedential for a facial Equal Protection challenge to a policy and practice. In the quintessential statutory ripeness case, the Supreme Court found a Forest Service plan not ripe for statutory review because the Plan created "no legal rights or obligations" and did not give anyone a right to cut trees or stop them from being cut, which was the heart of Sierra Club's injury. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–34, 736–37 (1998). Moreover, Sierra Club alleged no injury stemming from the creation of the plan itself. *Id.* at 734; *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (statutory case challenging a regulatory interpretation on hypothetical implementation of the regulation required further factual development to be ripe). Conversely, a discriminatory policy in operation today causes immediate unequal treatment of a group and need not meet the higher burden of pre-enforcement statutory cases. *See Skyline Wesleyan Church*, 968 F.3d at 747.

Because Plaintiffs are challenging operable Discounting Policies facially, and Practices cumulatively, across EPA's management of climate pollution, Plaintiffs

need not wait for more harm to bring their constitutional case. On the merits, this Court will have the context of the past 50 years of EPA rulemaking practices driven by OMB's and EPA's discriminatory Policies. FAC ¶¶ 21, 117, 122–23, 162–248, 349; *see, e.g.*, Doganova Decl. ¶ 14. Defendants illustrate as much in their briefing by disputing Plaintiffs' factual allegations, making their own unsupported allegations about regulations that have utilized the discount rate, MTD at 9, and erroneously asking this Court to consider the case *in vacuo*, without evidence contained in RIAs and regulatory processes. MTD at 13.

### C. Plaintiffs face substantial hardship and continuing harm if this Court declines to hear their claims.

Plaintiffs' discrimination case implicates an ongoing injury of unequal treatment, as well as substantial physical and mental harms. This case is dissimilar to *Ohio Forestry*, where allegations of no adverse legal effects and only that there would one day be "too much, and the wrong kind of, logging" were not a substantial hardship warranting review. 523 U.S. at 738. However, had Sierra Club's complaint alleged present injuries to enjoying recreation, the ripeness analysis would have been different, which the government agreed. *Id*. at 737–38.

In contrast, in another constitutional case, the Supreme Court concluded the plaintiffs' exposure to pollution from nuclear power plants, and threat of injury without reasonable compensation, were substantial hardships that supported prompt resolution of their claims. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 81–82 (1978). Delayed resolution of those plaintiffs' claims would foreclose *any* relief from plaintiffs' injuries. *Id*. In fact, all parties would be adversely affected by deferring a constitutionality determination of the challenged law. *Id*. The Supreme Court concluded "we will be in no better position later than we are now to decide this question." *Id*. at 82 (internal quotations omitted).

Unlike in *Ohio Forestry*, Plaintiffs have detailed physical and mental harms in their complaint. FAC ¶¶ 31–112. Like the plaintiffs in *Duke Power,* any delay in eliminating Defendants' discrimination and removing Plaintiffs' barriers to abating climate change will foreclose their equal treatment. FAC ¶¶ 112, 93, 107, 248, 260–333, 350–51. Defendants' Discounting Policies and Practices act as a barrier to safe and constitutional levels of climate pollution. FAC ¶¶ 197, 112, 248, 349. Even incremental changes to climate pollution can mitigate future mental and physical injuries and avoid irreversible climate tipping points, leaving Plaintiffs no recourse to restore Earth's energy balance. FAC ¶¶ 112, 348–51; *see also,* Stiglitz Decl. ¶¶ 8, 22–27; Pinsky Decl. ¶¶ 3, 16, 18–19.

That the full ramifications of the government-sanctioned discrimination to Children today will not be fully experienced by Plaintiffs until they are older presents no ripeness issue. *See Skinner v. Oklahoma*, 316 U.S. 535 (1942) (unconstitutional to force sterilization of criminal as violating fundamental right to procreate even though procreation was not possible for decades until release from prison). Because Plaintiffs allege an active injury-in-fact, and their claims are not only fit for judicial decision, but also delaying review would result in substantial hardship to Plaintiffs, there are no bases to dismiss on ripeness grounds. Defendants' Motion to Dismiss should be denied on this basis.

### D. Plaintiffs do not ask this Court to assume jurisdiction to review any specific EPA Clean Air Act Regulations.

Defendants raise a strawman argument: Plaintiffs' FAC does not challenge any EPA regulations under the Clean Air Act. Plaintiffs do not ask this Court to overturn or review a specific regulation for constitutionality. However, these regulations may be considered as evidence in an Equal Protection challenge to Defendants' discriminatory Discounting Policies and Practices. Evidence of patterns of discrimination by government actors, history around the discriminatory practice,

and legislative and administrative histories are established sources of evidence of intentional discrimination. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). This type of analysis is not unique to equal protection law. For example, the Supreme Court looks to regulatory histories when reviewing the constitutionality of firearm regulation. *See United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024). There is simply no legal basis for concluding this Court cannot consider EPA's past and present actions when determining an Equal Protection claim, and Plaintiffs' inclusion of regulatory history does not convert their claims.[3]

## III. PLAINTIFFS' AMENDED COMPLAINT STATES EQUAL PROTECTION CLAIMS UPON WHICH RELIEF CAN BE GRANTED

Defendants' motion ignores *every single Children's Equal Protection Supreme Court case* cited in Plaintiffs' brief opposing Defendants' first motion to dismiss. *See* ECF No. 37; MTD. While the Court need not determine here which claim of Equal Protection will prevail or which standard best applies, Plaintiffs have stated multiple viable claims for relief under the Equal Protection Clause. In failing to wrestle with the relevant body of law, Defendants argue straight to the facts at the heart of this controversy, which is not appropriate for resolution at the motion to dismiss stage and exemplifies why Defendants' motion should be denied: "the monetized value of discounted future benefits may or may not weigh in the balance when EPA enacts the regulations." MTD at 14. Plaintiffs' allegations that discount rates unconstitutionally classify Children differently than adults, and that such discounted benefits do in fact weigh in the balance and affect EPA's regulations must be taken as true under 12(b)(6) and are subject to proof on the merits.

[3] Defendants have abandoned their sovereign immunity defense; however, Plaintiffs rely on their original briefing on this issue should it arise. ECF No. 37.

### A. Plaintiffs allege Defendants' facial and intentional discrimination against Children.

Defendants' Discounting Policies intentionally and facially discriminate against Children. Facial discrimination can be established with text "coupled with basic facts." *Kadel v. Folwell*, 100 F.4th 122, 149–50 (4th Cir. 2024) (listing Supreme Court precedent that used basic facts to find facial discrimination); *Guinn v. United States*, 238 U.S. 347, 364–65 (1915) (finding facial discrimination where law "contains no express words of an exclusion from the standard . . . on account of race, color, or previous condition of servitude, . . . but the standard itself inherently brings that result into existence since it is based purely on a period of time before the enactment of the 15th Amendment, and makes that period the controlling and dominant test of the right of suffrage.").

While the Discounting Policies do not name Children as a disfavored group outright, like the suffrage law in *Guinn*, the temporality of the economic discounting "inherently brings that result into existence," *id.* at 364, since it is based on valuing "the present interests of adults above Children in a grave threat to Children's health and well-being and an open livable future." FAC ¶ 108. Even "seemingly neutral criteria" in a law when closely connected to the status of the disfavored group is constructively facial discrimination. *See Hecox*, 104 F.4th at 1078 ("The definition of 'biological sex' in the Act is written with 'seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.'" (citations omitted)). Plaintiffs adequately allege Defendants' Discounting Policies and Practices are designed and function to discriminate against Children. FAC ¶¶ 2, 105, 130–37, 140–47, 151–161, 197–98, 356–57, 378.

Because Plaintiffs adequately allege intentional, facial discrimination, the Court can conclude Plaintiffs allege valid causes of action under several Equal

Protection theories discussed below. The Supreme Court has recognized society's evolved understanding of the individual and societal harms of racial, gender, and LGBT discrimination that has led to the eradication of anti-miscegenation, male coverture laws, and same-sex marriage bans. *See Obergefell*, 576 U.S. at 673–74. It is time this iterative process—developing new insights and advanced understanding of the harms of group-based discrimination—is applied to Children facing irreversible lifetime injuries in our Nation's constitutional jurisprudence. *See id.* at 673 ("The reasons why marriage is a fundamental right became more clear and compelling from a full awareness and understanding of the hurt that resulted from laws barring interracial unions."); *id.* at 674 ("Responding to a new awareness, the Court invoked equal protection principles to invalidate laws imposing sex-based inequality on marriage."); *id.* at 660 ("These new insights have strengthened, not weakened, the institution of marriage. Indeed, changed understandings of marriage are characteristic of a Nation where new dimensions of freedom become apparent to new generations, often through perspectives that begin in pleas or protests and then are considered in the political sphere and the judicial process.").

Yet, Children's rights, and their evolution, are often obscured because the law tends to focus on adults. This case, like other equal protection cases, should be resolved on a full factual record so this Court can determine and apply the proper standard of review to Defendants' Discounting Policies and Practices. *See, e.g.*, *Brown*, 347 U.S. at 494 (relying on historical and social science evidence from the record below to reverse separate but equal to protect children); *Plyler*, 457 U.S. at 207 (relying on extensive findings of fact from preliminary injunction hearing below); *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 761 (E.D. Mich.), *rev'd* 772 F.3d 388 (6th Cir. 2014), *rev'd sub nom*. *Obergefell*, 576 U.S. 644 (relying on social science evidence presented at 8-day trial).

### B. Plaintiffs allege a cognizable *sui generis* Equal Protection claim.

The Bill of Rights is also for Children. *In re Gault*, 387 U.S. 1, 13 (1967). While "the Supreme Court has neither decided if children as a class should be deemed 'suspect' or 'quasi-suspect' nor explicitly provided an alternative doctrinal route to determine when state action runs afoul of young people's rights,"[4] in the last 70 years, the Supreme Court has factored the unique qualities, characteristics, and needs of Children into its constitutional calculus creating an "area of special constitutional sensitivity" mandating closer scrutiny of laws that impose a lifetime of hardship on young people for matters beyond their control. *See Plyler*, 457 U.S. at 226.

Children have faced a long and persistent history of discrimination, in large part due to their lack of political, economic, and other civil rights, which justifies their special treatment today under the Equal Protection Clause. The law has historically treated young Americans as "objects and not subjects of law,"[5] property of fathers in a form of "child coverture,"[6] and "indentured servants" or enslaved "commodities."[7] Children's rights remained stifled under the regime of child coverture in both state and federal law even after other groups gained rights.[8]

It took the civil rights movement and the Supreme Court's decision in *Brown* to catalyze Children's equal protection rights. 347 U.S. at 493–95; Smith, Brown*'s*

---

[4] Catherine E. Smith, Brown*'s Children's Rights Jurisprudence and How it Was Lost*, 102 B.U. L. Rev. 2297, 2300 (2022).

[5] Barbara Bennett Woodhouse, *The Courage of Innocence: Children as Heroes in the Struggle for Justice*, 2009 U. Ill. L. Rev. 1567, 1577 (2009).

[6] Anne C. Dailey & Laura A. Rosenbury, *The New Parental Rights*, 71 Duke L.J. 75, 84, 88–90 (2021) [hereinafter Dailey & Rosenbury].

[7] Steven Mintz, *Huck's Raft, A History of American Childhood* 38, 41 (2004).

[8] Dailey & Rosenbury at 90*; see also* Elizabeth G. Porter, *Tort Liability in the Age of the Helicopter Parent*, 64 Ala. L. Rev. 533, 540 (2013).

*Children's Rights Jurisprudence* at 2300, 2308–09.[9] "[Education] is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown*, 347 U.S. at 493. Not providing that educational opportunity and denying Children the tools needed to advance in society affected their success in life. *Id.* at 492. The Court recounted the district court's factual findings that segregation exacted a psychological toll on children because separating Black children from their peers "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id*. at 494. *Brown* emphasized the government's early injury to Children's development can significantly damage those Children's future well-being. *Id.*

*Levy* and *Weber* further developed Children's equal protection law. *Levy*, 391 U.S. at 70 (applying Equal Protection Clause to Children to strike down law denying wrongful death compensation to child of unwed parents). In *Weber v. Aetna Cas. & Sur. Co.*, the Court denounced "visiting this condemnation [of unequal treatment] on the head of an infant [as] illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth . . . ." 406 U.S. 164, 175 (1972). *Levy* and *Weber* accorded less deference to state decisions to protect Children's rights.[10]

---

[9] Earlier cases recognized children's constitutional rights. *See Powell v. Alabama*, 287 U.S. 45 (1932) (youths entitled to a right to counsel in criminal proceedings); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631 (1943) (children "stand on a right of self-determination in matters that touch individual opinion and personal attitude").

[10] Numerous cases have relied on the holdings in *Levy* and *Weber* to address the plight of children of unmarried parents. *See* Lawrence C. Nolan, *"Unwed Children" and Their Parents Before the United States Supreme Court from* Levy *to* Michael

*See Pickett v. Brown*, 462 U.S. 1, 7 (1983) (stating special concern over childhood discrimination).

Thereafter, the Supreme Court extended intermediate scrutiny to classifications that draw distinctions between marital and nonmarital children. *Clark v. Jeter*, 486 U.S. 456, 465 (1988). More recently, the Supreme Court reinforced the importance of acknowledging young people's economic and psychological injuries, striking down the Defense of Marriage Act, in part, because of the rights and benefits the Act denied children of same-sex married couples. *United States v. Windsor*, 570 U.S. 744, 772 (2013). This "brings financial harm to children of same-sex couples" and "humiliates tens of thousands of children now being raised by same-sex couples." *Id.* at 772–73. *Windsor* demonstrates the judiciary's continuing role in intervening to declare unconstitutional government conduct that subjects Children to a lifetime of disability and harm.

In *Plyler*, the Supreme Court focused on the "lasting impact of [education's] deprivation on the life of the child" and the harm caused to society by denying an education to children of undocumented parents. 457 U.S. at 221. Like the reasoning in *Brown*, to protect Children's equal rights, the *Plyler* Court noted "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Id.* (internal citations omitted).

*Levy*, *Weber*, and *Plyler* signal a *sui generis* analysis by sparsely referencing the classic indicia of "suspect" or "quasi-suspect" classifications rooted in the classic *Carolene Products* test. *United States v. Carolene Prod. Co.*, 304 U.S. 144, 152 n.4 (1938). As explained in *Plyler*:

---

H.: *Unlikely Participants in Constitutional Jurisprudence*, 28 Cap. U. L. Rev. 1, 25 (1999).

> [M]ore is involved in these cases than the abstract question whether [the statute] discriminates against a suspect class, or whether education is a fundamental right. [The statute] imposes a lifetime hardship on a discrete class of children not accountable for their disabling status.

457 U.S. at 223. Defendants ignore that *Plyler* did not recognize a suspect classification or a fundamental right, yet applied a heightened level of review, identifying this form of discrimination as an "area of special constitutional sensitivity." *Id.* at 226; *Nielsen v. Thornell*, 101 F.4th 1164, 1176 (9th Cir. 2024) (confirming *Plyler* "applied a heightened form of scrutiny" where there was no suspect class or a fundamental right because *Children* faced "devastating 'lifetime hardship'" from unequal treatment; refusing to extend analysis to adult prisoners in private prisons).

Children's special sensitivities and exclusion from voting, while still being entitled to their constitutional rights as citizens and natural persons, creates a special constitutional obligation of judicial guardianship of Children's rights.[11] Moreover, this Court cannot presume adult voters represent Children's interests because adults often do not.[12] FAC ¶ 111, 89.

Defendants' facially discriminatory Discounting Policies and Practices treat Children unequally in the context of life-threatening regulatory decisions to allow unsafe levels of climate pollution that harm Plaintiffs' physical, mental, and emotional development and long-term health, and subjects Plaintiffs to physical and mental traumas they must bear the rest of their lives. FAC ¶¶ 67–68, 57–61, 249–334. Like *Plyler*, *Levy*, and *Weber*, Plaintiffs' claims here can be reviewed *sui generis* for the extent to which EPA's conduct is unconstitutionally creating barriers and burdens to Plaintiffs' ability to live and enjoy their lives by imposing on them

---

[11] Anne C. Dailey, *Developing Citizens*, 91 Iowa L. Rev. 431, 497 (2006).
[12] Catherine E. Smith, *"Children's Equality Law" in the Age of Parents' Rights*, 71 Kan. L. Rev. 539, 545 (2023).

present, and a lifetime of, hardship for matters beyond their control. *See supra* Statement of Facts; FAC ¶¶ 39, 48, 57–61, 67–68, 76, 93, 97–99, 109–112, 231–32, 241. Ultimately, when Children bear the adverse consequences of majoritarian political power for matters over which they have no control, an "area of special constitutional sensitivity" warrants a heightened level of equal protection review. *Plyler*, 457 U.S. at 226.

**C. Plaintiffs also allege a cognizable adult-centric Equal Protection Claim.**

**i. Plaintiffs do not ask this Court to overturn any binding precedent.**

Neither the Supreme Court nor the Ninth Circuit has ruled in a case seeking suspect or quasi-suspect class status for Children.[13] The Supreme Court has only looked at protected class status for "old age." *See Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976). Generalizing this ruling, and subsequent rulings from the Supreme Court about the aged, would contradict the substantial case law discussed above that distinguishes adults from Children. *Murgia*'s analysis of old age is not dispositive here, and not even persuasive on protected class status for Children who are "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." 427 U.S. at 313 (cleaned up). Applying reasoning of a case denying protected status to older people to Children is akin to the faulty (and losing)

[13] Defendants misrepresent Ninth Circuit precedent in stating the Ninth Circuit has "squarely rejected claims that children are a suspect class," citing only *Flores-Villar.* MTD at 15. *United States v. Flores-Villar* is an abrogated gender discrimination case, not a case about protected status of Children. Defendants quote from a paragraph with *no* citations to precedent regarding "men under nineteen" who are fathers not having a claim for age-based discrimination. 536 F.3d 990, 998 (9th Cir. 2008), *abrogated by Sessions v. Morales-Santana*, 582 U.S. 47 (2017).

arguments about the political power of the LGBTQ community in an attempt to diminish members' claims of discrimination in law: "resid[ing] in disproportionate numbers in certain communities," "hav[ing] high disposable income," and being a "politically powerful minority." *Romer v. Evans*, 517 U.S. 620, 645–46 (1996) (Scalia, J., dissenting).

This Court should not adopt the adult-centric result in *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Authority*, but should engage the law and facts of this case on the merits, as did the D.C. Circuit, which acknowledged the Supreme Court has only reviewed age classifications for the "elderly." 386 F.3d 1148, 1150, 1152–55 (D.C. Cir. 2004) (finding standing and deciding Fourth and Fifth Amendment case on summary judgment regarding a 12-year-old being arrested, searched, and detained for eating a single french fry on the D.C. subway). None of Defendants' other out-of-Circuit cases is persuasive here.

**ii. Plaintiffs allege that they are members of a protected class warranting heightened scrutiny.**

Even under the adult-centric traditional equal protection analysis, Plaintiffs have adequately alleged the three factors utilized by the Supreme Court: Children have a history of being subjected to discrimination; possess obvious, immutable, or distinguishing characteristics that define Children as a discrete group; and are politically powerless. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Contrary to Defendants' attempt to ignore Children's cases, this case must be analyzed in accordance with well-established Supreme Court precedent interpreting the Constitution and recognizing both political and developmental vulnerabilities of Children, affording special consideration to Children's rights and wellbeing in nearly every area of law, especially when the consideration of the right at issue might result in grave consequences on the child's life or liberty. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 575 (2005) (capital punishment of a child under the age of 18, as opposed

to an adult, violates the Eighth Amendment); *Miller v. Alabama*, 567 U.S. 460, 489 (2012) (mandatory life-without-parole sentences for Children is cruel and unusual punishment, unlike adults); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 376–77, 379 (2009) (strip search of a middle school student violated the student's Fourth Amendment right of privacy).

Like other plaintiffs in novel equal protection claims, Plaintiffs have sufficiently *alleged* facts supporting a classification that *plausibly* warrants heightened review. *Twombly*, 550 U.S. at 570. First, Plaintiffs adequately allege Children have been subjected to a history of discrimination. FAC ¶ 374(e). Second, Plaintiffs adequately allege Children possess obvious, immutable, or distinguishing characteristics that define them as a discrete group. FAC ¶¶ 374, 260, 262, 323. Characteristics that define Children as a discrete group include being "in early phases of human development and physiologically and psychologically vulnerable," having "developing lungs, brains, and immune systems that are particularly sensitive to climate harms," and "life expectancy many decades beyond living adults." FAC ¶ 374. Like Children, alienage is a changeable status because non-citizens may naturalize and become citizens, yet it is a protected class.[14] *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977) (all alienage classifications are subject to strict scrutiny even though alienage can change). Finally, Plaintiffs adequately allege Children are politically powerless and dependent on caregivers and government, and even once of age to claim political rights, Children are disadvantaged by the political and economic power of corporations and older adults. FAC ¶¶ 7, 28, 89, 111, 258, 374, 380.

---

[14] Hiroharu Saito, *Equal Protection for Children: Toward the Childist Legal Studies*, 50 N.M. L. Rev. 235 (2020).

Plaintiffs adequately allege all three factors of the adult-centric equal protection analysis that Children are a class requiring heightened scrutiny.

**iii. Plaintiffs allege their fundamental rights are burdened by Defendants' facial discrimination against their group—Children.**

For unprotected classifications, when conduct implicates "sensitive and fundamental personal rights" the Court employs stricter scrutiny. *Weber.*, 406 U.S. at 172. In the context of Children, the Ninth Circuit applies strict scrutiny when "the classification . . . impinges a 'fundamental right.'" *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (applying strict scrutiny to a curfew ordinance because it limited children's fundamental freedom of movement).

Plaintiffs allege discrimination with respect to *seven* fundamental rights, FAC ¶¶ 389–403 (life, personal security, bodily integrity, dignity, family autonomy, exercise of cultural and spiritual traditions, and life-sustaining climate system); Defendants move to dismiss Plaintiffs' third equal protection claim, with respect to impingement of only *one* fundamental right. MTD at 16 (arguing only that "strict scrutiny would not apply in this case because the Constitution does not confer a fundamental right to a life-sustaining climate system" and ignoring the six other fundamental rights alleged). These six fundamental rights are either explicit in the Constitution or already recognized by the Supreme Court. U.S. Const. amend. V; *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993); s*ee also Rochin v. California*, 342 U.S. 165 (1952); *Ingraham v. Wright*, 430 U.S. 651, 673 (1977); *Youngberg v. Romeo*, 457 U.S. 307, 315, 318 (1982); *Winston v. Lee*, 470 U.S. 753, 761 (1985); *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring); *Obergefell*, 576 U.S. at 681; *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). At this stage of the proceedings, this Court has no need to determine the merits of which fundamental right is impinged, only that Plaintiffs have alleged *a* fundamental right

has been implicated by the Defendants' facial discrimination of Children. Plaintiffs have met this burden to demonstrate strict scrutiny applies at least six times over, and Defendants do not seek dismissal on those six grounds. Therefore, on these grounds alone, Plaintiffs' third claim may proceed to the merits and Defendants' motion must be denied.

Even with respect to the alleged seventh fundamental right of a "life-sustaining climate system," it bears correcting that Plaintiffs do not ask this Court to recognize a "right to a clean environment" or "a containment-free environment," which are broader and different rights. MTD at 16–17. Plaintiffs ask this Court to recognize an implicit negative right, to which government may not deprive them, in a climate system on Earth that can sustain their healthy lives, a necessary element for continuation of humanity and life on Earth as we know it. A fundamental right to a life-sustaining climate system is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *see* Opp'n to MTD, ECF No. 37 at 31.

Though the Supreme Court has not yet addressed the implied right to a life-sustaining climate system, other courts across the country and globally continue to answer this constitutional question and recognize this right, and so too should this Court during the merits phase. *See e.g.*, *Juliana v. United States*, 217 F. Supp. 3d 1224, 1250 (D. Or. 2016), *rev'd on other grounds and assuming the right existed*, 947 F.3d 1159, 1169–70 (9th Cir. 2020); *Matter of Hawai'i Elec. Light Co., Inc.*, 526 P.3d 329, 337 (Haw. 2023) (Wilson, J., concurring) (recognizing implicit right); *Navahine v. Hawai'i Dep't of Transp.*, No. 1CCV-22-0000631, Order Denying Defs.' MTD at 5 (Haw. 1st Circ. Ct. Apr. 19, 2023) (same); *Id.*, Joint Stipulation and Order re: Settlement, Exhibit A at 1–4 (Haw. 1st Circ. Ct. June 20, 2024); *Held v. Montana*, CDV-2020-307, Findings of Fact, Conclusions of Law, and Order at 102 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023) (fundamental constitutional right "includes climate as

part of the environmental life-support system"); *Urgenda Foundation v. Netherlands*, No. 19/00135, Judgment, ¶ 5.7.9 (Neth. Sup. Ct. Dec. 20, 2019) ("Climate change threatens human rights"); *Inhabitants of La Oroya v. Peru*, Inter-Am Ct. H.R. (ser. C) No. 511, Judgment, ¶ 143 (Nov. 27, 2023) ("States have a heightened duty to protect children and actions against risks to their health produced by the emission of polluting gases that contribute to climate change.") (unofficial translation); *M.K. Ranjitsinh v. Union of India*, 2024 INSC 280 (India Sup. Ct. 2024) (climate change and air pollution implicate rights to life and health).

**D. At minimum, this Court can find a cognizable claim even treating Children as an unprotected class with no fundamental rights.**

Even if this Court concluded Plaintiffs have no *sui generis* claim or protected class status and have none of the seven fundamental rights alleged above, Plaintiffs still have a cognizable equal protection claim under rational basis scrutiny because they have alleged facts showing Defendants' Discounting Policies and Practices are not rationally related to a legitimate end. *Romer*, 517 U.S. at 631; FAC ¶¶ 378–83; *see Hedgepeth*, 386 F.3d. at 1156. Under rational basis review, the Discriminatory Policies and Practices must be "narrow enough in scope" and may impose only "incidental disadvantages" on Children which "can be explained by reference to legitimate public policies." *Romer*, 517 U.S. at 632–33, 635 (ballot initiative did not pose merely "incidental disadvantages" on LGBTQ persons because it "denie[d] them protection across the board" and disqualified an entire "class of persons from the right to seek specific protection from the law").

Like the ballot initiative in *Romer,* Defendants' Discounting Policies and Practices "impos[e] a broad and undifferentiated disability on" Children. *Id.* at 632; *See also*, FAC ¶¶ 151–52, 110–11, 137–40, 158–61, 256–59, 360. EPA's Discounting Policies and Practices impose far more than only "incidental disadvantages" on

Children by creating a barrier to their equal treatment under regulatory programs regarding pollution controlled by a single federal agency, which in turn harm their physical and mental health. *Romer*, 517 U.S. at 635; FAC ¶¶ 67–68, 57–61, 112, 197, 351. Therefore, Plaintiffs have adequately alleged an Equal Protection claim subject to rational basis review on the merits.

## IV. EPA'S CONDUCT VIOLATES THE TAKE CARE CLAUSE AND CONSTITUTIONAL SEPARATION OF POWERS

Plaintiffs have stated a cognizable claim under the Take Care Clause and separation of powers principles by arguing EPA exceeded its delegated authority and in so doing, violated the Equal Protection Clause. FAC ¶¶ 404–23. The Take Care Clause provides the President, and his or her agents, "shall take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3. The "Take Care" mandate imposes a duty on the executive branch to exercise authority within the law prescribed by Congress and the Constitution. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952).

*Dalton v. Specter* is distinguishable because it did not address situations in which an executive agency exceeds its statutory authority, and in doing so, *also* violates a specific constitutional prohibition, as Plaintiffs allege here. 511 U.S. 462, 473–74 (1994); *see Sierra Club v. Trump*, 963 F.3d 874, 890 (9th Cir. 2020) (vacated on other grounds). Here, by discriminating against Children in policy and practice in regulating air pollution, Defendants not only acted outside of and in excess of their delegated authority, but violated express constitutional prohibitions of the Take Care Clause and the Equal Protection Clause, which are designed to protect individual liberties.

This Court should also reject Defendants' reliance on *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866) to argue the Take Care Clause is entirely non-justiciable. MTD at 18–19. An identical argument was rejected in *Citizens for*

*Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127 (D.D.C. 2018), where the court read *Johnson* as addressing "limitations on the ability of federal courts to issue an *injunction* against the President," and clarified that *Johnson* "does not so clearly foreclose" the issuance of a "declaratory judgment order . . . for a Take Care Clause violation," nor does it foreclose claims against other executive branch officials, like at EPA. 302 F. Supp. 3d at 138–140 (emphasis original).

The "Take Care" duty is especially critical to enforce where "Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions," and where the Supreme Court has foreclosed other remedies at law. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423, 428 (2011); FAC ¶ 410. "Agencies have only those powers given to them by Congress," and Congress does not "typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). "The agency . . . must point to 'clear congressional authorization' for the power it claims." *Id.* When legal remedies are limited by the Supreme Court, when Congress has delegated the authority to protect clean air and public health to a single agency, and where that agency discriminates against Children by using discounting policies Congress has never given it authority to use, Plaintiffs have stated a claim for relief under the Take Care Clause. *See Loper Bright*, 144 S. Ct. at 2269 (on issues of "deep 'economic and political significance'" Congress must "delegate such authority 'expressly' if at all." (citations omitted)). Critically, under separation of powers, this Court owes EPA no discretion in interpreting its authority to adopt and implement the policy of discounting. Indeed, the reverse is true. Only this Court can interpret the law and determine whether EPA has exceeded its authority. *Id.* at 2257. Notably, EPA does not argue in its motion to dismiss that Congress has delegated EPA any authority to conduct economic analyses using Discounting Policies and Practices that treat Children unequally and

harm them. *See generally* MTD at 18–19. "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Loper Bright*, 144 S. Ct. at 2273.

Plaintiffs' Take Care Clause claim has merit, and the Supreme Court has left open the opportunity for such a claim to proceed. *See United States v. Texas*, 579 U.S. 547 (2016); Opp'n to MTD, ECF No. 37 at 35–36. As such, Defendants' reliance on other district court opinions is unavailing because lower courts are split on whether a cause of action may be derived from the Take Care Clause. *See In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1137–38 (S.D. Cal. 2018) (concluding Take Care Clause applies to President's subordinates); *Florida v. United States*, No. 3:21CV1066, 2022 WL 2431414, at *13 (N.D. Fla. May 4, 2022) (denying federal government's motion to dismiss Florida's Take Care Clause claim, "where . . . the executive branch has completely abdicated its responsibly to enforce the law as written"). No binding precedent restricts this Court's ability to allow the Take Care Clause claim to proceed beyond the motion to dismiss.

This Court should reject Defendants' attempts to shield EPA's systemic discriminatory Policies and Practices, which dangerously exceed the authority Congress granted, from judicial review, and allow Plaintiffs' well-pleaded Take Care Clause claim to proceed.

## CONCLUSION

Defendants' Policies and Practices constitutionally injure Children, a disenfranchised group with less political power than adults[15], warranting judicial intervention, not dismissal. Equal protection is for Children, too. If this Court finds deficiencies with Plaintiffs' FAC, Plaintiffs respectfully request leave to amend.

---

[15] *See generally* Avroh, Noah, Maryam Declarations on their lack of political rights.

DATED this 12th day of August, 2024.

Respectfully submitted,

*s/ Julia A. Olson*
JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel
(*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE, SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254

Tel: (424) 424-0166

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 11,992 words, which complies with stipulation and order for a 12,000-word limit. ECF No. 59 (May 28, 2024).

DATED this 12th day of August, 2024.

*s/ Julia A. Olson*
JULIA A. OLSON

*Attorneys for Plaintiffs*

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF PLAINTIFF AVROH S. IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE**
**SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Avroh S., hereby declare and if called upon would testify as follows:

1. I am a Plaintiff in the above-entitled action. I make this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. I have personal knowledge of the facts stated herein, and if called to testify, I would and could testify competently thereto.

2. I am 15 years old and a resident of Palo Alto, California. I am a plaintiff in this case because I see the climate crisis worsening right before my eyes, which scares me. I am a plaintiff because I know my health and quality of life will be increasingly harmed as fossil fuel pollution continues, and because I want to have equal rights as adults and past generations when it comes to the livability of our climate and my home community. I want my government to make decisions about pollution and the climate crisis that takes me, and other children, equally into account, and maybe even prioritizes us since we are so disproportionately hurt.

3. During the last hearing in our case, Judge Fitzgerald suggested that young people can make an impact by volunteering and getting involved. While that is true to an extent, my experience shows me that I cannot adequately protect my climate system by engaging in actions such as volunteering. My experiences show me that actions like volunteering can only go so far and that without the right to vote, I need to direct the full extent of my voice to the court. I want the court to know about what I have done in my life and to offer a different perspective. This is not a complete list, but some of the things that came to mind when my attorneys asked me to tell my story of my volunteering and activism.

4. I became involved in climate advocacy first through my passion for conservation. I started a nature club in third grade in elementary school

alongside a close friend. It was centered around preservation and conservation, keeping our environment clean, and helping people reduce waste and manage it well. My school didn't have clubs so I asked my principal if I could start a club. She agreed but said that if I wanted to use a classroom at lunch, I would have to get a teacher to supervise us. I felt that it would be easier to meet independently, so we met in the library by ourselves instead. We had no school support or funds, except they let us put up posters we had made. We educated ourselves by reading and studying on our own without help from adults or online resources.

5. In fourth grade, when I was 9, I drafted my first petition that was about having my school have an equal amount of compost and trash bins to mitigate food waste, having volunteers present in the cafeteria to assist with minimizing food waste, and a partnership with Terracycle that helped us compost and recycle waste from our cafeteria. Methane pollution from waste in landfills contributes to climate change. I got over 200 signatures from going around the playground and asking teachers and administrators to sign on. I recall one teacher signing despite her quandaries that she could receive backlash for speaking up. I also scheduled meetings with the dean and school administrators. Because of my young age I didn't know how to handle negotiations around the petition when I took it to the administration. The school said everything I was doing was great, as long as it was me doing the work. They told me that adding compost bins or partnering with sustainability-oriented organizations would be too costly. My lack of knowledge about what they were referring to, hindered my ability to do anything. Ultimately, they told me, a nine-year-old, that I could volunteer to direct students about food waste but they would offer no support

whatsoever. As a kid, my access to connect with people in power or understand how to effectively take action made it really hard to have any effect.

6. Later in elementary school, I was trying to educate people about birds and trees on campus, including endangered species, by giving community members and parents a tour. I think people found it interesting, but I don't think it changed anything for the better. Then in fifth grade, the pandemic hit and so my efforts to organize were shut down. Around that time I was working on a project to spread awareness about the adverse health and environmental effects of unnatural, chemically formulated pesticides. I had compiled 36 pages worth of well-researched information, including solutions. Unfortunately, I was unable to implement this project due to the event I was preparing for being cancelled due to the pandemic. In addition, cleanups that I had been organizing with friends stopped occurring due to general concerns about staying healthy and safe during the pandemic.

7. I attended a big march in my city in front of city hall and we demanded action on climate. We marched through the downtown before rallying in front of city hall once again. However, besides trying to shift the attitude of many individuals from perception to action, this climate protest accomplished nothing tangible.

8. In sixth grade, I wrote a letter to Congresswoman Anna Eshoo, my representative in Congress, to speak out against Line 3, a crude oil pipeline project of Enbridge. She couldn't do anything to stop Line 3, but stated that she opposed "construction of this new pipeline because it would exacerbate climate change, increase the likelihood of oil spills, and infringe on Native American land." She stated that if there was legislation

in Congress to stop the construction, revoking the permits issued by the Army Corps of Engineers and the Minnesota Public Utilities Commission, she would vote for it. But no one introduced legislation to block it. No one did anything that worked. The pipeline was built and is operating, continuing significant fossil fuel use and harming waterways and wetlands. This is just one of many pipelines that continue fossil fuels and whose pollution EPA allows.

9. I joined Earth Guardians in late summer of 2020 and with them I wrote letters and made calls to insurance companies that were insuring fossil fuel companies. Together with friends we organized and tried to stop the money pipeline supporting fossil fuels. That money pipeline continues.

10. I knew from my research that banks were funding the pipeline projects like Line 3 so during the pandemic, I made a flyer. I would design them online. My dad would print them at his office as we didn't have a functional printer at the time. I would spend countless evenings cutting them out by hand and go door to door. I pretty quickly realized knocking on doors wasn't a good idea during the pandemic, so instead I slipped them under people's doors. I would also hand them out to whoever else was walking about the streets during the day. I asked people to consider divestment from the banks that were supporting fossil fuels. I would talk to people on the street about an online call that I participated in where a water protector who was supposed to be on the call had been arrested and not been granted her phone call. She was trying to stop a new oil pipeline. I remember listening to a woman speak, I remember seeing the pain in her eyes as she failed to establish contact with her friend. While these conversations may have been

impactful to a few, the truth was that the pipeline would be constructed and the greater effort to stop more pollution would ultimately fail.

11. I've also written letters or made phone calls to every big bank funding fossil fuels and asked them to divest.

12. In 2021, I wrote to my local paper, the Palo Alto Weekly about the connection of Line 3 and the banks that back Enbridge. The Weekly refused to publish my letter about this topic, with their editor at the time saying that the issue was not local enough. I wrote back arguing that the issue was very local, but these issues were not covered by our local paper, even though they covered all sorts of "non-local" topics from the Israel-Hamas war to the Russo-Ukraine war. A kid's voice speaking out on more fossil fuel infrastructure was not deemed newsworthy.

13. When school came back into hybrid form, we passed out even more of the flyers I had made. I distributed a total of 536 flyers alongside friends in my Earth Guardians crew.

14. In seventh grade, in 2021 and 2022, we did an event and petition to tell the story of Indigenous communities and overlay maps of the different oil pipelines affecting their lands and waters. We presented in front of the entire middle school about the stories of various water protectors and their efforts. We offered snacks and compassion while gathering signatures for a petition to oppose Line 3.

15. During Earth Week in seventh grade, we hosted goat yoga Earth Day. The slogan was: "Come for the goats, skip the yoga." The vast majority of our middle school came to, or participated in the event, over three days. We were encouraging people to live and eat more sustainably. Methane from livestock also contributes to climate change.

16. In the beginning of eighth grade, I designed posters with my friend in the Earth Guardians crew, Athena, to support our climate activism and create more awareness. My favorite poster said, "Solution, Not Pollution." Here is a picture of that poster. We put up our posters in every classroom in the middle school.




17.

18. Right now, I'm protesting an expansion of the private airport in Palo Alto where millionaires fly in and out of because that expansion will increase the fossil fuel pollution and add to climate change. That is one of the many kinds of fossil fuel pollution sources that EPA controls. According to the Federal Aviation Administration, there are 14,400 private airports around the country. I can't fight every dangerous expansion and even though I will try to stop this local one, I can't vote against it if it does come on the ballot, and I don't have money to compete with the people who do have money to lobby and influence these decisions. I started a petition to do my part to protect the Baylands. Below is a photo of one of our posters. We've put

these up in parks, online, and other areas. I've organized a team from a growing variety of organizations including the Palo Alto Student Climate Coalition (PASCC), Environmental Volunteers, Sierra Club, and Santa Clara Valley Audobon Society. We've garnered the attention of the Palo Alto Weekly, where we were on the cover of a recent publication, and ABC News. But as someone who can't vote, I'm not sure how far my voice can go. I don't know how our city council will respond to the expansion plans, and I can't vote for candidates who support the lives of children like me over the funds they receive. While many of our efforts may be strong-willed, they lack the political prowess and potency that a vote or real lobbying dollars would enable. In terms of my advocacy, I often find myself having nothing on the table.

19. 

20. In terms of actually achieving results, I believe that half the actions I engage in don't actually accomplish anything, and many are unfortunately symbolic or miniscule despite the incredible amount of time I dedicate to them. When I stopped trying to achieve real local results on the ground, like with composting and stopping trees from being cut, I next tried to bring people in to at least care about climate change, to shift from a world of apathy to a mindset of action. Sometimes I put hundreds of hours in to achieve the most microscopic good. Good that often doesn't reach or benefit those who need it the most, like children.

21. Sometimes my climate actions are also affected by climate change itself. For instance, two evacuations at my middle school from extreme weather shut down events I had been planning for months. We were planning an event about educating people around the fashion industry and their pollution impacts, as well as their relationship to animal cruelty. We had a significant portion of my school sign-up and at 1 pm on a Wednesday, the winds went crazy and trees and power lines were falling down on my school campus, we were evacuated and had to cancel our event. I was almost hit by a large tree branch. I was told to run, sticking close to the eaves as my friends and I were whipped with branches. We rescheduled our event for a week later and the same thing happened, but worse as it was raining heavily in addition, with flooding in our community. We were again hastily evacuated for extreme weather events that just don't normally happen in my area. Climate change foiled my climate action.

22. In the fall of 2022, I contributed to a climate art piece by a local nonprofit EngageOn, which is displayed in the Palo Alto Art Museum, again to raise awareness.

23. On April 19, 2024, I organized a protest and rally on climate crisis during Earth Week.

24. Last month, in June 2024, I was on Capitol Hill lobbying for the PROVE IT Act (Providing Reliable, Objective, Verifiable Emissions Intensity and Transparency Act of 2024). I only got to meet with staff members of Senator Butler, Representative Schiff, and Representative Eshoo. Even though it's just a small proposed action, I learned there are billions of dollars lobbying against it to keep fossil fuels intact. The well-versed staffer I met with said he didn't think it would go through because they were at the end of the legislative session and didn't have the support.

25. I have also done lobbying on energy permitting reform. Senator Manchin and another senator proposed a bill to revise NEPA to allow for renewable energy projects to proceed more quickly. We were also lobbying for Seedlings for Sustainable Habitats Act of 2023 and Increased Access for Technical Services Providers. I enjoyed talking with staffers, and it showed me how much money is funding fossil fuel interests and how we are really outnumbered when it comes to stopping fossil fuels.

26. These are just some of the things I have done in my life to protect our climate. I've also called my state senators and assemblymen about climate. I've sent emails about state bills. And I know that whatever I do, until the federal government stops treating me and other youth as less worthy of a safe climate, nothing I do will be enough to protect my rights.

27. I know our first complaint was dismissed because of *Juliana v. U.S.* I first came across the *Juliana* case when it was mentioned in a podcast that I listened to on the way to elementary school. I looked into the case online sometime between second and fourth grade. So I've been following the

case for almost half of my life. I had my family watch the *Juliana* Ninth Circuit hearing. As my volunteer work described above shows, by fourth grade, I had started to care and worry deeply about climate change. Learning about how the 21 youth plaintiffs were fighting for their constitutional rights to a livable climate in the face of our federal government continuing to prioritize fossil fuel energy over our lives and futures, inspired me, gave me hope, and opened my eyes to how all three branches of government had a role to play in helping us. I would see the *Juliana* plaintiffs get victories and setbacks, and with the case slowly progressing I was truly excited seeing it was going to trial again on an amended complaint in January 2024, and it was really hard to see the Ninth Circuit's response to the government's Petition for a Writ of Mandamus. To me, that was one of the biggest abuses to justice in the history of law. I truly hope it stills goes to trial—it deserves a trial. Their voices should be heard. If their argument is so wrong, then why can't a trial judge make that ruling?

28. After watching the *Juliana* case move through the courts and when the heat, fires, and smoke started mounting even more in my community, I reached out to Our Children's Trust in 2023 to see if I could also take legal action to protect my constitutional rights. The discrimination against young people in asserting their constitutional rights and in how our government treats us with respect to climate change is a real problem. It affects me every day and the choices I make about how to live my life in my childhood because I know I will live with the consequences long after all the adults are gone.

29. All of the facts I put in our complaint about me are true. I regularly am faced with heat, smoke, and ash. I get headaches, congestion, coughing, nose bleeds as a result and am often trapped inside during smoke season. Climate change has harmed my ability to play sports, enjoy family vacations, and even go to school. Part of the reason I quit soccer was that playing through wildlife smoke was something I didn't want to put myself through. But I want the court to understand that all of the harm I've already experienced is not done. It's going to get even worse if no one does anything to stop it and if the courts never look at our claims. The reports are that this fire season, which is already incredibly bad in California, could get even worse in the coming months than the past worse fire and smoke season. It's getting hotter and drier. But, there is still time to help us. Barely. There is still time to avert the ongoing potential for future harm to ourselves. We've undergone far too much and will continue to experience the inconceivable if we fail to draw the line. Shouldn't the line be equal treatment at least, and protecting children's lives?

30. I think the discrimination against me and young people is unconstitutional. I think the government should be working in an equal manner to protect us from pollution. Using discriminatory tactics is harmful to me. Our lives are being discounted and devalued literally and it affects me personally. It's crushing to know that my life is valued less than the adults of today and yesterday and that future lives are valued less. It makes me feel terrible. It makes me not want to have kids. To see the profound and far-reaching impact of the pollution EPA is allowing and permitting come back and hurt my community and myself is purely devastating. These scars may never heal, but we can avert future ones, ongoing ones—and we can start to heal.

The gravity of our situation is monumental, but I know we can work to build a better future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2024.

Avroh S.

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF ANDREW BRADT IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Andrew Bradt, hereby declare and if called upon would testify as follows:

1. I am a professor of law at the University of California, Berkeley School of Law. I have prepared this declaration as an expert in support of the Plaintiffs' response to Defendants' Rule 12(b)(1) motion to dismiss their amended complaint for lack of standing, and specifically to provide historical context for the declaratory judgment remedy. I have personal knowledge of the facts stated herein and, if called to testify, I would and could testify competently thereto. I have not received any compensation in connection with the preparation of this opinion.

2. My research focuses primarily in the areas of civil procedure, conflict of laws, and civil remedies. I have a special interest in and have researched and written on the history and application of the declaratory judgment.[1] My scholarship has been published in numerous law journals and has been cited by both courts and prominent legal treatises. I am a co-author, with Geoffrey C. Hazard, William A. Fletcher, and Stephen McG. Bundy, of *Pleading and Procedure—Cases and Materials* (12th ed., Foundation Press, 2020), and, with Edward Sherman, Richard Marcus, and Howard Erichson, of *Complex Litigation—Cases and Materials on Advanced Civil Procedure* (7th ed., West Academic, 2021). In 2019, I was elected to the membership of the American Law Institute and serve on the Members Consultative Groups for the Restatement (Third), Conflict of Laws, and the Restatement (Third), Torts: Remedies.

---

[1] Andrew D. Bradt, *Much to Gain and Nothing to Lose: Implications of the History of the Declaratory Judgment for the (b)(2) Class Action*, 58 Ark. L. Rev. 767 (2006).

3. In January 2023, I was appointed by the Chief Justice to a five-year term as Associate Reporter to the Advisory Committee on Civil Rules of the Judicial Conference of the United States. The opinions in this declaration are those of the author alone and do not reflect any view on the proper interpretation of the Federal Rules of Civil Procedure, or any opinion of the Committee or any of its members.

4. Prior to joining the Berkeley Law faculty, I was a Climenko Fellow and Lecturer on Law at Harvard Law School. Before entering academia, I was a litigator in the Issues & Appeals Group at Jones Day in New York City, and at Ropes & Gray in Boston. I served as a law clerk to the Honorable Robert A. Katzmann of the United States Court of Appeals for the Second Circuit and the Honorable Patti B. Saris of the United States District Court for the District of Massachusetts. I graduated magna cum laude from Harvard Law School, where I received the Joseph H. Beale Prize for Conflict of Laws, and summa cum laude from Harvard College, where I concentrated in Social Studies.

5. At Berkeley Law, I regularly teach courses in civil procedure, complex litigation, and remedies. I teach about declaratory relief in each of those courses, its importance, and in particular, how and why it differs from traditional forms of legal and equitable relief.

6. In sum, in my opinion, the Ninth Circuit's interpretation of Article III standing under the Declaratory Judgments Act is incorrect. In particular, its statement in *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020), that a case seeking declaratory relief fails the redressability prong of standing analysis because the declaration "is unlikely by itself to remediate [plaintiffs'] alleged injuries absent further court action" is

erroneous. There is, of course, no doubt that a plaintiff must have Article III standing to pursue a claim for declaratory relief. But the main purpose of declaratory relief is to provide parties with a live dispute a definition of their legal rights *without a further coercive remedy*, such as a contempt sanction. Were the Ninth Circuit's conclusion, that the remedy requires additional court coercion to redress the plaintiff's injury, correct, it would effectively mean that actions for only declaratory relief, or judgments that award only declaratory relief even though another remedy might be available, were not constitutional cases or controversies. In effect, it would render the Declaratory Judgments Act unconstitutional, contrary to Supreme Court precedent confirming its place in the American legal firmament.

7. The modern declaratory judgment is a uniquely American innovation. Although particular declaratory remedies, that is, remedies that have no coercive enforcement mechanism, have deep historical roots at common law (*e.g.*, an action to quiet title) and equity (*e.g.*, bills of peace), the expansion of the availability of declaratory relief is a product of the efforts of reformers in the early twentieth century, particularly the prominent professors Edwin Borchard and Charles Clark of Yale Law School, and Edson Sunderland of the University of Michigan Law School, and the American Bar Association, which viewed providing the need for declaratory relief an urgently needed reform.[2]

8. Indeed, as a general matter, until states passed statutes authorizing declaratory judgments in the 1910s and 1920s, they were typically unavailable. A general declaratory remedy would not fit with the rigid

[2] Bradt, 58 Ark. L. Rev. at 772-74.

"forms of action" required at common law in the days before notice pleading, and declaratory relief could often not be had in equity because of the requirement of imminent irreparable injury. Moreover, under the more rigid procedural regimes that predated the Federal Rules of Civil Procedure, a party who could not obtain a remedy at law or demonstrate the irreparable injury at equity was left without protection, or even a court that could hear his case.

9. As a result, parties uncertain about the proper interpretation of the law or a commercial instrument were therefore required to take a risky and potentially harmful action and then seek redress after the fact. The uncertainty, inefficiency, and needless harm caused by this formalist state of affairs triggered a reform movement to expand the availability of a declaratory remedy through legislation. The primary goal of those who advocated for declaratory relief was the availability of a remedy that would "enable parties to ascertain and establish their legal relations, so as to *conduct themselves accordingly*, and thus avoid the necessity of future litigation."[3] The declaratory judgment would allow parties with a live legal dispute to obtain "preventive relief," that is relief in advance of harm in the first instance, or additional harm, occurring. In the words of one Congressman, "Under the present law you take a step in the dark and then turn on the light to see if you stepped in a hole. Under the declaratory law, you turn on the light and then take the step."[4] Such a remedy would not provide "coercive relief," such as an executory judgment or an injunction

---

[3] Edwin M. Borchard, *The Declaratory Judgment—A Needed Procedural Reform*, 28 Yale L.J. 105, 110 (1918) (emphasis added).
[4] 69 Cong. Rec. 2030 (1928) (remarks of Rep. Gilbert).

backed by the threat of contempt. Rather a declaration would provide an authoritative determination of the parties' rights based on which they could plan their future conduct.

10. Similarly, an important benefit of declaratory relief would run to those challenging a federal statute as unconstitutional or otherwise illegal. Rather than require a potential plaintiff in such a case to break the law and risk prosecution in order to mount a challenge, an available declaratory remedy would allow such a challenge without forcing the challenger into a "dilemma no civilized legal system operating under a constitution should force any person . . . that the only way to determine whether the suspect is a mushroom or a toadstool is to eat it."[5] No injunction was thought necessary to require invalidation of an illegal statute; the government could be trusted to act in accordance with the declaration.

11. By 1932, 32 states and territories had passed statutes providing for the general availability of declaratory relief, aided by the development of a Uniform Declaratory Judgments Act in 1922. By this time, a federal analogue had passed the House three times, but could not achieve passage in the Senate due to doubts about its constitutionality under the Article III requirement of a case or controversy and prohibition of advisory opinions, an uncertainty expressed in various Supreme Court *dicta*. The most important such opinion was in *Willing v. Chicago Auditorium Association*, 277 U.S. 274, 289 (1928), in which Justice Brandeis wrote, seemingly somewhat offhandedly, that an order issued by a state court was "simply a

---

[5] Edwin M. Borchard, *The Constitutionality of Declaratory Judgments*, 31 Colum. L. Rev. 561, 589 (1931).

declaratory judgment" whose review was "beyond the power conferred on the federal judiciary."

12. Professor Borchard and other advocates for declaratory relief responded vigorously in several extensive law-review articles. In Borchard's view, declaratory relief was nothing like an advisory opinion "where there is an absence of adverse parties, or insufficiency of necessary parties defendant, or where the plaintiff lacks the necessary interest to sue, or where the controversy is not otherwise ripe for decision. Nor are abstract, hypothetical, academic, fictitious, or dead issues . . . determinable either by the Supreme Court, or any other court, under or outside the procedure for a declaratory judgment."[6] Professor Borchard offered a series of examples of the Supreme Court affirming awards of similar declaratory remedies without coercive effect in other cases involving rights to property, the enforceability of orders, and the validity of various financial instruments. In Borchard's view, "[i]n these cases there is not 'hostile act or threat,' but a controversy as to legal rights, which urgently requires settlement. What more should any court ask?"[7] The proper question is whether "a justiciable controversy exists."[8] Should a court conclude on the merits that a declaration ultimately would not serve a useful purpose in terminating the controversy, it possessed the same discretion it would enjoy at equity to decline to award it.[9]

13. The Supreme Court abruptly changed its mind about declaratory relief in 1933. Aided by an extensive amicus brief by Professors Borchard and

[6] *Id.* at 595-96.
[7] *Id.* at 601.
[8] *Id.* at 609.
[9] *Id.* at 613.

Clark (who would soon be named the reporter to the advisory committee that would draft the Federal Rules of Civil Procedure), the Court held that it had jurisdiction to review a declaratory judgment issued by the state courts of Tennessee under its declaratory-judgments statute that Tennessee's excise tax was unconstitutional. Speaking for the Court, Justice Stone explained that "so long as the case retains the essentials of an adversary proceeding, involving a real, not a hypothetical controversy, which is finally determined by the judgment below," cases awarding only declaratory relief qualified as a case or controversy under Article III.[10]

14. With uncertainty about constitutionality under Article III eliminated, the Congress quickly passed the federal Declaratory Judgments Act in 1934. In 1937, the Supreme Court confirmed the constitutionality of the Act in *Aetna v. Haworth*, 300 U.S. 227 (1937). Writing for the Court, Chief Justice Hughes explained that the question of justiciability in cases brought pursuant to the new statute revolved around "a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged." *Id.* at 241 (citations omitted). If such a case were presented, "the judicial function may be appropriately exercised although the adjudication of rights of the litigants may not require the award of process or the payment of damages." *Id.*

15. Although federal jurisdiction over cases seeking only a declaratory judgment is now clear, it is also important to note that the availability of other forms of relief does not threaten that jurisdiction. Nor does the plaintiff's decision to seek such relief alongside a declaratory judgment. As the statute explicitly states: "any court of the United States, upon the

[10] *Nashville, Chattanooga & St. Louis Ry. v. Wallace*, 288 U.S. 249, 264 (1933).

filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*." 28 U.S.C. 2201(a) (emphasis added). That this language was advocated by the same people, Clark and Sunderland, who would soon become the principal draftsmen of the original Federal Rules of Civil Procedure was no mistake: they all agreed that procedural and remedial law should be as simple and flexible as possible to facilitate courts' reaching the merits of cases.[11] The opportunity for parties to seek, and courts to award, declaratory relief in lieu of or alongside other remedies was part and parcel of this more general approach. No longer would litigants "be turned out of the courts on the excuse that they had come in through the wrong door" by seeking the wrong remedy.[12]

16. Therefore, declaratory relief need not only be "preventive," in the sense that it defines the parties' rights before harm ever occurs. A case seeking a declaratory judgment may establish liability, even if a coercive remedy is not awarded, even if such a coercive remedy would be available. A court's ability to choose among available relief, as I have written, "underscores the overall purpose of the declaratory judgment, which is to allow courts and parties to settle disputes using a procedural device with no formal requirements."[13]

17. The crucial question a federal court must address is whether a declaration of the parties' rights will resolve a ripe, and not hypothetical, controversy,

---

[11] Bradt, 58 Ark. L. Rev. at 786.
[12] Edwin M. Borchard, *The Federal Declaratory Judgments Act*, 21 Va. L. Rev. 35, 39 (1934).
[13] Bradt, 58 Ark. L. Rev. at 788.

and whether the resolution of that controversy will authoritatively guide the parties' future conduct. If a declaratory remedy will accomplish that goal, then it is justiciable under Article III. It of course may be the case that, like any other order, a recalcitrant defendant may not comply with the terms of a declaration.[14] Should such conduct violate the terms of the declaration, subsequent litigation seeking supplemental relief like an injunction, with the relitigation of the issues decided by the declaration collaterally estopped, could then follow. As Professors Laycock and Hasen note, because by the terms of the statute "[a] declaratory judgment has 'all the effect and force of a final judgment or decree' . . . [a] declaratory judgment is therefore issue preclusive in subsequent litigation with respect to all issues actually decided."[15]

18. In my view, therefore, the statement in the Ninth Circuit's opinion in *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020), that a case seeking declaratory relief fails the redressability prong of standing analysis because the declaration "is unlikely by itself to remediate [plaintiffs'] alleged injuries absent further court action" is anomalous and does not conform with historical and contemporary application of the Declaratory Judgments Act or the Supreme Court's determination that the Act is constitutional under Article III. Such a generalized requirement of "further court action" would read declaratory relief out of the law entirely. *All* declaratory remedies—even the venerable ones that predate general declaratory-judgment statutes, like quiet title—depend on the parties'

---

[14] Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L. J. 1091, 1118-20 (2014).

[15] Douglas Laycock & Richard L. Hasen, MODERN AMERICAN REMEDIES—CASES AND MATERIALS 600 (5th ed. 2019) (quoting 28 U.S.C. § 2201(a)).

amenability to follow the dictates of a final judgment, as do all coercive remedies (hence the availability of contempt as an ancillary remedy against a defendant unwilling to comply with an injunction). It is of course the case that a declaration should not issue solely to "benefit the plaintiffs psychologically." *Id*. [16] Thus, in my opinion, based on my historical and contemporary research on remedies and declaratory relief specifically, a declaration of unconstitutionality of a law, policy, or ongoing practice that causes harm, like alleged discrimination, should provoke action consistent with the court's order, and is the purpose of the Declaratory Judgments Act.[17] If further litigation is necessary to enforce the declaration through an injunction, it would then be proper, just as proceedings seeking contempt sanctions or writs of execution would follow a judgment providing coercive relief.

19. In sum, the text, history, and purpose of the Declaratory Judgments Act demonstrates that declaratory relief alone is consistent with the requirements of Article III as long as there is an active controversy between the parties and where a resolution of the parties' rights or obligations will define their legal relationship moving forward, thus avoiding unnecessary litigation, risk, and future injury.

[16] It is important to note that there is a meaningful difference between "psychological benefit" from winning as described in the opinion, versus a remedy that provides redress for tangible injury to mental health or the enjoyment of life, which is routinely available in different types of claims.

[17] Bray, 63 Duke L. J. at 1120 ("(Many of the most momentous and controversial decisions of constitutional law over the last century have been declaratory judgments . . . . No critic of any of these decisions has ever contended that it had less effect because it took the form of a declaratory judgment.").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2024.

s/ [signature]
Andrew Bradt

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Elizabeth Pinsky, hereby declare and if called upon would testify as follows:

1. I am a child and adolescent psychiatrist and pediatrician at Massachusetts General Hospital and Associate Director at the Massachusetts General Center for Environment and Health. I have personal knowledge of the facts stated herein and, if called to testify, I would and could testify competently thereto. Because of the importance of the issues presented in this case, I am providing this expert opinion on a pro bono basis and am not charging these young plaintiffs for my time in preparing this declaration.

2. I received my medical degree from Harvard Medical School and completed consecutive residencies in pediatrics and psychiatry followed by a child psychiatry fellowship at Massachusetts General Hospital. My clinical interests focus on the intersection of child mental and physical health, including childhood trauma associated with climate change. I am board certified in both pediatric medicine and psychiatry and an Assistant Professor in Psychiatry at Harvard Medical School. I lecture nationally on climate change and mental health, am the author of numerous related journal articles and textbook chapters, and serve as Chair of the Climate Change Committee at the American Academy of Child and Adolescent Psychiatry.

3. Climate change is a mental health emergency for children. Current levels of increased temperatures from greenhouse gas pollution, and the climate consequences of that, are already posing significant threats and harming children's physical and mental well-being. Further pollution and heating will exacerbate that already present harm to children. Conversely, fully accounting for children's lives and accurately incorporating these costs into policy making could begin to alleviate these escalating harms.

4. Compared to adults, children have disproportionate exposure to many of the pathways through which climate impacts human health. Children spend more time outdoors, and are physically closer to the ground where particulate matter and other pollutants are measurably more concentrated. Children breathe at a faster rate and require more calories and more water per pound of body weight than adults, exposing them to proportionately higher levels of pollutants. Young children are also uniquely vulnerable to severe harm from infectious diseases spreading in range and seasonality as the climate warms, including Zika, malaria, and Dengue.

5. Children experience direct impacts to their mental health through acute climate events like heat, which has been linked to deterioration in sleep, cognition, mood, and academic achievement. Heat is particularly dangerous for youth with chronic mental illness, who may have impaired temperature regulation due to neuroanatomic abnormalities or to side effects of common psychoactive medication. Likewise, chronic air pollution has been associated with increased rates of anxiety and depression in children, and episodic poor air quality has been associated with increased pediatric crisis presentations.

6. According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), the initial criterion for the diagnosis of Post Traumatic Stress Disorder (PTSD) is exposure to a traumatic event, described as actual or threatened death, serious injury, or sexual violence. As extreme weather events increase in frequency and intensity, so does exposure to a range of potentially traumatic exposures, including injuries, bereavement, and threats to availability of food, shelter, and medical care. Research has further shown that the aftermath of extreme weather events

is associated with increased risk of other traumatic exposures, including interpersonal violence, child abuse, and community and gender-based violence.

7. Short-term or acute climate events like hurricanes, floods, wildfires and evacuations, and extreme heat have been linked not just to PTSD, but also to a range of additional negative mental health outcomes including anxiety and depression, substance use disorders, and suicide. Recurrent or ongoing exposures, like drought conditions, consistently high temperatures, repeated exposures to wildfire smoke and poor air quality also lead to chronic traumatic stress. Studies have demonstrated that children who experience severe weather events may suffer psychiatric symptoms that are more severe and of longer duration compared to adults.

8. Even children who have not directly experienced climate-related trauma increasingly experience impairing distress in the setting of exposure to climate change through news media, social media, and awareness about how climate change will affect the viability of their futures. This distress can manifest itself as fear, dread, despair, disaffection, rage, or grief and is sometimes referred to as "eco-anxiety." It is important to note that "eco-anxiety" is not a mental illness, but a normative reaction to an imminent threat. Recent studies have shown a high prevalence of climate distress in young people, with related impact on their beliefs and feelings about their futures.

9. Though both adults and children can be affected by climate change, children are distinctly more vulnerable to life-long consequences for their physical and mental health in terms of both severity and duration. Early childhood is critical for brain development. Stress from even minor

disturbances during childhood, including environmental stressors, can irreversibly impact neurodevelopment. Specifically, exposure to products of fossil fuel combustion in childhood has been linked to lower IQ, attention-deficit hyperactivity disorder, and autistic traits.

10. The consequences of adversity experienced in childhood are also both quantitatively and qualitatively different from the consequences for adults. This fact has been firmly established by the robust Adverse Childhood Experiences literature. Adverse Childhood Experiences (ACEs) include both narrowly defined traumatic events (like those meeting PTSD criterion) and, more broadly, circumstances that threaten the safety, stability, and security of the childhood environment. Many of these adverse circumstances – such as housing insecurity, abrupt separation from a caregiver, and parental mental illness – are also more common in aftermath of extreme weather.

11. ACEs are associated with profound consequences in adulthood, including lower mental health, physical health, economic potential and even life expectancy. There is a powerful dose-response relationship between the total number of ACEs experienced and increased likelihood of negative adult outcomes. These outcomes are significant, incur enormous costs, and include lower educational attainment and employment, increased rates of mental illness and suicide, increased rates of cancer, diabetes, and heart disease, and early death.

12. As fossil fuel pollution continues, more heating will result and, thus, more incidences of childhood exposure to traumatic or harmful climate events. Already, a child born in 2020 is expected to be exposed up to a seven-fold

increase in extreme heat waves compared to someone born in 1960.[1] Thus the greater emissions, the greater a child's lifetime exposure to extreme climate events and the resulting ACEs and mental health consequences. The economic burden of health conditions associated with ACEs among current adults in the United States was recently estimated at $14.1 trillion annually.[2]

13. Compared to adults, children are at still further additional risk from climate change because their psychological and emotional development is in progress. The collective adult abdication of responsibility for their well-being inflicts a unique injury during this period of immaturity. The primary developmental task of early childhood is to establish a sense of security and trust through "attachment," a process that requires predictable adult caretakers who ensure the child's safety. It is from a base of so-called "secure attachment," established in childhood, that adolescents can develop the individuation and independence, motivation, and risk-taking that allow them to form meaningful relationships and become productive, contributing adults.

14. Children raised with caretakers who do not care for their basic needs and safety, or who do so unpredictably, are at risk for derangements in attachment and a range of negative adult outcomes, including anxiety, depression, and interpersonal difficulties. A similar child/caregiver

---

[1] Wim Thiery et al., *Intergenerational Inequities in Exposure to Climate Extremes*, 374 Science 158 (2021).

[2] Peterson C, Aslam MV, Niolon PH, et al., *Economic Burden of Health Conditions Associated With Adverse Childhood Experiences Among US Adults*. JAMA Netw Open. 2023;6(12):e2346323. doi:10.1001/jamanetworkopen.2023.46323

relationship can be applied on a population level for children and the adults in positions of power whose decision-making could, but does not, safeguard their wellbeing. Knowing that their government is continuing to permit fossil fuel pollution, treating children's lives unequally, with repercussions that will disproportionately impact them, unequally aggravates psychological harm for children. The failure by governments to respond to the climate crisis and to affirmatively contribute to it -- importantly *as perceived* by young people -- has been linked to climate distress in a study of 10,000 youth,[3] suggesting that it is not just fear of climate change, but this fear in combination with the belief that adults collectively will not protect them, that contributes to distress. This collective harm has been referred to as "institutional betrayal."

15. Children are also politically powerless, with no immediate control over the decisions that will impact their futures, contributing to a sense of helplessness in the face of institutional betrayal. These harms are amplified for children of color who are already vulnerable due to systems, or institutions, that have consistently perpetuated inequities in housing, education, health, and political power. Children, including Plaintiffs in this case, experience institutional betrayal by Defendants' knowingly and intentionally abdicating their fundamental role to keep them safe, and instead intentionally value their lives as less than those of adults.

16. Because institutional betrayal is a distinct harm, children reap immediate benefits when government eliminates one source of trauma, like the

[3] Caroline Hickman et al., *Climate Anxiety in Children and Young People and Their Beliefs About Government Responses to Climate Change: A Global Survey*, 5 The Lancet Planetary Health E863 (2021).

discriminatory unequal or the mistreatment of children. Thus, based on my research, other published research, and my experience working with children of all ages, it is my expert opinion that Plaintiffs' mental health, and therefore physical and developmental wellbeing, would immediately benefit from Defendants ceasing discriminatory policies and practices that devalue children's lives.

17. Every child living in the United States today is experiencing some level of harm from fossil fuel pollution and associated warming. These harms will mount as long as pollution and warming continue unabated. Conversely, every avoided fraction of a degree of warming confers benefit.

18. Similar to the products of fossil fuel combustion, there is no known safe level of exposure to lead: each additional microgram of exposure represents lost cognitive ability and lower academic achievement. Also similar to current exposure to warming, virtually all Americans born before 1980 were exposed to lead levels that would demand urgent action if detected in a child today. With abatement measures, average blood lead level of children in the US has steadily declined over the past 40 years from 15 μg/dL to 0.6 μg/dL, a change that represents millions – and possibly billions – of preserved IQ points and associated savings over time. These then-children also experienced *individual* benefits from abatement measures; failing to fully account for the specifically developmental nature of their vulnerability would have presented a significant hurdle to their protection. Changes in policy that lead to even incremental benefits to children in the short term have profound long-term benefits to those children's lives and to society at large, especially when the real human benefits are not economically discounted.

19. It is my expert opinion as a child and adolescent psychiatrist and pediatrician, and one of the nation's leading experts in the field of climate anxiety and trauma in our youngest populations, that removing discriminatory barriers to children accessing equal rights under the law, and attempting to secure equal privileges to live safely, to breathe clean air, to be free from extreme heat and other unnatural weather events, and at minimum to seek to prevent their worsening physical and mental health circumstances as climate pollution continues, is unquestionably meaningful for these children. Conversely, having courts deny their right to be heard and their rights and claims of harm to be considered is yet another institutional betrayal for the most politically powerless group of citizens in the country.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2024.

[signature]

Elizabeth Pinsky, MD

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF LILIANA DOGANOVA, PhD, IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE**
**SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Liliana Doganova, hereby declare and if called upon would testify as follows:

1. I have prepared this expert declaration in support of the young plaintiffs in *Genesis v. EPA*. I have personal knowledge of the facts and opinions stated herein and, if called to testify, I would and could testify competently thereto. Because of the importance of the issues presented in this case, I am providing this expert opinion on a pro bono basis and am not charging these young plaintiffs for my time in preparing this declaration.

2. I am an Associate Professor at the Centre de Sociologie de l'innovation, Mines Paris, PSL University, France, and recently completed a Visiting Fellowship at the Remarque Institute at New York University. I have a PhD in the social studies of science and technology studies (STS) from Mines Paris, PSL University. I am co-director of the program in Public Affairs and Innovation at Ecole des Mines de Paris.

3. I am a member of the editorial boards of *Valuation Studies* and *Journal of Cultural Economy.* My work is at the intersection of economic sociology and science and technology studies. It examines valuation practices in different fields of the economy. In particular, I have worked on business models, the valorization of public research, the construction of markets for bio- and clean-technologies, and more recently, on forest management and drug prices. I regularly publish in journals such as *Economy and Society*, *the Journal of Cultural Economy*, *Research Policy*, *Science as Culture*, and *Science and Public Policy*. I have authored 14 articles in academic peer-reviewed journals and 10 chapters in academic edited volumes. I have authored three books including, most recently, *Discounting the Future: The Ascendancy of a Political Technology* (2024), which explores the links

between valuation and temporality through a historical sociology of the technique of discounting the future. My academic publications are well recognized by my peers and have been cited 2,489 times in total (as counted by Google Scholar on August 6, 2024).

4. My domain of expertise is the historical and sociological examination of valuation practices in different fields of the economy. Building on the knowledge developed in the academic discipline of science and technology studies (STS), I examine techniques of economic valuation. I do not design or apply such techniques, as an economist would do. My expertise lies in the analysis of their historical origins, their current uses in social practices, the controversies that they trigger, and the effects that they produce in economy and society. In the last ten years, I have been conducting research on one particular valuation technique, known as discounting and embedded in standard tools for decision-making like cost-benefit analysis (CBA) in public policy and discounted cash flow (DCF) analysis and net present value (NPV) in firms. I have developed a historical sociology of discounting, covering its origins in scientific forestry in the 19th century, its formalization in economics in the early 20th century, its diffusion in corporate investment practices since the middle of the 20th century, its contemporary uses in the biopharmaceutical industry, its spread beyond the strict domain of the economy into international law (in particular, investor-state dispute settlement), and its implications for climate policy.

5. In order to treat as commensurate benefits and costs that occur at different points of time, standard cost-benefit analyses use discounting to translate future costs and benefits into their "present value". The present value of future costs and benefits is considered to be lower, due to their distance in

time and uncertainty. Future costs and benefits are translated into present value by reducing their value according to the "discount rate". Just as one would apply an interest rate to determine the future value of a present sum of money, the discount rate is meant to determine the present value of a future sum of money based on the assumption that a dollar today is worth more than a dollar tomorrow—or, as the saying goes, a bird in the hand is worth two in the bush. The practice of discounting devalues the future as a time that is less worthy than the present. At a discount rate of 5%, $100 in 10 years is worth $63 today and only 80 cents in 100 years. Put in human terms, it can be stated that discounting devalues children who do not hold economic power today, but will live in future years, and gives priority to present economic value held by adults over the future lives of children.

6. My research on discounting has demonstrated that this valuation technique is not neutral: it relies on strong assumptions about the value of different temporalities (namely, the assumption that the future is worth less than the present) and it produces political effects (namely, by discriminating against the social groups whose temporalities are over-valued or, conversely, devalued by the application of this technique). While discounting has been justified by the argument that individuals have a natural "preference for the present", its use beyond individual decision-making (e.g., when an individual decides whether to consume now or save for later) is the result of framing various situations as situations of "investment" and applying to them the forms and tools of financial reasoning (e.g., is it more worthy to invest money in this or that project?). In collective rather than individual decision-making, the discount rate no longer reflects an individual's preference for the present, but the returns expected by investors (the so-

called "cost of capital"); it does not express a natural characteristic of human beings, but a society's choice over the allocation of resources among different temporal horizons and social groups. Throughout its history, discounting has been shown to favor the short term and produce a bias against the longer future. This effect has been demonstrated, for example, for the determination of rotation lengths in forestry, the selection of investments in firms, and the implementation of environmental and climate change policies in public policy making and regulation.

7. When it comes to climate policies, the "people" being affected by those policies are not the same. Adults with economic power today are deciding to consume now and deprive, not themselves, but children and future generations of children of the possibility of consuming (or enjoying resources) later. Therefore, if we want children who will live in future years affected by decisions made today to have equal value and be represented equally in the decisions of policymakers today, discounting would need to be eliminated from the analysis. The unequal treatment of time in discounting frames the future as radically different from the present. Similar to the circumstance of "future generations", children today who might live beyond the end of this century embody a figure of otherness—"others" who appear more distant from our current economic needs and who often get depicted as being sometimes richer and smarter and more capable of solving problems they inherit in the future.

8. In their filing with the court, defendant EPA contests whether the policy and practice of discounting have any concrete effect on their decision-making, without making a definitive statement that it never does. EPA also suggests the discounting policy is "a recommendation." I offer my expert

opinion to the contrary that it would be highly unusual for a technique so ingrained in decision-making processes to *not* have a policy effect. Discounting policies guide agency policymakers in a process of decision-making that informs policy considerations and ultimate choices. We can see this play out historically in different organizational settings, and within EPA's own portfolio of pollution control.

9. My expert opinion is based on four key observations. First, in general terms, research in STS (science and technology studies) has demonstrated that techniques do have effects on the practices in which they are introduced. In particular, sociological research has established that technical artefacts have "agency" (they enable or, on the contrary, constrain certain forms of action) and that economic tools are "performative" (they shape the behavior of economic actors, rather than merely reflecting pre-existing behavior).[1] In the specific case of cost-benefit analysis, historical research has shown that this tool was introduced precisely with the purpose of producing an effect: ensuring that public policy decisions are reached through quantification and objectivity (i.e., following collectively agreed upon rules) rather than through subjective decisions, political influence and power struggles.[2] The agreed upon rule with discounting is that the present will be valued more than the future. Claiming that the tool of discounting—and hence cost benefit analysis—

[1] Bijker, Wiebe, & Law, John (Eds.). 1994. Shaping Technology/Building Society: Studies in Sociotechnical Change. MIT Press. MacKenzie, Donald, Fabian Muniesa & Lucia Siu (Eds.) 2020. Do Economists Make Markets? On the Performativity of Economics. Princeton University Press.

[2] Porter, Theodore M. 1995. Trust in Numbers: The Pursuit of Objectivity in Science and Public Life. Princeton University Press.

may or may not have an effect on decision-making raises a practical question of why the agencies have such a policy and practice in the first place and why they would defend it if it is found to generate unintended detrimental consequences.

10. Second, this general finding on the effects of techniques is supported by empirical research on the effects produced by discounting in different organizations. The use of discounting, as part of the procedure of cost-benefit analysis (CBA) of public policies or regulations, and of discounted cash flow (DCF) and net present value (NPV) analysis of corporate investments, has led to tangible effects in the decisions made by policy makers and managers. Even when these procedures are not mandatory, and when calculations do not automatically determine the decisions that are eventually made, they provide a "framing" in which the future is conceived as less worthy than the present. Even when CBA and DCF are allegedly considered as merely the basis for discussion, rather than an endpoint, they still introduce a bias against the long term. Although this bias may not translate in every decision made, it produces a clear trend that has been documented by research. Research in strategy and management has established a link, for example, between the use of the DCF and NPV tools in companies and the undertaking of more short-term rather than long-term investment projects by US companies in the 1980s.[3] Scholars have also concluded that the use of these tools causes managers to underestimate the

[3] Hayes, Robert H., & William J. Abernathy. 1980. "Managing Our Way to Economic Decline." Harvard Business Review 58.4, pp. 67–77. Hayes, Robert H., & David A. Garvin. 1982. "Managing As If Tomorrow Mattered." In Managerial Excellence: McKinsey Award Winners from the Harvard Business Review, 1980–1994, pp. 51–66. Cambridge, MA: Harvard Business Review Press.

benefits of proceeding with investments in innovation where the benefits accrue farther out in time.[4] Similarly, in the domain of public policy, experts in economics have established a link between the use of discounting in CBA and "climate inaction".[5] They have also proposed that changing the tool of discounting is a relevant way to change the observed effect of climate inaction. In particular, proposals to decrease discount rates to zero or almost zero, or even use negative discount rates, have been made by a growing number of experts and scholars in the field of environmental economics.[6]

11. Third, there is no reason to assume that the EPA is an organization in which this general, theoretically and empirically grounded, link between a tool and its effect (that is, the use of discounting and the decisions made) does not apply. EPA engages in CBA through its Regulatory Impact Analyses and employs discounting as a matter of policy. There is no doubt on the use of discounting by EPA. Procedures for CBA described in Circular A-4 explicitly include the use of discounting. In 2003, the operable circular (until 2025) revised recommended discount rates, requiring public agencies to provide estimates of CBA using two different discount rates: not only the 7 percent that had been in place since 1992, but also a 3 percent

---

[4] Christensen, Clayton. M., Stephen P. Kaufman, & Willy C. Shih. 2008. "Innovation Killers: How Financial Tools Destroy Your Capacity to Do New Things." Harvard Business Review 86.1, pp. 98–105 and 137.
[5] Stern, Nicholas. 2007. The Economics of Climate Change: The Stern Review. Cambridge, UK: Cambridge University Press.
[6] Stern, Nicholas. 2007. The Economics of Climate Change: The Stern Review. Cambridge, UK: Cambridge University Press. Fleurbaey, Marc & Zuber, Stéphane. 2013. Climate Policies Deserve a Negative Discount Rate. Chic. J. Int. Law 13, pp. 565-595.

rate. Both discount rates were justified with reference to investment practices. While the 7 percent rate was defined as the "rate of return to private capital in the U.S. economy," which "approximates the opportunity cost of capital," the 3 percent rate corresponded to the "rate of return on long-term government debt" as a proxy for "the rate that the average saver uses to discount future consumption".[7]

12. The circular from 2003 explicitly refers to the practice of EPA as an example of how these two discount rates should be used: "For regulatory analysis, you should provide estimates of net benefits using both 3 percent and 7 percent. An example of this approach is EPA's analysis of its 1998 rule setting both effluent limits for wastewater discharges and air toxic emission limits for pulp and paper mills. In this analysis, EPA developed its present-value estimates using real discount rates of 3 and 7 percent applied to benefit and cost streams that extended forward for 30 years. You should present a similar analysis in your own work."[8]

13. It should be noted that the circular acknowledges the discrimination introduced by discounting when costs and benefits are experienced by different generations. In a section on "intergenerational discounting," the circular explains: "Special ethical considerations arise when comparing benefits and costs across generations. Although most people demonstrate time preference in their own consumption behavior, it may not be appropriate for society to demonstrate a similar preference when deciding between the well-being of current and future generations. Future citizens who are affected by such choices cannot take part in making them, and

[7] OMB Circular A-4, 17 September 2003, p. 33.
[8] OMB Circular A-4, 17 September 2003, p. 34.

today's society must act with some consideration of their interest." However, the circular maintains that the same discounting techniques should be followed in intergenerational configurations, only "supplement[ing] the analysis with an explicit discussion of the intergenerational concerns (how future generations will be affected by the regulatory decision)". Then, the circular recommends, "policymakers would be provided with this additional information without changing the general approach to discounting".[9]

14. Fourth, to the evidence of the use of discounting by EPA (hailed as a leading example, rather than an exception), should be added the scarcer but telling evidence of the link between the use of discounting and specific regulatory decisions. One revealing example my research illuminated is the mobilization of CBA and discounting in the struggle over banning asbestos in the 1980s in the US. In the early 1980s, EPA drafted several proposals to ban asbestos, and then suddenly withdrew them. The U.S. House of Representatives' Energy Committee commissioned a report, which revealed the role played by the OMB in the withdrawn proposals. The OMB had recommended that the decision to ban asbestos should be based on a cost-benefit analysis: if the costs that regulation would incur for industry were higher than the benefits of saving human lives, regulation would not be justified. The OMB had recommended, further, that estimates of the costs and benefits of regulating asbestos apply a discount on the value of a human life for the years it takes for cancer to develop. More precisely, it assigned an arbitrary value of 1 million dollars to every life saved. But this value was to be discounted down to 22,000 dollars if cancer

[9] OMB Circular A-4, 17 September 2003, p. 35.

remains latent and causes death forty years later. An article in the New York Times aptly described the two conflicting views of discounting that clashed over the case of asbestos. For the OMB, "the practice of discounting reflects the amount of time it takes to get a return for money spent now to protect lives". For the Energy Committee, discounting was not only "morally repugnant" but also dangerous: if widely adopted, it could "thwart regulation of many toxic substances through the application of cost-benefit criteria" and the nation would run the risk of "fail[ing] to protect future generations from many serious chemical hazards."[10]

15. To sum up, research has consistently demonstrated that 1) techniques, and economic valuation techniques in particular, produce effects in the practices in which they are introduced by shaping behavior and decision-making, 2) discounting, as embedded in CBA, DCF and NPV procedures, generates a bias against the long-term in decision-making, even in organizations in which these procedures are neither mandatory nor the sole basis of reaching decisions; 3) discounting is supposed to be, and has been, consistently used by the EPA for decades, and has been maintained in spite of concerns about intergenerational discrimination; 4) there are clear examples from past cases in which the use of discounting in CBA has altered the EPA's decisions on implementing environmental regulation. Therefore, my expert opinion is that it is improbable that the use of discounting by the EPA has not had any policy effect and has not shaped the decisions made about the implementation of environmental regulation,

[10] Doganova, Liliana. 2021. "Discounting the Future: A Political Technology." In Jenny Andersson and Sandra Kemp, eds., Futures, pp. 380–94. Oxford, UK: Oxford University Press.

including pollution control. Moreover, the policy effect of discounting in EPA's decisions is a form of direct discrimination against future generations, as recognized in the OMB Circular A-4 of 2003. The bias against the long term and the discrimination against future generations, which have been demonstrated to be inherent in discounting, has direct discriminatory effect against children because they are in fact the future generations who will be living in the longer future. Children living today will undergo a similar form of discrimination as future generations of children, because children do not have political rights to participate in decisions made by present generations (present adults) on future matters (the future lives of present children). Therefore, it can be concluded that the discounting practice creates an inherent bias against children's interests in EPA's formulation of regulations to control greenhouse gas pollution and other forms of environmental regulation.

16. Discounting is not necessary to conduct economic analyses, and policymakers have many economic tools to construct accurate cost-benefit analyses that are not biased against children and their future lives. Thus, eliminating EPA's policy and practice of discounting would immediately alter the decision-making process and provide greater clarity into the true costs of these policies on children and future generations of children. Looking to other economic tools would open decision makers' eyes to a new set of possible solutions. It is my expert opinion that if policymakers eliminated discounting in their cost-benefit analysis, the benefits of stringent climate change policies, or pollution-control policies, are likely to greatly over-compensate their costs and justify significant pollution control climate policies.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 9, 2024.

Liliana Doganova, PhD

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.

**Plaintiffs,**

**vs.**

**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.

**Defendants.**

**Case No.: 2:23-CV-10345-MWF-AGR**

**DECLARATION OF PLAINTIFF NOAH C. IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**

Date: September 30, 2024
Time: 10:00 a.m.
Judge: Hon. Michael W. Fitzgerald
Courtroom: 5A

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE**
**SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Noah C., hereby declare and if called upon would testify as follows:

1. I am a Plaintiff in the above-entitled action. I make this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. I have personal knowledge of the facts stated herein, and if called to testify, I would and could testify competently thereto.

2. During our first court hearing in our case it was suggested to us that we could do lobbying and volunteering to make a difference. Having to lobby and volunteer avoids the very thing we are trying to do with this lawsuit—which is to protect our constitutional rights to be treated fairly. It is upsetting to have the main question we are asking to be resolved avoided: Do we have equal rights that must be protected despite what the political figureheads in power decide?

3. I am 15 years old and cannot vote. Despite my inability to vote, during my childhood since I was 9 years old, I have tried to do what the Court suggested to us—to advocate for policies that address climate change and its effects. I have been involved doing lobbying with an organization, Schools for Climate Action, that helps students engage with the government to address climate change. During the pandemic when I was going into sixth grade, I also lobbied for a Congressional Resolution, S.Con.Res.13/H.Con.Res., recognizing children's fundamental rights and climate recovery.

4. In their First Motion to Dismiss, Defendants stated the Court should not hear my case because these constitutional issues should be brought to the political branches of government. Yet I have brought these issues to the attention of Congress for several years. Students, including myself, have been telling our stories to Congress for years, yet we have not been heard

and our rights are not being protected because the government keeps pursuing policies that make climate change worse and treat me and other children unfairly, like the ones involved in our case.

5. In 2020, when I was around 9 years old, I participated in my first lobbying experience over Zoom to members of Congress. During one call, I felt like no one was listening to us, which made me cry and I had to leave the room to calm down.

6. Last year, in 2023, along with other students, I went out to Washington, D.C. to meet with members of Congress from both political parties to try to convince them to pass two resolutions, including a non-binding resolution stating that the climate crisis was harming youth mental health. This issue affects me personally because, as I put in our Amended Complaint, I have mental health struggles that have been caused by and are worsened by climate anxiety. Our group visited the offices of different representatives. This experience was extremely frustrating to me because several of these members of Congress treated us like a brief calendar item in their scheduled day that they had to endure and conclude as soon as possible. No meaningful climate change policies, or even non-binding resolutions, resulted from our work in Washington, D.C.

7. Despite hearing the stories of other students and me, very few members of Congress signed on to the non-binding resolution. The unwillingness of these members of Congress to listen to young people like me is extremely discouraging. Lobbying takes an emotional toll on me, to see firsthand that politicians won't do anything to stop what is happening to us, and it's disappointing when nothing comes from our efforts. When these members of Congress refuse to really listen to me, unlike an adult, I have no way to

vote them out of office. To protect my mental health, I have turned to other outlets outside of the political process to combat climate change, like choosing to be a Plaintiff in this action to stand up for my rights where I actually have a chance to be heard.

8. Though being shut out of the political process is discouraging, and having no right to legally participate in voting, I know my rights can still be protected through the courts, which is why I joined in filing this case.

9. In my experience, adults don't listen to children as much as they listen to other adults because they think we aren't mature enough to know what's going on in the world and what should be done. I have experienced getting the "pat on the head" and then shoved aside by politicians in favor of other priorities. We, as children, are not treated equally in our government's policies. EPA makes decisions about pollution based on who is in power and not based on science or what is best for children.

10. Watching big political figures make decisions about pollution and the world that I have no control over because I can't vote increases my climate anxiety. I would jump for joy if EPA was required to recognize us as a group of people with valid and equal concerns. It would make me less anxious about my future. We would have equal representation if we were listened to and taken into account fairly.

11. I don't want to have to keep lobbying Congress for my health and my future and if the court helped protect our rights, I wouldn't have to spend my childhood doing that. But it would also be a lot less stressful to go and lobby if our rights were protected through our lawsuit because the politicians I've lobbied in front of are made up of a lot of older men who

weren't interested in what we have to say. If they had to listen because our rights were protected, it would make a big difference.

12. If I didn't need to worry about my government's treatment of us and climate pollution, I would be less anxious and do the things I love to do with my family and friends and in nature. It would also be easier to focus on school. It is very difficult to sit in Algebra class one minute and have my rights ignored and the climate crisis worsen the next.

13. All of the facts I stated in the Amended Complaint about my injuries are true.

14. I understand that the Court cannot, on its own, solve the entire climate crisis. But if the Court at least tells EPA that it cannot discriminate against me and other young people, that will make a significant difference, and give us a chance at a life will less harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 9, 2024.

NoAH

Noah C.

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF JOSEPH E. STIGLITZ, PhD, IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Dr. Joseph E. Stiglitz, hereby declare and if called upon would testify as follows:

1. I am a University Professor at Columbia University with joint appointments in the Faculty of Arts and Sciences (Department of Economics), the Graduate School of Business (Department of Finance), and the School of International and Public Affairs. I have been retained as an expert on behalf of Plaintiffs. I serve as an expert in this case entirely *pro bono*. I have personal knowledge of the facts stated herein and, if called to testify, I would and could testify competently thereto.

2. I am the co-chair of the High-Level Expert Group on the Measurement of Economic Performance and Social Progress at the Organisation for Economic Co-operation and Development ("OECD"), and the Chief Economist of the Roosevelt Institute. I have received numerous fellowships and honors over my career, including the Nobel Memorial Prize in Economics in 2001.

3. Prior to assuming my position at Columbia University, I held professorships at Stanford University, Yale University, Princeton University, and the University of Oxford, where I taught a wide variety of graduate and undergraduate courses in economics and finance. Public economics and public finance, which study how governments raise funds and make expenditures, have been major pillars of my academic work.

4. From 1993 to 1997, I served as a member of President Clinton's Council of Economic Advisers, and from 1995 to 1997, as Chairman of the Council and a member of the President's Cabinet. As Chairman and Cabinet Member, I was heavily involved in formulating fiscal policy, sustainable economic policies (including environmental economic policies), financial

sector regulation and banking policy, and coordinating policy with the U.S. Treasury.

5. Environmental economics and economic policy around natural resources has been another focus of my academic and professional work. I was one of the lead authors of the 1995 Report of the Intergovernmental Panel on Climate Change, which shared the 2007 Nobel Peace Prize with former Vice President Gore. I was co-chair of the High-Level Commission on Carbon Prices (we released our report in May 2017). I was also involved in environmental economic policy during my time on the Council of Economic Advisors, where one of my responsibilities was evaluating, designing, and implementing public policies that affect the environment, and while Chief Economist of the World Bank, where one of my responsibilities was evaluating and designing environmentally sustainable economic policies. I have also published many peer-reviewed articles that examine how we treat externalities (e.g., pollution), public goods (e.g., the environment), and depletable and renewable natural resources.

6. I have studied and written extensively on discount rates and policies in cost benefit analyses, including on their use in the context of natural resources and in particular climate change.[1] I have long discussed the importance of

---

[1] *See, e.g.*, Joseph Stiglitz, Scott Barrett & Noah Kaufman, *How Economics Can Tackle the 'Wicked Problem' of Climate Change* (2024), https://igp.sipa.columbia.edu/sites/igp/files/2023-12/How-Economics-Can-Tackle-the-Wicked-problem-of-Climate-Change.pdf; Nicholas Stern & Joseph Stiglitz, *The Social Cost of Carbon, Risk, Distribution, Market Failures: An Alternative Approach*, NBER Working Paper 28472 (2021), https://www.nber.org/system/files/working_papers/w28472/revisions/w28472.rev0.pdf; Nicholas Stern, Joseph Stiglitz et al., *The Economics of Immense Risk, Urgent Action and Radical Change: Towards New Approaches to the Economics of Climate Change*, 29 J. Econ. Methodology 181 (2022), https://doi.org/10.1080/1350178X.2022.2040740.

reforming the use of discount rates, especially in the context of climate change, where we are concerned with the future wellbeing of children and generations to come; and even as chairman of the Council of Economic Advisers nearly 30 years ago during the Clinton administration, I argued for the use of low discount rates for climate related decisions. The reason I advocated at the highest level of our federal government for changing discount rate policies and practices in our regulatory systems was because of the outsized effect these economic analyses have on policymaking. While it is true that cost-benefit analyses are but one factor in a range of inputs, in my expert opinion, they heavily influence policy proposals and ultimate decision-making, including by EPA. Indeed, that is what the A-4 circular and regulatory impact analyses are intended to do: have an effect.

7. In short, the discounting policies challenged here provide a distorted evaluation of the full costs of climate disasters and other climate economic harm, including projections about the range of harms going forward, and the immense cost of delayed action to stop additional greenhouse gas pollution. These discounting policies have a disproportionate effect on children and future generations and the discounting practices do not provide an accurate view of the impacts either of climate change or actions taken to mitigate or adapt to climate change. This opinion is based on the principles underlying discount rates and the sensitivities of models generally to the discount rates employed in the analyses, particularly the discriminatory effects on children and future generations. In other words, discounting discriminates by date of birth—it attaches lower value (and consideration) to a person born later, like these children.

8. Decision making regarding climate mitigation is particularly sensitive to the discount rates used because the costs tend to be incurred today for benefits in the future. Because of compounding, even relatively small discount rates can minimize future benefits and suggest (wrongly) that proposed regulations have no or little net benefits, which is a required consideration for regulatory rulemaking.

9. The graphs below illustrate the effect of the choice of discount rate. The first graph shows how much a dollar at some year in the future is worth today under three discount rates: 7%, 3%, and 0.1%. As the graph shows, at a 7% discount rate a dollar 10 years in the future is only worth about $0.50 today. Thus, to justify a cost of $1 today, we would need benefits of at least $2 in 10 years' time. Using a 7% discount rate a dollar 100 years in the future is worth only a little more than $0.001 today (or one tenth of one cent). That is, to justify investing a dollar today to mitigate climate change would require benefits of at least $1,000 in 100 years. Or to put it another way, we would rather give $1,000 to someone alive today than give a dollar to our greatgrandchildren 100 years from now. To a first order approximation, our greatgrandchildren simply do not count.

10. At a 3% discount rate, that same dollar 100 years from now is worth about $0.05 today, or about 45 times as much, and at a 0.1% discount rate, it is worth about $0.90 today or about 800 times as much.




11. The second graph highlights this latter point by showing the relative values of a dollar 200 years in the future by comparing present value at a 3% and 0.1% discount rate relative to the 7% discount rate. That is, it compares the ratio of the present values for the same dollar in the future using different discount rates. For benefits 200 years in the future, the present value at a 3% discount is *more than 2,000* times the present value at 7%. However, the 3% discount does not even register on the graph because the value at a 0.1% rate is *more than 600,000* times the present value at a 7% rate. These comparisons are only about the relative weights we give future benefits in decision making today (not about the magnitude of those benefits, which have been understated, too, as we have learned more about climate science). Given these huge impacts in shifting value, it is critical

to only use a discount rate where there are not such significant risks of undervaluing future and long-term harm, as we might otherwise undervalue something by a factor of many thousands, even hundreds of thousands.




12. The EPA in its regulatory impact analyses ("RIAs") acknowledges the sensitivity of climate benefits to the choice of discount rate. As the EPA states in a 2020 RIA: "The forgone climate benefits are highly sensitive to the choice of the discount rate, as climate impacts accrue over long time

horizons and models project increasing marginal damages associated with greenhouse gas emissions over time."[2]

13. These "increasing marginal damages" are what will be borne by young people and future generations and are systematically undervalued in regulatory decision using too-high discount rates (while the cost savings of inaction are pocketed by today's adults who will not live to see those "increasing marginal damages").

14. I wrote about this issue of "increasing marginal damages" in a School of International and Public Affairs ("SIPA") paper in 2023, particularly as it applies to climate change and its impact on children and future generations: "More reasonably, and more ethically, we should value our children and grandchildren as much as we value ourselves."[3] The argument is not new. Frank Ramsey, an economist who developed the cornerstone model of macroeconomics, a model which subsequently has been the foundation of Integrated Assessment Models (IAM) which, themselves have played a large role in regulatory analysis[4], argued in 1928 that future generations should be weighed equally with the current generation. The argument has received close attention and substantial support in economics.[5] Essentially,

---

[2] U.S. EPA, Regulatory Impact Analysis for the Review and Reconsideration of the Oil and Natural Gas Sector Emission Standards for New, Reconstructed, and Modified Sources, at 3-47 (2020).

[3] Joseph Stiglitz, Scott Barrett & Noah Kaufman, *How Economics Can Tackle the 'Wicked Problem' of Climate Change* (2024).

[4] Unfortunately, many of the developers and users of IAM's did not account fully for Ramsey's deeper thinking about the formulation of analyses entailing the maximization of intergenerational welfare.

[5] F.P. Ramsey, *A Mathematical Theory of Saving*, 38 Economic Journal 543 (1928). *See*, Nicholas Stern, *Why Are We Waiting? The Logic, Urgency and Promise*

the Ramsey argument is that pure-time discounting is discrimination by date of birth – it attaches lower weight to a life that is otherwise identical, simply because a person is born later. That is not what we expect from a constitutional democracy, and certainly not what we would expect from most parents and grandparents when thinking about the next (and future) generations.

15. The only basis in economics to weight a future generation's value less today is if future generations are guaranteed to be wealthier. This is implicitly acknowledged in the OMB Circular A-4: "If consumption continues to increase over time—as it has for most of U.S. history—an increment of consumption will be less valuable in the future than it would be today (all else equal); as total consumption increases, the value of a marginal unit of consumption declines."[6]

16. In recent years, median per capita consumption (that is, the per capita income of the representative individual, one such that half the population

---

*of Tackling Climate Change* (MIT Press 2015) (Chapters 5 and 6 for references discussing Ramsey). *See also*, Nicholas Stern, *Ethics, Equity and the Economics of Climate Change Paper 1: Science and Philosophy*, 30 Economics & Philosophy 397 (2014) and Nicholas Stern, *Ethics, Equity and the Economics of Climate Change Paper 2: Economics and Politics*, 30 Economics & Philosophy 445 (2014) for further discussions. Chichilnisky et al. (2020) have shown that under standard assumptions the only valid reason for pure-time discounting is probability of extinction. *See*, G. Chichilnisky, P. Hammond & N. Stern, *Fundamental Utilitarianism and Intergenerational Equity with Extinction Discounting*, 54 Social Choice & Welfare 397 (2020).

[6] OMB Circular No. A-4, at 75 (2023), https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.

The rate at which the marginal utility decreases with consumption has been estimated (using behavior towards risk) as between 1 and 2, that is a 1% increase in consumption leads to a decrease in marginal utility of between 1 to 2%.

has a per capita income higher, half lower) has been largely stagnant, which were we to extrapolate this for the future in economic terms, would imply no discounting.

17. Average consumption has been increasing at a somewhat higher rate, reflecting the growth of inequality, with those at the top doing increasingly well. Even assuming a 1% increase in per capita consumption would imply discounting (under the standard assumptions about how rapidly marginal utility decreases with increases in consumption) of 1 to 2%.

18. However, there are two flaws with this analysis, both of which suggest that the appropriate discount rate should be lower than these numbers (besides the observation made earlier that median consumption has been stagnant.) First, the economy may *not* grow forever, and there is especially the risk that that would be the case with climate change as climate catastrophes increase and the natural climate system becomes less stable and more inhospitable to human and other life, foundations on which a prosperous economy are based. If the effects of climate change are large and pervasive enough (there is an endogeneity here – when we do *not* take climate action today, we make the risk of catastrophes in the future higher!) the discount rate is negative. What is left over for consumption, after we pay the repair of the damage brought on by climate change, and for the investment to sustain even low rates of growth, may diminish over time, implying an *increase* in the marginal utility of consumption, and thus a *negative* discount rate.

19. Put another way, the concept of future generations having more wealth or economic growth does not account for the reality that climate change causes potentially irreversible losses that even future wealth cannot

recover, or can recover only with increasingly large expenditures in money. For instance, increasing temperatures and smoky air cannot be remedied with money. The people who die from asthma as a result cannot really be compensated by giving them more money (though regulatory analyses typically do place a market value on these lost lives.) With adequate economic resources, more air conditioners and air purifiers can provide some relief from the dangerous outdoor conditions, but that does not ever return to children their ability to safely play outside as temperatures, fires, and smokey conditions rise and tipping points are reached.[7]

20. Another helpful economic framework to think about this question is insurance – climate mitigation today is partly directed at avoiding future catastrophes. As I wrote in SIPA last year: "Consider a situation where climate change's effects turn out to be particularly severe, which is a realistic possibility that most [Integrated Assessment Models] ignore. Incomes of future generations will be reduced as a result—but they will have to spend a lot to repair the damage and to adapt to the new climate, at precisely those times when they are least able to do so. *Doing something* about climate change reduces risk. Like an insurance policy, we are willing to pay a lot upfront to avoid the possibility of horrific outcomes later on."[8]

21. The possible catastrophic impacts of climate change are well documented, along with the financial burdens and risks being passed to our children and

---

[7] Technically in economics, we say that the "climate" (broadly understood) and normal, material consumption goods interact such that the degradation of the environment (climate) can cause a marked increase in the marginal utility of a dollar to future generations.

[8] Joseph Stiglitz, Scott Barrett & Noah Kaufman, *How Economics Can Tackle the 'Wicked Problem' of Climate Change*, at 5 (2024).

future generations. The great uncertainty associated with climate risk implies a willingness to pay a very high insurance premium, and a correspondingly lower (or more negative) discount rate. Martin Weitzman[9] has emphasized the importance of incorporating this uncertainty, as have Stern and Stiglitz (2022).[10]

**Enormous Costs of Worsening Climate Change for Young People**

22. The *Fifth National Climate Assessment* (2023)—the U.S. government's report on climate change impacts, risks, and responses[11]—states:

a. "Each additional increment of warming is expected to lead to more damage and greater economic losses compared to previous increments of warming, while the risk of catastrophic or unforeseen consequences also increases." (Overview at 5)

b. "In the 1980s, the country experienced, on average, one (inflation-adjusted) billion-dollar disaster every four months. Now, there is one every three weeks, on average. . . . Extreme events cost the US close to $150 billion each year—a conservative estimate that does not account for loss of life, healthcare-related costs, or damages to ecosystem services." (Overview at 17)

---

[9] *See, e.g.*, Martin L. Weitzman, *Why the Far-Distant Future Should Be Discounted at Its Lowest Possible Rate*, 36 J Env't Econs. & Mgmt. 201 (1998), https://scholar.harvard.edu/files/weitzman/files/why_far-distant_future.pdf.

[10] Nicholas Stern, Joseph Stiglitz et al., *The Economics of Immense Risk, Urgent Action and Radical Change: Towards New Approaches to the Economics of Climate Change*, 29 J. Econ. Methodology 181 (2022).

[11] The *Fifth National Climate Assessment* is "the U.S. Government's preeminent report on climate change impacts, risks, and responses. It is a congressionally mandated interagency effort that provides the scientific foundation to support informed decision-making across the United States." https://nca2023.globalchange.gov/.

23. NOAA recorded the number of deaths from billion-dollar climate-weather disasters from 1980 to 2023, showing that the loss of life is significant.[12] In September 2017, there were 2,981 deaths from Hurricane Maria *alone* (the single deadliest event in the 44-year record from NOAA).

24. Costs to human health and the burden on our healthcare system are also substantial. As the Commonwealth Fund reports, "[o]ne study of 10 climate events from 2012 in the U.S. revealed that the health-related costs, including hospital admissions, emergency department visits, other medical costs and lost wages totaled $10 billion in 2018 dollars."[13] This amount includes both mortality costs (people dying earlier) and morbidity costs and lost wages.[14]

25. In 2023, twenty-eight separate billion-dollar weather and climate disasters occurred in the U.S.—the highest number of billion-dollar disasters on record.[15]

26. The graph below depicts the growth in climate damages over time. Climate disasters are not static, but will worsen, even exponentially, as more pollution is added to the atmosphere.

---

[12] NOAA, *National Centers for Environmental Information, Billion-Dollar Weather and Climate Disasters: Events* (2024), https://www.ncei.noaa.gov/access/billions/events/.

[13] Shanoor Seervai et al., *The Impact of Climate Change on Our Health and Health Systems*, The Commonwealth Fund (May 4, 2022), https://www.commonwealthfund.org/publications/explainer/2022/may/impact-climate-change-our-health-and-health-systems.

[14] Vijay S. Limaye et al., *Estimating the Health-Related Costs of 10 Climate-Sensitive U.S. Events During 2012*, 3 GeoHealth 245 (2019), https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2019GH000202.

[15] NOAA, *U.S. Struck with Historic Number of Billion-Dollar Disasters in 2023* (Jan. 9. 2024), https://www.noaa.gov/news/us-struck-with-historic-number-of-billion-dollar-disasters-in-2023.

27. Preventing, or even reducing, more greenhouse gas pollution today and in the years to come will make an enormous difference for children and future generations. The simple methodological change described in this Declaration would, itself, have a significant impact.




## Conclusion

28. From an economics standpoint, the appropriate discount rate, if any, for society to be using is much lower than the government has been using, and perhaps even negative. Anything else will not only lead to incorrect cost-benefit analyses, but also, and in particular, cause significant harm to children just because they are young; the methodology that has been employed by the government to assess alternative policies (e.g. regulations and investments) systematically "discounts" them, or in other language, treats them as second-class citizens, or of little accord. In my expert

opinion, to treat children equally with adults living today, taking account of the high and growing risk, e.g. with loss of life and property as a result of extreme weather events, I would recommend that a cost-benefit sensitivity analysis include a very low, no discount, and negative discount rates; certainly EPA must use a discount rate lower than what was used in the last three presidential administrations, including presently.

29. It is my expert opinion that eliminating the policies at issue here, the use of an excessively high discount rate, will remove a significant barrier for controlling fossil fuel pollution to the full extent necessary to protect the lives of children and their planet. At minimum, it will compel government decisionmakers, like those at EPA to remove the differential treatment that disadvantages children.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 11, 2024.

Respectfully submitted,

______________________________
Joseph E. Stiglitz, Ph.D.

opinion, to treat children equally with adults living today, taking account of the high and growing risk, e.g. with loss of life and property as a result of extreme weather events, I would recommend that a cost-benefit sensitivity analysis include a very low, no discount, and negative discount rates; certainly EPA must use a discount rate lower than what was used in the last three presidential administrations, including presently.

29. It is my expert opinion that eliminating the policies at issue here, the use of an excessively high discount rate, will remove a significant barrier for controlling fossil fuel pollution to the full extent necessary to protect the lives of children and their planet. At minimum, it will compel government decisionmakers, like those at EPA to remove the differential treatment that disadvantages children.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 11, 2024.

Respectfully submitted,

[signature]

Joseph E. Stiglitz, Ph.D.

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE**
**SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Maryam D., hereby declare and if called upon would testify as follows:

1. I am a Plaintiff in the above-entitled action. I make this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. I have personal knowledge of the facts stated herein, and if called to testify, I would and could testify competently thereto.

2. I am 16 years old and a resident of Garden Grove, California. Everything that is in our Amended Complaint about me and the harms I am suffering is true. Along with being a plaintiff in this case, I work with youth climate organizations to try to change government laws and policies that affect my right to a livable climate. My ability to protect myself is limited because I don't have political rights, like voting and running for office, and I don't have all of the privileges and rights that adults have either.

3. My age also limits my ability to be involved in climate activism. For example, prior to December 2023, my parents did not allow me to have my own cell phone so I could not personally use my phone to get involved. I also still am limited because I do not have a driver's license and can't even drive to the library without one of my parents.

4. Even so, I am doing everything I am able to do to stop climate crisis from getting worse and to try to get leaders to stop the pollution causing it. I joined Fridays for Future in 2022 in middle school. Initially, I did sign making events, went to protests, and did other activities with my local group. When there were global climate strikes, I helped plan a strike in Irvine. We also organized marches. Separate from Fridays for Future, I also planned climate strike in Fullerton with a group at my middle school.

5. I joined the national Sunrise team in 2022. I helped run phone banks for Sunrise. I ran trainings and hosted phone banks to talk to people about climate policies and candidates who said they would take action on climate crisis. I became local hub coordinator with Sunrise of Orange County in fall of 2022.

6. When I'm asked why I became part of Sunrise or Fridays for Future, two youth climate organizations, I explain that I did not feel like I had a choice but to start climate activism. If I wanted a future, I had to join.

7. As part of my role with Sunrise and Fridays for Future, I have met with politicians and attended city council meetings. I have done a lot of local work.

8. The only times I've seen council members listen to kids is when they are making decisions about murals, or when there are plans for parades like for boy scouts or other more typical "kid activities."

9. On the issues I care about, especially climate crisis, they respect older voices more and discount what we, the youth, have to say. I have seen even more deference to older white men at city council meetings, especially in my own city of Garden Grove where we have a conservative city council.

10. In Garden Grove, we asked our city for legally binding climate action plans to eliminate fossil fuel pollution by a set date, but we were not heard and they have refused to stop fossil fuel pollution.

11. In Irvine, we also asked for legally binding climate action plans to eliminate fossil fuel pollution. Activists had been working towards this since 2016 and I got involved in 2022. Initially, we won some

commitments toward a plan, but then they reversed course. There was interest by the Irvine City Council and especially their staffers, but it now appears there will be nothing binding and if they adopt a plan, it will be voluntary and unenforceable.

12. I see Irvine as one of the most liberal city councils. There's only one conservative politician on the council and yet, even with Democrats in control, we can't convince the council to commit in a binding way to climate action and emission reductions.

13. I've also gone to Orange County and the Board of Supervisors to advocate for climate action.

14. I have helped advocate for induction cook tops instead of gas stoves in my community to avoid the use of gas that causes climate change, and we have been told by politicians that certain types of food, like Korean food, could not be cooked on induction stoves. Though this is not accurate, we were told this shift in appliances would upset voters.

15. Politicians often don't respond to our emails. When we give comments during city council meetings, some council members laugh, some just ignore us, and once one council member even fell asleep while we were speaking. Most council members are not responsive or receptive to our concerns about climate change and our request that they take action to protect our future. Sometimes council staff members will meet with us. What I have learned from staffers is that they can't do anything more on climate crisis or to protect our environment because of their voters. The story goes that the voters won't like it and so they can't do anything different.

16. In sum, my experience has been that the local officials don't value our equal right to a livable climate and future. Even if they say they care, they are not willing to do anything differently. I have even been spoken to in aggressive tones by politicians who don't like that I am there and think I am too young to understand what is happening.

17. I love my city, but I don't know how much my city loves me. I'm a young person of color and I don't feel seen by leaders. Being Muslim and female already makes it harder to be listened to. Being young and not even of voting age, compounds my ability to make a difference and even be seen or listened to.

18. Joining the Sunrise local hub was the first thing I saw I could do to try to protect my future. I jumped in and put aside my free time and my social life in order to do everything I could when I wasn't doing my studies to try to make a difference. In addition to the local level work, I've worked on national climate issues through phone banking trying to persuade voters. I sign climate petitions that relate to federal or U.S. policy. However, I don't think I have power to influence policy on a national level or that my congressional representatives represent my interests. They don't see me as a voter or someone who has real influence like through money contributions.

19. When I think about how the government's discrimination of young people is affecting my future, it's really sad and scary. Every summer growing up my brother and I would play outside a game called "Calvin Ball" that we learned from the Calvin and Hobbes books. We loved playing that game outside in the summer months. Now, we are a little

older and it keeps getting hotter, which keeps us inside more. We've stopped playing Calvin Ball. The fires and smoke are also really scary. I used to think we were safe from fires and big tropical storms, but now we aren't. It's worrisome to think where I live is not going to be even as it is right now for long. It's going to keep getting worse.

20. Until the people who run our government and make decisions about fossil fuel pollution see that we are being treated differently than adults and it is harming my rights, and other kids' rights, politicians will be able to keep doing the same thing, ignore me, and listen to adult voters who want to keep their fossil fuel appliances and cars and other things burning up my planet. I won't feel like I can be free to live my life as a young person as long as this continues. I've already lost so much of my childhood with this fear. I've asked adults and leaders to help. So far, no one has.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 12, 2024.

Maryam

Maryam D.

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF JULIA A. OLSON IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

I, Julia A. Olson, hereby declare and if called upon would testify as follows:

1. I am an attorney of record for Plaintiffs in the above-entitled action. I submit this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss, ECF No. 62. I have personal knowledge of the facts stated herein, except as to those stated upon information and belief, and if called to testify, I would and could testify competently thereto.

2. I am also an attorney of record for plaintiffs in *Juliana v. United States*, No. 15-cv-01517 (D. Or.) ("*Juliana*"). I have been counsel for the *Juliana* plaintiffs since the case was filed in August 2015.

3. It is important to clarify several of the important differences between the instant case and the *Juliana* case:

   a. The operative (First Amended) *Juliana* complaint at issue in the Ninth Circuit's opinion, 947 F.3d 1159 (9th Cir. 2020), did not request a declaration that a specific federal government policy is unconstitutional under the Equal Protection Clause. No. 15-cv-01517, ECF No. 7.

   b. The operative (First Amended) *Juliana* complaint did not challenge any federal agency's discounting policies and practices, including that of EPA and OMB. No. 15-cv-01517, ECF Nos. 7.

   c. The operative (First Amended) *Juliana* complaint did not challenge any specific discriminatory federal policy as facially unconstitutional and brought no claim under the Take Care Clause.

   d. The operative (First Amended) *Juliana* complaint requested different relief than what is sought here. The plaintiffs in *Juliana* sought broader injunctive and different declaratory relief, while Plaintiffs in the instant case seek specific declaratory relief

regarding Defendants' Discounting Policies and Practices and narrow corresponding injunctive relief. FAC, Request for Relief.

e. Besides the different claims for relief, the operative (First Amended) *Juliana* complaint is based on different government conduct and causation, namely the federal fossil fuel energy system controlled by many different entities within the executive branch.

4. The operative (Second Amended) *Juliana* complaint at the time of the Ninth Circuit's writ of mandamus to the district court, No. 24-684 (9th Cir. May 1, 2024), did not seek an injunction against a specific EPA policy under the Equal Protection Clause. No. 15-cv-01517, ECF No. 542. The Ninth Circuit never reviewed that Second Amended Complaint.

5. Attached to this declaration are true and correct copies of the following documents.

a. **Exhibit 1**: *Gautreaux v. Chicago Housing Authority*, No. 66C1459, Complaint (N.D. Ill. Aug. 9, 1966), referenced at page 16 of Plaintiffs' Opposition to Defendants' Motion to Dismiss.

b. **Exhibit 2**: *Melendres v. Arpaio*, No. 07-02513, First Amended Complaint (D. Ariz. July 16, 2008), referenced at page 16-17 of Plaintiffs' Opposition to Defendants' Motion to Dismiss.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 12, 2024.

*s/ Julia A. Olson*
Julia A. Olson

file Gautreaux

321-2829

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOROTHY GAUTREAUX, ODELL JONES, DOREATHA R. CRENCHAW, EVA RODGERS, JAMES RODGERS and ROBERT M. FAIRFAX, Plaintiffs, | CIVIL ACTION NO. 66C 1459 |
| v. | |
| THE CHICAGO HOUSING AUTHORITY, a Corporation, and ALVIN E. ROSE, Executive Director, Defendants | |

COMPLAINT

COUNT I

1. Jurisdiction of this Court is invoked pursuant to Title 28, U.S.C. §1343. This is an action in equity seeking relief under Title 42, U.S.C. §1983, and Title 28, U.S.C. §§2201 and 2202. The rights sought to be secured in this action are rights guaranteed by the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States and by Title 42, U.S.C. §§1981 and 1983.

filed 8/9/66

2. This is a proceeding for a declaration that defendants have carried on and are continuing to carry on a racially discriminatory public housing system within the City of Chicago, Illinois, for a permanent injunction enjoining defendants from carrying on the racially discriminatory aspects of such public housing system in the future, and for other appropriate relief.

3. Plaintiffs are all Negro citizens of the United States who presently reside in the City of Chicago, Illinois and are tenants in "regular family" public housing projects (i.e., projects for persons other than the elderly) operated by the defendant, The Chicago Housing Authority (the "Authority"), or have filed, on forms provided by the Authority, written applications for and are eligible to be housed in, and have a right in accordance with Authority Rules to be housed in, such projects.

4. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their behalf and on behalf of all other Negro tenants and applicants similarly situated. The members of the class on whose behalf this suit is brought are so numerous that joinder of all members is impracticable. There are questions of law and fact involved common to the class, the claims of the plaintiffs as representative parties are typical of the claims of the class, and the plaintiffs as representative

parties will fairly and adequately protect the interests of the class. The prosecution of separate actions by individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants, and (B) adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Defendants have acted, in all respects stated herein, on grounds generally applicable to the class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

5. Defendants are the Authority, a municipal corporation organized and existing under the laws of the State of Illinois and its Executive Director. The principal office of the Authority is located in Chicago, Illinois. The public housing facilities in the City of Chicago are under the jurisdiction, management and control of the defendants.

6. Under the laws of the State of Illinois the Authority has the power and the duty to engage in low-rent housing

projects, which activity is declared by such laws to be a governmental function essential to the public interest.

7. Under the laws of the State of Illinois the Authority has the power and the duty to select and acquire real property as sites for regular family public housing projects in the City of Chicago, but such sites, when selected by the Authority, may not be acquired by it until the Authority has advised the City Council of the City of Chicago (the "City Council") of the description of the sites proposed to be acquired and the City Council has approved the acquisition thereof by the Authority. The statute of the State of Illinois which requires such approval by the City Council (Ill.Rev.Stats., Ch. 67-1/2, §9) was enacted and became effective in 1949.

8. During the period from 1950 to the present, the applicants for and tenants of regular family public housing projects of the Authority have been predominantly Negro. At present, approximately 93% of the applicants for regular family public housing projects whose names appear on the Authority's waiting list therefor are Negro, and approximately 90% of the tenants in such projects are Negro.

9. With respect to residence the City of Chicago is, and continuously since 1950 has been, highly segregated along

racial lines. At the time of the filing of this Complaint, Negroes numbering approximately 1,000,000 persons constituted over 25% of the total population of Chicago. At such time over 85% of all Negroes living in Chicago resided in neighborhoods the racial composition of which was all Negro or substantially all Negro (hereinafter "Negro neighborhoods"). During the entire period from 1950 to the present, over 75% of all Negroes living in Chicago resided in Negro neighborhoods. Such Negro neighborhoods were and are predominantly large and contiguous, and not small and scattered, and they constitute compact, segregated areas of Negro residence the bulk of which is known as the Negro Ghetto.

10. Such large scale residential segregation of Negroes within the Negro Ghetto in Chicago has had and will continue to have highly detrimental effects upon Negroes living therein, including the following:

(a) Physical isolation from and lack of social contact with the larger predominantly white community within which the Negro Ghetto is located generate, among Negro residents thereof, feelings of inferiority as to their status in the community that affect their hearts and minds

in a way unlikely ever to be undone. The separation of the races is usually interpreted as denoting the inferiority of the Negro group, and the sense of inferiority thus imparted to residents of the Negro Ghetto detrimentally affects their motivation and their ability to become useful members of the society at large, and has a tendency to retard their educational, social and political development. Such feelings of inferiority and other detrimental effects have been and are produced by the Negro Ghetto in Chicago.

(b) Physical isolation from and lack of social contact with the larger predominantly white community within which the Negro Ghetto is located results, and has resulted in Chicago, in a pervasive life pattern of pathology marked by ignorance, fear, racial misunderstanding, broken homes, illegitimacy, delinquency, drug addiction, hatred and violence, all of which cripples and destroys great numbers of persons living within the Negro Ghetto.

(c) Segregation in education invariably occurs where Negroes are residentially segregated and such educational segregation has occurred in Chicago and has followed the geographic pattern of the residential segregation hereinabove referred to. At the time of the filing of this Complaint approximately 90% of the Negroes attending elementary schools and approximately 70% of the Negroes attending high schools in Chicago attended segregated Negro schools -- i.e., schools which were all Negro or substantially all Negro. Such educational segregation is harmful to children attending such schools, generates feelings of inferiority as to their status in the community that affects their hearts and minds in a way unlikely ever to be undone, results in inferior education for such children, and detrimentally affects their motivations and their ability to become useful adult members of the society at large.

(d) As is stated in Executive Order No. 11063 of the President of the United States, "discriminatory policies and practices result in segregated patterns of housing and necessarily produce other forms of discrimination and segregation which deprive many Americans of equal opportunity in the exercise of their inalienable rights to life, liberty, and the pursuit of happiness." The Negro Ghetto in Chicago is one such segregated pattern, has produced and continues now to produce such other forms of discrimination and segregation and has caused and continues now to cause such deprivation of opportunity to the residents thereof.

11. Since 1950 and prior to April 7, 1965, numerous sites were selected by the Authority, approved by the City Council, and acquired by the Authority for the purpose of erecting regular family public housing projects thereon. Following such acquisition the Authority erected regular family public housing projects on such sites consisting of hundreds of dwelling units and housing thousands of tenants, and the Authority presently maintains and operates the same.

12. Substantially all of said numerous sites selected for regular family public housing projects by the Authority and approved by the City Council since 1950 and prior to April 7, 1965, were in neighborhoods which were at the time of such selection, and are now, Negro neighborhoods, and were and are within the areas known as the Negro Ghetto.

13. Prior to April 7, 1965, the Authority selected, and on or shortly prior to April 7, 1965, the City Council approved sites for the following described proposed new regular family public housing projects:

1. Project 2-12, Washtenaw & 12th Place, 201 dwelling units.

2. Project 2-27, Adams and Wood Avenues, 105 dwelling units.

3. Project 2-28, Six Scattered Sites, 241 dwelling units.

4. Project 2-32, 43rd and Princeton, 444 dwelling units.

In addition, prior to April 7, 1965 the Authority selected Project 2-33, Pershing Road and Cottage Grove Avenue, for expansion, involving the construction of 606 additional dwelling units at or adjacent to the site of such project. Said proposed projects and the proposed expansion of Project 2-33 are hereinafter collectively referred to as the "Five Proposed Projects." Each of the sites for the Five

Proposed Projects is in a neighborhood which was at the time of selection and is now a Negro neighborhood, and was and is within the areas known as the Negro Ghetto.

14. The Five Proposed Projects are large scale public housing projects designed and intended to provide in the aggregate approximately 1,600 new dwelling units for the housing of thousands of public housing tenants as follows:

| | |
|---|---|
| 2-15 story buildings | 1-13 story building |
| 1-14 story building | 1-10 story building |
| 4-8 story buildings | 22-3 story buildings |
| 5-7 story buildings | 1-2 story building |

Construction of the Five Proposed Projects has not yet begun.

15. In 1966 the Authority selected and submitted to the City Council for approval twelve additional sites for twelve proposed additional regular family public housing projects, designed and intended to provide in the aggregate approximately 1,300 dwelling units for the housing of thousands of public housing tenants. Eleven of the sites for said twelve proposed projects (hereinafter collectively referred to as the "Twelve Proposed Projects") are located in the Woodlawn, Oakwood, Lawndale and East Garfield Park areas of Chicago, and the twelfth site is located at 118th Street and Wood Avenue. On or about July 11, 1966, the City Council approved

11 of such sites. Each of the sites for the Twelve Proposed Projects is in a neighborhood which was at the time of selection and is now a Negro neighborhood, and was and is within the areas known as the Negro Ghetto.

16. Since 1950 substantially all of the sites selected by the Authority for regular family public housing projects have been in Negro neighborhoods and within the areas known as the Negro Ghetto because the Authority has deliberately chosen sites for such projects which would avoid the placement of Negro families in white neighborhoods. After 1949 the Authority sold and did not build regular family public housing projects upon sites previously acquired by it in white neighborhoods, because the Authority deliberately determined not to submit any sites for City Council approval of regular family public housing projects which would result in the placement of Negro families in white neighborhoods.

17. The Authority deliberately chose Negro neighborhoods for each of the sites for the Five Proposed Projects and for the Twelve Proposed Projects to avoid the placement of Negro families in white neighborhoods.

18. The effect of the selection of sites by the Authority in Negro neighborhoods upon Negro applicants for and tenants of regular family public housing projects

has been and continues to be that:

(a) Such applicants and tenants, if they choose to live in defendant's public housing facilities at all, have been and are forced to reside within the Negro Ghetto in the City of Chicago, and have been and are denied the opportunity to reside in public housing facilities in white neighborhoods;

(b) Existing patterns of Negro residential and school segregation in the City of Chicago have been and are continued and strengthened and the detrimental effects and evil consequences of such segregation, all as alleged in Paragraph 10 hereof, are enlarged and imposed upon such applicants and tenants; and

(c) The impact of such detrimental effects and evil consequences, as alleged in paragraph 10 hereof, upon such applicants and tenants, is the greater because, by reason of the site selection policies hereinabove described, such impact appears to have the force and sanction of law.

19. By reason of the facts hereinabove alleged, construction of the Five Proposed Projects and of the Twelve Proposed Projects on the sites selected therefor, and perpetuation thereby of defendants' racially discriminatory public housing system, (a) will force plaintiffs and the class they represent to live exclusively in Negro neighborhoods within the Negro Ghetto if they choose to live in defendants' public housing facilities at all, (b) will preclude plaintiffs and the class they represent from having the opportunity to reside in public housing facilities in white neighborhoods, and (c) will continue and strengthen existing patterns of residential and school segregation in the City of Chicago and impose the evil consequences thereof, all as alleged in paragraph 10 hereof, upon plaintiffs and the class they represent.

20. By reason of the facts hereinabove alleged the rights of plaintiffs and the class they represent under the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and under Title 42, U.S.C. §§1981 and 1983, have been and are being violated by defendants, and plaintiffs and the class they represent have suffered and will continue to suffer irreparable injury. Plaintiffs and the class they represent

have no adequate remedy at law to redress the grievances set forth.

WHEREFORE, Plaintiffs pray:

(1) That after a full hearing this Court declare that defendants have been and are carrying on a racially discriminatory public housing system within the City of Chicago, Illinois, that such system is in violation of the rights of plaintiffs and the class they represent under the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and under Title 42, U.S.C. §§1981 and 1983, and that plaintiffs and the class they represent have the right under said Amendment and Title to have sites for regular family housing projects in the City of Chicago selected in such locations as will alleviate and mitigate, not continue and strengthen, existing patterns of Negro residential and school segregation in the City of Chicago.

(2) That after a full hearing this Court permanently enjoin defendants from carrying on and perpetuating the racially discriminatory aspects of their public housing system within the City of Chicago, and from constructing

the Five Proposed Projects and the Twelve Proposed Projects on any sites which have been selected in a racially discriminatory manner, or which will have the effect of continuing and strengthening existing patterns of Negro residential and school segregation in the City of Chicago;

(3) That after a full hearing this Court order defendants to submit for the approval of this Court a comprehensive plan for the selection of future sites in defendants' public housing system which would eliminate the discriminatory aspects of such system, and retain jurisdiction until the same is effectively carried out and completed; and

(4) That plaintiffs and the class they represent be given such other and further relief as the Court may deem just and equitable.

COUNT II

1. Jurisdiction of this Court is invoked pursuant to Title 28, U.S.C. §1343. This is an action in equity seeking relief under Title 42, U.S.C. §1983 and Title 28, U.S.C. §2201 and 2202. The rights sought to be secured in this action are rights secured by an Act of Congress providing for equal rights and for the protection of civil rights, to wit, Title 42, U.S.C §2000d (Section 601 of Title VI of the Civil Rights Act of 1964).

2. This is a proceeding for a declaration that defendants have carried on and are continuing to carry on a racially discriminatory public housing system within the

City of Chicago, Illinois, in violation of Title 42, U.S.C. §2000d, for a permanent injunction enjoining defendants from carrying on the racially discriminatory aspects of such public housing system in the future, and for other appropriate relief.

3 - 19. The allegations of paragraphs 3 through 19 of Count I of this Complaint are incorporated herein by reference as paragraphs 3 through 19 of this Count II.

20. Defendants have applied for, have received and have employed Federal financial assistance in the construction of and otherwise in support of the numerous regular family public housing projects referred to in paragraph 11 hereof. Defendants have applied for and either have received or shortly will receive and will continue to receive Federal financial assistance for the proposed construction of and otherwise in support of the Five Proposed Projects, and have applied for and received assurance that they will receive Federal financial assistance for the proposed construction of and otherwise in support of the Twelve Proposed Projects. Defendants propose to use such assistance in the construction of and otherwise in support of the Five Proposed Projects and the Twelve Proposed Projects.

21. By reason of the facts hereinabove alleged, and particularly by reason of the use of Federal financial assistance by defendants in connection with and in support of their racially discriminatory public housing system and their proposed use of such assistance for the proposed construction of and otherwise in support of the Five Proposed Projects and the Twelve Proposed Projects on the sites presently selected therefor, the rights of plaintiffs and the class they represent, under Title 42, U.S.C §2000d, have been and will continue to be violated, and plaintiffs and the class they represent have suffered and will continue to suffer irreparable injury. Plaintiffs and the class they represent have no adequate remedy at law to redress the grievances herein set forth.

WHEREFORE, Plaintiffs pray:

(1) That after a full hearing this Court declare that defendants have been and are carrying on a racially discriminatory public housing system within the City of Chicago, Illinois, and that plaintiffs and the class they represent have the right under Title 42, U.S.C. §2000d to end the employment of Federal financial assistance in connection with and in support of the racially discriminatory aspects thereof;

(2) That after a full hearing this Court permanently enjoin defendants from employing Federal financial assistance in carrying on and perpetuating the racially discriminatory aspects of their public housing system within the City of Chicago and from employing Federal financial assistance in constructing or otherwise in support of the Five Proposed Projects and the Twelve Proposed Projects on any sites which have been selected in a racially discriminatory manner, or which will have the effect of continuing and strengthening existing patterns of Negro residential and school segregation in the City of Chicago; and

(3) That plaintiffs and the class they represent be given such other and further relief as the Court may deem just and equitable.

## COUNT III

1 - 15. The allegations of paragraphs 1 through 15 of Count I of this Complaint are incorporated herein by reference as paragraphs 1 through 15 of this Count III.

16. Since 1950 substantially all of the sites selected by the Authority for regular family public housing projects have been in Negro neighborhoods and within the areas known as the Negro Ghetto. After 1949 the Authority sold and

did not build regular family public housing projects upon sites previously acquired by it in white neighborhoods.

17. Each of the sites for the Five Proposed Projects and for the Twelve Proposed Projects is in a Negro neighborhood, and within the areas known as the Negro Ghetto.

18 - 20. The allegations of paragraphs 18 through 20 of Count I of this Complaint are incorporated herein by reference as paragraphs 18 through 20 of Count III.

WHEREFORE, Plaintiffs pray:

(1) That after a full hearing this Court declare that defendants have been and are carrying on a racially discriminatory public housing system within the City of Chicago, Illinois, that such system is in violation of the rights of plaintiffs and the class they represent under the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and under Title 42 U.S.C. §§1981 and 1983, and that plaintiffs and the class they represent have the right under said Amendment and Title to have sites for regular family housing projects in the City of Chicago selected in such locations as will alleviate and mitigate, not continue and strengthen, existing patterns of Negro residential and school segregation in the City of Chicago;

(2) That after a full hearing this Court permanently enjoin defendants from carrying on and perpetuating the racially discriminatory aspects of their public housing system within the City of Chicago, and from constructing the Five Proposed Projects and the Twelve Proposed Projects on any sites which will have the effect of continuing and strengthening existing patterns of Negro residential and school segregation in the City of Chicago;

(3) That after a full hearing this Court order defendants to submit for the approval of this Court a comprehensive plan for the selection of future sites of defendants' public housing system which would eliminate the discriminatory aspects of such system, and retain jurisdiction until the same is effectively carried out and completed; and

(4) That plaintiffs and the class they represent be given such other and further relief as the Court may deem just and equitable.

COUNT IV

1 - 2. The allegations of paragraphs 1 and 2 of Count II of this Complaint are incorporated herein by reference as paragraphs 1 and 2 of this Count IV.

3 - 15. The allegations of paragraphs 3 through 15 of Count I of this Complaint are incorporated herein by reference as paragraphs 3 through 15 of this Count IV.

16 - 17. The allegations of paragraphs 16 and 17 of Count III of this Complaint are incorporated herein by reference as paragraphs 16 and 17 of this Count IV.

18 - 21. The allegations of paragraphs 18 through 21 of Count II of this Complaint are incorporated herein by reference as paragraphs 18 through 21 of this Count IV.

WHEREFORE, Plaintiffs pray:

(1) That after a full hearing this Court declare that defendants have been and are carrying on a racially discriminatory public housing system within the City of Chicago, Illinois, and that plaintiffs and the class they represent have the right under Title 42, U.S.C. §2000d to end the employment of Federal financial assistance in connection with and in support of the discriminatory aspects thereof;

(2) That after a full hearing this Court permanently enjoin defendants from employing Federal financial assistance in carrying on and perpetuating the racially discriminatory aspects of their public housing system within the City of Chicago and from employing Federal financial assistance in

constructing or otherwise in support of the Five Proposed Projects and the Twelve Proposed Projects on any sites which will have the effect of continuing and strengthening existing patterns of Negro residential and school segregation in the City of Chicago; and

(3) That plaintiffs and the class they represent be given such other and further relief as the Court may deem just and equitable.

Alexander Polikoff
Charles R. Markels
Bernard Weisberg
Milton I. Shadur
Merrill A. Freed

By______________________________
Alexander Polikoff
Attorneys for Plaintiffs
231 South LaSalle Street
Chicago, Illinois 60604
CEntral 6-4500

Charles R. Markels
120 South LaSalle Street
Chicago, Illinois
ST 2-3680

Bernard Weisberg
111 West Jackson Boulevard
Chicago, Illinois
HA 7-9250

Milton I. Shadur
208 South LaSalle Street
Chicago, Illinois
AN 3-3700

Merrill A. Freed
33 North LaSalle Street
Chicago, Illinois
RA 6-9020

STEPTOE & JOHNSON LLP
Collier Center
201 East Washington Street
Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile: (602) 257-5299

David J. Bodney (06065)
dbodney@steptoe.com
Peter S. Kozinets (019856)
pkozinets@steptoe.com
Karen J. Hartman-Tellez (021121)
khartman@steptoe.com
Isaac P. Hernandez (025537)
ihernandez@steptoe.com

Attorneys for Plaintiffs
(Additional Attorneys for Plaintiffs listed on next page)

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL DE JESUS ORTEGA MELENDRES, JESSICA QUITUGUA RODRIGUEZ, DAVID RODRIGUEZ, VELIA MERAZ, MANUEL NIETO, JR., on behalf of themselves and all others similarly situated, and SOMOS AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona, MARICOPA COUNTY SHERIFF'S OFFICE, and MARICOPA COUNTY, ARIZONA,<br><br>Defendants. | No. CV 07-02513-PHX-MHM<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(Class Action)**<br><br>[Assigned to the Hon. Mary H. Murguia] |

Additional Attorneys:

ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, Arizona 85011-0148
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

Daniel Pochoda (021979)
dpochoda@acluaz.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0770
Facsimile: (415) 395-0950

Robin Goldfaden*
rgoldfaden@aclu.org
Mónica M. Ramírez*
mramirez@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512 x136
Facsimile: (213) 629-0266

Kristina M. Campbell (023139)
kcampbell@maldef.org
Nancy Ramirez*
nramirez@maldef.org

*Pro Hac Vice Application to be filed

Plaintiffs Manuel de Jesus Ortega Melendres, Jessica Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., on behalf of themselves and all others similarly situated, and Somos America (collectively, "Plaintiffs") allege as follows:

**PRELIMINARY STATEMENT**

1. This is a class action to enforce the Fourth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964; and Article II, § 8 of the Arizona Constitution. Plaintiffs seek declaratory and injunctive relief against Defendants Sheriff Joe Arpaio ("Arpaio"), the Maricopa County Sheriff's Office ("MCSO") and Maricopa County, Arizona (collectively, "Defendants").

2. As described below, Defendants have engaged in a widespread pattern and practice of racial profiling and other racially and ethnically discriminatory treatment in an illegal, improper and unauthorized attempt to "enforce" federal immigration laws against large numbers of Latino persons in Maricopa County without regard for actual citizenship or valid immigration status.

3. Claiming authority under a limited agreement with U.S. Immigration and Customs Enforcement (ICE) that actually prohibits the practices challenged here, Defendants have launched a series of massive so-called "crime suppression sweeps" that show a law enforcement agency operating well beyond the bounds of the law. During these sweeps, which have shown no signs of abating since Defendants began them in September 2007, large numbers of MCSO officers and volunteer "posse" members under Defendants' direction and control have targeted Latino persons for investigation of immigration status, using pretextual and unfounded stops, racially motivated questioning, searches and other mistreatment, and often baseless arrests. Defendants' pattern and practice of racial profiling goes beyond these sweeps to include widespread, day-to-day targeting and mistreatment of persons who appear to be Latino.

4. To curtail Defendants' illegal conduct, Plaintiffs bring this action as representatives of a class of Latino persons who, as a result of racial profiling, have been or will be stopped, detained, interrogated or searched by Arpaio and his agents in

moving or parked vehicles in Maricopa County. The moment Plaintiffs and those they represent were stopped by Defendants, they became the victims of "an all too familiar set of circumstances – an intrusive law enforcement stop and seizure of innocent persons on the basis of suspicions rooted principally in the race of the 'suspects.'" *Washington v. Lambert*, 98 F.3d 1181, 1182 (9th Cir. 1996). Plaintiffs seek judicial relief to enjoin Defendants' unlawful racial profiling and the attendant racially motivated mistreatment and constitutional injuries that Plaintiffs and the class will otherwise continue to endure.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1343, 2201 and 2202, and to award attorneys' fees under 42 U.S.C. § 1988(b).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

7. Plaintiff Manuel de Jesus Ortega Melendres ("Mr. Ortega") is a citizen and resident of Mexico. At the time of the events underlying this lawsuit, he was lawfully present in the United States. He is of Latino descent and, by physical appearance, is a person of color. He is a retired school teacher.

8. Plaintiffs David and Jessica Rodriguez, husband and wife, are U.S. citizens and residents of Maricopa County. The Rodriguezes are of Latino descent and, by physical appearance, are persons of color.

9. Plaintiffs Velia Meraz and Manuel Nieto, Jr., siblings, are U.S. citizens and residents of Maricopa County. They are of Latino descent and, by physical appearance, are persons of color. They work for their family-owned business in Phoenix.

10. Plaintiff Somos America/We Are America is a community-based non-profit membership organization, comprised of grassroots organizations, community and

religious leaders, labor unions, students and others, established in March 2006 to mobilize for equal rights for immigrant communities in Arizona and for comprehensive immigration reform. Somos America's organizational mission includes seeking to combat racial discrimination directed at Latinos. Plaintiff Somos America and its members have been injured by the pattern and practice of Defendants alleged in this Complaint.

11. Upon information and belief, because of their race, color and/or ethnicity, Somos America members have been unlawfully targeted, stopped, questioned and/or detained by Defendants, and those they direct and control, as a result of Defendants' policy and practice of profiling and targeting persons whom they believe to be of Latino descent to determine their immigration status. As a result of Defendants' policy and practice and failure to provide adequate training and supervision, Defendants' agents have pretextually, with racial motivation and without adequate cause stopped vehicles driven or ridden in by Somos America members and have subjected occupants to discriminatory, unreasonable and burdensome questioning and other differential treatment without individualized suspicion or any evidence of criminal activity. Several individual members have reported to Somos that they have been stopped while driving in Maricopa County by MCSO officers without good cause and subjected to the mistreatment described herein.

12. Because of Defendants' policies and pattern and practice of racially profiling persons in Maricopa County whom they believe to be of Latino descent, Somos America has experienced an increase in various requests for assistance from persons who have been negatively impacted by Defendants' actions. In response, Somos America and its members have participated in monitoring Defendants' pattern and practice and assisting persons who have been unlawfully racially profiled by Defendants. Somos America is concerned that it will not be able to meet adequately this increased demand for assistance. Already its limited sources have been, and continue to

be, diverted and drained as a result of Defendants' policies and practices and the harm they cause.

13. Defendant Joseph M. Arpaio is the Sheriff of Maricopa County, Arizona, and is sued in his official capacity. He is the final decisionmaker for Maricopa County in the area of law enforcement, and is responsible for setting and implementing the policies and practices of the MCSO, including but not limited to creating and regulating department policies regarding the stops and arrests and related treatment of individuals in motor vehicles in Maricopa County.

14. Defendant Arpaio, on behalf of the MCSO and with the Maricopa County Board of Supervisors, is responsible for entering into a Memorandum of Agreement (MOA) with U.S. Immigrations and Customs Enforcement (ICE) that purports to authorize enforcement of federal immigration laws by specially nominated and cross-trained MCSO Sheriff's deputies. Defendant Arpaio, in his role as Sheriff, is responsible for implementation and administration of the MOA. He is also responsible for directing MCSO immigration enforcement activity that is legally unauthorized and conducted pursuant to his policy and practice of racial profiling.

15. Upon information and belief, Arpaio participated in the authorization, planning and supervision of the actions of the MCSO employees involved in the events described in this Complaint. Upon information and belief, Arpaio is also responsible for recruiting, training, supervising and managing members of the MCSO's volunteer "posse" that have carried out Defendants' policies and practices and have participated in the events described herein without adequate selection processes, proper authority, or adequate training and supervision.

16. Upon information and belief, Arpaio is also responsible for the institution of a telephonic "hotline" used to generate and pursue "tips" about suspected immigration violations notwithstanding the complexity of immigration law, the general lack of training, knowledge, and experience among the public in immigration law, and the unfortunate reality that such a hotline invites individuals to equate race with

immigration status and allows some to pursue personal grievances by way of a hotline complaint. Arpaio established and has overseen an "Illegal Immigration and Interdiction" unit, known as the "Triple I Unit," to pursue hotline tips and other immigration enforcement activities carried out in the manner described herein.

17. Upon information and belief, Arpaio failed to train MCSO personnel and volunteers adequately and to promulgate appropriate policies to prevent the unlawful stops of Plaintiffs and class members based on impermissible racial profiling and arbitrary and unreasonable stops and seizures. Arpaio has also failed to develop criteria to avoid the abuse of the unchecked discretion he has afforded MCSO personnel, and has established, implemented and enforced illegal and unconstitutional policies and practices that have caused the unlawful treatment of Plaintiffs and class members by MCSO Deputies and other personnel and "posse" members.

18. Defendant MCSO is a law enforcement agency in Maricopa County. Upon information and belief, MCSO programs and activities receive financial assistance through federal grants and other contributions from the U.S. Department of Justice ("DOJ") and other federal agencies. As a recipient of federal financial assistance, MCSO is legally required to provide and conduct its programs and activities in a racially and ethnically non-discriminatory manner.

19. Defendant Maricopa County, Arizona, is a political subdivision of the State of Arizona that can sue and be sued in its own name. Upon information and belief, Maricopa County programs and activities receive federal financial assistance. The County is therefore legally required to conduct its programs and activities in a racially and ethnically non-discriminatory manner. By both its action and inaction, Defendant Maricopa County has agreed with, accepted, acquiesced in, and sanctioned Defendant Arpaio's focus on supposed enforcement of federal civil immigration laws at the expense of pursuit of criminal conduct and has done the same with regard to Defendants' policy and practice of employing illegal and improper racial profiling and other discriminatory treatment of Plaintiffs and other Latino persons in Maricopa

County. In fact, the Chair of the Maricopa County Board of Supervisors has praised as good law enforcement these policies and practices of Defendant Arpaio in the face of large-scale criticism that they specifically target Latinos.

**GENERAL ALLEGATIONS**

**Limits on Defendants' Authority to Perform Immigration Functions**

20. In or around January 2007, Defendants Maricopa County and Arpaio entered into an MOA with ICE that provided for a maximum of 160 nominated, trained and certified personnel of the MCSO to perform certain immigration enforcement functions in limited circumstances. (A true copy of the MOA is attached hereto as Exhibit A.)

21. Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g) authorizes the Secretary of the U.S. Department of Homeland Security, of which ICE is a part, to enter into MOAs with state and local law enforcement agencies to train and permit designated officers to perform certain immigration enforcement functions. Under such agreements, the designated state and local officers are to be trained and supervised by appropriate ICE officers.

22. According to ICE, "[t]he 287(g) program is designed to enable state and local law enforcement personnel, incidental to a lawful arrest and during the course of their normal duties, to question and detain individuals for potential removal from the United States, if these individuals are identified as undocumented illegal aliens and they are suspected of committing a state crime." *Fact Sheet, Section 287(g) of the Immigration and Nationality Act* (September 24, 2007), *at* http://www.ice.gov/pi/news/factsheets/factsheet287gprogover.htm. (A true copy of the Fact Sheet is attached hereto as Exhibit B.)

23. ICE has made clear that "[t]he 287(g) program is not designed to allow state and local agencies to perform random street operations," and "is not designed to impact issues such as excessive occupancy and day laborer activities." *Id.* ICE guidelines state, "Police can only use 287(g) authority when people are taken into

custody as a result of violating state or local criminal law. Police cannot randomly ask for a person's immigration status or conduct immigration raids," and "**[officers may only] use their authority when dealing with someone who is suspected of a state crime that is <u>more than a traffic offense</u>**." *Id.* (emphases added).

24. Part I of the MOA provides that "the exercise of the immigration enforcement authority granted under this MOA to participating LEA [Law Enforcement Agency] personnel shall occur only as provided in this MOA." Part V provides that the immigration enforcement authority granted to Defendants is "subject to the limitations contained in this MOA." (Ex. A.)

25. Part XV of the MOA provides in part that "[p]articipating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice 'Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies' dated June 2003." (Ex. A.)

26. The DOJ Guidance states: "'Racial profiling' at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures." It notes that "[r]acial profiling in law enforcement is not merely wrong, but also ineffective." (A true copy of the DOJ Guidance is attached hereto as Exhibit C.)

27. The DOJ Guidance directs that "**[i]n making routine or spontaneous law enforcement decisions, <u>such as ordinary traffic stops</u>, Federal law enforcement officers may not use race or ethnicity to any degree**, except that officers may rely on race and ethnicity in a specific suspect description." (Ex. C (emphases added).)

28. Arpaio has utilized deputies trained under the MOA – and, on information and belief has also used other MCSO deputies and other personnel and volunteers who are not specially nominated and cross-trained to perform immigration duties – on and/or in support of his "Triple I Unit." In doing so (and in other ways), he has violated the applicable ICE guidelines as to what a 287(g) agreement may allow.

29. In short, Defendants' authority to enforce federal immigration law is constrained and limited by the U.S. and Arizona Constitutions, federal and state law, and the MOA. Defendants have grossly exceeded these limits by devising and implementing an invidious and unconstitutional custom, policy and practice of racial profiling toward Latino persons in Maricopa County and an unconstitutional policy and practice of stopping Latino drivers and passengers, pretextually and without individualized suspicion or cause, and of subjecting them to different, burdensome, stigmatizing and injurious treatment once stopped. Consequently, Defendants have violated the constitutional and civil rights of Plaintiffs and countless other Latino members of the Maricopa County community.

**<u>Defendants' Racial Profiling and Immigration "Sweeps"</u>**

30. Specifically, Defendants have adopted an unlawful, racially-biased policy of stopping, detaining, questioning and/or searching persons in vehicles in Maricopa County who are or appear to be Latino to interrogate them about their perceived immigration status based on nothing more than their race, color and/or ethnicity. Defendants have implemented this policy in Maricopa County in part through a series of so-called "crime suppression sweeps" that target persons who appear to be Latino for stops, questioning, arrests and other differential treatment that is not based on a constitutionally acceptable level of cause or suspicion and that is in any event racially motivated.

31. However, as exemplified by the stops of several Plaintiffs described below, this racially-motivated and biased policy of targeting persons who appear to be Latino for immigration enforcement through pretextual and unfounded stops, interrogation, and arrests also applies and is followed as a general matter by MCSO personnel and is not limited to when "sweeps" are being conducted. Persons who appear to be Latino, when driving or riding in a car, are at risk of being stopped and subjected to burdensome, time-consuming, harassing and stigmatizing interrogation, searches and other mistreatment that may culminate in an arrest and further detention.

These stops and interrogations are frequently unsupported by reasonable suspicion or probable cause, and in any event, are pretextual and racially motivated.

32. Indeed, upon information and belief, Caucasian drivers and passengers involved in the same or similar acts or alleged violations are treated differently and their vehicles stopped at much lower rates than similarly situated Latino drivers and passengers pursuant to MCSO policy and practice. Further, Caucasian drivers and passengers are treated differently and less intrusively and detained for shorter periods of time after their vehicles are stopped by MCSO personnel than Latino drivers and passengers after being stopped. Latino occupants are also treated differently and more intrusively by MCSO than Caucasian occupants of the same vehicle.

33. Defendants' pattern and practice of racial profiling is evidenced by numerous statements of Arpaio. For example, Arpaio has claimed that physical appearance alone is sufficient to question an individual regarding their immigration status. *See* Howard Witt, "Does Crackdown Cross Line? Arizona Efforts Stir Racial Profiling Claims," *Chicago Tribune*, May 26, 2008.

34. At a press conference last year, he described his operations as a "pure program" designed "to go after illegals, not the crime first." *See* Richard Ruelas, "Arpaio Stays Silent on Real ICE Plan," *The Arizona Republic*, March 2, 2007, at B10. Arpaio's practice is to "go after illegals . . . . You go after them, and you lock them up." *Id.* Arpaio and Maricopa County do not have legal authority under federal or state law or the MOA to engage in such conduct, let alone to do so in a discriminatory manner.

35. Defendants have targeted specific areas of Maricopa County that have high Latino populations or large numbers of Latino day laborers for pretextual "crime suppression operations." On information and belief, large numbers of MCSO deputies and hundreds of volunteer "posse" members, assisted by members of motorcycle clubs such as the "American Freedom Riders," have been concentrated in such areas during these "sweeps." *See, e.g.*, Press Release, Maricopa County Sheriff's Office, "Sheriff's

Operation in Guadalupe Returns: Arpaio Disregards Mayor Jimenez's Request to Leave Town" (April 4, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe%202008.pdf.

36. Defendants' sweeps were launched in September 2007, have continued through the present time, and show no signs of abating.

37. On or about September 27, 2007, Arpaio and MCSO initiated a "crime suppression operation" in Cave Creek, Arizona, to investigate and arrest persons deemed by them to be "illegal" immigrants and to disrupt a "day labor" center in the parking lot of a local church where persons who are predominantly Latino gather. Acting under color of law and Arpaio's orders, several MCSO officers detained, questioned and arrested at least nine Latino individuals because they allegedly were undocumented immigrants. In the case of at least one vehicle that MCSO officers stopped after it left the church parking lot, MCSO officers let the Caucasian driver leave and did not issue a citation to him, but they questioned, detained and arrested the Latino passengers in the Caucasian driver's vehicle. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff's Office Not Waiting for Loitering and Soliciting Ordinance to Take Effect" (September 27, 2007), *at* http://www.mcso.org/include/pr_pdf/CC.pdf. Upon information and belief, the officers did not have reasonable suspicion or probable cause to believe that any driver stopped or passenger questioned had committed a violation of Arizona or federal law, and in any event, used a traffic violation to investigate the immigration status of all Latino occupants.

38. On October 4, 2007, Arpaio and MCSO initiated another "crime suppression operation" in Queen Creek, Arizona. Again, at least 16 Latino individuals were detained, questioned and arrested on suspicion of being undocumented immigrants. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff Arpaio Goes After Day Laborers" (October 4, 2007), *at* http://www.mcso.org/include/pr_pdf/Queen%20Creek%20Day%20Laborers.pdf. Upon information and belief, the officers did not have reasonable suspicion or probable cause to believe that any driver stopped or passenger questioned had committed a violation of Arizona or federal law, and in any event, used a

traffic violation to investigate the immigration status of all Latino occupants. Upon information and belief, there were other persons who appeared to be Latino beyond the number arrested who were also subject to pretextual, racially motivated stops and questioning aimed at investigating them for immigration enforcement.

39. For several months beginning in October 2007, Defendants Arpaio and MCSO targeted the intersection of 34th Street and Thomas Road in central Phoenix because of the presence of day laborers near Pruitt's Furniture Store. *See, e.g.*, Press Release, Maricopa County Sheriff's Office, "Arpaio Intensifies Presence at Pro-Illegal Immigration Protests at Pruitt's" (December 5, 2007), *at* http://www.mcso.org/include/pr_pdf/Arrests%20120507.pdf. Upon information and belief, MCSO did not engage in these activities at the invitation or request of the City of Phoenix Police Department, which has jurisdiction over this area. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation. These officers stopped and questioned Latino drivers and passengers prior to having adequate cause or suspicion that they were involved in criminal acts, and in any event, for racially motivated reasons, singled them out for investigation and enforcement and subjected them to different treatment.

40. On December 5, 2007, Defendant Arpaio announced that he was increasing the number of MCSO deputies patrolling the Pruitt's parking area. *Id.* Arpaio announced that he was acting in response to protests by members of the Latino community about the policies of the MCSO and the Pruitt's owner. During the operation at Pruitt's, Arpaio and his officers stopped, detained, questioned and arrested Latino persons in the vicinity of the store. Upon information and belief, the officers did not have reasonable suspicion or probable cause to believe that those stopped had committed a violation of Arizona or federal law prior to making the stop, and in any event, for racially motivated reasons, singled them out for investigation and enforcement and subjected them to different treatment. In an apparent effort to suppress the Pruitt

store protesters' exercise of their First Amendment rights, Arpaio announced that he would continue to patrol the area until the protests ended. *Id.*

41. On or about January 18, 2008, Arpaio and MCSO conducted a "crime suppression operation" between 16th and 40th Streets and McDowell and Indian School Roads in Phoenix. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff Mobilizes Posse in Central Phoenix" (January 18, 2008), *at* http://www.mcso.org/include/pr_pdf/Sheriff%20Mobilizes%20Posse%20in%20Central%20Phoenix.pdf. Upon information and belief, MCSO did not engage in these activities at the invitation or request of the Phoenix Police Department, which has jurisdiction over this area. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation. To justify the massive use of MCSO resources in the area bounded by 16th and 40th Streets and Indian School and McDowell Roads in Phoenix, Defendant Arpaio stated: "I anticipate that many illegal immigrants will be arrested as the central Phoenix neighborhood remains a popular spot for day laborers." *Id.* Such day laborers are predominantly Latino, but are by no means exclusively noncitizens, let alone all undocumented.

42. In late March 2008, Arpaio and MCSO conducted a "crime suppression operation" at Cave Creek and Bell Roads in Phoenix because of the existence of the Macehueli Day Labor Center, which is run by one of the leaders of the Pruitt's protests, Salvador Reza. *See* Press Release, Maricopa County Sheriff's Office, "Bell Road Crime Suppression Patrols" (March 28, 2008), *at* http://www.mcso.org/include/pr_pdf/Bell%20Operations%2032808.pdf. Upon information and belief, MCSO did not engage in these activities at the invitation or request of the Phoenix Police Department, which has jurisdiction over this area. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation. Defendant Arpaio praised as "patriotic" the private groups, including the American Freedom Riders, that on information and belief, had been harassing all Latino persons entering and leaving this legal center. Upon

information and belief, Arpaio was aware of the anti-immigrant reputation of the American Freedom Riders and the public use of racial epithets by their members.

43. Between April 3 and April 6, 2008, Arpaio and MCSO conducted a "crime suppression operation" in the Town of Guadalupe, Arizona. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff's Crime Suppression Operation Moves to Guadalupe" (April 3, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe %20Operation.pdf. Upon information and belief, MCSO officers engaged in racial profiling, targeting individuals who appeared to them to be Latino during this operation.

44. As MCSO is the law enforcement agency for the Town of Guadalupe, Arpaio was aware that nearly all of the residents of Guadalupe are of Latino and/or Native American descent. In response to the criticism of his tactics and allegations of racial profiling by the Mayor of Guadalupe, Rebecca Jimenez, Arpaio publicly labeled her "a supporter of illegal immigration." *See* Press Release, Maricopa County Sheriff's Office, "Sheriff's Operation in Guadalupe Returns: Arpaio Disregards Mayor Jimenez's Request to Leave Town" (April 4, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe%202008.pdf.

45. On April 4, 2008, after the commencement of the MCSO sweep in the Town of Guadalupe, Phoenix Mayor Phil Gordon formally requested that U.S. Attorney General Michael Mukasey launch a Justice Department investigation into the "discriminatory harassment, improper stops, searches and arrests" of Latino persons in Maricopa County by the MCSO. (A copy of Mayor Gordon's letter is attached as Exhibit D.)

46. On or about May 7, 2008, Arpaio and MCSO conducted a "crime suppression operation" in Fountain Hills, Arizona. *See* Press Release, Maricopa County Sheriff's Office, "Mesa Drop House" (May 8, 2008) *at* http://www.mcso.org/include/pr_pdf/mesa%20drop%20house%2050808.pdf. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation as described above for other sweeps.

47. On or about June 26, 2008, Arpaio and MCSO conducted a "crime suppression operation" in Mesa, Arizona, using nearly 200 deputies and posse members. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff's Crime Suppression/Illegal Immigration Operation Moves Into Mesa" (June 26, 2008) *at* http://www.mcso.org/include/pr_pdf/Mesa%20Crime%20Suppression.pdf. Upon information and belief, MCSO did not engage in these activities at the invitation or request of the City of Mesa Police Department, which has jurisdiction over this area. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation as described above for other sweeps.

48. On information and belief, the MCSO personnel involved in these "crime suppression sweeps" and in the vehicle stops of Plaintiffs and other Latinos in Maricopa County have targeted, stopped, interrogated, detained or arrested Latino persons based on their race, color and/or ethnicity, pretextually and not because of probable cause or reasonable suspicion that they had committed any crime.

**Additional Indicia of Racial Bias**

49. In early 2008, Arpaio established a telephone hotline to facilitate MCSO's unlawful, racially-biased immigration enforcement tactics and its racial profiling of Latinos in Maricopa County. Arpaio was aware that his policy of acting on anonymous citizen "tips" about alleged undocumented immigrants and his invitation for untrained members of the public to participate in his enforcement campaign would result in false, inaccurate, and racially motivated reports about Latino residents. As opposed to law enforcement use of tips from the public which are based on suspected criminal activity and behaviors, a citizen report that an individual is "here illegally" will often be based solely on an individual's race, color and/or ethnicity. On information and belief, this hotline has been used to further the policies and practices complained of herein and has increased their racially discriminatory impact.

50. Racial profiling in law enforcement operations has been recognized as a serious and recurrent problem by elected officials and associations representing chiefs of

police and other law enforcement professionals across the nation and beyond. Professional safeguards have been developed for law enforcement agencies to monitor and deter racially motivated practices when stopping and questioning the drivers of vehicles and any passengers. These safeguards include: collecting data for every vehicle stop, including data regarding the race of the persons affected, the identity of the officers involved, the reason for the stop and the actions taken; regularly analyzing this data for the agency and for particular units and officers; intervening if the resulting data indicate a problem of racial profiling or racial animus; requiring ongoing training of all personnel in the area of racial bias and sensitivity; disciplining personnel upon documented findings of racially improper actions; video and audio taping of all vehicle stops from start to finish; and making available to the public the results of the agency's monitoring efforts and its internal reviews of racial profiling or race discrimination complaints.

51. On information and belief, Defendants have not adequately implemented, or even begun to implement, the foregoing safeguards. Rather, Arpaio and other Defendants have remained steadfast in their resolve to continue their course. As a result, Plaintiffs and those they seek to represent continue to be at risk for being subjected to pretextual stops, detention, questioning, searches and other mistreatment, without adequate cause or suspicion and because of the color of their skin.

## CLASS REPRESENTATIVES

52. Defendants' behavior toward the following Plaintiffs starkly illustrates the unlawful policies, practices and conduct described above.

### The Unlawful Stop and Detention of Manuel de Jesus Ortega Melendres

53. On September 6, 2007, Mr. Ortega legally entered the United States at the border station in Nogales, Arizona.

54. Mr. Ortega possesses a U.S. Visa that is valid through August 23, 2016, and possessed a Permit issued by the U.S. Department of Homeland Security that was valid through November 1, 2007.

55. On or about September 26, 2007, at 6:15 a.m., Mr. Ortega was a passenger in a vehicle in Cave Creek, Arizona that was stopped by officers from the Maricopa County Sheriff's Office. The vehicle was being driven by a Caucasian male, but the passengers, including Mr. Ortega, were Latino men.

56. The officers told the driver that he was being stopped for speeding, but they did not give him a citation or take him into custody.

57. The officers looked at Mr. Ortega sitting in the vehicle and asked him to produce identification.

58. Mr. Ortega showed them the following documents that he had in his wallet: (a) his United States Visa, which has his photograph and fingerprint on it; (b) his Mexican Federal Voter Registration card, which also has his photograph and fingerprint on it; and (c) a copy of the Permit he was given by the U.S. Department of Homeland Security with a stamp showing its validity through November 1, 2007.

59. Although Mr. Ortega produced identification establishing his legal status, the officers told him to exit the vehicle.

60. After exiting the vehicle, the officers pushed Mr. Ortega against a police vehicle and roughly patted him down over his entire body.

61. The Sheriff's officers then took everything out of Mr. Ortega's pockets, including his wallet and a small bottle of lotion that Mr. Ortega occasionally applies to his face so that his skin does not become dry.

62. The Sheriff's officers, upon removal of the small bottle of lotion from Mr. Ortega's pocket, asked Mr. Ortega in a confrontational manner, "How many times a week do you jack off?"

63. Mr. Ortega was then handcuffed with his arms behind his back. Mr. Ortega had a broken wrist years ago that did not heal correctly. His wrist has a visible deformity and causes him pain. Mr. Ortega asked the Sheriff's officers to please be careful in handcuffing him, but they handled him roughly. The officers kept Mr. Ortega's hands handcuffed behind his back for approximately 40 minutes.

64. The officers then put Mr. Ortega in the back of a Sheriff's vehicle and took him to the Sheriff's office in Cave Creek where he was placed in a holding cell for four hours.

65. Throughout the time that Mr. Ortega was seized from the vehicle, patted down, handcuffed, transported to the Sheriff's office, placed in the holding cell and left to remain in the holding cell, no one from the Sheriff's office explained anything to him, and no one offered to get a Spanish speaking officer or translator to assist in communicating with him.

66. The officers did not advise Mr. Ortega of his Miranda rights.

67. The officers did not give Mr. Ortega any opportunity to make a phone call.

68. The officers did not tell Mr. Ortega what crime he allegedly committed, or if he was being charged with any crime.

69. The officers did not say anything about what might happen to Mr. Ortega.

70. The officers did not give Mr. Ortega any documents regarding his arrest or their putting him in jail.

71. After the Sheriff's officers left Mr. Ortega in the jail for four hours, they placed him in handcuffs again and drove him to downtown Phoenix. The driver of that vehicle spoke Spanish. Mr. Ortega explained that his wrist was quite painful and asked if he could be handcuffed with his hands in front of him rather than behind him. The driver said that he could not do that.

72. The officers drove Mr. Ortega to the local ICE office. They took him inside and removed the handcuffs. Mr. Ortega's hands were swollen, and he was in pain.

73. At the ICE office, Mr. Ortega was placed in a holding cell again and left unattended for more than an hour.

74. Mr. Ortega was then taken to an ICE official who did not identify himself. The Sheriff's officers who arrested Mr. Ortega were also present.

75. The ICE official asked for Mr. Ortega's documents. He took a quick look at the documents and said, "These documents are good." The ICE official told Mr. Ortega he was free to leave.

76. Mr. Ortega had been in custody for about nine hours. During that time, Mr. Ortega was never: (a) given any water, (b) given any food, (c) told his rights, or (d) given the name of any of the officers involved.

77. Mr. Ortega also was never given any paperwork, other than a case number, with any information about his: (a) being stopped, (b) being taken into custody by the Sheriff's officers, (c) being held in jail by the Sheriffs officers, (d) being transferred to the ICE office, (e) being held in jail at the ICE office, or (f) his being released from custody.

78. After being released, Mr. Ortega had to make his own way from downtown Phoenix to Cave Creek.

79. Because of Mr. Ortega' experience with the Maricopa County Sheriff's officers he is now afraid. He is frightened to walk on the street or be seen in public in Maricopa County because he fears that the Sheriff's officers will come and arrest him again because he is Latino and does not speak English.

80. Mr. Ortega is afraid that the Sheriff's officers will hurt him physically if they pick him up again.

81. Mr. Ortega is afraid that he will be thrown in jail without any explanation, without any rights, and without any opportunity to get help even though the federal government of the United States has issued a Visa to him that gives him permission to be here.

**The Unlawful Stop and Detention of David and Jessica Rodriguez**

82. On or about December 2, 2007, Mr. and Mrs. Rodriguez, along with their two young children, visited Lake Bartlett.

83. As they were leaving the preserve, while driving on a paved road, they saw a sign that read, "Road Damaged." They could then see that the road ahead was

washed out by recent rains. Two Sheriff's vehicles were parked on the opposite side of the wash-out.

84. Like the motorcycle rider behind him, Mr. Rodriguez decided to turn around and head the other way.

85. The two Sheriff's vehicles followed. The deputies stopped Mr. Rodriguez, the motorcycle (now in front of them) and another sedan.

86. The deputies let the motorcycle and sedan go in short order, without visibly exchanging any documentation.

87. When Deputy Matthew Ratcliffe approached Mr. Rodriguez, however, Deputy Ratcliffe asked for a social security card, driver's license, vehicle registration and proof of insurance.

88. Mrs. Rodriguez asked Deputy Ratcliffe why he needed to see a social security card, to which he responded, "standard procedure."

89. Deputy Ratcliffe then asked Mr. Rodriguez whether he had seen the "Road Closed" sign. Mr. Rodriguez explained that he had seen only a "Road Damaged" sign. The Rodriguezes later discovered that there was a "Road Closed" sign, but on a part of the paved road that they had not traveled.

90. Deputy Ratcliffe took down Mr. Rodriguez's information and returned to his vehicle.

91. While they waited, the Rodriguezes watched another deputy pull over several other vehicles, and from all appearances, the other drivers were being given only warnings.

92. When Deputy Ratcliffe returned, Mrs. Rodriguez asked if they could be given a warning like everyone else. He said no.

93. Mrs. Rodriguez told Deputy Ratcliffe that this was selective enforcement. She said that this looked like racial profiling.

94. Deputy Ratcliffe became visibly angry and gave them a citation for failure to obey a traffic control device.

95. Deputy Ratcliffe returned to his vehicle, turned on his siren and yelled over the loud speaker "you're free to go."

96. As Mr. Rodriguez drove to the exit of the preserve, he finally saw the "Road Closed" sign. He pulled over and waited on the side of the road. Mr. Rodriguez was able to stop and speak with several drivers he had seen pulled over by Sheriff's deputies. Not one of them had been asked for a social security card, and not one of them had been given a citation. The other drivers were all Caucasian.

97. The next day, Mrs. Rodriguez filed a formal complaint with the MCSO. To date, she has not received a formal response.

**The Unlawful Stop and Detention of Velia Meraz and Manuel Nieto, Jr.**

98. On or about March 28, 2008, a little before 3:00 p.m., Ms. Meraz and Mr. Nieto drove down the block from their family business, Manuel's Auto Repair, to the Quick Stop at the corner of N. Cave Creek and E. Nisbet Roads.

99. They had the windows down, and Ms. Meraz was singing along to Spanish music.

100. Pulling into the Quick Stop, they noticed a Sheriff's vehicle behind one of the vehicles at the pumps. The officer, Deputy Alberto Armendariz, was speaking with two Latino-looking men in handcuffs.

101. As soon as Mr. Nieto parked the car, Deputy Armendariz yelled over to them that they should leave. Ms. Meraz asked why.

102. Leaving the two handcuffed gentlemen, Deputy Armendariz approached Ms. Meraz and accused them of disturbing the peace. Ms. Meraz explained that she was just singing to her music.

103. Deputy Armendariz repeated that they had better leave before he arrested them for disorderly conduct. Ms. Meraz said that they would leave, but asked the deputy for his badge number.

104. The Deputy then starting speaking into his radio, evidently calling for additional officers.

105. As Mr. Nieto and Ms. Meraz pulled out of the Quick Stop, they noticed a motorcycle officer coming down Cave Creek Road.

106. Deputy Armendariz waved at the motorcycle officer, directing him to follow Mr. Nieto and Ms. Meraz.

107. Mr. Nieto then saw the motorcycle officer and three other Sheriff's vehicles behind them. The motorcycle officer told Mr. Nieto to pull over and get out of the car.

108. Mr. Nieto quickly dialed 9-1-1 and reported that he was being harassed by Sheriff's officers for no apparent reason.

109. Mr. Nieto's family business was no more than 50 yards away, so he pulled into the parking lot there.

110. The four police vehicles descended on them, blocking off the street and their business. The officers jumped out of their vehicles and raised their weapons.

111. Among the officers were Deputies Douglas Beeks and Cesar Brockman.

112. An officer grabbed Mr. Nieto and pulled him out of the car. He was pressed face first against his car. His arms were twisted behind his back and he was handcuffed.

113. An officer then asked Mr. Nieto if he had a driver's license. He responded that he did.

114. The sound of the commotion drew other people from the repair shop. The officers told them to stay back. The customers were told that they needed to leave or be arrested.

115. Mr. Nieto was petrified that he was going to be arrested in front of his family, neighbors and customers, though he had done nothing wrong.

116. Mr. Nieto's father, who had come out of the shop, called out to the officers that the repair shop was his business, that Mr. Nieto and Ms. Meraz were his children and that they all were U.S. citizens.

117. The officers immediately backed down and lowered their weapons. Mr. Nieto was let out of the handcuffs. The officers asked for his identification and ran it through their computer system. They did not give him any citation.

118. Mr. Nieto asked why the officers had subjected him and his sister to such treatment. He was not given any explanation, nor any apology.

119. Upon information and belief, Mr. Nieto and Ms. Meraz were targeted because they look Latino. Upon information and belief, what happened to them was part of the sweep going on at that time on Cave Creek Road.

**CLASS ALLEGATIONS**

120. This is a class action seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2) on behalf of Plaintiffs and all other similarly situated individuals.

121. The class that Plaintiffs seek to represent consists of all Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona. This class is so numerous that joinder of all members is impracticable.

122. There are questions of law and fact common to all members of the class and all class members have been directly affected by the challenged actions of Defendants. Each putative class member has been or will be subjected to arbitrary, racially-motivated, discriminatory stops, questioning, detentions, arrests and/or searches conducted by Defendants. Each putative class member has been or will be subjected to stops, detentions, interrogations and/or searches, pretextually, without consent, without any reasonable, articulable suspicion or probable cause that such class member had committed a crime or was engaged in criminal or other unlawful activity, and in a manner to which Caucasian drivers and passengers in vehicles in Maricopa County are generally not subjected.

123. The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of the class.

124. The representative Plaintiffs will fairly and adequately protect the interests of the class.

125. Defendants in this case have taken actions in violation of the class members' constitutional rights and/or refused to act in accordance with those rights, which are grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

126. Plaintiffs' counsel is competent and experienced in class action litigation of the type brought here.

**REQUISITES FOR RELIEF**

127. As a result of the conduct of Defendants described above, Plaintiffs have been denied their constitutional and civil rights. Defendants' policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiffs, including but not limited to further violations of their constitutional and civil rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiffs therefore seek injunctive relief restraining Defendants from continuing to engage in and enforce the unlawful and unconstitutional policies, practices, conduct and acts described herein.

**FIRST CLAIM FOR RELIEF: EQUAL PROTECTION**
**(Fourteenth Amendment)**

128. Plaintiffs hereby incorporate by this reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

129. As Latino persons, Plaintiffs are members of a protected class.

130. As Latino persons, those individuals stopped, detained, questioned or searched by MCSO agents during the class period are members of a protected class.

131. Defendants, acting under color of law and in concert with one another, engaged, and continued to engage, in profiling and discriminatory treatment of Plaintiffs and other Latino individuals based on their race, color and/or ethnicity.

132. Defendants have acted pretextually, with racial motivation and without reasonable suspicion or probable cause to stop, detain, question, search and/or arrest Plaintiffs or any of the other Latino individuals referred to above.

133. By purposefully stopping, detaining, questioning, searching and/or arresting Plaintiffs and subjecting them to different, burdensome and injurious treatment because of their race, color and/or ethnicity, Defendants deprived Plaintiffs and members of the plaintiff class of the equal protection of the law within the meaning of the Fourteenth Amendment to the U.S. Constitution. These actions violated Plaintiffs' and class members' Fourteenth Amendment rights and 42 U.S.C. § 1983.

134. Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under state and federal law.

135. By their conduct described above, Defendants in general, and Arpaio in particular, have devised and implemented a policy, custom and practice of illegally stopping, detaining, questioning or searching Latino individuals because of their race, color and/or ethnicity.

136. Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

137. As a direct, proximate result of Defendants' wrongful conduct, Plaintiffs and class members have suffered and will continue to suffer significant and substantial emotional harm and additional injuries.

**SECOND CLAIM FOR RELIEF: UNREASONABLE SEARCH AND SEIZURE**
**(Fourth and Fourteenth Amendments)**

138. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

139. Pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution, state and local governments are prohibited from conducting unreasonable searches and seizures.

140. Defendants, acting under color of law and in concert with one another, stopped, seized, searched, arrested and/or impermissibly extended stops of Plaintiffs, pretextually, for racially motivated reasons and without probable cause or reasonable suspicion that they had violated the law. Such conduct violated the Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 42 U.S.C. § 1983.

141. Upon information and belief, Arpaio and the other Defendants, acting under color of law and in concert with one another, have engaged in a custom, practice and policy of stopping, seizing, searching and arresting Latino individuals in Maricopa County, pretextually, for racially motivated reasons and without probable cause or reasonable suspicion that they had committed any crime.

142. Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under state and federal law.

143. Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

**THIRD CLAIM FOR RELIEF: VIOLATION OF ARIZONA CONSTITUTION ARTICLE II, § 8**

144. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

145. Article II, § 8 of the Arizona Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

146. By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated the rights guaranteed to

Plaintiffs and other similarly situated individuals under Article II, § 8 of the Arizona Constitution.

147. Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

**FOURTH CLAIM FOR RELIEF: RACE DISCRIMINATION IN FEDERALLY FUNDED PROGRAMS**
**(Defendants MCSO and Maricopa County)**

148. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

149. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

> i. [N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

150. Defendant MCSO is the law enforcement agency for Maricopa County, Arizona, and receives federal funding and other financial assistance from the Department of Justice and other federal agencies. As a recipient of federal financial assistance, MCSO is required to conduct its activities in a racially non-discriminatory manner pursuant to Title VI of the Civil Rights Act of 1964.

151. Defendant County of Maricopa is a political subdivision of the State of Arizona and, as a recipient of federal funds, is required to conduct its activities in a racially non-discriminatory manner pursuant to Title VI of the Civil Rights Act of 1964.

152. Federal regulations implementing Title VI further provide that no program receiving financial assistance through the DOJ shall utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color and/or ethnicity, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color and/or ethnicity.

153. The methods employed by Arpaio, MCSO and Maricopa County discriminate against individuals based on their race, color and/or ethnicity as described herein.

154. Defendants MCSO's and Maricopa County's violations of 42 U.S.C. § 2000d and its implementing regulations have caused and will continue to cause Plaintiffs and other similarly situated individuals public humiliation and additional harms in that they will continue to be subjected to unlawful discrimination unless it is stopped.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of a class of all those similarly situated, respectfully demand judgment against Defendants awarding the following:

A. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race, color and/or ethnicity and denied Plaintiffs and plaintiff class equal protection of the laws in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983;

B. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' stops, interrogations, detentions, searches and/or arrests of Plaintiffs and other similarly situated individuals without probable cause or reasonable, articulable suspicion to believe that they had committed a crime violated the Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 42 U.S.C. § 1983;

C. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violate the rights of Plaintiffs and other similarly situated individuals provided by Article II, § 8 of the Arizona Constitution;

D. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants engaged in race discrimination in violation of Title VI of the Civil Rights Act of 1964 and 42 C.F.R. § 101 *et seq.*;

E. A preliminary and permanent injunction prohibiting Defendants from continuing to engage in such race, color and/or ethnicity-based discrimination as described herein and to put into place safeguards sufficient to ensure that such discrimination does not continue in the future;

F. A preliminary and permanent injunction prohibiting Defendants from exceeding the limits of their authority under the MOA and state and federal law;

G. An award of attorneys' fees and costs of suit, plus interest, pursuant to 42 U.S.C. § 1988; and

H. Such other relief as the Court deems just and proper.

DATED this 16th day of July 2008.

STEPTOE & JOHNSON LLP

By /s/ David J. Bodney

David J. Bodney
Peter S. Kozinets
Karen J. Hartman-Tellez
Isaac P. Hernandez
Collier Center
201 East Washington Street
Suite 1600
Phoenix, Arizona 85004-2382

ACLU FOUNDATION OF ARIZONA
Daniel Pochoda
P.O. Box 17148
Phoenix, Arizona 85011-0148
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT
Robin Goldfaden
Mónica M. Ramírez
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0770
Facsimile: (415) 395-0950

MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
Kristina M. Campbell
Nancy Ramirez
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512 x136
Facsimile: (213) 629-0266

Attorneys for Plaintiffs

561437

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
ANDREW S. COGHLAN (CA Bar No. 313332)
andrew.coghlan@usdoj.gov
Environmental Defense Section
SEAN C. DUFFY (NY Bar No. 4103131)
sean.c.duffy@usdoj.gov
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044
Ph: (202) 532-3252 (Coghlan); Ph: (202) 305-0445 (Duffy)

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENESIS B., a minor, by and through her guardian, G.P., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Defendants. | No. 2:23-cv-10345-MWF-AGR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 53)**<br><br>Date: Sept. 16, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

**TO THE HONORABLE COURT AND TO ALL PARTIES:**

PLEASE TAKE NOTICE that on September 16, 2024 at 10:00 a.m., or as soon as this matter may be heard in the above-entitled Court located at 350 West First Street, Courtroom 5A, Los Angeles, California 90012, Defendants, the United States of America, the United States Environmental Protection Agency, Michael

Regan in his official capacity as Administrator of the Environmental Protection Agency, the Office of Management and Budget, and Shalanda D. Young will move the Court to dismiss the First Amended Complaint for Declaratory and Injunctive Relief (ECF No. 53) in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The jurisdictional grounds for dismissing the complaint are that: (1) Plaintiffs lack Article III standing to bring this suit; (2) Plaintiffs' facial challenge to discounting is not ripe; and (3) the Court lacks jurisdiction to consider challenges to EPA's Clean Air Act Regulations. In addition, the claims should be dismissed because the complaint fails to state cognizable claims based on (1) a violation of a fundamental right; (2) the equal protection component of the Fifth Amendment Due Process Clause; or (3) the Take Care Clause of Article II, § 3.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on July 15, 2024.

Dated: July 22, 2024

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Andrew S. Coghlan*
ANDREW S. COGHLAN
Environmental Defense Section
SEAN C. DUFFY
Natural Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044
Ph: (202) 532-3252 (Coghlan)
Ph: (202) 305-0445 (Duffy)
andrew.coghlan@usdoj.gov
sean.c.duffy@usdoj.gov

*Attorneys for Defendants*

Of Counsel:

DANIEL CONRAD
United States Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

DANIEL JACOBSON
General Counsel
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

ANDREW S. COGHLAN (CA Bar No. 313332)
andrew.coghlan@usdoj.gov
Environmental Defense Section
SEAN C. DUFFY (NY Bar No. 4103131)
sean.c.duffy@usdoj.gov
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044
Ph: (202) 532-3252 (Coghlan); Ph: (202) 305-0445 (Duffy)

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENESIS B., a minor, by and through her guardian, G.P., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Defendants. | No. 2:23-cv-10345-MWF-AGR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 53)**<br><br>Date: September 16, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii
INTRODUCTION ........ 1
BACKGROUND ........ 2
STANDARD OF REVIEW ........ 4
ARGUMENT ........ 5
I. Plaintiffs' claims are non-justiciable ........ 6
A. Plaintiffs lack standing ........ 6
1. Plaintiffs' alleged injuries are not fairly traceable to discounting. ........ 7
2. Plaintiffs' harms are not redressable. ........ 10
B. Plaintiffs' facial challenge to discounting is not ripe. ........ 11
C. The Court lacks jurisdiction to consider challenges to EPA's Clean Air Act Regulations. ........ 13
II. Plaintiffs have failed to state a claim. ........ 13
A. The Amended Complaint fails to allege a cognizable equal protection claim. ........ 14
B. Plaintiffs have not stated a claim under the Take Care Clause. ........ 18
CONCLUSION ........ 19

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 5, 18

*Badgerow v. Walters*,
596 U.S. 1 (2022) ... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 5

*Brnovich v. Biden*,
630 F. Supp. 3d 1157 (D. Ariz. 2022) ... 19

*Cigar Ass'n of Am. v. FDA*,
5 F.4th 68 (D.C. Cir. 2021) ... 3

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ... 14

*City of Columbus v. Trump*,
453 F. Supp. 3d 770 (D. Md. 2020) ... 19

*City & Cnty. of San Francisco v. U.S. Postal Serv.*,
546 F. App'x 697 (9th Cir. 2013) ... 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 6

*Colwell v. Dep't of Health & Hum. Servs.*,
558 F.3d 1112 (9th Cir. 2009) ... 4, 5

*Cunningham v. Beavers,*
858 F.2d 269 (5th Cir. 1988) ... 15

*Dalton v. Specter*,
511 U.S. 462 (1994) ... 18

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) .......... 5

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) .......... 17

*DeVillier v. Texas*,
601 U.S. 285 (2024) .......... 19

*Egbert v. Boule*,
596 U.S. 482 (2022) .......... 19

*Ely v. Velde*,
451 F.2d 1130 (4th Cir. 1971) .......... 17

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .......... 18

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 7, 9

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 2

*Gabree v. King*,
614 F.2d 1 (1st Cir. 1980) .......... 16

*Guertin v. Michigan*,
912 F.3d 907 (6th Cir. 2019) .......... 16, 17

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*,
816 F.3d 1241 (9th Cir. 2016) .......... 11, 12, 13

*Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*,
386 F.3d 1148 (D.C. Cir. 2004) .......... 15

*Jachetta v. United States*,
653 F.3d 898 (9th Cir. 2011) .......... 13

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .......................................................... 10, 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) .......................................................... 4

*Lake v. City of Southgate*,
No. 16-10251, 2017 WL 767879 (E.D. Mich. Feb. 28, 2017) .......................... 17

*Las Americas Immigrant Advoc. Ctr. v. Biden*,
571 F. Supp. 3d 1173 (D. Or. 2021) .......................................................... 19

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008) .......................................................... 14

*Lehnhausen v. Lake Shore Auto Parts Co.*,
410 U.S. 356 (1973) .......................................................... 18

*Lignite Energy Council v. EPA*,
198 F.3d 930 (D.C. Cir. 1999) .......................................................... 8

*Louisiana v. Biden,*
64 F.4th 674 (5th Cir. 2023) .......................................................... 7, 8

*Louisiana v. Biden*,
No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022),
*app. to vacate stay denied*, 142 S. Ct. 2750 (2022) (Mem.) .......................... 7

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................... 6

*Massachusetts Board of Retirement v. Murgia*,
427 U.S. 307 (1976) .......................................................... 15

*Matter of E. Coast Foods, Inc.*,
80 F.4th 901 (9th Cir. 2023),
*cert. denied*, 144 S. Ct. 1064 (2024) .......................................................... 5

*Michigan v. EPA*,
576 U.S. 743 (2015)....................8

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867)....................18, 19

*Missouri v. Biden*,
52 F.4th 362 (8th Cir. 2022),
*cert. denied*, 144 S. Ct. 278 (2023)....................7

*Nat'l Lime Ass'n v. EPA*,
233 F.3d 625 (D.C. Cir. 2000)....................8

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003)....................11

*Nat'l Sea Clammers Ass'n v. City of New York*,
616 F.2d 1222, 1237–38 (3d Cir. 1980), *vacated on other grounds sub nom. Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981)....................17

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998)....................11, 12

*Polanco v. Diaz*,
76 F.4th 918 (9th Cir. 2023),
*cert. denied*, 2024 WL 2116278 (May 13, 2024)....................17

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)....................2

*SF Chapter of A. Philip Randolph Inst. v. U.S. EPA*,
No. C 07-04936 CRB, 2008 WL 859985 (N.D. Cal. Mar. 28, 2008)....................17

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981)....................2

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .......... 5

*United States v. Flores-Villar*,
536 F.3d 990 (9th Cir. 2008) .......... 15

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 16

*We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*,
76 F.4th 130 (2d Cir. 2023) .......... 15

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) .......... 8

**STATUTES**

42 U.S.C. § 7412(d)(3) .......... 8

42 U.S.C. § 7607(b)(1) .......... 13

**FEDERAL RULES OF CIVIL PROCEDURE**

Federal Rule of Civil Procedure 12(b)(1) .......... 5

Federal Rule of Civil Procedure 12(b)(6) .......... 6

**EXECUTIVE ORDER**

Exec. Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993) .......... 2, 3, 4

**FEDERAL REGISTER**

87 Fed. Reg. 74702 (Dec. 6, 2022) .......... 9

88 Fed. Reg. 5558 (Jan. 27, 2023) .......... 9

89 Fed. Reg. 16202 (Mar. 6, 2024) .......... 9

89 Fed. Reg. 16820 (Mar. 8, 2024)....................9

**GUIDANCE DOCUMENTS**

EPA Guidelines for Preparing Economic Analysis (2016) ....................4, 8, 12

OMB Circular A-4 (Nov. 9, 2023) ....................3, 4, 8, 12

## INTRODUCTION

In their Amended Complaint, Plaintiffs allege that discounting—an analytical methodology that translates monetized future effects into present-value units—is unconstitutional when used by the Environmental Protection Agency (EPA) and the Office of Management and Budget (OMB) to assess benefits and costs of regulations aimed at reducing greenhouse gas (GHG) emissions. But Plaintiffs do not claim harm from discounting itself. Rather, they say that they are injured by regulations that EPA issues under the Clean Air Act, which, Plaintiffs contend, do not sufficiently limit GHG emissions and thus cause various climate-related injuries.

Attempting to bridge the gap between their legal objections to discounting and their alleged injuries, Plaintiffs suggest that EPA programmatically under-regulates GHG emissions *because* it discounts the future benefits of reducing those emissions. But EPA, like any agency, considers many factors in determining whether and how to regulate. Monetized, discounted future benefits may or may not weigh in the balance. Under the Clean Air Act, they regularly do not. And because Plaintiffs identify no instance in which EPA actually relied on discounted future benefits to justify less stringent restrictions on GHG emissions, the link between discounting and Plaintiffs' alleged climate-related injuries is necessarily speculative and attenuated. So too is any claim that a favorable judgment would redress Plaintiffs' harms, a conclusion compelled by binding precedent, as this Court has already determined. Plaintiffs therefore lack standing. For many of the same reasons that Plaintiffs lack standing, their abstract challenge to discounting, unbound from any concrete application, is also not ripe. And Plaintiffs cannot cure these fatal jurisdictional defects by framing their attack on discounting as a direct challenge to Clean Air Act regulations that allegedly rest on discounted future benefits, since any such challenges may be brought only in circuit courts. For

these reasons, the Court should again dismiss for lack of subject-matter jurisdiction, this time without leave to amend.

Even if their claims were justiciable, Plaintiffs fail to state claims for which relief can be granted. Plaintiffs allege that EPA's regulations violate the equal protection component of the Due Process Clause by discriminating against children, but children are not entitled to special protection under that clause, and, in any case, Plaintiffs offer no basis for concluding that EPA regulations are discriminatory. Plaintiffs likewise cannot assert an equal protection claim based on an implied fundamental right to a life-sustaining climate system because the Constitution does not confer such a right. And while Plaintiffs contend that the use of discounting violates the Take Care Clause of Article II, § 3, they have not stated and cannot state a claim directly under that provision. Plaintiffs have thus failed state a cognizable claim under any of the four counts in the Amended Complaint.

## BACKGROUND

The President oversees executive agencies' regulatory programs. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213–14 (2020); *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 492, 496 (2010); *see also Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981) (affirming "the basic need of the President and his White House staff to monitor the consistency of executive agency regulations with Administration policy"). Since the 1970s, every President has required some form of rulemaking review overseen by OMB.

Executive Order 12866 establishes the current framework for presidential oversight of agencies' regulatory programs. Exec. Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993). It creates a regulatory-review process coordinated by OMB, and it directs agencies to follow certain principles. One such principle is that "to the extent permitted by law and where applicable," agencies should "propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Exec. Order No. 12866, § 1(b)(6). To

that end, agencies must assess anticipated costs and benefits before proposing any "significant" action. *Id.* § 6(a)(3)(B)–(C). Agencies may do this by preparing a regulatory impact analysis (RIA). RIAs are informational documents that, standing alone, have no independent legal effect. Thus, they are generally not subject to judicial review. Only in specific circumstances—such as when an agency chooses to justify a rule based on the analysis in its RIA—will that RIA be reviewable in the course of reviewing an agency's action. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 76 (D.C. Cir. 2021).

Various OMB guidance documents, in particular Circular A-4, set out recommendations to help agencies develop RIAs that comply with Executive Order 12866. *See* OMB, Circular A-4 (Nov. 9, 2023).[1] One of the analytical methods described in Circular A-4 is a "benefit-cost analysis," in which "both benefits and costs" to society of a particular regulation "are expressed in monetary units to the extent feasible" and weighed against each other. OMB, Circular A-4 at 4; *see also id.* at 27 (agencies "should, if feasible, report the monetized value of the anticipated benefits and costs to society").

Because benefits and costs "often take place in different time periods," *id.* at 75, Circular A-4 offers guidance on using discount rates to express monetized future effects in present-value units, *id.* at 75–82. Discounting is the subject of a robust body of peer-reviewed literature. *See id.* Circular A-4 synthesizes that literature and provides "[s]everal reasonable approaches to discounting," *id.* at 75–76, including default discount rates for use in RIAs, *id.* at 76–77. But Circular A-4 does not require that agencies use a particular discount rate for their benefit-cost analyses. *Id.* at 77. Nor does Circular A-4 require agencies to woodenly interpret and apply the results of their benefit-cost analyses. Rather, it acknowledges that "[c]onducting high-quality analysis requires competent professional judgment" and

---

[1] https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf

that "[d]ifferent regulations may call for different emphases in the analysis." *Id.* at 4.

Circular A-4 also acknowledges that Congress may dictate how agencies decide whether and how to regulate, and it disclaims any intent to "supplant any analytic or other requirements set out in the statutes that authorize or require agency action." *Id.* at 3. So does Executive Order 12866, which provides, in § 9, that "[n]othing in this order shall be construed as displacing the agencies' authority or responsibilities, as authorized by law."

EPA's Guidelines for Preparing Economic Analyses (Guidelines) are similarly non-prescriptive.[2] The Guidelines summarize "analytical methodologies, empirical techniques, and data sources that can assist in performing economic analysis of environmental policies," but they do "not provide a rigid blueprint or a 'cookbook' for all policy assessments," which will vary depending on "case-specific factors and will require professional judgment." Guidelines at 1-2. The Guidelines also note that the mode of economic analysis described therein "cannot be used in setting standards" under some statutes; and, in any case, is "but one component in the decision-making process," which may turn on other considerations including "enforceability, technical feasibility, affordability, political concerns, and ethics, to name but a few." *Id.*

## STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute. *Badgerow v. Walters*, 596 U.S. 1, 7 (2022). A plaintiff bears the burden of showing that a court has subject-matter jurisdiction over the claims. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112,

---

[2] https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses-2016

1121 (9th Cir. 2009) (party asserting a claim must show that there is Article III standing and that the claims are ripe). If the plaintiff cannot meet this burden, the case should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. *Matter of E. Coast Foods, Inc.*, 80 F.4th 901, 905 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1064 (2024). For purposes of a Rule 12(b)(1) motion, a court is not limited to the allegations in the complaint and may consider materials outside the pleadings. *Colwell*, 558 F.3d at 1121.

A court should dismiss a complaint pursuant to Rule 12(b)(6) if the complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In reviewing a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded material facts alleged in the complaint and construes them in the light most favorable to the plaintiff. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (cleaned up). But a court need not accept as true a legal conclusion couched as a factual allegation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). When reviewing a motion to dismiss under Federal Rule 12(b)(6), a court is limited to the face of the complaint, materials incorporated by reference, and matters of judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

The Court should re-dismiss this case under Rule 12(b)(1). Plaintiffs' Amended Complaint suffers from many of the same threshold defects as their original Complaint and from new justiciability problems. Because there is no non-speculative connection between the generalized practice of discounting and Plaintiffs' alleged climate-related harms, Plaintiffs cannot establish standing's prerequisites of causation and redressability. Because Plaintiffs identify no EPA regulations that were based, even in part, on discounted future benefits of avoided

GHG emissions, they also cannot establish that their claims are ripe. And because the courts of appeals have exclusive original jurisdiction over challenges to EPA actions under the Clean Air Act, Plaintiffs cannot remedy their standing and ripeness problems by attempting to challenge in district court the specific regulations that they say cause them harm.

Alternatively, the Court should dismiss the Amended Complaint under Rule 12(b)(6). The sweeping substantive due process and equal protection rights that Plaintiffs assert lack any basis in constitutional text, history, or precedent. And the Take Care Clause does not furnish a basis for affirmative relief in an Article III court. Plaintiffs therefore fail to state a claim on which relief could be granted.

## I. Plaintiffs' claims are non-justiciable.

### A. Plaintiffs lack standing.

The "irreducible constitutional minimum of standing" requires Plaintiffs to show they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). Where, as here, a plaintiff is not "the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). And the standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Even assuming for now that at least one Plaintiff has alleged a legally cognizable injury in fact based on climate-related harms, Plaintiffs cannot show that discounting caused the injury, or that an order declaring discounting unconstitutional would remedy their alleged harms.

### 1. Plaintiffs' alleged injuries are not fairly traceable to discounting.

To "establish causation," Plaintiffs "must show a predictable chain of events leading from" the challenged government action to their alleged harms. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024). Plaintiffs allege that because EPA uses discounting to prepare RIAs, it under-regulates GHG emissions, causing Plaintiffs' climate-related injuries. *See, e.g.*, Am. Compl. ¶¶ 1–2, 24–25, 121–23, 247–48. But, as the Fifth and Eighth Circuits recently held, the link between a single input in a benefit-cost analysis and a hypothetical, generalized regulatory outcome is too speculative and attenuated to support standing.

The courts reached those holdings in cases concerning Executive Order 13990, which directs agencies to account for the estimated "social costs of GHG"—the monetized damages associated with incremental increases in GHG emissions—when conducting internal regulatory reviews. *See Missouri v. Biden*, 52 F.4th 362, 365 (8th Cir. 2022), *cert. denied*, 144 S. Ct. 278 (2023); *Louisiana v. Biden,* 64 F.4th 674, 684 (5th Cir. 2023). Two state coalitions challenged estimates of the social costs of GHG, arguing, for standing purposes, that if agencies relied on those estimates, then the agencies would over-regulate GHG emissions and injure the states. *Missouri*, 52 F.4th at 368; *Louisiana*, 64 F.4th at 681. But, as here, the challengers identified no regulation that was based on the analytical input to which they objected. *Missouri*, 52 F.4th at 368; *Louisiana*, 64 F.4th at 680. And so the courts dismissed on standing grounds, holding, among other things, that "increased regulatory costs are not traceable to the [social cost of GHG] 'because agencies consider a great number of other factors in determining when, what, and how to regulate or take agency action.'" *Missouri*, 52 F.4th at 370 (quoting *Louisiana v. Biden*, No. 22-30087, 2022 WL 866282, at *2 (5th Cir. Mar. 16, 2022) (per curiam), *app. to vacate stay denied*, 142 S. Ct. 2750 (2022) (Mem.)); *see also Louisiana*, 64 F.4th at 684.

That reasoning is apt here. As with Executive Order 13990, both OMB's Circular A-4 and EPA's Guidelines afford agencies "discretion in conducting their cost-benefit analyses" in a manner "consistent with applicable law." *Louisiana*, 64 F.4th at 681; *supra* pp. 3–4. Thus, neither document requires EPA to use any particular mode of analysis when determining whether and how to exercise its Clean Air Act authority. And because many provisions of the Clean Air Act preclude reliance on, or at least do not require, a formal benefit-cost analysis of the type described in Circular A-4 and EPA's Guidelines, the Agency often does not rely on such analyses to justify its regulations.

That is true, for example, when EPA sets National Ambient Air Quality Standards (NAAQS) under 42 U.S.C. § 7409, where EPA cannot consider costs at all, let alone weigh monetized discounted costs against monetized discounted benefits. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 466 (2001). Nor does EPA rely on benefit-cost analyses when it acts under 42 U.S.C. § 7412(d)(3) to set National Emission Standards for Hazardous Air Pollutants, which must be based "exclusively upon the emissions reductions achieved by the best-performing sources." *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 640 (D.C. Cir. 2000). Even when EPA must consider costs in deciding whether a regulation is "necessary and appropriate," the Supreme Court has expressly declined to require "a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Michigan v. EPA*, 576 U.S. 743, 759 (2015). Lower courts have likewise recognized that the Clean Air Act affords EPA a "great degree of discretion" in balancing costs against an array of other enumerated statutory factors that may or may not encompass the exhaustive scope of impacts reflected in the formal benefit-cost analyses that EPA prepares for RIAs. *Lignite Energy Council v. EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999). And the Agency has routinely eschewed reliance on such analyses to weigh advantages and disadvantages of regulation under the Clean Air Act.

The very regulations that Plaintiffs reference—Am. Compl. ¶¶ 163–96—illustrate this practice. For example, in EPA's 2022 Proposed Rule titled "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," the RIA for which is cited at Amended Complaint ¶ 178, the agency noted that "[i]n NAAQS rulemaking, the RIA is done for informational purposes only, and the proposed decisions on the NAAQS in this rulemaking are not based on consideration of the information or analyses in the RIA." 88 Fed. Reg. 5558, 5563 (Jan. 27, 2023). In its 2024 Final Rule reconsidering the Particulate Matter NAAQS, *see* Am. Compl. ¶ 192, EPA again noted that "although an RIA has been prepared, the results of the RIA have not been considered in issuing this final rule," 89 Fed. Reg. 16202, 16373 (Mar. 6, 2024). And in its Supplemental Proposed Rule and Final Rule titled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review"—*see* Am. Compl. ¶¶ 180, 182, 189—EPA explained that it had "weighed the relevant statutory factors to determine the appropriate standards and did not rely on the monetized benefits analysis" prepared pursuant to Executive Order 12866 "for purposes of determining the [emissions] standards" in its rule. 89 Fed. Reg. 16820, 17019 (Mar. 8, 2024); *accord* 87 Fed. Reg. 74702, 74843 (Dec. 6, 2022).

In sum, EPA's regulatory decisions under the Clean Air Act need not, and often do not, reflect *any* reliance on RIA benefit-cost analyses that include discounted monetized future benefits. Plaintiffs' assertion that the use of discounting in preparing those RIA analyses will necessarily cause EPA to under-regulate GHG emissions is thus speculative and attenuated, at best. Because the standing doctrine's "causation requirement precludes speculative links" and "rules out attenuated links," *All. for Hippocratic Med.*, 602 U.S. at 383, Plaintiffs fail to show that their injuries are fairly traceable to EPA's reliance on discounting.

**2. Plaintiffs' harms are not redressable.**

Plaintiffs also fail to show that the declaratory relief they seek is "substantially likely to redress their injuries." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). With respect to redressability, *Juliana* "is on all fours with this action." Order, ECF No. 50 at 5. There, as here, the plaintiffs claimed climate-related injuries allegedly due to government actions authorizing greenhouse gas emissions. *Juliana*, 947 F.3d at 1164, 1169. There, as here, the plaintiffs argued that the government's actions violated their rights under the Fifth Amendment. *Id.* And there, as here, the plaintiffs sought (*inter alia*) a declaration to that effect. *Id.* at 1170. But the Ninth Circuit ordered dismissal for lack of redressability, holding that the requested declaratory relief, while "undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action." *Id.*[3]

So too here. As this Court already held, the link between a declaratory order on discounting and any future EPA action is "speculative." Order at 6. And it piles speculation upon speculation to assume that a favorable judgment "is substantially likely to remedy the injuries to Plaintiffs' 'bodies, their homes, and their daily lives.'" *Id.* (quoting Pls' Opp'n to Defs' Mot to Dismiss, ECF No. 37, at 8 (MTD Resp.)). Nothing in the Amended Complaint alters these conclusions.

---

[3] As previously noted, when the Ninth Circuit decided *Juliana*, it remanded to the district court with instructions to dismiss for lack of standing. *See* Mem. & Points of Auth. in Supp. of Mot. to Dismiss 9–10 n.4, ECF No. 36 (MTD). But on remand, the district court instead allowed the plaintiffs to file an amended complaint. *Id.* The United States then petitioned for writ of mandamus to enforce the Ninth Circuit's earlier mandate. *Id.* The Ninth Circuit granted that petition. *See* EPA Notice Suppl. Auth., ECF No. 47. It has since denied the plaintiffs' motion for rehearing or reconsideration en banc, with no judge noting a dissent, and without even requesting a response by the government. Order, *United States v. United States Dist. Ct. for the Dist. of Or.*, No. 24-684 (9th Cir. July 12, 2024).

Because the Clean Air Act does not require, and in some cases prohibits, EPA's reliance on monetized future social benefits, an order declaring discounting unconstitutional is not substantially likely to alter how EPA exercises its statutory authority to regulate GHG emissions. Nor is there any basis to presume that an order enjoining the practice of discounting—which Plaintiffs repeatedly describe only as a "thumb on the scale," Am. Compl. ¶¶ 2, 24, 151–52, 197—could "stop catastrophic climate change or even ameliorate [Plaintiffs'] injuries," which relate to global concentrations of GHG. Order at 6 (quoting *Juliana*, 947 F.3d at 1171). The Court should again dismiss on redressability grounds.

**B. Plaintiffs' facial challenge to discounting is not ripe.**

For many of the same reasons that Plaintiffs lack standing, their claims are also not ripe. The ripeness doctrine, which draws "both from Article III limitations on judicial power and from prudential reasons," *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003), prevents "courts from entangling themselves in abstract disagreements over administrative policies," *Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*, 816 F.3d 1241, 1252 (9th Cir. 2016) (cleaned up). To analyze ripeness, courts consider: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *National Park Hosp. Ass'n*, 538 U.S. at 808. "Absent a statutory provision providing for immediate judicial review," an agency regulation is not ordinarily considered ripe for review "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Id.* (cleaned up).

The Supreme Court's decision in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), is instructive. At issue was a Forest Service land management plan that established where, how, and how much timber could be harvested in a certain area. *Id.* at 729. But before the Forest Service could allow logging

activities under that plan, it would first have to undertake a separate administrative action that would itself be subject to notice and comment, and judicial review. *Id.* at 729–30. Thus, while the plan made "logging more likely," there remained "considerable legal distance between the adoption of the Plan and the moment when a tree is cut." *Id*. at 730.

Dismissing on ripeness grounds, the Court stressed that the plan itself did "not grant, withhold, or modify any formal legal license, power, or authority." *Id.* at 733. And if the Forest Service ever chose to permit logging based on the plan, then the plaintiffs would have "ample opportunity" to press their claims "at a time when harm is more imminent and more certain." *Id.* at 734. But resolving the case in the meantime "would require time-consuming judicial consideration of the details of an elaborate, technically based plan," "without benefit of the focus that a particular logging proposal could provide"—all to reach a merits judgment that would "turn out to have been unnecessary" if the agency were to modify or abandon its plan. *Id.* at 736. The Court declined to do so. *Id.* at 739.

That reasoning controls here. Discount rates—one potential input among many in regulatory decision-making—do not dictate any particular regulatory outcome. And neither Circular A-4 nor EPA's Guidelines mandate that EPA consider discounted future benefits when deciding whether and how to regulate GHG emissions. *Supra* pp.3–4; *see also Louisiana*, 64 F.4th at 678 ("OMB expressly does not bind agencies to its methodologies."). Thus, the "policy" to which Plaintiffs object, Am. Compl. ¶¶ 130–31, does not "command anyone"—certainly not Plaintiffs—"to do anything or to refrain from doing anything," *Ohio Forestry Ass'n*, 523 U.S. at 733. If EPA issues what Plaintiffs believe to be an insufficiently stringent regulation based on discounted future benefits, then Plaintiffs can assert their constitutional claims in a challenge to that regulation in the appropriate court. *See infra* p. 13. But "in the absence of a concrete application," Plaintiffs' objections to discounting are just the sort of "abstract

disagreements over administrative policies, that the ripeness doctrine seeks to avoid." *Habeas Corpus Res. Ctr.*, 816 F.3d at 1254 (cleaned up). The Court should dismiss on ripeness grounds.

**C. The Court lacks jurisdiction to consider challenges to EPA's Clean Air Act Regulations.**

Plaintiffs cannot bolster their argument for standing or ripen their claims by asking this Court to review Clean Air Act regulations that, in their view, under-regulate GHG emissions because of EPA's reliance on discounting. That is because challenges to "*any* . . . final action of the [EPA] Administrator" under the Clean Air Act "may be filed *only* in" a circuit court "within sixty days" of the grounds giving rise to suit. 42 U.S.C. § 7607(b)(1) (emphasis added). That mandate for timely, direct circuit-court review "displaces district court jurisdiction under 28 U.S.C. § 1331." *Virginia v. United States*, 74 F.3d 517, 526 (4th Cir. 1996). It also defines the scope of the United States' consent to suit and thus precludes on sovereign immunity grounds district-court review of EPA's Clean Air Act actions. *See generally Jachetta v. United States*, 653 F.3d 898, 903 (9th Cir. 2011) ("Before we may exercise jurisdiction over any suit against the government, we must have a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver."); *see also* MTD 5–7; Defs.' Reply In Supp. of Mot. to Dismiss 3–6, ECF No. 43 ("MTD Reply"). For both reasons, this Court lacks subject-matter jurisdiction to consider the EPA regulations that Plaintiffs say cause them harm. What Plaintiffs are left with, then, is a challenge to discounting *in vacuo*, which fails for the reasons noted above.

**II. Plaintiffs have failed to state a claim.**

Even if the Court concludes that it has jurisdiction, it should dismiss the Amended Complaint because it fails to state any claim for which relief could be granted.

### A. The Amended Complaint fails to allege a cognizable equal protection claim.

Plaintiffs have failed to state a cognizable equal protection claim. The general rule is that government action that classifies certain groups of people differently from others "is presumed to be valid and will be sustained if the classification drawn by the [government action] is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citation omitted); *see City & Cnty. of San Francisco v. U.S. Postal Serv.*, 546 F. App'x 697, 698 (9th Cir. 2013); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588–89 (9th Cir. 2008). This general rule gives way only when a government action burdens a fundamental right protected by the Constitution or uses a suspect classification such as race. Those government actions are subject to heightened scrutiny and will be sustained only if they are suitably tailored to a sufficiently important government interest. *City of Cleburne*, 473 U.S. at 440. Applying that framework, Plaintiffs' equal protection claims fail because there is no suspect classification or government action burdening a fundamental constitutional right.

First, Plaintiffs' equal protection claims fail at the threshold because the use of discounting does not employ any age-based classifications. MTD 16–17. Plaintiffs contend that discounting "is a weapon of intergenerational oppression" that harms children, "violates Plaintiffs' rights," and subjugates children's vital interests "in favor of the financial interests of other adults and corporations." Am. Compl. ¶¶ 367, 371, 380. But the use of discount rates to express monetized future effects in present value units in no way classifies children differently than adults. And as noted, *supra* pp. 6–13, the monetized value of discounted future benefits may or may not weigh in the balance when EPA enacts the regulations that Plaintiffs allege harm them. Thus, Plaintiffs have failed to identify any challenged action that classifies children differently from others, and their equal protection claims must fail for that reason alone.

But even if discounting did somehow classify children or future generations differently, the equal protection claims would still fail for several reasons. Contrary to Plaintiffs' contentions, strict scrutiny would not apply to the use of discounting because Plaintiffs cannot show that children or future generations are a suspect class in need of extraordinary protection. The Supreme Court has declined to treat classifications based on age as suspect and has thus declined to apply heightened scrutiny to government actions that classify by age. In *Massachusetts Board of Retirement v. Murgia*, the Supreme Court explained that "a suspect class is one saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." 427 U.S. 307, 313 (1976) (cleaned up). The Court rejected the claim that old age defines a "discrete and insular group" for purposes of equal protection analysis because old age "marks a stage that each of us will reach if we live out our normal span." *Id.* at 313–14 (cleaned up).

Consistent with *Murgia*, the Ninth Circuit (and other courts of appeals) have squarely rejected claims that children are a suspect class. *See United States v. Flores-Villar*, 536 F.3d 990, 998 (9th Cir. 2008) ("age is not a suspect class"); *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 158 (2d Cir. 2023) ("age is not a suspect classification."); *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.) (noting that the "broad array of laws and government programs dedicated to protecting and nurturing children—combined with the large numbers of voters who are parents or otherwise concerned about children—belies the argument that children and their needs cannot attract the attention of the legislature"); *Cunningham v. Beavers,* 858 F.2d 269, 273 (5th Cir. 1988) ("No cases have ever held, and we decline to hold, that children are a suspect class."); *Gabree v. King*, 614 F.2d 1, 2 (1st Cir. 1980) (stating that young people have not

been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness, as to justify searching judicial scrutiny").

Second, Plaintiffs have failed to allege that any discrimination burdens a fundamental right protected by the Constitution. While there is no dispute that climate change poses a serious threat and that addressing climate change will require, among other things, the active involvement of the federal government, strict scrutiny would not apply in this case because the Constitution does not confer a fundamental right to a life-sustaining climate system.

The Supreme Court has repeatedly instructed courts considering novel due process claims to "exercise the utmost care whenever . . . asked to break new ground in this field, . . . lest the liberty protected by the Due Process Clause be subtly transformed" into judicial policy preferences. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (cleaned up). More specifically, the Court has "regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* at 720–21 (cleaned up). Plaintiffs' request that this Court recognize an implied fundamental right to a life-sustaining climate system, Am. Compl. ¶¶ 389, 400, Prayer for Relief (p. 108 ¶ 4), contradicts that directive, because such a purported right is without basis in the Nation's history or tradition.

Consistent with the Supreme Court's direction, courts that have considered claims seeking to establish a healthy environment or climate as rights protected by the Constitution have rejected those claims. *See Guertin v. Michigan*, 912 F.3d 907, 921–22 (6th Cir. 2019) (The "Constitution does not guarantee a right to live in a contaminant-free, healthy environment."); *Nat'l Sea Clammers Ass'n v. City of New York*, 616 F.2d 1222, 1237–38 (3d Cir. 1980) (finding it "established in this circuit and elsewhere that there is no constitutional right to a pollution-free environment"), *vacated on other grounds sub nom. Middlesex Cnty. Sewerage*

*Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981); *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971) (observing that arguments "in support of a constitutional protection for the environment" have not "been accorded judicial sanction"); *cf. Lake v. City of Southgate*, No. 16-10251, 2017 WL 767879, at *4 (E.D. Mich. Feb. 28, 2017) ("[W]henever federal courts have faced assertions of fundamental rights to a 'healthful environment' or to freedom from harmful contaminants, they have invariably rejected those claims."); *SF Chapter of A. Philip Randolph Inst. v. EPA*, No. C 07-04936 CRB, 2008 WL 859985, at *7 (N.D. Cal. Mar. 28, 2008) (rejecting asserted rights to be free from climate change pollution and to have a certain quality of life). And Plaintiffs point to no relevant contrary authority to support their claim that the Due Process Clause of the Fifth Amendment supports an implied fundamental right to a life-sustaining climate system. Instead, they rely on cases based on state statutes or constitutions, foreign law, or international law. MTD Resp. 37. But none of those cases invoked the United States Constitution in support of the constitutional right Plaintiffs seek to establish in this case.

At bottom, the Due Process Clause acts as a "limitation on the State's power to act" rather than a "guarantee of certain minimal levels of safety and security." *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023), *cert. denied*, 2024 WL 2116278 (May 13, 2024) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). Plaintiffs thus cannot establish a cognizable substantive due process claim based on an agency's alleged failure to provide guaranteed levels of safety from harms due to climate change. Because the Amended Complaint fails to state a cognizable claim premised on a violation of any recognized fundamental right, Count III should be dismissed.

Plaintiffs' equal protection claims, therefore, could only proceed if Plaintiffs could establish that there was no rational basis for discounting, particularly EPA's use of it in RIAs. But rational basis review affords government actions "a strong

presumption of validity" and upholds the action "if there is any reasonably conceivable state of facts that could provide a rational basis" for the action. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). A plaintiff's burden in attacking the rational basis of government actions is "to negative every conceivable basis which might support [them]." *Id.* at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The Amended Complaint fails to meet this standard. It merely alleges, in conclusory fashion, that EPA and OMB discount the value of children's lives and allow dangerous levels of climate pollution, and that this is not rationally related to a legitimate government interest. Am. Compl. ¶ 383. The Amended Complaint offers no support for these conclusory allegations, which are afforded no weight in a Rule 12(b)(6) analysis. *Iqbal*, 556 U.S. at 678. As noted above, *supra* pp. 3–4, discounting is an analytical methodology that has been the subject of peer-reviewed literature and has long been used to translate monetized future effects into present value units. And Plaintiffs have not alleged facts from which the Court might conclude that discounting lacks a rational basis. *See id.* For all of these reasons, Counts I, II, and III should be dismissed for failure to state a claim.

**B. Plaintiffs have not stated a claim under the Take Care Clause.**

Finally, Plaintiffs allege that EPA violated the Take Care Clause of Article II, § 3 by "act[ing] far in excess of [its] . . . legal authority" under the Clean Air Act. Am. Compl. ¶¶ 405, 413. This claim ignores the "well established" distinction between "claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 473–74 (1994). The former simply "are not 'constitutional' claims." *Id.* at 473. That is reason enough to dismiss Count IV.

Count IV fails for two more reasons. First, the Take Care Clause does not furnish a basis for affirmative relief in an Article III court because "the duty of the President . . . to see that the laws are faithfully executed" "is purely executive and

political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867).

Second, Count IV also fails because the Take Care Clause supplies no private right of action. The Supreme Court recently stressed that "[a]t bottom, creating a cause of action is a legislative endeavor." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (cleaned up); *see also DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts."). Heeding that admonition, several district courts have recently refused to infer an implied cause of action under the Take Care Clause. *See, e.g.*, *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1178 (D. Ariz. 2022) ("separation of powers principles and the Take Care Clause do not provide Plaintiffs with causes of action"); *accord Las Americas Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020). If it reaches the issue, this Court should too.

**CONCLUSION**

For the reasons explained above, the Court should grant Defendants' motion and dismiss without leave to amend the Amended Complaint.

Dated: July 22, 2024

TODD KIM
Assistant Attorney General
United States Deparment of Justice
Environment and Natural Resources Division

/s/ Andrew S. Coghlan
ANDREW S. COGHLAN
Environmental Defense Section
SEAN C. DUFFY
Natural Resources Section
Trial Attorneys
Ben Franklin Station, P.O. Box 7611

Of Counsel:

DANIEL CONRAD
United States Environmental Protection Agency
Office of General Counsel

1200 Pennsylvania Ave., NW
Washington, D.C. 20460

DANIEL JACOBSON
General Counsel
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

Washington, DC 20044
Ph: (202) 532-3252 (Coghlan)
Ph: (202) 305-0445 (Duffy)
andrew.coghlan@usdoj.gov
sean.c.duffy@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,161 words, which complies with the word limit of L.R. 11-6.1.

Dated: July 22, 2024

*<u>/s/ Andrew S. Coghlan</u>*
ANDREW S. COGHLAN
*Attorney for Defendants*